IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BEFORE THE HONORABLE WILLIAM B. SHUBB

UNITED STATES OF AMERICA

        Plaintiff,

vs.                    Sacramento, California
                         No. 2:18-CR-00119
                         TUESDAY
FIRDOS SHEIKH          9:03 A.M.

        Defendant.
_____/

--oOo--

REPORTER'S TRANSCRIPT OF PROCEEDINGS

--oOo--

APPEARANCES:

For the Government:        U.S. DEPARTMENT OF JUSTICE
                         950 Pennsylvania Ave NW
                         PHB 5616
                         Washington, D.C.  20530,
                         BY:  WILLIAM E. NOLAN
                              DAVID N. REESE
                              Trial Attorneys

For the Defendant:         ALMADANI LAW
                         BY:  YASIN M. ALMADANI
                         14742 Beach Boulevard, Suite 410
                         La Mirada, California 90638

Official Reporter:        Tiphanne G. CROWE
                         CSR No. 10958
                         501 I Street
                         Sacramento, CA  95814
                         Tcrowe.csr@gmail.com

*Proceedings recorded by mechanical stenography.  Transcript produced by computer-aided transcription.*

SACRAMENTO, CALIFORNIA, FEBRUARY 25TH, 2020, 9:03 A.M.

--o0o--

THE CLERK:  Criminal case 18-119, the United States v. Firdos Sheikh.

Counsel, your appearances.

MR. NOLAN:  William Nolan on behalf of the United States, your Honor, here with co-counsel, David Reese.

MR. ALMADANI:  Yasin Almadani on behalf of Dr. Sheikh, your Honor, and with me is Dr. Sheikh.

THE COURT:  I've read the materials that you've each submitted on the *Franks* issue.  Most recently, however, I received another memo from Mr. Almadani suggesting there's a *Brady* issue.

I'm not sure whether that can be separated from the *Franks* issue, so before we start talking about the hearing on *Franks*, I want to put it into the context of your argument with regard to *Brady*.

MR. ALMADANI:  Yes, your Honor.  This case was investigated in 2013, and it was charged five years later.  The Government had plenty of time to look through its materials, and we all know that in *Kyles versus Whitley*, the Court stated that when the Government charges a case, the *Brady* obligation kicks in.

The Government charged this case, held on to *Brady* material until a year later when we had to make a motion for

1    it.  The Court, at that point, granted our motion, and

2    instructed the Government to hand over all *Brady* material by

3    August 30th, 2019.  That shouldn't have needed to happen.  We

4    should have had it already.

5         But then Mr. Reese sends me material, and represents

6    that they have looked through everything, and they've disclosed

7    all *Brady* material to us.  On September 23 Mr. Reese then sends

8    me an e-mail stating that he's looked through the agent notes.

9    There's nothing to add really, and they're all consistent with

10   the reports, and on that basis, we brief our suppression issue,

11   and, you know, I proceed to cross the agent and everything.

12        Not only were there notes that were kept from us that

13   had impeachment information that called into question the

14   credibility of the reports themselves, which they were relying

15   on for their memory, or to refresh their recollection, we were

16   also entitled to those reports under Rule 26.2.  We didn't get

17   that.

18        Then in a conversation outside of court, during the

19   context of that suppression hearing, I, again, tried to confirm

20   with the prosecutors:  Do I have all the *Brady* material?  They

21   represented:  You do.

22        It turns out that just -- and so we briefed the *Franks*

23   issue.  I looked through all of the reports, and we came up

24   with some pretty significant argument.

25        On the eve of this hearing, after everything has been

1  briefed, the Government on Wednesday -- after the close of

2  business -- sends me agent notes -- I think it was three sets

3  of agent notes -- and then characterizes that as, well, we

4  missed something.

5      Alfredo, in fact, a week before leaving had told Dr.

6  Sheikh that he was going to leave, and Dr. Sheikh said okay,

7  and then he left.

8      In the context of a forced labor, indentured

9  servitude, case where the warrant is based upon just those two

10 charges, that's about as exculpatory as it gets.

11     What's a little worse there, your Honor, is that the

12 Government represented to me that there's nothing else in those

13 notes that's exculpatory, but I did my due diligence.

14     Turns out there's a whole lot that shows that those

15 notes are materially inconsistent with the reports on important

16 issues, and there is -- there is information in those notes

17 that should have been disclosed to the Magistrate.  I wasn't

18 able to brief that to the Court, because I wasn't given the

19 *Brady* material, your Honor.

20     THE COURT:  So what are the other -- I read about the

21 statement that Alfredo told her he was going to leave, and she

22 said it was okay.  What's the other *Brady* material you are

23 referring to?

24     MR. ALMADANI:  I will -- I'll list it out for the

25 Court, your Honor.

1          THE COURT:  Could you come up to the lectern here.

2          MR. ALMADANI:  Should I also, your Honor?

3          MR. NOLAN:  I assumed he was going to follow.

4          THE COURT:  Whoever is speaking, just be at the

5     lectern.

6          MR. ALMADANI:  Yes, your Honor.  So, your Honor, there

7     are notes from Gildardo's interview that were not -- and

8     there's statements that were not contained in the reports.

9     Here are a couple of statements that were not contained in the

10    reports.

11         In fact, the reports stated that Dr. Sheikh was not

12    there at her ranch except Monday.  So six days of the week she

13    wasn't there from 9:00 a.m. to past midnight.  That's what the

14    report stated.  Turns out, actually, that the notes stated that

15    Dr. Sheikh was not there on those days from 9:00 a.m. to 3:00

16    a.m.  That's what Gildardo had told them.

17         So it's not just the whole day, it's the whole day and

18    a third of the night she's not there.  In the context of a

19    forced labor, indentured servitude, case where they're

20    claiming -- their witnesses are claiming that they're being

21    watched all the time, this completely cuts against that, your

22    Honor, and the fact that between 12:00 a.m. and 3:00 a.m. is

23    significant.

24         Number two, Gildardo had disclosed to the agents that

25    he knew Dr. Sheikh was over 50 years old, and the other two men

1  that were supposedly being held captive were 40 years old.

2  They were men, and she was living alone.  She was never there.

3  Those facts were not in the reports, and those were important

4  facts to tell the Magistrate in the context of what -- the

5  story they are presenting here.

6  Prakash and Alfredo had claimed that they were forced

7  to work -- Prakash had claimed that he had been forced to work

8  10 hours a day, 7 days a week.  Alfredo was saying something

9  along the lines of 12 to 14 hours.

10  It was disclosed then in those notes, not in the

11  reports, that Gildardo had said that they actually worked from

12  7:00 a.m. to 3:30 p.m.  It cuts against the story.  The

13  Magistrate is entitled to know if their witnesses have

14  inconsistent stories, and especially an unlikely work schedule,

15  the way that these, you know, victims who have to actually

16  present that they are severe victims of human trafficking in

17  order to get their immigration benefits.  The Magistrate is

18  entitled to know this information.  This was not disclosed to

19  us.

20  Moving on, they knew, and they didn't disclose to us,

21  that Prakash, prior to working, or having some work with Dr.

22  Sheikh, had some odd jobs with another man named James Brewer,

23  who introduced him, or who introduced him to another man who

24  introduced him to Dr. Sheikh.

25  At that time Prakash was actually homeless.  He was

1       just looking for somebody to give him work.  That was not in

2       the reports, and the fact is that James --

3                 THE COURT:  Is that in these reports that you now

4       have?

5                 MR. ALMADANI:  It's in the notes that we now have,

6       your Honor.

7                 THE COURT:  All right.

8                 MR. ALMADANI:  In fact, James Brewer, your Honor,

9       Prakash voluntarily agreed, and was happy to work for James

10      Brewer for a room in a camper, and $200 a month.  He was happy

11      with that, and voluntarily working until Brewer couldn't really

12      afford -- didn't have any work for him --

13                THE COURT:  Now, is all this in those notes?

14                MR. ALMADANI:  This is in the notes, your Honor, and

15      it's not in the reports.

16                THE COURT:  I just want to make sure that what you

17      tell me is something you just discovered from these notes.

18                MR. ALMADANI:  Absolutely, your Honor, and I've gone

19      through the notes and the reports with a fine-tooth comb, and

20      this is not the reports, and it's in the notes.

21                When Dr. Sheikh -- what they are claiming are these

22      terrible conditions that -- that Prakash then claimed he was

23      working under, is pretty much the same thing.  In fact, he was

24      getting paid more by Dr. Sheikh.

25                So it begs the question, the Magistrate -- if the

1    Magistrate knew that he voluntarily was working for this other

2    man, who he then asked to introduce to somebody else, and then

3    came and was working odd jobs for Dr. Sheikh on better terms,

4    and then he turns around and says that those are bad

5    conditions, the Magistrate is entitled to know that, your

6    Honor.

7            THE COURT:   So you are saying that we should not go

8    ahead with the *Franks* hearing today?  That you should have an

9    opportunity to present the materials that you have recently

10   received, and to give me another brief on why the information

11   in these materials would affect the *Franks* hearing; is that

12   what you are saying?

13           MR. ALMADANI:   Well, I can -- I can -- I can actually

14   answer that question in the alternative, your Honor, actually.

15   I'm sort of saying that, but not pressing the issue, because I

16   have had a chance to look through some of these notes, and I

17   think that I can get, you know, I can cross the agent, and get

18   this into the record, and present the argument to the Court.

19   If the Court would like it in a brief, which the Court might

20   want to consider, then I would be happy to do that, but --

21           THE COURT:   Well, but how am I going -- you are

22   relying on the fact that I'm going to be able to take such

23   careful notes.  That it's not written down anywhere.  I'll just

24   listen to what you ask the agent, and then I'll be able to get

25   all the information that way.

1       MR. ALMADANI:  Well, your Honor, actually --

2       THE COURT:  Aren't you even going to give the Court

3  the notes?

4       MR. ALMADANI:  Yes.  The Court makes a great point.  I

5  actually have given the notes as well -- the Court has a

6  binder, yes, but, your Honor --

7       THE COURT:  Do I have this?  I didn't get this.

8       THE CLERK:  We'll I'm putting it together for you.

9       THE COURT:  Okay, so I haven't seen this yet?

10      MR. ALMADANI:  You have not seen that, your Honor,

11  because I was going to cross on that.

12      Your Honor, actually, I would be happy to present the

13  Court with a supplemental brief.  On top of that, your Honor, I

14  believe that we haven't had the entire *Brady* disclosure still.

15      The Government is still in violation of the Court's

16  order and the rules.  We haven't had the full *Brady* disclosure.

17  I have put that it our sur-reply.  We're entitled to the

18  operational plan that the agents had, because the operational

19  plan is going to tell us what they knew about the area before

20  they executed the -- or before they authored the search

21  warrant.

22      We're also entitled to what we haven't received.

23  Are -- is the -- we've got the TV's application for Prakash,

24  but we're also entitled of the TV's application for the other

25  alleged victim, who is Alfredo, and I can tell the Court that

1  I've looked at that TV's application, and there's lots of

2  material in there that would impeach Prakash at a trial, and so

3  we're entitled to have that information also for Alfredo.

4          Your Honor, we're entitled to have --

5          THE COURT:  That's -- that's different than the *Franks*

6  issue.  They didn't testify at a *Franks* hearing yet, and so

7  whether you need information to cross-examine them doesn't

8  pertain to the *Franks* issue.

9          MR. ALMADANI:  It doesn't pertain to this particular

10 *Franks* issue, your Honor, but it does pertain to the overall

11 *Brady* obligation that they've had for a year and a half.

12         THE COURT:  Well, let me hear from you, Mr. Nolan.

13 Did the Court order you to produce *Brady* material?

14         MR. NOLAN:  It did, your Honor.

15         THE COURT:  And why didn't you do it?

16         MR. NOLAN:  We did, your Honor.  What I would like to

17 do if I could, to address this, is address two things with the

18 Court.  One, I'd like to take a minute to explain the

19 disclosure that we made six days ago, which led to the motion

20 last night.

21         And then I'd like to ask the Court for an opportunity

22 to respond to the written motion last night in writing

23 ourselves, and I'll go into some of that in a moment, if I

24 could, but first, if I could just take a moment to explain the

25 disclosure and how that came about.

1          If we could back up to the first hearing that we had,

2   which was in regards to the 4th Amendment issue, and the

3   Miranda issue.  That hearing encompassed events that took place

4   on one day, and one day on July 1, 2013, and those -- and we

5   were going to call one witness, which we did, the agent for

6   that case.

7          In preparing for that hearing, we sent an e-mail.  I

8   don't recall exactly how many days before, but in -- before

9   that hearing, in preparation to counsel, I said:  We intend to

10  call one witness, Special Agent Carol Webster.  The event she's

11  going to testify to, or memorialized in ROI 1, and here are the

12  notes, and we discussed the notes from ROI 1.

13         At that same time we also made a representation that

14  we had gone through other notes in the case, specifically Carol

15  Webster's, compared them to ROI's, and found them to be

16  consistent as defense counsel just said, so we had made that

17  representation at that time.

18         Then we get to this hearing, and in preparation for

19  this hearing we send an e-mail to defense counsel saying we

20  plan to call one witness if -- if an evidentiary hearing is

21  required, which will be Agent Kizenko, the affiant.

22         His affidavit is based on essentially four things.

23  What happened that day, which he already had the notes from, as

24  well as the interview of three different witnesses, and we

25  disclosed the notes of those three different witnesses.

1          When we re-reviewed those notes -- and we do this

2   often -- we double-check our notes.  We double-check our

3   disclosures.  That's built into the process -- we found that

4   there was a mistake.  We found that there was something in the

5   notes, specifically -- and reading from the notes -- that about

6   a week before Alfredo --

7          THE COURT:  I'm sorry, are these the notes you

8   already turned over to them?

9          MR. NOLAN:  Yes.

10          THE COURT:  And so what are you telling me now?  There

11   was something wrong in the notes?

12          MR. NOLAN:  No.  No.  We turned over the notes, and at

13   the same time, we pointed to something in the notes that was

14   not in the ROI and should have been.

15          THE COURT:  But can I back up then?  What did the

16   order requiring you to disclosure *Brady* information say?

17          MR. NOLAN:  Just to disclose all *Brady* information.

18          THE COURT:  Did it say when?

19          MR. NOLAN:  Yes.

20          THE COURT:  What did it say?

21          MR. NOLAN:  I think the exact date was back in

22   August.

23          THE COURT:  Okay.  Now, you are telling me that this

24   new information was not disclosed, because it didn't pertain to

25   the witnesses that were going to testify at the previous

1    hearing?

2            MR. NOLAN:  No.  What I'm saying is, this is a mistake

3    on our part.  It was not disclosed, because we missed it.  It

4    was aligned in the notes, that existed in the notes, that was

5    not in the ROI --

6            THE COURT:  But how can you disclose some of the notes

7    and not disclose a line?  What did you do, black it out?

8            MR. NOLAN:  No.  No.  No, I'm sorry.  I may have

9    misspoken that in terms of the timing.  We didn't disclose the

10   notes back in August.  We reviewed them.  It's not our -- it's

11   not our normal procedure to disclose all of the notes.  We

12   disclosed the reports.

13           We don't necessarily disclose the agent notes that

14   correspond to those.  I often do that.  Many prosecutors do

15   that closer in time to when the witness will testify, which we

16   are doing in this case.  So we eventually did disclose these

17   notes --

18           THE COURT:  But if you now acknowledge that this is

19   *Brady* material --

20           MR. NOLAN:  Yes.

21           THE COURT:  You do?

22           MR. NOLAN:  Yes.

23           THE COURT:  You didn't disclose the *Brady* material

24   when you were ordered to do so?

25           MR. NOLAN:  We missed it at that point.

1    THE COURT:  Well, you see, you have to err on the side

2  of disclosing too much if you are going to do it the way you do

3  it, because the consequences of not disclosing material that

4  you should have disclosed are much greater than the

5  consequences of disclosing material that you did not have to

6  disclose.

7    MR. NOLAN:  Understandable, your Honor, and that is

8  why we build in these double -- and even triple -- checks as we

9  move close to trial.  So when we did find it, and did discover

10  it, as we re-reviewed the notes, we disclosed it immediately.

11    That very evening we sent an e-mail to defense

12  counsel.  We pointed exactly where it was in the notes.

13  Exactly where it should have been in the ROI.  It was a

14  mistake.  It was an honest mistake.  The agent missed it, and

15  then we missed it in the review.  We caught it in the second

16  time in the review, and we disclosed it immediately --

17    THE COURT:  Now, Mr. Almadani is about to tell me

18  several other instances in the notes where he claims it is

19  *Brady* material that was not previously disclosed.

20    I think I haven't even heard everything he had to say,

21  but he started to tell me about how in Gildardo's interview he

22  said that the Defendant was not there from 12:00 a.m. to 3:00

23  a.m., which sounds like it's relevant, and if not exculpatory,

24  certainly favorable to the defense.

25    MR. NOLAN:  Right.

1    THE COURT:  So what about all these other examples

2    from the notes that Mr. Almadani is telling me constitute *Brady*

3    material?

4    MR. NOLAN:  Right.  So we would argue two things on

5    that.  One, first thing is we have not seen what exactly --

6    we're hearing it for the first time as well -- what exactly,

7    additionally, to what we pointed out as *Brady*, the defense is

8    now saying this was also *Brady*, and should have been disclosed.

9    So we're learning of that now, and we would like an

10   opportunity to respond to that.

11   THE COURT:  No.  That's not the way *Brady* is supposed

12   to work.  Mr. Almadani has stated it correctly.  You don't need

13   to have an order from the Court in order to be required to

14   disclose *Brady*.  I don't often even make an order, because

15   sometimes I simply say:  The Government knows its obligations,

16   and the Court expects them to comply with those obligations.

17   Now, you don't have to wait to hear from Mr. Almadani

18   to know what constitutes *Brady* material.  That's your job.

19   MR. NOLAN:  Right.  And you are absolutely right, your

20   Honor.  I guess what I'm suggesting is that -- two things.

21   One, I'm not convinced everything he is claiming to be *Brady* is

22   *Brady*.

23   THE COURT:  Well, these two things we've heard so far

24   are.

25   MR. NOLAN:  And then the second thing is, I am not --

1    I'm fairly certain much of what he has already said was

2    disclosed in another form, not necessarily the notes.  So while

3    the notes may not have had all of that material, that

4    material -- all the things about Prakash's other jobs, things

5    like that, were disclosed in other reports, and have already

6    been disclosed.

7            THE COURT:  That's a good possibility, but right now

8    we don't know.  Let me see if I can streamline this

9    discussion.

10           MR. NOLAN:  Of course.

11           THE COURT:  You both seem to be telling -- no, I guess

12   Mr. Almadani said he is, and he isn't, but you seem to be

13   telling me you don't want to go forward with this *Franks*

14   hearing until you've had an opportunity to respond to all of

15   the arguments about the *Brady* motion, right?

16           MR. NOLAN:  I am -- I am saying that if the defense's

17   position is the materials that we -- we were deprived an

18   opportunity to prepare for this hearing, then, yes, we would

19   like to do two things.

20           One, first of all, if the defense's initial reaction

21   to receiving this was:  Hey, there's material in here that I

22   need to brief.  I'm going to do a motion to postpone based on

23   your disclosing this at this time.  We, of course, would not

24   have objected to that.

25           So that's the first thing, so we are not necessarily

1   in objection to giving the defense as much time as it needs if

2   it feels this material is helpful to a *Franks* hearing, and we

3   would like the opportunity to respond to that, so I guess

4   that's what I'm saying.

5          If it's not, if the defense is saying:  You know, I

6   wasn't going to use any of this material anyway, then I think

7   we can proceed with the *Franks* hearing.

8          THE COURT:  They are not saying they weren't going to

9   use this material.  There are actually some things they are

10  telling me that they not only were going to use, they do want

11  to use, and they think it's highly relevant.  Let me ask you

12  another question.

13         MR. NOLAN:  Of course.

14         THE COURT:  What do you think the sanction ought to be

15  if the Court finds you did violate *Brady*?

16         MR. NOLAN:  Right.  So the important thing on this is

17  that as soon as we discovered this piece of material, we

18  disclosed it.  We disclosed all of the notes.  Here they are.

19  We were going to do that anyway, just as we did before the

20  first hearing.

21         THE COURT:  You were going to do what anyway?

22         MR. NOLAN:  Disclosing the notes --

23         THE COURT:  All of the notes?

24         MR. NOLAN:  No, not every note, but the notes that

25  were permanent to this hearing.  So now knowing that this was

1   not done intentionally, we were not trying to hide materials.

2   We were not doing that in any kind of intentional way.  Once

3   the mistake was uncovered, it was disclosed immediately.  So

4   then the question becomes:  What is the prejudice?  And in

5   terms of trial, there's no prejudice.  We're well before trial,

6   so it can be used at trial.

7          The prejudice, necessarily, is what -- what -- can we

8   use this material in this hearing, and that may require

9   postponing the hearing, and we understand that.

10         Now, in terms of sanctions, the Defendant's motion,

11  which was filed last night, the discovery motion, and this is

12  why I would ask for an opportunity to respond.  I've only had a

13  chance to read it one time, and haven't spent the thorough

14  research that a motion like that deserves to be able to

15  respond.  But my initial reading is he sets forth, essentially,

16  a list of sanctions.  Six requests that he's asking the Court

17  to order the Government to do to cure this defect.

18         What I would ask is an opportunity to respond to it,

19  because when I read those, some of those I think either may

20  have already been done.  I think two of them actually were

21  done.  Some of them I think we can do.  We're not necessarily

22  obligated to do, but we can be reasonable, and we'll do it.

23         THE COURT:  I don't know what those six things are.  I

24  am not privy to that request.

25         MR. NOLAN:  It was in the motion.  I don't have the

1  hard copy with me, because it was just filed last night

2  electronically, but there's a series of essentially six things.

3  I believe it was six, it may have been more.  But it was A

4  through maybe F, G -- do you have a copy, Mr. Almadani, a hard

5  copy?

6  MR. ALMADANI:  Only on my --

7  MR. NOLAN:  Here we go, your Honor.  The defense's

8  motion has in Section -- Section 3 A through G, excuse me, A

9  through H.

10  THE COURT:  All right.  I don't have it right in front

11  of me now, but I'll believe you.

12  MR. NOLAN:  So what we would like is the opportunity

13  to respond to that, because there may be areas where we can do

14  that.  If there are areas where we couldn't do that, we'd like

15  to be able to brief that.

16  I'd like to be able to give the motion consideration.

17  I'd like to be able to talk with others at the Department to

18  make sure that what we may agree to do is consistent with

19  department policy and the law.

20  And then where there's areas where we think we

21  shouldn't do that, we're not obligated to do it, and we have a

22  disagreement between the defense and the prosecutors, we'd like

23  to brief that so that we can narrow these issues to the Court,

24  and then the Court can rule on what it needs to do having been

25  briefed.

1          THE COURT:  There are two separate questions here.

2     One is whether these new revelations affect the *Franks* motion,

3     and I think the answer to that is they do.  Mr. Almadani wants

4     to have the Court consider the information he has received in

5     these notes in connection with the *Franks* hearing, and that

6     sounds like a reasonable request.

7          The other question is:  Does it constitute a *Brady*

8     violation, and if so, what are the sanctions?  You and I may

9     have a different understanding of *Brady*.  You said it several

10    times now, that the failure to disclose this information was

11    not intentional on your part.

12         I don't read *Brady* to require intentional failure to

13    disclose exculpatory information.  It's an affirmative

14    obligation on the Government.  When you go back to the

15    department, and you talk to them about department policy, I

16    hope they all agree with me.

17         MR. NOLAN:  Right.

18         THE COURT:  Now, it's -- it's not negotiable.  You

19    don't -- if it's *Brady* material, you turn it over.  That's --

20    that's the bottom line, and the next question becomes, if you

21    haven't done that, what is the sanction?  So if you are going

22    to brief something, I suppose that's the second question that

23    you need to brief.

24         MR. NOLAN:  And I would argue that the sanction

25    depends on the prejudice, and so I think that's the

1 intermediate step is to determine what prejudice has been made

2 by the timing of the --

3 THE COURT: Right. There's some prejudice already.

4 The prejudice has been not only to defense counsel, but to the

5 Court. I come out here this morning ready to hear arguments,

6 ready to hear testimony, if necessary, and ready to decide at

7 the end of those arguments and testimony the *Franks* motion.

8 Now, we have to put it over, and I have to go through

9 that again. Mr. Almadani has to put additional time, which, I

10 assume, he bills to his client on this case now, because he

11 wasn't able to go over these materials earlier in connection

12 with the motion. There's already some prejudice.

13 So I think you need to look seriously, if there's a

14 *Brady* violation, what is the sanction, and there's case law on

15 that, I'm sure.

16 Okay. Mr. Almadani, how do you suggest we proceed

17 from here?

18 MR. ALMADANI: Your Honor, I think it does then make

19 sense to put it over for us to be able to review, but I would

20 like to respond to a couple of the points Mr. Nolan was making,

21 because I don't think they are entirely fair.

22 First of all, your Honor, when the Government

23 represents that its gone over these notes, and there's nothing

24 inconsistent, and I don't find just one line, your Honor. I

25 find line after line, item after item. The point is that these

1    notes were made prior to the warrant being authored.

2         If we had these notes earlier, we could have

3    potentially brought a *Franks* motion quite a bit earlier.  As

4    the Court has noticed in their oppositions, they have been

5    trying to -- to just not even have a *Franks* hearing.

6         That's unfair for them -- in their opposition they

7    moved this Court to not even have a *Franks* hearing, to just

8    have a status conference before disclosing these notes.  That's

9    not okay for the Government to do, because we trust them to

10   give us -- to over-produce so that we can also make a

11   determination.

12        Clearly they've gone over these things, and they have

13   not understood what *Brady* is.  They have to err on the side of

14   caution.  My client's also prejudiced, your Honor, because she

15   has Speedy Trial rights.  That's why you have to go -- as a

16   former prosecutor, I was always taught to go over your file

17   before you indict.  You have the control -- the timing of the

18   indictment.  You have to go over your file.  You got to get

19   your *Brady* material together.

20        You can't be producing that a year later, a year and a

21   half later, because you have an obligation to bring the

22   Defendant to trial in 70 days.  Yes, we put it over a lot of

23   times for counsel to prepare, but that doesn't excuse their

24   violation, and the prejudice that occurs when this type of a

25   violation occurs, your Honor.

1        You know, the other thing is this notion, and this

2   idea that these things are disclosed in another report, they

3   are not, because the timing actually matters.  If there was an

4   interview of, let's say, Prakash or Alfredo done in September

5   of 2018, and something like this was disclosed in that

6   particular ROI, that is not -- that's still not a sufficient

7   disclosure, because the timing matters.  In order for us to

8   bring the *Franks* motion, we had to know these notes and this

9   interview took place earlier than the warrant.

10        So if they've disclosed it in an ROI, you know, two

11  years later he said the same thing, that's not sufficient, your

12  Honor.  This has been pretty significant.  You know, the other

13  part of it is, your Honor, that I have been asking them and

14  asking them, and I've been very nice about it, and very patient

15  about it.  They haven't even disclosed the unredacted report,

16  so we could actually have a meaningful cross-examination with

17  the name Prakash on there.  These reports refer to P.K. and

18  E.L., and L, and the Court has had discussions with them about

19  it.

20        We're entitled to that information.  There is no

21  witness safety issue here, your Honor, absolutely none, and so

22  we're entitled to have the reports.  We're also entitled to

23  have the unredacted reports, because this case is built

24  entirely on impeachable witness testimony.  It's all -- it's

25  these individuals who wanted immigration benefits, and they

1   have twisted and exaggerated stories to get them, and that's

2   why this woman is sitting here, and her life is turned upside

3   down because of that, and that's not fair.

4   And so we're entitled to investigate their witnesses

5   ourselves.  We're not going to go bother the witnesses, but

6   we're entitled to investigate who these people are that are

7   accusing her.  She's entitled to that, your Honor, and --

8   THE COURT:  So what is there about the reports that

9   prevents you from doing that?

10  MR. ALMADANI:  Because when we get a name -- when we

11  get a report that's saying E.L. said that, we don't know who

12  E.L. is, we'd like to be able to know who E.L. is.  What the

13  true name is so that we can run a -- you know, run our own

14  private investigator to check out who this person is, what this

15  person's representation is in the community.  This bears on

16  credibility of these witnesses apparently the Government has

17  banked its entire case on.

18  THE COURT:  Well, I'm not so sure that what you are

19  talking about here is *Brady* material.  The ability to

20  cross-examine a witness.

21  MR. ALMADANI:  That falls under Rule 16, your Honor.

22  I apologize --

23  THE COURT:  It does, but that's not *Brady*.  Some

24  courts have undertaken to review everything the Government has,

25  and go through it and decide what's *Brady* material and what

1  isn't.  I have never done that.

2          The one reason I haven't done it is I don't have the

3  time.  Another reason I haven't done it, is that I'm not as

4  familiar with the reports as the Government is.  I'm not as

5  familiar with the potential defenses, and it is almost

6  impossible for me to know what's exculpatory without knowing

7  more about the case, which I don't.

8          But the primary reason that I don't do that is I don't

9  think it's my job.  I think it's the United States Attorney's

10  job.  *Brady* says so much, and I insist that the United States

11  Attorney do his or her job.  That's the primary reason I don't

12  do it.

13          So I'm not going to take the Government's reports and

14  look at what they've redacted and decide whether it's *Brady*

15  material or not.  I'm not going to take the Government's

16  reports and look at things that they haven't turned over and

17  decide whether it's *Brady* material or not.  That's the

18  Government's job, and when you have a doubt, you turn it over.

19  That's the -- that's the only way it works.

20          So, I'm not going to order the Government to turn over

21  unredacted reports.  I've already ordered the Government to

22  turn over *Brady* material, and I'm going to have you brief the

23  question of whether there is a continuing *Brady* violation,

24  whether there has been a *Brady* violation in the past, and as

25  part of that question, I want to know what the sanctions are,

1   if there have been.  Now, it undoubtedly will depend on the

2   extent that the Court may or may not find a violation, but I

3   want to know that.

4        I believe all of that is a separate question from the

5   *Franks* hearing, which we're still going to go forward with.  So

6   I hate to have to do this again, but I'll let you file new

7   briefs on the *Franks* issue, and I'll ask that you put it all

8   together in one place, so I don't have to go back to the old

9   briefs and the new, and decide what's new and what isn't.

10  We'll start from scratch on the *Franks* motion.

11       We'll start with Mr. Almadani's brief, and then if you

12  need more time to make sure you've got all the material the

13  Government is going to give you, then I'll give you that time.

14  Then we'll have the Government's brief, and a reply, and then

15  we'll come back here for a hearing.

16       My position on the hearing was that if anybody wants

17  to call a witness, the Court will hear those witnesses in the

18  *Franks* hearing.  I know that there are courts that have said we

19  don't need a *Franks* hearing, and they've written long opinions

20  about why they do not, and sometimes those opinions are

21  affirmed.  Sometimes they are not.

22       But I always like to say that if the issue is serious

23  enough for us to be talking about it, it's serious enough for

24  me to hear whatever evidence one side or the other wants me to

25  hear on the motion.

1          So on the *Franks* motion, if either one of you wants to

2   call witnesses, I will hear those witnesses, and that will be

3   the *Franks* hearing.  Now at the same time, we might as well

4   have that *Brady* issue fully briefed so that we can decide that

5   at the same time, because we can't just keep going with this

6   case.  As you point out, Dr. Sheikh has a right to have this

7   case brought to trial, and brought to trial quickly.

8          Now, if I hear again that there's material that I find

9   to be *Brady* material that hasn't been turned over after this, I

10  guarantee you the sanctions are going to be as severe as the

11  law allows.  All right.  Suggest a briefing schedule.

12          MR. ALMADANI:  May I have a moment to look at my

13  calendar, your Honor?

14          THE COURT:  Yes.

15          MR. NOLAN:  May I ask a simple question on this in

16  terms that you talked about briefing -- redo the *Franks*

17  hearing, and I just want to be clear on that.  So this will be

18  as if it supercedes the last one; is that what you are saying?

19          THE COURT:  Yes, I want it all together in one

20  place.

21          MR. NOLAN:  Okay, so -- and then there is currently a

22  pending motion on discovery.  Would you want the Government to

23  respond to that motion that was filed last night by the

24  defense?

25          THE COURT:  Refresh my recollection.  Didn't I tell

1   you in this case I would hear discovery motions instead of the

2   Magistrate, or is that a different case?

3           MR. NOLAN:   I don't know if that's come up.

4           THE COURT:   Our local rules are the discovery motions,

5   in criminal or civil cases, are heard by our magistrate judges.

6   On some occasions, in order to simplify it, expedite matters,

7   and keep all the motions before me, I've said I would hear

8   discovery motions.

9           I don't know if I said that in this case.   If I

10  didn't, it's the magistrate judge that will hear it.

11          MR. ALMADANI:   Your Honor, may I address that?   Just

12  because of the history of this case, and what's gone on, and

13  the way that the Government has not disclosed matters, we would

14  prefer that your Honor hear these motions, but, of course, it's

15  up to the Court.

16          THE COURT:   I think that probably makes sense if, for

17  no other reason, besides what Mr. Almadani says, timing.   I

18  want to make sure that -- the way we do these motions makes

19  sense.

20          So what's the discovery motion?   Is that on file now?

21          MR. NOLAN:   Yes --

22          MR. ALMADANI:   It is on file, your Honor, and I just

23  had it open, I apologize.   Okay, here it is, your Honor.   So

24  we've made a discovery motion on the basis of not just *Brady*,

25  but Rule 16, Rule 26.2, and, well, *Giglio* and *Henthorn* are

1  related to *Brady*, so those would be part of the *Brady* motion.

2       But there is a motion on Rule -- on the basis of Rule

3  16.   That has to do with the -- the witness' names, your Honor.

4  There's no reason to have redacted witness names, because we

5  are entitled to know who these people are, who the accusers

6  are.

7       And especially given the fact that these witnesses,

8  based on the notes that we're getting now, and the reports that

9  we're getting, they are highly impeachable witnesses.   We're

10 entitled to do our own investigation on them.

11      We're not -- you know, there's no -- this is not a

12 gang case.   It's not a drug case --

13      THE COURT:   No minors involved?

14      MR. ALMADANI:   No minors involved, your Honor.

15      THE COURT:   When is that motion noticed for hearing?

16      MR. ALMADANI:   Actually, your Honor, we included it

17 with our sur-reply, but I can notice a brand new motion for

18 that if the Court would like.

19      THE COURT:   Make it separate.   Let's keep these things

20 separate.

21      MR. ALMADANI:   Sure, your Honor.

22      THE COURT:   Now there's three things.   There's the

23 *Franks* issue, the *Brady* issue, and now there's the discovery

24 motion.

25      MR. ALMADANI:   Yes, your Honor.

1          THE COURT:  Put the discovery motion on for hearing.

2     I think it makes sense before we go forward with the rest of

3     the *Franks* hearing.

4          MR. ALMADANI:  Yes, your Honor.

5          THE COURT:  So you've already got it.  When would you

6     like to -- how much time would you want to respond?

7          MR. NOLAN:  14 days.

8          THE COURT:  So it's on file now.  If you had 14 days

9     to reply, you'd have until about the second week in March.

10    I'll give you until March the 9th to respond.  Do you want to

11    reply?  Do you want a week to reply?

12         MR. ALMADANI:  Yes, your Honor.

13         THE COURT:  March the 16th, and then we can hear that

14    on March the 23rd, through the discovery motion, on March the

15    23rd.

16         MR. ALMADANI:  If your Honor can give me just a moment

17    to check my calendar.  March 23 sounds dangerous to me, but if

18    the Court could give me a second.

19         I apologize, your Honor, I have a case management

20    conference that day in Southern California.

21         THE COURT:  Do you want to put it over one week to

22    March 30th?

23         MR. ALMADANI:  That works for me.

24         THE COURT:  So that will be the order then.  Let's set

25    the *Franks* hearing for some time after that.  Now, the question

1  is, do you need to know what materials you are going to have

2  from the discovery motion before you brief the *Franks* motion?

3  I don't want to have to do it a third time.

4  　　　　MR. ALMADANI:  I agree, your Honor.  We -- I don't --

5  I just have not been given the materials, so I have no idea

6  what to expect --

7  　　　　THE COURT:  Okay.  Let's go back here a minute, and

8  ask whether you really need two weeks to respond to this

9  discovery motion.  Have you seen the discovery motion?

10  　　　　MR. NOLAN:  I read it through once last night.

11  　　　　THE COURT:  Does it look like you really need two

12  weeks, or does it look like you could do it in a couple days?

13  　　　　MR. NOLAN:  Well, because I would like to -- I don't

14  know if a couple of days, necessarily, just scheduling in other

15  cases --

16  　　　　THE COURT:  Let me see the discovery motion.  Do you

17  have a copy of it?  I have it right here.  Let me look.

18  　　　　MR. NOLAN:  It's specifically -- it's Section 3 is

19  what I was referring to last time.

20  　　　　THE COURT:  Well, it's two pages, but it covers a lot

21  of categories.

22  　　　　MR. ALMADANI:  Yes, your Honor.  It starts on page

23  four.  These are essentially renewed discovery requests.  These

24  are all things that they are obligated to produce without us

25  really asking for them.

1          MR. NOLAN:  If I could address that, your Honor --

2          THE COURT:  Well, they are not all things.  I'm just

3 looking at the title here, "Grand Jury testimony."  They are

4 not required to give you Grand Jury testimony, per se.

5          MR. ALMADANI:  Unless it falls within Rule 26.2, your

6 Honor.  That's all we're asking for.  If it falls within Rule

7 26.2, we're entitled to it.  Otherwise, the Court is correct.

8          MR. NOLAN:  That is why we would like the opportunity

9 to respond to it.  I do think there are things in there that we

10 either have done already, and would like to be able to point

11 that out, and go over that with defense counsel --

12          THE COURT:  You know, I don't care.  At this point,

13 unless we're talking about *Brady* --

14          MR. NOLAN:  Okay --

15          THE COURT:  -- I don't care about that you've done it

16 before.  They should have known.  These types of issues.  I

17 just want to know should I grant it, or should I deny it?  If

18 you've already done it, then you don't care whether I grant it.

19          And if there's some reason that you shouldn't be

20 required to turn it over, or you don't want to turn it over,

21 then I need to know that.

22          MR. NOLAN:  And that's what we'd like the opportunity

23 to do.  I just haven't had the opportunity --

24          THE COURT:  I'll give you one week.  How about one

25 week?  March the 2nd.

1          MR. ALMADANI:  That would make our reply, your Honor,

2     due on March 9?

3          THE COURT:  March 9.

4          MR. ALMADANI:  Yep.

5          THE COURT:  And then I could hear it on March the

6     16th.

7          MR. ALMADANI:  March 16 would work for us, your

8     Honor.

9          THE COURT:  Is that all right for you?

10         MR. NOLAN:  Can I double-check?

11         MR. ALMADANI:  As they are checking that, your Honor,

12    there is an issue with the *Brady*.  We believe there's still

13    outstanding *Brady* material, and before we brief the issue of

14    whether *Brady* was violated, we need that material, so they

15    would have to -- I think they have to make some supplemental

16    disclosures, but, you know...

17         THE COURT:  Well, no.  They've already been ordered to

18    turn over *Brady* material.  If they haven't, that's the

19    violation.  They don't get to keep coming back and saying:  How

20    much *Brady* do we give you now?  How much *Brady* do we give you

21    later?  When do we give it to you?  They don't get to do that.

22    They are representing to the Court that they've given you all

23    *Brady* material.  If that representation is false, we'll deal

24    with it.

25         MR. ALMADANI:  Yes, your Honor.

1    THE COURT:  So is the 16th okay?

2    MR. NOLAN:  We will make that work.

3    THE COURT:  All right.

4    THE CLERK:  Is that 9:00 o'clock?

5    THE COURT:  Well, that's the calendar.  Let me see

6    what else is on the calendar.  We may be able to have you come

7    in a little later since you're coming in from out of town.

8    THE CLERK:  Nothing right now --

9    THE COURT:  Okay, 9:00 o'clock.

10   MR. ALMADANI:  Yes, your Honor.

11   THE COURT:  And that's just the hearing on the

12   discovery motion.

13   MR. ALMADANI:  Yes, your Honor.

14   THE COURT:  Okay.  Is the schedule clear now?

15   MR. NOLAN:  The schedule is clear for the discovery,

16   and then I --

17   THE COURT:  Well, the schedule for everything else,

18   too.

19   MR. NOLAN:  And then at that time, is it at that time

20   that we'll then set out a schedule for *Franks*?

21   THE COURT:  Right.  We're going to break it down the

22   way I said.

23   MR. NOLAN:  I understand.

24   MR. ALMADANI:  Thank you, your Honor.

25   THE COURT:  All right.

1    (The proceedings adjourned at 9:48 a.m.)

2                    --oOo--

3    I certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5                         /s/ Tiphanne G. Crowe

6    _____
     TIPHANNE G. CROWE
     CSR No. 10958

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25