Yasin M. Almadani (Cal. Bar No. 242798)
ALMADANI LAW
14742 Beach Blvd., Suite 410
La Mirada, California 90638
(213) 335-3935 | YMA@LawAlm.com

*Attorney for Defendant*

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FIRDOS SHEIKH,<br><br>Defendant. | Case No. 2:18-CR-119-WBS-1<br><br>**DEFENDANT'S REPLY AND MOTION FOR DISMISSAL TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR DISCOVERY [DE 87]; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: March 9, 2020<br>Time:            9:00 a.m.<br><br>Trial Date: TBD<br><br>Judge: Hon. William B. Shubb<br>Courtroom:   Five (14th Floor) |

Defendant Firdos Sheikh, M.D. ("Dr. Sheikh" or "Defendant"), by and through her counsel of record, Yasin M. Almadani, hereby files the above-captioned reply and motion for dismissal necessitated by **new *Brady* violations** found in the government's latest opposition and elsewhere independently by the Defense. This filing is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 9, 2020

Respectfully submitted,

ALMADANI LAW


__   */s/ Yasin M. Almadani*_____
Yasin M. Almadani, Esq.
*Attorney for Defendant*

## <u>TABLE OF CONTENTS</u>

I.   *INTRODUCTION AND PROCEDURAL HISTORY* ........................................................ 1

   A.   **The Hearing on February 25, 2020** .............................................................. 1

   B.   **Summary of the Reply** .............................................................................. 2

II.   *Part I: FACTS ESTABLISHING A PATTERN OF GOVERNMENT MISCONDUCT AND THE UNRELIABILITY OF the PROSECUTORS TO FAITHFULLY MEET THEIR DISCOVERY OBLIGATIONS* ...................................................................................................... 3

   A.   **Legal and Ethical Standards of Prosecution** ................................................ 3

   B.   **New *Brady* Material Disclosed After the February 25, 2020 Hearing, *Brady* Material that was Misrepresented by the Government, and Potential *Brady* Information That Remains Outstanding** ....... 4

      1.   Failure to Disclose Agents' Pre-Warrant Knowledge of a Strip Mall with Restaurants and a Convenience Store Within a Mile of Dr. Sheikh's Ranch ........................................................................ 4

      2.   Failure to Disclose That a Court in This District Has Found That Special Agent Carol Webster May Have Committed Perjury and Been Involved in Brady and Naupe Violations; the Court Has Ordered Investigation and Discovery in That Case ........................................................................ 6

      3.   Providing Misleading Information About the T-Visa Benefits in Violation of Brady ..................... 7

      4.   Failure to Disclose the Impeachable Close Relationship Between HSI and Opening Doors ............... 8

      5.   Affirmative Misrepresentation and Failure to Disclose Discussions Between Victim Prakash and the Agents with Respect to Immigration Benefits for Assisting with Dr. Sheikh's Prosecution ............ 9

      6.   Potential Failure to Disclose Payment or Waiver of Filing Fees ........................................ 9

   C.   ***Brady* Information Disclosed on the Eve of the February 25, 2020 Hearing After the Government First Attempted to Have That Hearing Cancelled** .......................................... 10

   D.   ***Brady* Information Disclosed Over One Year into the Litigation and Only After the Defense Requested a Court Order** ................................................................. 13

   E.   **Other Outstanding Issues of Concern** ....................................................... 13

      1.   Prakash's Debriefs ............................................................................. 13

2.   Grand Jury ................................................................................................. 15

3.   Illicit Motivations ...................................................................................... 15

**III.   Part II:  Request for Dismissal** .......................................................................... **15**

A.   **Background** ..................................................................................................... **15**

B.   **Dismissal Based on the Prosecutors' Disregard for Dr. Sheikh's Constitutional *Brady* Rights** ...... **17**

C.   **Dismissal Based on Government Failures Resulting in Speedy Trial Right Violation** ................... **18**

**IV.   Part III: Stipulated and Outstanding Discovery Issues** ................................................... **20**

A.   **Agent Notes** ................................................................................................... **21**

B.   **Operational Plans** .......................................................................................... **21**

C.   **Grand Jury Testimony** ..................................................................................... **21**

D.   **Immigration Benefits Provided to Government Witnesses** ........................................ **23**

E.   **Reports with Unredacted Witness Names** ........................................................... **23**

F.   ***Henthorn* Request** ......................................................................................... **23**

G.   **Improper Motivations to Investigate and Charge** ................................................. **23**

H.   **Additional Brady/Giglio Material** ..................................................................... **24**

**V.   CONCLUSION** ................................................................................................... **24**

*Defendant's Reply in Support of Renewed Motion for Discovery*        *Case No. 2:18-CR-119-WBS-1*

# TABLE OF AUTHORITIES

## CASES

*Bartone v. United States,*
    375 U.S. 52 (1963) (per curiam) ........................................... 16

*Berger*
    295 U.S. ........................................................................... 4,15

*Brady v. Maryland,*
    373 U.S. 83 (1963) ............................................................. 5,15

*Burton v. United States,*
    483 F.2d 1182 (9th Cir.) ....................................................... 16

*California v. Trombetta,*
    467 U.S. 479, 104 S. Ct. 2528 (1984) ..................................... 14

*Cone v. Bell,*
    556 U.S. 449 (2009) ............................................................... 5

*Giglio v. United States,*
    405 U.S. 150 (1972) ............................................................... 5

*In re Grand Jury Proceedings,*
    62 F.3d 1175 (9th Cir. 1995) ................................................. 21

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ...............................................................
5,15,20

*McNabb v. United States,*
    318 U.S. 332 (1943) ............................................................. 16

*United States v. Bagley,*
    475 U.S. 667 (1985) ............................................................. 5,20

*United States v. DeMarco,*
    401 F. Supp. 505 (C.D. Cal. 1975) ........................................ 21

*United States v. Agurs,*
    427 U.S. 97 (1976) ................................................................. 5

*United States v. Cerullo, No. 05cr1190 BEN,*
    2007 U.S. Dist. LEXIS 101282 (S.D. Cal. Sep. 7, 2007) ........... 21

*United States v. Chapman,*
    524 F.3d 1073 (9th Cir. 2008) ................................................
4,16,17

*United States v. Estepa,*
    471 F.2d 1132 (2d Cir. 1972) ................................................ 21

*United States v. Ferreboeuf,*
    632 F.2d 832 (9th Cir. 1980) ................................................ 21

*United States v. Hanna,*
    55 F.3d 1456 (9th Cir. 1995) ................................................ 15

*United States v. Henthorn,*
    931 F.2d 29 (9th Cir. 1991) ..................................................... 5

*United States v. Leslie,*
    759 F.2d 366 (5th Cir. 1985) ................................................... 4

*Defendant's Reply in Support of Renewed Motion for Discovery*     Case No. 2:18-CR-119-WBS-1

*United States v. Mendoza*,
     530 F.3d 758 (9th Cir. 2008)  ........................................................
4,17,18,19
*United States v. Navarro-Vargas*,
     408 F.3d 1184 (9th Cir. 2005) (en banc)  ...................................... 21
*United States v. Payner*,
     447 U.S. 727 & n.7 (1980) ........................................................ 16
*United States v. Roberts*,
     618 F.2d 530 (9th Cir. 1980)  ..................................................... 21
*United States v. Siriprechapong*,
     181 F.R.D. 416 (N.D. Cal. 1998) ................................................ 21
*United States v. Toilolo, No. 11-00506 LEK*,
     2014 U.S. Dist. LEXIS 34571 ....................................................14

*Defendant's Reply in Support of Renewed Motion for Discovery    Case No. 2:18-CR-119-WBS-1*

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.   INTRODUCTION AND PROCEDURAL HISTORY

While this is intended to be a reply to the Defense's renewed discovery motion [DE 87][1] (which it is), new revelations by the government and independently discovered information by the Defense raise grave concerns of prosecutorial misconduct, including what appears to be additional, newly discovered instances of deliberate (or at least reckless) suppression of *Brady* information by the prosecutors; there is also a credible concern that the grand jury was misled.  Up to this point, the Defense has been circumspect not to raise prosecutorial misconduct despite numerous misrepresentations by the government to the Defense and to the Court concerning the completeness of the government's *Brady* disclosure.  The Court has also been very patient with the government.  But newly discovered information demonstrates that the government's "*mea culpas*" and requests for do-overs have gone too far—the government has ignored the law, ignored the orders of this Court, actively steered the Court and Defense away from exculpatory information, and begrudgingly revealed exculpatory information only when forced to do so.  The sheer number and gravity of the violations raise issues of government misconduct that tie directly into the discovery motion and Dr. Sheikh's speedy trial rights.  At this point, it is all but impossible to trust the current prosecutors to reliably execute their discovery obligations and, as such, under Ninth Circuit caselaw, the delays resulting from the government's disregard of this Court's orders and Dr. Sheikh's constitutional rights have become presumptively unreasonable (regardless of whether the government's misconduct was negligent, reckless, or intentional) so to warrant this Court's exercise of its supervisory powers to dismiss the indictment.  For the reasons set forth below, the indictment should be dismissed.

### A.   The Hearing on February 25, 2020

At the hearing on February 25, 2020, the government acknowledged one *Brady* violation while trying to minimize others.  (Ex. AAA: R/T 2/25/20 at 13).[2]  Thereafter, the Court had to repeatedly explain the government's *Brady* obligations to the prosecutors as they tried to make excuses to cover their

---

[1] "DE" refers to "docket entry" followed by a docket control number.  The page number references the PACER page citation across the document's top margin.

[2] "R/T" denotes "record transcript" followed by the date, followed by the page number.  The relevant lines in the transcript are highlighted for the Court's convenience.

*Defendant's Reply in Support of Renewed Motion for Discovery*          *Case No. 2:18-CR-119-WBS-1*

violations.  (Ex. AAA: R/T 2/25/20 at 15, 25).  The Court found that Dr. Sheikh, Defense Counsel, and the Court had already suffered prejudice as a result of the government's admitted *Brady* violation as of the February 25 hearing.  Importantly, the Court stated:

> As you point out, Dr. Sheikh has a right to have this case brought to trial, and brought to trial quickly.
>
> Now, if I hear again that there's material that I find to be *Brady* material that hasn't been turned over after this, **I guarantee you the sanctions are going to be as severe as the law allows**.

(Ex. AAA: R/T 2/25/20 at 27) (emphasis added).

The Court later reiterated the point:

> They've already been ordered to turn over *Brady* material.  If they haven't, that's the violation.  They don't get to keep coming back and saying:  How much *Brady* do we give you now?  How much *Brady* do we give you later?  When do we give it to you?  They don't get to do that.  **They are representing to the Court that they have given you all *Brady* material.  If that representation is false, we'll deal with it.**

(Ex. AAA: R/T 2/25/20 at 33) (emphasis added).

It turns out that the government's representation to the Court was again false; it turns out that even at the February 25 hearing, the government was still knowingly holding onto *Brady/Giglio* material while also failing to disclose other important *Brady* material unknown to the Defense at the time and which the Defense recently independently discovered, as discussed in more detail below.  Based on the Court's admonitions, Dr. Sheikh respectfully requests dismissal, which is a permissible sanction available to the Court under these circumstances.

### B.      Summary of the Reply

This Reply is presented in three parts.  In the first part, the Defense will demonstrate that due to *Brady* violations and other misrepresentation issues, the prosecutors in this case have engaged in reckless if not intentional misconduct.  In doing so, they did not hold steadfast to the prosecutorial standards expected of them by this Court and the Supreme Court, as well as the ethical standards expected of them by the California Bar.  Hence, the government can no longer be relied upon to faithfully prosecute this case including meeting its serious discovery obligations.

In the second part of the Reply, the Defense will argue two bases for dismissal *in lieu* of additional

2

discovery production:

(1)     ***Brady* Violation as a Basis for Dismissal**.  New demonstrable *Brady* violations yet again demonstrate a violation of this Court's orders and a reckless disregard for Dr. Sheikh's constitutional rights; this in turn implicates the Court's guarantee at the February 25, 2020 hearing to levy the severest of sanctions, which under the present circumstances is dismissal pursuant to the Court's inherent supervisory powers.  This theory of dismissal is controlled by the Ninth Circuit's precedent in *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008).

(2)     **Six Amendment Speedy Trial Violation as a Basis for Dismissal**.  The government's failures to date, including various misrepresentations and *Brady* violations, have trampled Dr. Sheikh's constitutional Sixth Amendment speedy trial rights.  Under this theory, even *negligent* failures by the government warrant dismissal.  This theory of dismissal is controlled by the Ninth Circuit's precedent in *United States v. Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008).

In the third part of the Reply, the Defense will address stipulated as well as outstanding discovery issues, with the hope that a dismissal will have mooted any such issues.

## II.     PART I: FACTS ESTABLISHING A PATTERN OF GOVERNMENT MISCONDUCT AND THE UNRELIABILITY OF THE PROSECUTORS TO FAITHFULLY MEET THEIR DISCOVERY OBLIGATIONS

### A.     Legal and Ethical Standards of Prosecution

Being a prosecutor is a privilege "and this privilege requires federal prosecutors to adhere to the highest standards of fairness and justice."  *United States v. Leslie*, 759 F.2d 366, 373 (5th Cir. 1985) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . .  [W]hile he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Berger* 295 U.S. at 88.

Under *Brady* and its progeny, the government is required to produce evidence that exculpates a

---

3

1    defendant when such evidence is material to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83 (1963),

2    and *Giglio v. United States*, 405 U.S. 150 (1972).  Because this is a Constitutional obligation, *Brady*

3    material must be disclosed early and regardless of whether the defendant makes a request for it.  *See*

4    *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *U.S. v. Bagley*, 475 U.S. 667, 676 (1985).  Under *Giglio*

5    and its progeny, the government is required to produce material that impeaches a witness.  405 U.S.  at

6    154.  As with *Brady* material, *Giglio* material must be disclosed regardless of whether the defendant

7    makes a request for it.  *Kyles*, 514 U.S. at 432-33.  The duty under *Giglio* includes a duty to check agent

8    personnel files for impeachment information. *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991).

9    Evidence of an alleged victim's criminal record must also be disclosed.  *United States v. Agurs*, 427 U.S.

10   97 (1976).  A prosecutor's pre-trial obligations to disclose favorable or impeaching evidence may arise

11   more broadly under a prosecutor's ethical or statutory obligations.  *Cone v. Bell*, 556 U.S. 449 (2009).

12       The rules of ethics require the prosecutor in a criminal case to "[m]ake timely disclosure to the

13   defense of all evidence or information known to the prosecutor that the prosecutor knows or reasonably

14   should know tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence, except

15   when the prosecutor is relieved of this responsibility by a protective order of the tribunal."  Cal. R. Prof.

16   Conduct 5-110(G).

17       **B.       New *Brady* Material Disclosed After the February 25, 2020 Hearing, *Brady* Material that was Misrepresented by the Government, and Potential *Brady* Information That Remains Outstanding**

18

19             **1.       *Failure to Disclose Agents' Pre-Warrant Knowledge of a Strip Mall with Restaurants and a Convenience Store Within a Mile of Dr. Sheikh's Ranch***

20

21       As discussed at the February 25, 2020 hearing, exculpatory/impeachment information relevant to

22   the *Franks* issue in this case falls within the ambit of *Brady/Giglio*.  As such, the agents' knowledge of

23   exculpatory facts prior to the warrant being executed was highly relevant.

24       One salient allegation in the government's warrant narrative (Ex. W) was that Prakash (Witness

25   2) and Alfredo (Witness 3) were being starved by Dr. Sheikh and did not have sufficient access to food.

26   The agents' pre-warrant knowledge of three key facts taken together would completely undercut this

27   allegation in a *Franks* analysis: (1) The ranch was very easy to leave, and Dr. Sheikh was almost never

28   there; (2) Dr. Sheikh paid the men $300-$400 per month and the men were free to walk off (as they

4

eventually ended up doing) and earn money elsewhere; and (3) there was a strip mall with restaurants and a convenience store within approximately a mile of the ranch.

It is the agents' pre-warrant knowledge of this third fact, the nearby strip mall, that prosecutors failed to disclose despite having the information and despite understanding that the fact was important to one of Dr. Sheikh's *Franks* arguments.  Indeed, the Defense raised the precise issue in its *Franks* motion (DE 84) suspecting it to be true, <u>but there was nothing in the discovery with which to cross-examine or impeach the agent on this fact</u>.  The operational plans within the government's possession (or at least this particular information contained within them about the agents' pre-warrant knowledge of the strip mall) would provide the cross-examination material for the *Franks* hearing owed to the Defense under *Brady*.

Under *Kyles*, this *Brady* material should have been disclosed at the outset; if not, it should have been disclosed when the Court ordered *all Brady* material to be produced by August 30, 2019 (over one year after the case was filed) and the government confirmed that all *Brady* material had been produced by that date; if not, it should have been produced prior to Agent Webster testifying in September and then again in December 2019; if not, it should have been produced when the Defense filed its *Franks* motion on January 13, 2020, spelling out the relevance of the information; if not, it should have been disclosed prior to the *Franks* hearing on February 25, 2020, which the government tried to have the Court cancel attempting to escape production all together.  (*See* DE 85 at 20 ("The government, therefore respectfully requests that this Court convert the February 25, 2020, *Franks* hearing to a status conference to schedule a trial date.")).  Had the hearing been cancelled per the government's request, the government may have escaped producing even the *Brady* material it did end up producing at the last minute essentially on the eve of the *Franks* hearing after all briefing had been completed.  The government's lack of disclosure went far beyond negligence and rose to the level of at least recklessness.

Moreover, had there not been a *different Brady* violation identified at the February 25 hearing, the hearing would have gone forward and the Defense would have been deprived of the opportunity to cross examine and impeach the agent with the benefit of the strip mall information (to counter the points of hunger and isolation); the discovery was needed for effective impeachment because there is no telling whether the agent would have been honest about it.  The Court would also have been deprived in its

*Defendant's Reply in Support of Renewed Motion for Discovery*          *Case No. 2:18-CR-119-WBS-1*

1   administration of justice.

2       The February 25 hearing allowed the Defense to identify the government's recklessness with

3   respect to *Brady* and then issue spot for the government, making granular requests to obtain *Brady*

4   information, which the Defense should never have to do.  And it was only then, *after* the February 25,

5   2020 hearing, *after* the Defense made a specific request to obtain operational plans to assess precisely

6   this information—the agents' pre-warrant knowledge of the strip mall approximately a mile away (*see*

7   DE 87 at 6-7)—that the government finally half-way revealed the information in its Opposition (DE 90

8   at 4-5) filed on March 2, 2020.

9           **2.     *Failure to Disclose That a Court in This District Has Found That Special***
            ***Agent Carol Webster May Have Committed Perjury and Been Involved in***
10          ***Brady and Naupe Violations; the Court Has Ordered Investigation and***
            ***Discovery in That Case***

11

12      Securing a court's permission to move forward with discovery and investigation on a motion

13  brought under 28 U.S.C. § 2255 is no easy task.  It requires specific, credible allegations with supporting

14  facts sufficient to show significant constitutional violations resulting in prejudice.  (*See* Ex. BBB at 5-6).

15      Special Agent Carol Webster ("Webster") is one of the lead agents in this case.  She has authored

16  numerous reports, and many of the charges filed against Dr. Sheikh, including the false statements

17  charges, result directly from Webster's work on the case.  Webster was also the agent who testified before

18  this Court in September and December 2019, where she gave a starkly different account from the Defense

19  witnesses whose accounts were all consistent with one another.  Webster's credibility was directly on the

20  line and the Defense identified several areas where her credibility was impeached by conflicting evidence.

21      On March 6, 2020, however, the Defense learned for the very first time that on December 17,

22  2017, a court in this District had granted an evidentiary hearing on a Section 2255 motion and ordered

23  investigation and discovery on the basis of what appear to be factually supported allegations that Webster

24  may have committed perjury and overlooked the immigration fraud of one of her alleged victims, and the

25  government may have elicited false testimony and failed to disclose *Brady* material in that matter.  *United*

26  *States v. Sekhon*, et al. Case No. 2:06-CR-0058-JAM-EFB P; (*See* Ex. BBB at 1, 6-7; Declaration of

27  Yasin M. Almadani ("Almadani Decl.") at ¶ 2).  The allegations, which appear to be supported by a

28  number of declarations before the court, show that Webster may have given false testimony at trial in

*Defendant's Reply in Support of Renewed Motion for Discovery*          *Case No. 2:18-CR-119-WBS-1*

1    combination with her alleged victim for whom she helped secure immigration benefits and may also have

2    purposely overlooked significant immigration fraud on the part of that alleged victim. (*See id*. at 6-7).

3        That a court has found that these very serious allegations are sufficiently supported to merit

4    discovery in a Section 2255 context certainly bears upon this case; it is *Brady/Giglio* material that should

5    have been disclosed to the Defense, and should also have been brought to this Court's attention before

6    Webster took the stand in September and December 2019. The Defense does not know whether the Court

7    was apprised, but the Defense certainly was not.

8        So much of the government's case rides on Webster's credibility, and the key defense here (which

9    is already supported by significant tangible evidence) is that the HSI agents (including Webster), Opening

10   Doors, and the alleged victims all worked together to fabricate unsupported charges against Dr. Sheikh

11   each for their own respective benefit. (*See* Declaration of Former Supervisory HSI Special Agent David

12   Wright ("Wright Decl.")). As such, the Defense submits that it is a significant *Brady* violation for the

13   government to have not disclosed this important information; it should have been brought to the Court's

14   attention and appropriately addressed.

15        **3.    *Providing Misleading Information About the T-Visa Benefits in Violation of Brady***

16

17        In response to the Court's order to provide all *Brady* material by August 30, 2019, the government

18   sent a letter on August 29, 2019, that contains misleading information in violation of *Brady*. In that letter,

19   the prosecutor stated that three of the government's witnesses had received "T-Visas" in this case. (Ex.

20   CCC). The prosecutor went on to explain, "A T-Visa is a temporary immigration benefit that enables

21   certain victims of a severe form of human trafficking to remain in the United States *for up to 4 years if*

22   *they have assisted law enforcement in an investigation or prosecution of human trafficking*. T-Visa

23   nonimmigrant status is also available for certain qualifying family members of trafficking victims." (Ex.

24   CCC at 3). That was the full extent of the prosecutor's explanation of the benefit, which turned out to be

25   misleading.

26        Defense counsel took the prosecutor at his word and understood the T-Visa benefit to only allow

27   a temporary stay in the United States. As a result, the Defense assigned an impeachment value to this

28   seemingly temporary benefit that was inaccurate.

---

7

On or about March 5, 2020, Defense Counsel coincidentally learned that the T-Visa can actually be converted to a permanent residency (green card) as long as the victim continues to assist law enforcement in the case and the prosecution of the alleged trafficker is completed. (Almadani Decl. at ¶ 3). This is a highly significant part of the benefit that would motivate the victims in this case to lie on the stand. By affirmatively providing a misleading and incomplete description of the T-Visa benefit (omitting the most significant benefit and motivation to lie), the government lulled the defense into a false impression; had the Defense continued to reasonably rely on the government's misleading description, Dr. Sheikh would have lost a significant impeachment opportunity and defense counsel would have been set up for an ineffective assistance of counsel claim.

When the government attorney takes it upon himself to explain a benefit, especially the complex immigration context, that description should be fully accurate, and the Defense should be able to fully rely on it. For the government to have misled the Defense in this way is beyond reckless.

### 4. *Failure to Disclose the Impeachable Close Relationship Between HSI and Opening Doors*

On March 9, 2020, the Defense independently learned for the first time that HSI and Opening Doors may have a long-standing relationship whereby Opening Doors helps HSI increase its prosecution statistics by finding and referring alleged victims, and HSI in turn gives millions of dollars a year to Opening Doors. (Almadani Decl. ¶ 4). The information remains unverified and the Defense remains unaware of the details of this relationship. If true, this relationship naturally creates an illicit incentive to overlook exaggerated stories of alleged victims for HSI to increase its prosecution statistics and for Opening Doors to collect millions in grant money, while each uses the other to give the appearance of legitimacy.

The impeachment potential is particularly significant in this case because an examination of the evidence here shows that HSI and Opening Doors together pushed through T-Visa applications of Prakash, Alfredo, and at least one other witness by rubber stamping obviously exaggerated stories of these individuals that significantly lacked credibility when compared with the full breadth of evidence known to the government. (*See* Wright Decl.). The evidence shows that the agents here ignored significant exculpatory information to obtain a warrant by presenting a misleading picture to the

8

1   magistrate, and the government likely misled the grand jury in similar fashion to obtain an indictment.

2   (*See id*.).  In this context, the details of the close relationship between HSI and Opening Doors and the

3   way that the statistics-money exchange works are fruitful grounds for impeachment at trial and is even

4   relevant to the *Franks* issue.  This is *Brady* material within the government's possession that still has not

5   been produced.

6   **5.      Affirmative Misrepresentation and Failure to Disclose Discussions Between**
         **Victim Prakash and the Agents with Respect to Immigration Benefits for**
7         **Assisting with Dr. Sheikh's Prosecution**

8        In the August 29, 2019 letter, the prosecutor also represented that the agents did not have any

9   discussions with any of the government witnesses until those witnesses were provided immigration

10  benefits starting in 2014.  (See Ex. CCC at 2).  The Defense has reason to believe that the government is

11  concealing its discussions concerning immigration benefits that were discussed with the alleged victims

12  in this case when those alleged victims were first identified, prior to the search warrant being authored,

13  which bears upon the credibility of their statements for purposes of the *Franks* hearing as well as for trial.

14       Two facts inform this issue.  First, as discussed above, Opening Doors has a close feeder

15  relationship with HSI, and a primary function of Opening Doors is to secure immigration benefits for

16  alleged victims of human trafficking with HSI's active support in exchange for the alleged victims

17  assisting HSI with prosecution of their alleged oppressors.  At the hearing on December 17, 2019,

18  Webster testified that on July 1, 2013, HSI referred Prakash to Opening Doors (R/T 2/17/2019 at 128); it

19  is important to note that Prakash had told agents that same day that he was afraid of being deported and

20  had made four investigative monitored phone calls to Dr. Sheikh at the agents' request.  It is inconceivable

21  that under these circumstances, the agents had no discussions with Prakash about immigration benefits,

22  as the government represents.  The Defense submits that in similar fashion to the *Sekhon* case discussed

23  above (where agents Webster is currently being investigated for perjury), Webster and the government

24  are not being truthful with respect to *Brady/Giglio* information about immigration benefits discussed with

25  the alleged victims when the victims were first apprehended.

26  **6.      Potential Failure to Disclose Payment or Waiver of Filing Fees**

27       The Defense has reason to believe that the government either waived, paid directly, or paid

28

---
9

*Defendant's Reply in Support of Renewed Motion for Discovery*          *Case No. 2:18-CR-119-WBS-1*

indirectly through grant money provided to Opening Doors significant immigration application filing fees (believed to be over $1,000 each) for its alleged "victims" and witnesses that applied for T-Visas. The Defense has not seen this information in the discovery and believes this *Brady/Giglio* material has not been disclosed.

### C. *Brady* Information Disclosed on the Eve of the February 25, 2020 Hearing After the Government First Attempted to Have That Hearing Cancelled

Because the government's continued *Brady* violations in this case have undermined the discovery process beyond reason and made this motion to dismiss necessary, the Defense presents a brief discussion of the government's earlier *Brady* violations for purposes of completeness.

The search warrant in this case was obtained on July 8, 2013 at 3:00 p.m. and was executed the next morning at 7:25 a.m. This subsection discusses a number of items under *Brady/Giglio* that were disclosed for the very first time on February 19, 2020, essentially on the eve of the *Franks* hearing, after the government had repeatedly represented and confirmed that all *Brady* material had been produced and tried to have the hearing cancelled. It should be noted that the following items are important for both trial and the *Franks* issue, and as such, the fact that agents knew this information *prior* to executing the search warrant is material because the exculpatory facts were not disclosed to the magistrate. Contrary to the government's claim, the Defense submits that there was more than just one *Brady* item not disclosed until February 19, 2020; there were several. Not disclosed in prior discovery is agents' knowledge of the following exculpatory facts that were kept from the magistrate:

1.      On July 2, 2013, Alfredo informed agents that he told Sheikh that he was going to leave a week prior to actually leaving and she said it was fine. (Ex. DDD at 11528). This negates Alfredo's claim of forced labor and the government admits that it was a *Brady* violation to not disclose it.

2.      On July 2, 2013, Alfredo informed agents that he had a brother in Texas who was a legal permanent resident. (Ex. DDD at 11535). The fact that Alfredo actually had family in the United States, in combination with the many other exculpatory facts missing in the warrant affidavit (*see* Wright Decl.), further negates the claim that Alfredo had nowhere to go and no one to turn to, and thus negates the claim of forced labor, thereby falling under *Brady/Giglio*. Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* information.

*Defendant's Reply in Support of Renewed Motion for Discovery*          *Case No. 2:18-CR-119-WBS-1*

3.      On July 2, 2013, Alfredo informed agents that Dr. Sheikh never raised her hands on anyone. (Ex. DDD at 11535). In a forced labor case, in combination with the many other exculpatory facts missing in the warrant affidavit (*see* Wright Decl.), the fact that the alleged victim admitted that Dr. Sheikh never raised a hand on anyone further negates the claim of forced labor, and thus falls under *Brady/Giglio*. Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* information.

4.      On June 26, 2013, Gildardo informed agents that Dr. Sheikh was a 50+ year-old woman who lived alone, while Prakash and Alfredo (the alleged victims) were 40-year-old men. (Ex. EEE at 11538). In a forced labor case, in combination with the many other exculpatory facts missing in the warrant affidavit (*see* Wright Decl.), the fact that the alleged victims were men at least 10 years younger than the 50+ year-old woman (Sheikh) who was their alleged oppressor living alone further negates the claim of forced labor, and thus falls under *Brady/Giglio*. Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* information.

5.      On June 26, 2013, Gildardo informed agents that Dr. Sheikh was not present at the ranch six days out of the week from 9 a.m. to 3 a.m. (Ex. EEE at 11545). In a forced labor case, in combination with the many other exculpatory facts missing in the warrant affidavit (*see* Wright Decl.), the fact that Dr. Sheikh was at the property only six hours a night further negates the claim of forced labor, and thus falls under *Brady/Giglio*. Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* information.   [The government had previously disclosed that the witnesses had stated that Sheikh was gone from the property six days a week from 9 a.m. to after midnight, but the Defense would submit that the fact that the government knew that she was gone an entire third of the night (until 3 a.m.) is significant and has a greater impact on the fact finder in terms of a forced labor charge.]

6.      On June 26, 2013, Gildardo informed agents that Alfredo and Prakash would work from 7:30 a.m. to 3:30 p.m. (Ex. EEE at 11540). In a forced labor case, in combination with the many other exculpatory facts missing in the warrant affidavit (*see* Wright Decl.), the fact that the government's own reporting witness stated that Alfredo and Prakash worked reasonable hours and that this information directly contradicted Alfredo and Prakash's claims of working 12 and 14 hours to casts themselves as

11

victims of "extreme" trafficking, which is the type of hardship required to obtain a T-Visa, further negates the claim of forced labor, and thus falls under *Brady/Giglio*. Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* information.

7.   On July 1, 2013, Prakash informed agents that prior to his work with Sheikh, he was homeless for two months after which he took up employment with a man named James Brewer; Brewer gave Prakash a place in a camper and $200 per month, and Prakash voluntarily worked there until Brewer had no work remaining, and Prakash was then referred to Dr. Sheikh. (Ex. FFF at 11548). In a forced labor case, in combination with the many other exculpatory facts missing in the warrant affidavit (*see* Wright Decl.), the fact that Prakash was working voluntarily on worse terms with Brewer than at Dr. Sheikh's ranch (because he would otherwise be homeless), further negates the claim of forced labor, and thus falls under *Brady/Giglio*. It should be noted that Dr. Sheikh had no obligation to house or employ any of these men regardless of whether they were homeless, and it is clear from the evidence that they were free to leave any time. Agents' knowledge in this regard prior to the warrant affidavit being authored is likewise *Brady* information.

8.   On July 1, 2013, Prakash informed agents that he had a friend living nearby in Fruitridge. (Ex. FFF at 11549). In a forced labor case, in combination with the many other exculpatory facts missing in the warrant affidavit (*see* Wright Decl.), had a friend nearby, in combination with the many other exculpatory facts missing in the warrant affidavit (*see* Wright Decl.) further negates the claim that Prakash had nowhere to go and no one to turn to, and thus negates the claim of forced labor, thereby falling under *Brady/Giglio*. It should be noted that Dr. Sheikh had no obligation to house or employ any of these men regardless of whether they were homeless, and it is clear from the evidence that they were free to leave any time. Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* information.

Even if the Court finds any one of these facts by themselves to not be sufficiently significant, their combination certainly is quite significant under *Brady*. Yet neither these facts nor the agents' pre-warrant knowledge of them was disclosed prior to February 19, 2020.

*Defendant's Reply in Support of Renewed Motion for Discovery*        *Case No. 2:18-CR-119-WBS-1*

### D.   *Brady* Information Disclosed Over One Year into the Litigation and Only After the Defense Requested a Court Order

The government's letter of August 29, 2019 (produced over a year into the litigation) contained affirmative misrepresentations (as identified above), was woefully incomplete, and was itself late under the *Brady* requirement of expeditious disclosure.  (Ex. CCC)

### E.   Other Outstanding Issues of Concern

#### 1.   *Prakash's Debriefs*

On March 6, 2020, the Defense asked the government whether there exist any notes of the agents' conversations with alleged victim Prakash who had made four separate monitored calls to Dr. Sheikh on July 1, 2013, at the agents' request.[3]  During these calls, which contained a mixture of Urdu and English, it became clear that, in stark contrast to Prakash's fabricated claim of "forced labor," Dr. Sheikh did not make a single threat of harm or legal process against Prakash to force him to come back to her; the calls completely cut against Prakash's made up story of such threats.  Nevertheless, this material exculpatory information was omitted from the warrant affidavit.  The calls suggest, and it makes sense that the agents debriefed Prakash after every call and there is some indication that the agents may have been coaching Prakash to try to goad Dr. Sheikh into making threats.[4]  The Defense is entitled to know what the agents learned during these debrief sessions and how they coached Prakash between the calls, because it bears upon the agents' knowledge of material exculpatory information that was kept from the magistrate.  That is, the magistrate was entitled to know that Dr. Sheikh did not make any threats of harm or legal process even after four consecutive coached calls by the government's star "victim".  For purposes of cross examination and impeachment, it is important for the Defense to know what was discussed in the debriefs between the calls and what type of coaching occurred.  If notes of these debrief sessions exist, the Defense is entitled to those notes.  If notes were made, but are now lost or destroyed, the Defense is entitled to know that, as well.  *See California v. Trombetta*, 467 U.S. 479, 488, 104 S. Ct. 2528, 2534 (1984) (government has a duty to preserve evidence that "might be expected to play a significant role in the

---

[3] The government has responded that they will be unable to provide a response by the date of this filing.

[4] There is no dispute that Prakash speaks English relatively well and would have been able to be debriefed on his conversations with Sheikh.

13

*Defendant's Reply in Support of Renewed Motion for Discovery*        *Case No. 2:18-CR-119-WBS-1*

suspect's defense").  Indeed, the fact of spoliation of potentially exculpatory information is itself relevant to impeachment and exculpation under *Brady*.

Finally, *Brady* information within the knowledge of the government need *not* be memorialized to be discoverable.  *See, e.g., United States v. Toilolo*, No. 11-00506 LEK, 2014 U.S. Dist. LEXIS 34571, at *19 (D. Haw. Mar. 17, 2014) ("While the initial statement was not memorialized in a written statement, report, or notes, it was known to law enforcement, and the Government's counsel should have disclosed this information by letter as *Brady/Giglio* material. Failure to notify defense counsel therefore constitutes a *Brady/Giglio* violation.").  Even if notes were never made, it was the prosecutors' duty (especially when the *Franks* issue came to the fore on December 18, 2019, and the Court found there to be significant issues sufficient to merit a *Franks* hearing (R/T 12/18/19 at 372)), to inquire about and disclose what the agents learned during the debriefs after each of Prakash's calls and why the agents felt it necessary to have Prakash make four separate calls one after another.  The Defense submits that if the agents were to tell the truth, both the agents and the alleged "victim" would admit that they were frustrated that Dr. Sheikh was not making any of the threats one would expect in a human trafficking or forced labor case.  This information—the agents' pre-warrant knowledge that even after repeated attempts, Dr. Sheikh did not make any threats that would be expected in a "forced labor" case—is significant to the *Franks* issue and thus also falls within the ambit of *Brady* as material evidence favorable to the Defense.

This is but one example of potential exculpatory/impeachment material within the government's knowledge (whether memorialized or not) that still has not been produced.  The Defense does not have a crystal ball and it is unfair for the government to require the Defense to issue spot *Brady* for the government.  Indeed, even the Court pointed this out at the February 25 hearing: "I don't think it's my job.  I think it's the United States Attorney's job.  *Brady* says so much, and I insist that the United States Attorney do his or her job."  (Ex. A: R/T 2/25/20 at 25).  The Court's understanding is consistent with that of the Ninth Circuit:

> The prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a

1         failure to disclose is in good faith or bad faith, *see Brady*, 373 U.S. at 87),
the prosecution's responsibility for failing to disclose known, favorable
2         evidence rising to a material level of importance is inescapable." *Kyles*, 514
U.S. 419, 432-33 (emphasis added). Such an obligation flows naturally and
3         directly from Justice Sutherland's admonition in *Berger v. United States*,
295 U.S. 78, 88 (1935), that a prosecutor's interest is 'not that it shall win a
4         case, but that justice shall be done.

5   *United States v. Hanna*, 55 F.3d 1456, 1461 (9th Cir. 1995).

6       Unfortunately, the current prosecutors have repeatedly demonstrated that they cannot be relied

7  upon to conduct a *timely* and faithful *Brady* review.  As a result, the Court, Defense Counsel, and Dr.

8  Sheikh have been significantly prejudiced; the just result is dismissal, not more production.

9              **2.**     **Grand Jury**

10      The Defense further submits that when the Court found that a *Franks* hearing was warranted based

11  on significant issues of material misrepresentations and omissions negating probable cause, it triggered

12  the prosecutors' duty to review grand jury testimony to confirm whether it also suffers from similar

13  defects.  If it does, then the prosecutors, acting in good faith *in pursuit of justice* as required by the

14  Supreme Court and the rules of ethics of this State's Bar, had a duty to disclose the grand jury testimony

15  to the Defense so that a motion to dismiss could be brought before the Court.  The troubled history of this

16  case makes it crucial that there be an unbiased review of grand jury testimony in this case. The issue is

17  briefed more fully in Part III of this Reply.

18              **3.**     **Illicit Motivations**

19      The Wright Declaration demonstrates that this was a significantly ill-charged case.  As noted in

20  the Wright Declaration (¶ 8), illicit investigating and charging motivations should be explored in this

21  case.  These motivations may be contained in text messages, emails, notes, and/or conversations between

22  and among the agents and prosecutors.  Evidence of illicit motivations for career advancement may also

23  be found in personnel files.  There is no indication that this material was ever searched; it was certainly

24  not produced.

25  **III.**    **PART II:  REQUEST FOR DISMISSAL**

26      **A.**    **Background**

27      When it comes to human trafficking, forced labor, and indentured servitude, Dr. Sheikh is not the

28

*Defendant's Reply in Support of Renewed Motion for Discovery*     *Case No. 2:18-CR-119-WBS-1*

1    usual suspect.  She is a highly decorated physician.  (Ex. GGG).  She is well-respected by colleagues and

2    community leaders.  (Ex. HHH).  And she is beloved by her patients.  (Ex. III).  In a small-knit community

3    like Sacramento and Elk Grove, prosecution of a person like Dr. Sheikh, especially for "human

4    trafficking"—similar to the prosecution of a prominent lawyer, prosecutor, judge, politician, or other

5    well-respected community member on such a charge—was sure to grab headlines.  And it certainly did,

6    spurred on by the government's own ominous-sounding press release against Dr. Sheikh.  (Ex. JJJ).

7         The government got its headlines and statistic.  The alleged "victims," whose inconsistent stories

8    did not add up got significant immigration benefits.  And Dr. Sheikh got her life turned up-side-down.

9         But in getting there, the government trampled all over Dr. Sheikh's constitutional rights, including

10    rights under *Brady*, *Franks*, and the Six Amendment.

11        It is also noteworthy that the U.S. Attorney's Office for the Eastern District of California has not

12    joined in this prosecution.[5]   Indeed, the significant exculpatory information and weaknesses in this case

13    vis-à-vis the guidance for prosecutors provided by the Department of Justice make clear that this case

14    should have not been charged.  The United States Attorney's Manual ("USAM") states, in relevant part,

15    "both as a matter of fundamental fairness and in the interest of the efficient administration of justice, no

16    prosecution should be initiated against any person unless the attorney for the government believes that

17    the admissible evidence is sufficient to obtain and sustain a guilty verdict by an unbiased trier of fact."

18    USAM at 9-27.220.  The Defense submits that when the government's cherry-picked, misleading story

19    to the magistrate (and likely to the grand jury) is supplemented (and completed) with the numerous

20    exculpatory facts known to the government, even probable cause is eviscerated let alone guilt beyond a

21    reasonable doubt as required by the USAM.

22        But to be clear, the Defense does not ask for the Court to invade upon prosecutorial discretion,

23    but only to dismiss the indictment under the Court's supervisory powers in order to remedy the violation

24

25        [5] The current prosecutors claim that this is a recusal case.  But the "recusal" issue that the
     current prosecutors keep relying on could have been addressed by walling off the particular prosecutor

26    whose mother knew Dr. Sheikh; moreover, the Defense is informed and believes that the AUSA on
     whom the "recusal" is based left the U.S. Attorney's Office long ago, yet the Office still has not joined

27    this case.  Based on the available evidence and *Brady* material continuing to trickle in from the
     government, the Defense would submit that a careful prosecutor in the Eastern District of California

28    would not have charged this incredibly weak case.  *See* USAM at 9-27.220.

*Defendant's Reply in Support of Renewed Motion for Discovery*        *Case No. 2:18-CR-119-WBS-1*

of Dr. Sheikh's recognized statutory or constitutional rights, to preserve judicial integrity, and to deter future unlawful conduct. *See infra, Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008).

Moreover, at least one former supervisory agent with the Department of Homeland Security Investigations ("HSI"), David Wright, looking at this case with fresh eyes has opined that under the HSI's investigatory standards in 2013, this case should have been closed based on what the agents saw and learned at the "welfare check" and interviews they had conducted by July 2, 2013. (*See* Wright Decl.)

## B.      Dismissal Based on the Prosecutors' Disregard for Dr. Sheikh's Constitutional *Brady* Rights

***Request for Dismissal***.   Under the standards set by the Ninth Circuit in *Chapman*, Dr. Sheikh respectfully requests that this Court dismiss the indictment in exercise of the Court's inherent supervisory powers to remedy the flagrant misbehavior by the government in recklessly disregarding Dr. Sheikh's constitutional *Brady* rights; a dismissal would to preserve judicial integrity of these proceedings and deter any such future conduct. *See Chapman*, 524 F.3d at 1085. <u>Recklessness</u> on the part of the government suffices for dismissal. *Id.*

***Legal Standard***.   Federal courts possess an inherent power to supervise the administration of justice in order to establish and maintain civilized standards of procedure and justice. *McNabb v. United States*, 318 U.S. 332, 340 (1943); *see United States v. Payner*, 447 U.S. 727, 734-35 & n.7 (1980); *Bartone v. United States*, 375 U.S. 52, 54 (1963) (per curiam); *Burton v. United States*, 483 F.2d 1182, 1187 (9th Cir.), *aff'd on rehearing*,483 F.2d 1182 (9th Cir. 1973).

In *Chapman*, the Ninth Circuit reiterated that a district court may exercise its supervisory power "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *Chapman*, 524 F.3d at 1085 (quoting *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991). "However, because dismissing an indictment with prejudice encroaches on the prosecutor's charging authority, this sanction may be permitted only in cases of flagrant prosecutorial misconduct." *Chapman*, 524 F.3d at 1085 (9th Cir. 2008) (internal citations and quotation marks omitted).

For a district court to find "flagrant misbehavior" on the part of the government, <u>the court need</u>

17

1   not find intentional misconduct; rather, a finding of "*reckless disregard for the prosecution's*

2   *constitutional obligations*" is sufficient for dismissal. *Chapman*, 524 F.3d at 1085 ("We have never

3   suggested, however, that 'flagrant misbehavior' does not embrace reckless disregard for the prosecution's

4   constitutional obligations.") (emphasis added).

5          At the previous hearing (February 25, 2020), the Court had relied upon the government's

6   representation that *all Brady* material had been produced and warned of the severest of sanctions if there

7   were not true.  (Ex. AAA: R/T 2/25/20 at 27).

8          As it turned out, the government had not disclosed all *Brady* material even as of February 25, and

9   there may be additional *Brady* material that still has not been produced.  And while the Defense fully

10  recognizes that the Court is never bound by any guarantee and that it is always up to the Court's discretion

11  how deal with matters before it, Dr. Sheikh respectfully requests that this Court exercise its inherent

12  supervisory power to dismiss this action.

13         **C.      Dismissal Based on Government Failures Resulting in Speedy Trial Right Violation**

14         ***Request for Dismissal***.  Under the standards set by the Ninth Circuit in *Mendoza*, Dr. Sheikh

15  respectfully requests that this Court dismiss the indictment in exercise of the Court's inherent supervisory

16  powers to remedy the constitutional violation of Dr. Sheikh's speedy trial rights that was compounded

17  by the repeated reckless violations of Dr. Sheikh's constitutional *Brady* rights.  *See Mendoza*, 530 F.3d

18  at 762-64.  Negligence on the part of the government suffices for dismissal.  *Mendoza*, 530 F.3d at 762.

19         ***Legal Standard***.  In *Mendoza*, the Ninth Circuit underscored, "The Sixth Amendment guarantees

20  that criminal defendants 'shall enjoy the right to a speedy and public trial . . . .'" *Mendoza*, 530 F.3d at

21  762 (citing U.S. Const. amend. VI).  To determine whether a defendant's Sixth Amendment speedy trial

22  right has been violated, courts balance the following four factors: (i) length of delay, (ii) the reason for

23  the delay, (iii) the defendant's assertion of her right, and (iv) prejudice to the defendant. *Id.* (citing *Barker

24  v. Wingo*, 407 U.S. 514, 530 (1972)).

25         "None of these four factors are either necessary or sufficient, individually, to support a finding

26  that a defendant's speedy trial right has been violated.  Rather the factors are related and must be

27  considered together with such other circumstances as may be relevant.  Further, the balancing of these

28

                                                    18

factors, and other relevant circumstances, must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." *Mendoza*, 530 F.3d at 762 (internal citations and quotation marks omitted).

**Length of Delay**. "For speedy trial claims, the length of the delay is measured from the time of the indictment to the time of trial. If the length of delay is long enough to be considered presumptively prejudicial, an inquiry into the other three factors is triggered. <u>Generally, a delay of more than one year is presumptively prejudicial</u>." *Mendoza*, 530 F.3d at 762 (internal citations and quotation marks omitted) (emphasis added).

The delay here, which is significantly over one year (approximately one year and eight months to date), creates a presumption of prejudice. The investigation in this case began in June 2013. It appears that nearly all facts upon which the indictment is based and all key government witnesses were known to the government by July 2, 2013, if not just a couple of months after that. (*See generally* DE 1). Nevertheless, the case was charged approximately five years later on June 21, 2018. Since then, another <u>one year and eight months</u> have passed as the government continues to trickle out *Brady* material in piecemeal fashion, unreasonably requiring the Defense to issue spot exculpatory material for the government, and burdening the Court to make order after order for timely *Brady* production.

**Reason for Delay**. The Ninth Circuit has held that prejudice may be presumed when the delay results from *negligence* on the part of the government. *Mendoza*, 530 F.3d at 762 (prejudice was presumed upon a finding that government acted with negligence in locating the defendant) (emphasis added).

In this case, negligence is a foregone conclusion because the government's misconduct here (discussed above) is at least reckless. Furthermore, the violations here—repeated failures to disclose *Brady* material despite repeated Court orders—is far worse a reason for delay than is negligence in locating a defendant, which was the error found to be sufficiently prejudicial in *Mendoza*. *See id*. This factor establishes severe prejudice and heavily favors dismissal.

**Defendant's Assertion of Speedy Trial Right**. This factor is somewhat odd to consider in the context of this case. Dr. Sheikh's constitutionally guaranteed speedy trial right attached at indictment,

and whenever she waived time, it was under the good-faith belief that the government understood its *Brady* obligations and had expeditiously produced *Brady* material.  It turns out, however, that the government had been holding on to *Brady* material and still may be holding on to *Brady* material.  In this context, the waivers are a bit meaningless.

   ***Prejudice***.  As discussed above, prejudice may be presumed when the delay results from *negligence* on the part of the government.  *Mendoza*, 530 F.3d at 762.  Because the government's *Brady* violations here went far beyond negligence, prejudice is presumed and no further discussion is needed.

   Nevertheless, for purposes of completeness, it should be noted that the Supreme Court has recognized three additional "forms of prejudice that can result from post indictment delay: (1) oppressive pretrial incarceration, (2) anxiety and concern of the accused, and (3) the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence."  *Mendoza*, 530 F.3d at 764.  While the first of the three factors is inapposite, the latter two are salient here.  It goes without saying that a person of Dr. Sheikh accomplishments, stature, and position within the community has suffered and continues to suffer incredible anxiety and embarrassment as the government persists in its irresponsible indictment.  In addition, the possibility of memories being dimmed and loss of exculpatory evidence (especially in light of the government's already known reckless actions) is ever looming.

   Finally, at the February 25, 2020 hearing, as to prejudice, the Court also underscored:

> There's some prejudice already.  The prejudice has been not only to defense counsel, but to the Court.  I come out here this morning ready to hear arguments ready to hear testimony, if necessary, and ready to decide at the end of those arguments and testimony the *Franks* motion.  Now, we have to put it over, and I have to go through that again.  Mr. Almadani has to put additional time, which, I assume, he bills to his client on this case now, because he wasn't able to go over these materials earlier in connection with the motion.  There's already some prejudice.

(Ex A. R/T 2/25/2020 at 21).

   For the foregoing reasons, the indictment should additionally be dismissed on Speedy Trial grounds under *Mendoza*.

## IV.   PART III: STIPULATED AND OUTSTANDING DISCOVERY ISSUES

   The law cited by the government in its Opposition (DE 90) is presumably intended to show that the government is being overly generous with its production when it is actually *not*, given the discovery

*Defendant's Reply in Support of Renewed Motion for Discovery*          *Case No. 2:18-CR-119-WBS-1*

misconduct to date.  Discovery is a fact-intensive process and whether something is discoverable must be decided on a case-by-case basis.  For instance, the government cites cherry-picked caselaw that agents' notes are not automatically subject to production.  (DE 90 at 3-4).  But what the government glosses over is that if the notes contain *Brady* material (as they did here), they must be produced expeditiously without the need for a court order.  *See Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *U.S. v. Bagley*, 475 U.S. 667, 676 (1985).

### A.  Agent Notes

The Defense requested "all notes generated by agents in this case, including all interview notes of all witnesses."  (DE 87 at 6).  The government has agreed to produce "agents notes in its possession from ROIs the agents authored in this case."  (DE 90 at 3).  The Defense remains concerned that there may be agent notes that did not result in an ROI that may contain information favorable to the defense under *Brady*, material to the preparation of the defense under Rule 16, and/or that "tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence" under Rule 5-110 of the Cal. R. Prof. Conduct.  Moreover, given the tenner of this case, if any notes were lost or destroyed without the creation of a report, the Defense is entitled to that information, too.

### B.  Operational Plans

The Defense's discovery request concerning operational plans was intended to determine whether agents knew at the time of obtaining the search warrant and/or prior to executing it that a strip mall with payphones, eateries, and a gas station was within a very short walking distance of the ranch.  (DE 87 at 6).  Instead of providing the operational plans, the government has stipulated that "agents were prior to executing the search warrant that a strip mall with commercial businesses was approximately one mile from the defendant's property."  (DE 90 at 4-5).  The *Brady* violation concerning this new disclosure is discussed above.

### C.  Grand Jury Testimony

The breadth of relevant information missing from the warrant affidavit makes one thing clear: if the grand jury was presented a similarly misleading picture as the magistrate who authorized the warrant, the Defense is entitled to disclosure of grand jury testimony to challenge probable cause.

---

21

1    Under Federal Rules of Criminal Procedure 6(e)(3)(E)(i) and 6(e)(3)(E)(ii), a court may authorize

2    disclosure of a grand-jury matter "preliminarily to or in connection with a judicial proceeding" or "at the

3    request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter

4    that occurred before the grand jury." Fed. R. Crim. Pro. 6(e)(3)(E)(i) and (ii).   A defendant seeking

5    disclosure of grand jury proceedings must demonstrate a "particularized need" for the production of those

6    proceedings.  *In re Grand Jury Proceedings*, 62 F.3d 1175, 1179 (9th Cir. 1995).  Mere "unsubstantiated,

7    speculative assertions of improprieties in the proceedings" do not constitute a particular need.  *United*

8    *States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980) (quoting *United States v. Rubin*, 559 F.2d 975,

9    988 (5th Cir. 1977), vacated on other grounds, 439 U.S. 810, 99 S.Ct. 67 (1978)).

10    Presenting a misleading picture to the grand jury is grounds for dismissal.  The Ninth Circuit has

11    underscored the Supreme Court's insistence that "the grand jury remains as a shield against unfounded

12    prosecutions."  *United States v. Navarro-Vargas*, 408 F.3d 1184, 1196 (9th Cir. 2005) (*en banc*) (citations

13    omitted).  While it is unusual for an indictment to be dismissed, an indictment may be dismissed if a

14    district court determines that the grand jury was misled in a manner that "it no longer operated as an

15    independent body and buffer between the Government and the Defendant" and Defendant suffered

16    prejudice as a result.  *See, e.g., United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972) (indictment

17    dismissed where grand jury misled into believing that hearsay evidence was eyewitness testimony);

18    *United States v. Cerullo*, No. 05cr1190 BEN, 2007 U.S. Dist. LEXIS 101282, at *2 (S.D. Cal. Sep. 7,

19    2007) (dismissing indictment where grand jury was misled by the prosecutor); *see also U.S. v. DeMarco*,

20    401 F. Supp. 505, 513 (C.D. Cal. 1975), *aff'd* at 550 F.2d 1224 (9th Cir. 1977) (dismissal of indictment

21    proper where prosecutor had threatened informant with indictment to obtain testimony in another case

22    and grand jury was unaware of prosecutor's improper motive for bringing indictment); *United States v.*

23    *Roberts*, 618 F.2d 530, 533 (9th Cir. 1980) ("We need not belabor the well-established principle that the

24    prosecutor has a special obligation to avoid 'improper suggestions, insinuations, and especially assertions

25    of personal knowledge.'") (quoting *Berger v. United States*, 295 U.S. 78, 88, (1935)); *United States v.*

26    *Siriprechapong*, 181 F.R.D. 416, 426 (N.D. Cal. 1998) (misleading the grand jury may form grounds for

27    dismissal).

28

*Defendant's Reply in Support of Renewed Motion for Discovery*        *Case No. 2:18-CR-119-WBS-1*

As discussed above, when the Court found that substantial issues with the warrant affidavit had been raised, it triggered the prosecutor's duty under standards of justice and rules of ethics to review and disclose grand jury testimony if it suffered from similar defects.  To date, prosecutors resist disclosure without confirming that the grand jury testimony does not suffer from similar defects.  But because the prosecutors have proven themselves unreliable with respect to *Brady* disclosures, the Defense submits that they can no longer be relied upon to conduct a faithful review of grand jury testimony for potential disclosure.  Rather, if the case is not dismissed, the Defense requests that Counsel for Defense be given an opportunity to conduct such review under protective order (attorney's eyes only) to determine if a motion for disclosure is merited and, if merited, file such a motion under seal.  Alternatively, the Court can conduct an *in camera* review, but such review would need to be done after the Court has been fully briefed on the breadth of issues implicated in the *Franks* motion.  And if it does turn out that the government was unjustifiably resisting disclosure, then that would be yet another example of the government's failure to adhere to principles of fairness.

### D.    Immigration Benefits Provided to Government Witnesses

As discussed above, the Defense believes all *Brady* material concerning immigration benefits has still not been provided.

### E.    Reports with Unredacted Witness Names

While the Defense accepts the government's agreement to produce this information, the Defense maintains that the case should be dismissed.

### F.    *Henthorn* Request

While the Defense accepts the government's agreement to produce this information, the Defense maintains that the case should be dismissed.  The already known *Brady* violation in this regard—the failure to disclose Carol Webster's possible perjury in the *Sekhon* case—is quite significant.

### G.    Improper Motivations to Investigate and Charge

While the Defense accepts the government's agreement produce this information, the Defense maintains that the case should be dismissed for the significant constitutional violations to date.

*Defendant's Reply in Support of Renewed Motion for Discovery        Case No. 2:18-CR-119-WBS-1*

1

### H.     Additional Brady/Giglio Material

2

The government in this case has proven itself to be unreliable in this regard.

3

## V.     CONCLUSION

4

For the foregoing reasons, Dr. Sheikh requests that the Court dismiss this case.

5

Dated: March 9, 2020                               Respectfully submitted,

6                                                              ALMADANI LAW

7

8                                                              */s/ Yasin M. Almadani*
                                                               Yasin M. Almadani, Esq.
9                                                              *Attorney for Defendant*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Defendant's Reply in Support of Renewed Motion for Discovery*          *Case No. 2:18-CR-119-WBS-1*

1   Yasin M. Almadani (Cal. Bar No. 242798)
    ALMADANI LAW
2   14742 Beach Blvd., Suite 410
    La Mirada, California 90638
3   (213) 335-3935 | YMA@LawAlm.com

4   *Attorney for Defendant*

5

6                    **UNITED STATES DISTRICT COURT**

7            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

                        **SACRAMENTO DIVISION**
8

9   UNITED STATES OF AMERICA,              Case No. 2:18-CR-119-WBS-1

10          Plaintiff,
                                           **DECLARATION OF DAVID WRIGHT**
11          v.

12   FIRDOS SHEIKH,                        **In Support of Defendant's Reply and
                                           Motion for Dismissal to the Government's
13          Defendant.                     Opposition to Defendant's Renewed
                                           Motion for Discovery [DE 87]**
14
                                           Hearing Date: March 9, 2020
15                                         Time:          9:00 a.m.

16                                         Trial Date: TBD

17                                         Judge: Hon. William B. Shubb
                                           Courtroom:   Five (14th Floor)
18

19

20

21

22

23

24

25

26

27

28
                                    1

I, David E. Wright, do hereby state and declare the following:

1.      I am a retired Special Agent ("SA") of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), formerly the United States Customs Service and was employed as such from August 1991 until January 2017 (over 25 years of service).  I was assigned to the Office of the Special Agent in Charge ("SAC") Los Angeles and Office of the Assistant Special Agent in Charge (ASAC) in Riverside, California.  I was promoted to Group Supervisor in August 2001 and oversaw the enforcement of federal criminal statutes involving human smuggling/trafficking, drug smuggling/trafficking and money laundering.  I have conducted and supervised numerous investigations of individuals and/or criminal organizations that were involved in smuggling/trafficking activities, as well as tracing the movement of illicit proceeds generated by these crimes.

2.      I have received criminal investigative training from the Federal Law Enforcement Training Center ("FLETC").  I have participated in numerous human smuggling/trafficking investigations conducted by HSI, which resulted in the arrest of subjects and the seizure of evidence and/or assets.  Through these investigations and training, I am familiar with the operations of international human smuggling/trafficking organizations in the United States and abroad.

3.      I have specialized training and experience in smuggling/trafficking and conspiracy investigations.  I have participated in numerous investigations, which have included the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants, the use of court-ordered intercepts of wire and/or electronic communications, and the analysis of seized records, physical evidence, and taped conversations.   I have been present during the execution of search warrants and consent searches where individuals that were being smuggled or trafficked were located.  I have also spoken with defendants and other witnesses who have extensive knowledge of the inner workings of major human smuggling/trafficking organizations.  In addition, I have spoken with other experienced HSI investigators concerning the methods and practices of human smugglers and human traffickers.

4.      I have reviewed several Reports of Investigation (ROIs) and handwritten notes prepared

by HSI Sacramento concerning Firdos SHEIKH, who is alleged to have been involved in human trafficking.  I have also viewed numerous photographs that are of SHEIKH's residence located at 10454 Menlo Oaks Court, Elk Grove, CA, where two individuals were allegedly being held against their will and forced to perform labor for little or no pay. Human trafficking involves the use of force, fraud, or coercion to obtain some type of labor or commercial sex act.  Based on my training and experience, I do not believe that SHEIKH was involved in human trafficking, and if I were supervising this case during my tenure at HSI, I would have closed the case for the following reasons:

      a.    Aside from Alfredo's claim during a July 2, 2013, interview that SHEIKH "threatened to cut off both of Alfredo's hands" because she suspected that Alfredo was stealing from her, none of the other witnesses allege that they were threatened with the use of force.  Additionally, the three witnesses are men in their 40's, while SHEIKH is a woman in her late 50's.  The witnesses also presumably had access to gardening tools, etc., that they could have used as weapons or to defend themselves.  I do not see how these male witnesses would reasonably perceive SHEIKH as a physical threat.  Moreover, Alfredo's credibility is undercut by several statements he made that are internally inconsistent as well as inconsistent with those of the other witnesses; and the credibility is severely undermined when taking into account the very significant immigration benefits Alfredo stood to gain by falsely casting himself as a human trafficking victim.

      b.    All three witnesses voluntarily agreed to work for SHEIKH and stated that they were paid between $200 and $500 per month at various times.  Each of the witnesses also states that they were offered and accepted living accommodations as part of their compensation.  Furthermore, inconsistent with Prakash's story about being forced to work, Prakash readily admitted he was a homeless individual who voluntarily worked for lesser compensation just prior to seeking work from SHEIKH.

      c.    When Witness Gil was interviewed on June 28, 2013, he admitted that he was in the United States illegally.  Gil did not claim to ever be coerced or to have ever been threatened with SHEIKH contacting Immigration authorities.  Gil did not state that Alfredo or Prakash were ever threatened with force or coerced with threats of contacting Immigration authorities.

*Revised Declaration of David Wright*        *Case No. 2:18-CR-119-WBS-1*

1    d.    Alfredo and Prakash both claim that SHEIKH had threatened to contact

2  Immigration if they attempted to leave or did not perform the work they were hired for.  During his

3  interview, Alfredo admitted that his true name was not Alfredo, but that was the name people called

4  him.  Alfredo had been doing odd jobs for SHEIKH since 2009 and previously worked for a local

5  cement company.  Prakash claimed to have been in the United States for over 15 years and held

6  numerous jobs in both California and Colorado.  He voluntarily took a job immediately preceding his

7  work with SHEIKH on similar terms but lesser compensation.  No mention is made of their

8  Immigration history or if they had previously been deported, but both had managed to elude

9  Immigration authorities for a significant period of time.  Additionally, both Alfredo and Prakash

10  presumably knew that Gil had voluntarily left SHEIKH's employ and not faced any reprisal.

11    e.    Furthermore, just a week prior to leaving, Alfredo told SHEIKH that she was

12  going to leave and her response was not threatening at all.  She simply said okay.

13    f.    On July 1, 2013, at the welfare check, Prakash was found outside the property,

14  showing that he could have easily left any time.  The agent's notes also show that Prakash had a friend

15  whose apartment Prakash could go to who was living relatively close by in Fruitridge, CA.  From the

16  interview notes, it was clear Prakash had several contacts in the area to whom he could have reached

17  out.

18    g.    Furthermore, the day of the welfare check (July 1, 2013), Prakash was asked that

19  day by agents to make four consecutive monitored phone calls.  From my training and experience, I

20  know that the primary purpose of these calls from a law enforcement perspective was to record

21  SHEIKH threatening Prakash to return either by force or legal process.  But SHEIKH never made such

22  threats.  On the contrary, SHEIKH appeared to be very nice to Prakash and it was clear from the calls

23  that it was up to Prakash to return or not.  Also, from my training and experience, the agents certainly

24  would have debriefed Prakash after each call and coached him on how to get a threat out of SHEIKH,

25  which, again, did not happen.  Observing this and knowing that Prakash could be highly motivated to

26  lie hoping for immigration benefits, I would have had serious doubts about his credibility.  Based on the

27  totality of the evidence and the conflicting witness statements, I would not have believed that there was

28

*Revised Declaration of David Wright*                                    *Case No. 2:18-CR-119-WBS-1*

a credible basis to seeks a warrant for forced labor or indentured servitude and would have advised my agents to close the case. I found it curious that none of this was disclosed to the magistrate.

5.     Furthermore, the Homeland Security website (dhs.gov/blue-campaign/indicators-human-trafficking) offers a list of indicators that can assist in identifying human trafficking. The website also states, "Not all indicators listed above are present in every human trafficking situation, and the presence or absence of any of the indicators is not necessarily proof of human trafficking." Some of the indicators are:

a.     Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

i.     Each witness admits that Gil was permitted to leave and faced no reprisal for doing so. Gil offered Alfredo several opportunities to leave on June 24 and again on June 26, however Alfredo declined in hopes of receiving his pay. Alfredo stated that SHEIKH's son, Aamir suggested Alfredo leave if he was unhappy. SHEIKH stated that she had told Alfredo to leave on several occasions because she did not trust him. Alfredo ultimately did leave on June 28 by hopping a small horse fence the height of a hurdle and faced no reprisal from SHEIKH. Alfredo stated that a Vietnamese family had worked at SHEIKH's property and had left over a pay dispute. No mention is made of the family's immigration status or of any reprisals taken by SHEIKH. Prakash stated that he was prepared to leave in June, however he was also waiting to see if he was paid. As stated above, when Prakash was contacted by HSI agents on July 1, he was located outside of SHEIKH's property.

ii.     Alfredo and Prakash stated that SHEIKH had put locks on several gates accessing the property and installed security cameras to prevent them from leaving. In analyzing photos of SHEIKH's property, it is apparent that much it is enclosed by a waist or chest high fence and that the fencing is broken or dilapidated in some areas. Alfredo stated that he observed that a lock on a rear gate was broken and that he suggested that SHEIKH fix it. During her interview on July 1, SHEIKH stated that the security cameras were installed because she had concerns about unauthorized individuals accessing the property to fish and suspected that some animals and plants had been stolen. Alfredo corroborates SHEIKH's statement and said that SHEIKH told him and Prakash that the

cameras were being installed because she (SHEIKH) suspected them of theft.  The ROI describing Gil's interview simply states that there were security cameras on the property, however the investigative notes of the same interview indicates that the cameras were "for burglars".  Prakash stated that SHEIKH told him that the cameras were installed to ensure that he was working and would not leave. However, Prakash then stated that he was prepared to leave if he was not paid.  Both Alfredo and Prakash stated that the cameras were not installed until May 2013, approximately one month prior to HSI arriving.

> b.  Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

> i.  Gil and Alfredo stated that SHEIKH mostly lived alone at the 10454 Menlo Oaks Court property, except for when her son, Aamir or her parents visited.  The interview notes show that Gil stated that SHEIKH was away from the property six days a week from 9 AM to 3 AM, actually being on the property for only six hours at night during those days.  Alfredo corroborated that SHEIKH went to work around approximately 9 AM to 10 AM and did not return until sometime after midnight.  SHEIKH's son Aamir stated that SHEIKH had recently gone to the Caribbean for approximately five days.  Based on this information, it is apparent that Gil, Alfredo and Prakash were left unattended for most of the time they were at SHEIKH's property and possibly for as long as five continuous days without her even being in the country.

> ii.  Alfredo claims that initially he only worked at SHEIKH's property on weekends and held a full-time job at a local cement company.  He stated that after several months, he decided to leave the cement company and work at SHEIKH's full-time.  Alfredo stated that SHEIKH provided him with a phone, but that service was discontinued because SHEIKH did not pay the bill. Alfredo stated that this prevented him from being able to contact anyone else that he knew.  Both Gil and SHEIKH's son, Aamir contradicted this statement.  Gil stated that he received a call from Alfredo on June 26, 2013; importantly Gil said that Alfredo was using a cell phone provided to Alfredo by SHEIKH.  Additionally, Gil provided a number for Alfredo to HSI.  On July 1, when SA Eugene Kizenko attempted to call the number, he ended up speaking with Prakash.  At the conclusion of

1    Prakash's interview by HSI, the report states that Prakash provided agents with a phone number for

2    both himself and a friend of Alfredo's.  Aamir stated that Alfredo has his own phone, that Alfredo liked

3    to frequent nightclubs and he believed that Alfredo had a girlfriend.  Alfredo and SHEIKH each

4    mentioned that SHEIKH did not like Alfredo's friends coming over to SHEIKH's property, which

5    contradicts Alfredo's assertion that he felt as though he could not leave because he did not know how to

6    contact anyone.

7             c.        Does the person lack personal possessions and appear not to have a stable living

8    situation?

9                  i.        Alfredo stated that he left several pieces of personal property behind at

10   SHEIKH's property to including a television, DVD player, tools and a power washer.

11                 ii.        During Prakash's interview with HSI agent's on July 1, 2013, he told

12   agents that his identification documents were in a trailer on SHEIKH's property.  Agents went to the

13   trailer and located two state identity documents within Prakash's duffle bag.  It was clear that SHEIKH

14   had not confiscated any IDs (actually it appears she did not even know Prakash's ID was in the trailer

15   until agents told her); Prakash had complete control of it.  Furthermore, when Alfredo was interviewed

16   by HSI Sacramento he also was able to produce identification which he gave to the agents, it is clear

17   then that SHEIKH did not have Alfredo's ID either.  SHEIKH's actions were not consistent with human

18   trafficking, forced labor, or indentured servitude, where the oppressor, who is preventing freedom of

19   movement and threatening to report the victims, normally maintains control of their identity documents.

20   An experienced agent investigating human trafficking and forced would have understood this.

21                 iii.        As stated above, both Alfredo and Prakash appear to have be in

22   possession of a cellular phone that had been provided by SHEIKH.  This fact is also inconsistent with

23   the suggestion that Alfredo or Prakash were being isolated or held against their will in any way.  The

24   witness's statement that SHEIKH may have checked the phone from time to time, even if true, is to be

25   expected since SHEIKH was apparently paying the bill.  There is no indication that Alfredo was

26   punished in any way after any of these alleged checks, which is what one would expect in a human

27   trafficking case.

28

*Revised Declaration of David Wright*                                                        *Case No. 2:18-CR-119-WBS-1*

d.       Does the person show signs of having been denied food, water, sleep, or medical care?

i.       Alfredo claims that he was promised food as part of his employment, however Gil and initially Prakash did not assert that food would be included as terms of their employment.  Later Prakash stated that SHEIKH did not feed him on a regular basis.  Alfredo stated that he was not fed in a consistent manner and sometimes went without food.  However, when Prakash moved in, Alfredo said that SHEIKH told them to buy their own food and SHEIKH would take them to the grocery store.  This corroborates SHEIKH's statement that she would take Alfredo shopping at Winco.  Moreover, there was a strip mall with fast food restaurants and a convenience store walking distance about one mile from the ranch, which agents knew about but never informed the magistrate when securing the warrant.  As to credibility and changing stories, Gil stated that Alfredo and Prakash never had any food to eat so he (Gil) would buy their food for them when he would go to the grocery store.  But this is contradicted by statements of the other witnesses.  Prakash stated that SHEIKH spent $80 per month on food for him.  According to interview notes taken one July 1, 2013, Prakash also admitted that he had the option to stay on SHEIKH's property rent free and received over $1,700 in pay over the course of his six-month stay; he had no family to support and appeared to have no necessary expenses other than food.  Prakash's statement that he was unable to feed himself is not supported by the indisputable evidence.  Based on this information alone, and bearing in mind that Prakash had a motive to lie and exaggerate in pursuit of immigration benefits, it is my opinion that the facts in this case do not establish probable cause to believe that SHEIKH was engaged in the forced labor or involuntary servitude.

ii.       Alfredo claims that he initially was paid approximately $400 per month, but then subjected to deductions that SHEIKH would make, sometimes leaving him with $100.  Alfredo did not explain why SHEIKH made these deductions.  Alfredo stated that he and Prakash had their pay reduced to approximately $200 per month once Gil and his wife moved in, because Gil would be taking over much of the responsibilities.  Alfredo stated that he received $200 in April 2013 and $200 in May 2013, but he had not yet been paid for June. Gil stated that he was paid $400 per week and had a set

*Revised Declaration of David Wright*                                      *Case No. 2:18-CR-119-WBS-1*

schedule of 7 AM to 3:30 PM, however he quit his position due to a pay dispute.  Prakash stated that he was paid $380 (accounting for the $80 food allowance) for each January and February, $400 for March, $300 in April, $250 in May 2013 and that he had not yet received payment for June.

iii.     Alfredo stated that Prakash needed medical treatment on a couple of occasions and that SHEIKH would treat Prakash, however she would charge Prakash $50 for the treatments.  It seems that SHEIKH, a neurologist, was even providing cheap healthcare to Prakash.  Agents should have picked on the fact that an exam and injection treatment with a certified neurologist would likely have cost much more than $50 dollars per treatment; to make any real assessment of this information, they should have inquired how much these treatments would have costs one of SHEIKH's regular patients.  This significantly contradicts Prakash's statement that SHEIKH would provide little or no assistance when Prakash was ill.

6.     While certain claims by the witnesses and some facts, such as the existence of padlocked gates, could be considered indicators, it is my opinion that this case does not meet the threshold to consider human trafficking charges.  There are numerous inconsistencies and contradictions with the witnesses' statements concerning if they were free or able to leave, if they had means of contacting others, whether they had access to food and other necessities, etc.

a.     The impression the warrant affidavit gave was that the property was a fenced off, locked down compound difficult to leave.  But looking at the photographs of the property and knowing how easily Gil, Alfredo, and Prakash left without any threat or consequence, the only reasonable conclusion was that SHEIKH was not forcing anyone to stay and work on her property.  She had no obligation to employ, house, or feed them.  They were free to leave any time if they felt unhappy or slighted, and the evidence shows that they did leave.  But reading the warrant affidavit, there is no escaping the conclusion that the magistrate was severely misled in this case.

b.     Gil, Alfredo and Prakash had all been in the United States for several years, worked for other area employers and knew other people in the local community.  All three left other jobs and voluntarily accepted employment with SHEIKH.  Gil and Alfredo stated that SHEIKH worked long hours and was absent from the property for much of the day.   All three witnesses appear to have

1   possessed cellular phones and had been paid in the months prior to June 2013.  Alfredo and Prakash

2   knew that Gil had left without reprisal from SHEIKH, but both stated that they chose to remain in

3   anticipation of receiving additional payment.  Based on my training and experience, the evidence makes

4   it almost impossible to believe that Alfredo or Prakash felt that they were be being forced to work under

5   the threat of force, fraud, or coercion.

6            c.     SHEIKH stated that prior to employing Gil, Alfredo and Prakash, she had

7   employed teams of workers to perform landscaping tasks at the Menlo Oaks property.  When HSI

8   executed the search warrant on July 9, 2013, they found a team of workers performing work on the

9   grounds.  In most human trafficking scenarios, the trafficker typically profits from the work of the

10   victims, such as with a pimp/prostitute or restaurant owner/restaurant employee relationship.  In this

11   case, SHEIKH is a well-to-do neurologist who is purported to be too cheap to pay for landscaping

12   work.  From a practical standpoint, it does not make sense to me for SHEIKH to jeopardize her

13   lucrative career by threatening and forcing people to live and work on her property.

14            d.     Alfredo and Prakash stated that SHEIKH did not feed them on a regular basis,

15   however Alfredo later stated that SHEIKH would take he and Prakash to the grocery store.  Gil stated

16   that he would often buy food for them when he went to the grocery store.  Both Alfredo and Prakash

17   said that they had received payment from SHEIKH and admit that they were left unattended much of

18   the day.  I researched the immediate area and found that there is a Subway, a pizza shop and other

19   restaurants approximately 1.3 miles from SHEIKH's residence.  Because agents conducted two field

20   operations at SHEIKH's property (including one on July 1, 2013) and because in 2013 HSI required

21   agents to create operational plans prior to conducting field operations for agent safety, I believe agents

22   in this case would have known this information well prior to executing the search warrant.  Indeed, I am

23   informed that the government finally confirmed just last week that agents did know this information

24   prior to executing the search warrant.  This information is highly relevant because Alfredo and Prakash

25   could have walked a short distance to purchase food with money they were receiving and given that

26   they had no rent to pay or any other significant expenses.  The magistrate should have been informed of

27   this.

28

7.      Looking at the totality of the evidence, I would have had serious questions about Prakash, Alfredo, and Gil's credibility as well as their motivation to obtain immigration benefits by falsifying information to cast themselves as human trafficking victims.  As an HSI supervisor, I would not have found this case to merit further investigation after the welfare check and witness interviews of Gil, Prakash, and Alfredo, all of which was concluded by July 2, 2013.  I am surprised that the investigation was allowed to move forward and a warrant was sought.

8.      Based on my experience, there can be illicit motivations for pursuing investigation and prosecution that do not accord with the high standards of the Department of Homeland Security Investigations.  These would include media attention with an unusual or high-profile target, potential for awards or promotions, to achieve work performance targets set by the Department, specific animus towards the target, etc.

9.      Finally, based on my training and experience in interacting with many magistrates and obtaining warrants, I believe that if I or any HSI agent that I supervised had disclosed the full picture, the real totality of the circumstances, to a magistrate, as the law requires, the warrant in this case would have not have been issued.

10.      I have attempted to provide the facts and analysis contained in this declaration to the best of my abilities.  This declaration is not meant to be my complete and final analysis of the case.

*                *                *

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: March 9, 2020                              Respectfully submitted,

*/s/ David Wright*
David Wright

*Revised Declaration of David Wright*                              *Case No. 2:18-CR-119-WBS-1*

1  Yasin M. Almadani (Cal. Bar No. 242798)
   ALMADANI LAW
2  14742 Beach Blvd., Suite 410
   La Mirada, California 90638
3  (213) 335-3935 | YMA@LawAlm.com

4  *Attorney for Defendant*

5

                    **UNITED STATES DISTRICT COURT**

6

             **FOR THE EASTERN DISTRICT OF CALIFORNIA**

7

                       **SACRAMENTO DIVISION**

8

9  UNITED STATES OF AMERICA,               Case No. 2:18-CR-119-WBS-1

10        Plaintiff,                       **DECLARATION OF YASIN M. ALMADANI**

11        v.

12  FIRDOS SHEIKH,                         **In Support of Defendant's Reply and Motion
                                           for Dismissal to the Government's Opposition
13        Defendant.                       to Defendant's Renewed Motion for Discovery
                                           [DE 87]**
14
                                           Hearing Date: March 9, 2020
15                                         Time:          9:00 a.m.

16                                         Trial Date: TBD

17                                         Judge: Hon. William B. Shubb
                                           Courtroom:   Five (14th Floor)
18

19

20

21

22

23

24

25

26

27

28

                                    1
────────────────────────────────────────────────────
*Revised Declaration of Yasin M, Almadani*        *Case No. 2:18-CR-I19-WBS-1*

I, Yasin M. Almadani, do hereby state and declare the following:

1.      I am an attorney at law, duly licensed to practice before all state and federal courts in California, and counsel of record for Defendant in this action.  I am submitting this declaration in support of Defendant's Reply to the Government's Opposition to Defendant's Renewed Motion for Discovery.  The facts stated in this declaration are based upon my own personal knowledge, and if called as a witness, I could and would testify competently about the same.

2.      On March 6, 2020, I learned for the very first time that on December 17, 2017, a court in this District granted an evidentiary hearing on a Section 2255 motion and ordered investigation and discovery on the basis of what appear to be factually supported allegations that Webster may have committed perjury and overlooked immigration fraud of one of her alleged victims, and the government may have elicited false testimony and failed to disclose *Brady* material in that matter.

3.      On or about March 5, 2020, I learned for the very first time that the T-Visa can actually be converted to a permanent residency (green card) as long as the victim continues to assist law enforcement in the case and the prosecution of the alleged trafficker is completed.  I am not an immigration expert and learned this information only coincidentally, prior to which I was fully relying on the government's description that the T-Visa was only a tempor2ary immigration benefit that had already been provided and thus would not really affect trial testimony.

4.      On March 9, 2020, I learned for the very first time that HSI and Opening Doors may have a long-standing relationship whereby Opening Doors helps HSI increase its prosecution statistics by finding and referring alleged victims and HSI in turn gives millions of dollars a year to Opening Doors.  The information remains unverified and the Defense remains unaware of the details of this relationship.  If true, this relationship naturally creates an illicit incentive to overlook exaggerated stories of alleged victims for HSI to increase prosecution statistics and Opening Doors to

/ / /

/ / /

*Revised Declaration of Yasin M, Almadani*                                    *Case No. 2:18-CR-119-WBS-1*

collect millions in grant money, while each uses the other to give the appearance of legitimacy.

*                    *                    *

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: March 9,  2020                           Respectfully submitted,


                                                */s/ Yasin M. Almadani*
                                                Yasin M. Almadani

*Revised Declaration of Yasin M, Almadani*                    *Case No. 2:18-CR-119-WBS-1*

# Ex. AAA

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF CALIFORNIA
 2               BEFORE THE HONORABLE WILLIAM B. SHUBB

 3     UNITED STATES OF AMERICA

 4                    Plaintiff,

 5     vs.                          Sacramento, California
                                    No. 2:18-CR-00119
 6                                  TUESDAY
       FIRDOS SHEIKH               9:03 A.M.
 7
                       Defendant.
 8     _____/

 9                            --oOo--

10                 REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                            --oOo--

12     APPEARANCES:

13     For the Government:          U.S. DEPARTMENT OF JUSTICE
                                    950 Pennsylvania Ave NW
14                                  PHB 5616
                                    Washington, D.C.  20530,
15                                  BY:  WILLIAM E. NOLAN
                                         DAVID N. REESE
16                                       Trial Attorneys

17
       For the Defendant:          ALMADANI LAW
18                                 BY:  YASIN M. ALMADANI
                                   14742 Beach Boulevard, Suite 410
19                                 La Mirada, California 90638

20     Official Reporter:          Tiphanne G. CROWE
                                   CSR No. 10958
21                                 501 I Street
                                   Sacramento, CA  95814
22                                 Tcrowe.csr@gmail.com

23

24     Proceedings recorded by mechanical stenography.  Transcript
       produced by computer-aided transcription.
25
```

2

1          SACRAMENTO, CALIFORNIA, FEBRUARY 25TH, 2020, 9:03 A.M.

2                              --o0o--

3          THE CLERK:  Criminal case 18-119, the United States v.

4    Firdos Sheikh.

5          Counsel, your appearances.

6          MR. NOLAN:  William Nolan on behalf of the United

7    States, your Honor, here with co-counsel, David Reese.

8          MR. ALMADANI:  Yasin Almadani on behalf of Dr. Sheikh,

9    your Honor, and with me is Dr. Sheikh.

10         THE COURT:  I've read the materials that you've each

11   submitted on the *Franks* issue.  Most recently, however, I

12   received another memo from Mr. Almadani suggesting there's a

13   *Brady* issue.

14         I'm not sure whether that can be separated from the

15   *Franks* issue, so before we start talking about the hearing on

16   *Franks*, I want to put it into the context of your argument with

17   regard to *Brady*.

18         MR. ALMADANI:  Yes, your Honor.  This case was

19   investigated in 2013, and it was charged five years later.  The

20   Government had plenty of time to look through its materials,

21   and we all know that in *Kyles versus Whitley*, the Court stated

22   that when the Government charges a case, the *Brady* obligation

23   kicks in.

24         The Government charged this case, held on to *Brady*

25   material until a year later when we had to make a motion for

3

1    it.  The Court, at that point, granted our motion, and

2    instructed the Government to hand over all *Brady* material by

3    August 30th, 2019.  That shouldn't have needed to happen.  We

4    should have had it already.

5         But then Mr. Reese sends me material, and represents

6    that they have looked through everything, and they've disclosed

7    all *Brady* material to us.  On September 23 Mr. Reese then sends

8    me an e-mail stating that he's looked through the agent notes.

9    There's nothing to add really, and they're all consistent with

10   the reports, and on that basis, we brief our suppression issue,

11   and, you know, I proceed to cross the agent and everything.

12        Not only were there notes that were kept from us that

13   had impeachment information that called into question the

14   credibility of the reports themselves, which they were relying

15   on for their memory, or to refresh their recollection, we were

16   also entitled to those reports under Rule 26.2.  We didn't get

17   that.

18        Then in a conversation outside of court, during the

19   context of that suppression hearing, I, again, tried to confirm

20   with the prosecutors:  Do I have all the *Brady* material?  They

21   represented:  You do.

22        It turns out that just -- and so we briefed the *Franks*

23   issue.  I looked through all of the reports, and we came up

24   with some pretty significant argument.

25        On the eve of this hearing, after everything has been

4

1    briefed, the Government on Wednesday -- after the close of

2    business -- sends me agent notes -- I think it was three sets

3    of agent notes -- and then characterizes that as, well, we

4    missed something.

5            Alfredo, in fact, a week before leaving had told Dr.

6    Sheikh that he was going to leave, and Dr. Sheikh said okay,

7    and then he left.

8            In the context of a forced labor, indentured

9    servitude, case where the warrant is based upon just those two

10   charges, that's about as exculpatory as it gets.

11           What's a little worse there, your Honor, is that the

12   Government represented to me that there's nothing else in those

13   notes that's exculpatory, but I did my due diligence.

14           Turns out there's a whole lot that shows that those

15   notes are materially inconsistent with the reports on important

16   issues, and there is -- there is information in those notes

17   that should have been disclosed to the Magistrate.  I wasn't

18   able to brief that to the Court, because I wasn't given the

19   *Brady* material, your Honor.

20           THE COURT:  So what are the other -- I read about the

21   statement that Alfredo told her he was going to leave, and she

22   said it was okay.  What's the other *Brady* material you are

23   referring to?

24           MR. ALMADANI:  I will -- I'll list it out for the

25   Court, your Honor.

5

1           THE COURT:  Could you come up to the lectern here.

2           MR. ALMADANI:  Should I also, your Honor?

3           MR. NOLAN:  I assumed he was going to follow.

4           THE COURT:  Whoever is speaking, just be at the

5    lectern.

6           MR. ALMADANI:  Yes, your Honor.  So, your Honor, there

7    are notes from Gildardo's interview that were not -- and

8    there's statements that were not contained in the reports.

9    Here are a couple of statements that were not contained in the

10   reports.

11          In fact, the reports stated that Dr. Sheikh was not

12   there at her ranch except Monday.  So six days of the week she

13   wasn't there from 9:00 a.m. to past midnight.  That's what the

14   report stated.  Turns out, actually, that the notes stated that

15   Dr. Sheikh was not there on those days from 9:00 a.m. to 3:00

16   a.m.  That's what Gildardo had told them.

17          So it's not just the whole day, it's the whole day and

18   a third of the night she's not there.  In the context of a

19   forced labor, indentured servitude, case where they're

20   claiming -- their witnesses are claiming that they're being

21   watched all the time, this completely cuts against that, your

22   Honor, and the fact that between 12:00 a.m. and 3:00 a.m. is

23   significant.

24          Number two, Gildardo had disclosed to the agents that

25   he knew Dr. Sheikh was over 50 years old, and the other two men

6

1    that were supposedly being held captive were 40 years old.

2    They were men, and she was living alone.  She was never there.

3    Those facts were not in the reports, and those were important

4    facts to tell the Magistrate in the context of what -- the

5    story they are presenting here.

6          Prakash and Alfredo had claimed that they were forced

7    to work -- Prakash had claimed that he had been forced to work

8    10 hours a day, 7 days a week.  Alfredo was saying something

9    along the lines of 12 to 14 hours.

10         It was disclosed then in those notes, not in the

11   reports, that Gildardo had said that they actually worked from

12   7:00 a.m. to 3:30 p.m.  It cuts against the story.  The

13   Magistrate is entitled to know if their witnesses have

14   inconsistent stories, and especially an unlikely work schedule,

15   the way that these, you know, victims who have to actually

16   present that they are severe victims of human trafficking in

17   order to get their immigration benefits.  The Magistrate is

18   entitled to know this information.  This was not disclosed to

19   us.

20         Moving on, they knew, and they didn't disclose to us,

21   that Prakash, prior to working, or having some work with Dr.

22   Sheikh, had some odd jobs with another man named James Brewer,

23   who introduced him, or who introduced him to another man who

24   introduced him to Dr. Sheikh.

25         At that time Prakash was actually homeless.  He was

7

1    just looking for somebody to give him work.  That was not in

2    the reports, and the fact is that James --

3              THE COURT:  Is that in these reports that you now

4    have?

5              MR. ALMADANI:  It's in the notes that we now have,

6    your Honor.

7              THE COURT:  All right.

8              MR. ALMADANI:  In fact, James Brewer, your Honor,

9    Prakash voluntarily agreed, and was happy to work for James

10   Brewer for a room in a camper, and $200 a month.  He was happy

11   with that, and voluntarily working until Brewer couldn't really

12   afford -- didn't have any work for him --

13             THE COURT:  Now, is all this in those notes?

14             MR. ALMADANI:  This is in the notes, your Honor, and

15   it's not in the reports.

16             THE COURT:  I just want to make sure that what you

17   tell me is something you just discovered from these notes.

18             MR. ALMADANI:  Absolutely, your Honor, and I've gone

19   through the notes and the reports with a fine-tooth comb, and

20   this is not the reports, and it's in the notes.

21             When Dr. Sheikh -- what they are claiming are these

22   terrible conditions that -- that Prakash then claimed he was

23   working under, is pretty much the same thing.  In fact, he was

24   getting paid more by Dr. Sheikh.

25             So it begs the question, the Magistrate -- if the

8

1   Magistrate knew that he voluntarily was working for this other

2   man, who he then asked to introduce to somebody else, and then

3   came and was working odd jobs for Dr. Sheikh on better terms,

4   and then he turns around and says that those are bad

5   conditions, the Magistrate is entitled to know that, your

6   Honor.

7          THE COURT:   So you are saying that we should not go

8   ahead with the *Franks* hearing today?  That you should have an

9   opportunity to present the materials that you have recently

10  received, and to give me another brief on why the information

11  in these materials would affect the *Franks* hearing; is that

12  what you are saying?

13         MR. ALMADANI:   Well, I can -- I can -- I can actually

14  answer that question in the alternative, your Honor, actually.

15  I'm sort of saying that, but not pressing the issue, because I

16  have had a chance to look through some of these notes, and I

17  think that I can get, you know, I can cross the agent, and get

18  this into the record, and present the argument to the Court.

19  If the Court would like it in a brief, which the Court might

20  want to consider, then I would be happy to do that, but --

21         THE COURT:   Well, but how am I going -- you are

22  relying on the fact that I'm going to be able to take such

23  careful notes.  That it's not written down anywhere.  I'll just

24  listen to what you ask the agent, and then I'll be able to get

25  all the information that way.

9

1          MR. ALMADANI:  Well, your Honor, actually --

2          THE COURT:   Aren't you even going to give the Court

3    the notes?

4          MR. ALMADANI:  Yes.  The Court makes a great point.  I

5    actually have given the notes as well -- the Court has a

6    binder, yes, but, your Honor --

7          THE COURT:   Do I have this?  I didn't get this.

8          THE CLERK:  We'll I'm putting it together for you.

9          THE COURT:   Okay, so I haven't seen this yet?

10         MR. ALMADANI:  You have not seen that, your Honor,

11   because I was going to cross on that.

12         Your Honor, actually, I would be happy to present the

13   Court with a supplemental brief.  On top of that, your Honor, I

14   believe that we haven't had the entire *Brady* disclosure still.

15         The Government is still in violation of the Court's

16   order and the rules.  We haven't had the full *Brady* disclosure.

17   I have put that it our sur-reply.  We're entitled to the

18   operational plan that the agents had, because the operational

19   plan is going to tell us what they knew about the area before

20   they executed the -- or before they authored the search

21   warrant.

22         We're also entitled to what we haven't received.

23   Are -- is the -- we've got the TV's application for Prakash,

24   but we're also entitled of the TV's application for the other

25   alleged victim, who is Alfredo, and I can tell the Court that

10

1    I've looked at that TV's application, and there's lots of

2    material in there that would impeach Prakash at a trial, and so

3    we're entitled to have that information also for Alfredo.

4              Your Honor, we're entitled to have --

5              THE COURT:  That's -- that's different than the *Franks*

6    issue.  They didn't testify at a *Franks* hearing yet, and so

7    whether you need information to cross-examine them doesn't

8    pertain to the *Franks* issue.

9              MR. ALMADANI:  It doesn't pertain to this particular

10   *Franks* issue, your Honor, but it does pertain to the overall

11   *Brady* obligation that they've had for a year and a half.

12             THE COURT:  Well, let me hear from you, Mr. Nolan.

13   Did the Court order you to produce *Brady* material?

14             MR. NOLAN:  It did, your Honor.

15             THE COURT:  And why didn't you do it?

16             MR. NOLAN:  We did, your Honor.  What I would like to

17   do if I could, to address this, is address two things with the

18   Court.  One, I'd like to take a minute to explain the

19   disclosure that we made six days ago, which led to the motion

20   last night.

21             And then I'd like to ask the Court for an opportunity

22   to respond to the written motion last night in writing

23   ourselves, and I'll go into some of that in a moment, if I

24   could, but first, if I could just take a moment to explain the

25   disclosure and how that came about.

11

1          If we could back up to the first hearing that we had,

2     which was in regards to the 4th Amendment issue, and the

3     Miranda issue.  That hearing encompassed events that took place

4     on one day, and one day on July 1, 2013, and those -- and we

5     were going to call one witness, which we did, the agent for

6     that case.

7          In preparing for that hearing, we sent an e-mail.  I

8     don't recall exactly how many days before, but in -- before

9     that hearing, in preparation to counsel, I said:  We intend to

10    call one witness, Special Agent Carol Webster.  The event she's

11    going to testify to, or memorialized in ROI 1, and here are the

12    notes, and we discussed the notes from ROI 1.

13         At that same time we also made a representation that

14    we had gone through other notes in the case, specifically Carol

15    Webster's, compared them to ROI's, and found them to be

16    consistent as defense counsel just said, so we had made that

17    representation at that time.

18         Then we get to this hearing, and in preparation for

19    this hearing we send an e-mail to defense counsel saying we

20    plan to call one witness if -- if an evidentiary hearing is

21    required, which will be Agent Kizenko, the affiant.

22         His affidavit is based on essentially four things.

23    What happened that day, which he already had the notes from, as

24    well as the interview of three different witnesses, and we

25    disclosed the notes of those three different witnesses.

12

1           When we re-reviewed those notes -- and we do this

2     often -- we double-check our notes.  We double-check our

3     disclosures.  That's built into the process -- we found that

4     there was a mistake.  We found that there was something in the

5     notes, specifically -- and reading from the notes -- that about

6     a week before Alfredo --

7           THE COURT:  I'm sorry, are these the notes you

8     already turned over to them?

9           MR. NOLAN:  Yes.

10          THE COURT:  And so what are you telling me now?  There

11    was something wrong in the notes?

12          MR. NOLAN:  No.  No.  We turned over the notes, and at

13    the same time, we pointed to something in the notes that was

14    not in the ROI and should have been.

15          THE COURT:  But can I back up then?  What did the

16    order requiring you to disclosure *Brady* information say?

17          MR. NOLAN:  Just to disclose all *Brady* information.

18          THE COURT:  Did it say when?

19          MR. NOLAN:  Yes.

20          THE COURT:  What did it say?

21          MR. NOLAN:  I think the exact date was back in

22    August.

23          THE COURT:  Okay.  Now, you are telling me that this

24    new information was not disclosed, because it didn't pertain to

25    the witnesses that were going to testify at the previous

13

1    hearing?

2            MR. NOLAN:  No.  What I'm saying is, this is a mistake

3    on our part.  It was not disclosed, because we missed it.  It

4    was aligned in the notes, that existed in the notes, that was

5    not in the ROI --

6            THE COURT:  But how can you disclose some of the notes

7    and not disclose a line?  What did you do, black it out?

8            MR. NOLAN:  No.  No.  No, I'm sorry.  I may have

9    misspoken that in terms of the timing.  We didn't disclose the

10   notes back in August.  We reviewed them.  It's not our -- it's

11   not our normal procedure to disclose all of the notes.  We

12   disclosed the reports.

13           We don't necessarily disclose the agent notes that

14   correspond to those.  I often do that.  Many prosecutors do

15   that closer in time to when the witness will testify, which we

16   are doing in this case.  So we eventually did disclose these

17   notes --

18           THE COURT:  But if you now acknowledge that this is

19   *Brady* material --

20           MR. NOLAN:  Yes.

21           THE COURT:  You do?

22           MR. NOLAN:  Yes.

23           THE COURT:  You didn't disclose the *Brady* material

24   when you were ordered to do so?

25           MR. NOLAN:  We missed it at that point.

14

1      THE COURT:  Well, you see, you have to err on the side

2  of disclosing too much if you are going to do it the way you do

3  it, because the consequences of not disclosing material that

4  you should have disclosed are much greater than the

5  consequences of disclosing material that you did not have to

6  disclose.

7      MR. NOLAN:  Understandable, your Honor, and that is

8  why we build in these double -- and even triple -- checks as we

9  move close to trial.  So when we did find it, and did discover

10  it, as we re-reviewed the notes, we disclosed it immediately.

11      That very evening we sent an e-mail to defense

12  counsel.  We pointed exactly where it was in the notes.

13  Exactly where it should have been in the ROI.  It was a

14  mistake.  It was an honest mistake.  The agent missed it, and

15  then we missed it in the review.  We caught it in the second

16  time in the review, and we disclosed it immediately --

17      THE COURT:   Now, Mr. Almadani is about to tell me

18  several other instances in the notes where he claims it is

19  *Brady* material that was not previously disclosed.

20      I think I haven't even heard everything he had to say,

21  but he started to tell me about how in Gildardo's interview he

22  said that the Defendant was not there from 12:00 a.m. to 3:00

23  a.m., which sounds like it's relevant, and if not exculpatory,

24  certainly favorable to the defense.

25      MR. NOLAN:  Right.

15

1          THE COURT:  So what about all these other examples

2     from the notes that Mr. Almadani is telling me constitute *Brady*

3     material?

4          MR. NOLAN:  Right.  So we would argue two things on

5     that.  One, first thing is we have not seen what exactly --

6     we're hearing it for the first time as well -- what exactly,

7     additionally, to what we pointed out as *Brady*, the defense is

8     now saying this was also *Brady*, and should have been disclosed.

9          So we're learning of that now, and we would like an

10    opportunity to respond to that.

11         THE COURT:  No.  That's not the way *Brady* is supposed

12    to work.  Mr. Almadani has stated it correctly.  You don't need

13    to have an order from the Court in order to be required to

14    disclose *Brady*.  I don't often even make an order, because

15    sometimes I simply say:  The Government knows its obligations,

16    and the Court expects them to comply with those obligations.

17         Now, you don't have to wait to hear from Mr. Almadani

18    to know what constitutes *Brady* material.  That's your job.

19         MR. NOLAN:  Right.  And you are absolutely right, your

20    Honor.  I guess what I'm suggesting is that -- two things.

21    One, I'm not convinced everything he is claiming to be *Brady* is

22    *Brady*.

23         THE COURT:  Well, these two things we've heard so far

24    are.

25         MR. NOLAN:  And then the second thing is, I am not --

16

1    I'm fairly certain much of what he has already said was

2    disclosed in another form, not necessarily the notes.  So while

3    the notes may not have had all of that material, that

4    material -- all the things about Prakash's other jobs, things

5    like that, were disclosed in other reports, and have already

6    been disclosed.

7         THE COURT:  That's a good possibility, but right now

8    we don't know.  Let me see if I can streamline this

9    discussion.

10        MR. NOLAN:  Of course.

11        THE COURT:  You both seem to be telling -- no, I guess

12   Mr. Almadani said he is, and he isn't, but you seem to be

13   telling me you don't want to go forward with this *Franks*

14   hearing until you've had an opportunity to respond to all of

15   the arguments about the *Brady* motion, right?

16        MR. NOLAN:  I am -- I am saying that if the defense's

17   position is the materials that we -- we were deprived an

18   opportunity to prepare for this hearing, then, yes, we would

19   like to do two things.

20        One, first of all, if the defense's initial reaction

21   to receiving this was:  Hey, there's material in here that I

22   need to brief.  I'm going to do a motion to postpone based on

23   your disclosing this at this time.  We, of course, would not

24   have objected to that.

25        So that's the first thing, so we are not necessarily

17

1    in objection to giving the defense as much time as it needs if

2    it feels this material is helpful to a *Franks* hearing, and we

3    would like the opportunity to respond to that, so I guess

4    that's what I'm saying.

5         If it's not, if the defense is saying:  You know, I

6    wasn't going to use any of this material anyway, then I think

7    we can proceed with the *Franks* hearing.

8         THE COURT:  They are not saying they weren't going to

9    use this material.  There are actually some things they are

10   telling me that they not only were going to use, they do want

11   to use, and they think it's highly relevant.  Let me ask you

12   another question.

13        MR. NOLAN:  Of course.

14        THE COURT:  What do you think the sanction ought to be

15   if the Court finds you did violate *Brady*?

16        MR. NOLAN:  Right.  So the important thing on this is

17   that as soon as we discovered this piece of material, we

18   disclosed it.  We disclosed all of the notes.  Here they are.

19   We were going to do that anyway, just as we did before the

20   first hearing.

21        THE COURT:  You were going to do what anyway?

22        MR. NOLAN:  Disclosing the notes --

23        THE COURT:  All of the notes?

24        MR. NOLAN:  No, not every note, but the notes that

25   were permanent to this hearing.  So now knowing that this was

18

1    not done intentionally, we were not trying to hide materials.

2    We were not doing that in any kind of intentional way.  Once

3    the mistake was uncovered, it was disclosed immediately.  So

4    then the question becomes:  What is the prejudice?  And in

5    terms of trial, there's no prejudice.  We're well before trial,

6    so it can be used at trial.

7            The prejudice, necessarily, is what -- what -- can we

8    use this material in this hearing, and that may require

9    postponing the hearing, and we understand that.

10           Now, in terms of sanctions, the Defendant's motion,

11   which was filed last night, the discovery motion, and this is

12   why I would ask for an opportunity to respond.  I've only had a

13   chance to read it one time, and haven't spent the thorough

14   research that a motion like that deserves to be able to

15   respond.  But my initial reading is he sets forth, essentially,

16   a list of sanctions.  Six requests that he's asking the Court

17   to order the Government to do to cure this defect.

18           What I would ask is an opportunity to respond to it,

19   because when I read those, some of those I think either may

20   have already been done.  I think two of them actually were

21   done.  Some of them I think we can do.  We're not necessarily

22   obligated to do, but we can be reasonable, and we'll do it.

23           THE COURT:  I don't know what those six things are.  I

24   am not privy to that request.

25           MR. NOLAN:  It was in the motion.  I don't have the

19

1    hard copy with me, because it was just filed last night

2    electronically, but there's a series of essentially six things.

3    I believe it was six, it may have been more.  But it was A

4    through maybe F, G -- do you have a copy, Mr. Almadani, a hard

5    copy?

6              MR. ALMADANI:  Only on my --

7              MR. NOLAN:  Here we go, your Honor.  The defense's

8    motion has in Section -- Section 3 A through G, excuse me, A

9    through H.

10             THE COURT:  All right.  I don't have it right in front

11   of me now, but I'll believe you.

12             MR. NOLAN:  So what we would like is the opportunity

13   to respond to that, because there may be areas where we can do

14   that.  If there are areas where we couldn't do that, we'd like

15   to be able to brief that.

16             I'd like to be able to give the motion consideration.

17   I'd like to be able to talk with others at the Department to

18   make sure that what we may agree to do is consistent with

19   department policy and the law.

20             And then where there's areas where we think we

21   shouldn't do that, we're not obligated to do it, and we have a

22   disagreement between the defense and the prosecutors, we'd like

23   to brief that so that we can narrow these issues to the Court,

24   and then the Court can rule on what it needs to do having been

25   briefed.

20

1           THE COURT:  There are two separate questions here.

2    One is whether these new revelations affect the *Franks* motion,

3    and I think the answer to that is they do.  Mr. Almadani wants

4    to have the Court consider the information he has received in

5    these notes in connection with the *Franks* hearing, and that

6    sounds like a reasonable request.

7           The other question is:  Does it constitute a *Brady*

8    violation, and if so, what are the sanctions?  You and I may

9    have a different understanding of *Brady*.  You said it several

10   times now, that the failure to disclose this information was

11   not intentional on your part.

12          I don't read *Brady* to require intentional failure to

13   disclose exculpatory information.  It's an affirmative

14   obligation on the Government.  When you go back to the

15   department, and you talk to them about department policy, I

16   hope they all agree with me.

17          MR. NOLAN:  Right.

18          THE COURT:  Now, it's -- it's not negotiable.  You

19   don't -- if it's *Brady* material, you turn it over.  That's --

20   that's the bottom line, and the next question becomes, if you

21   haven't done that, what is the sanction?  So if you are going

22   to brief something, I suppose that's the second question that

23   you need to brief.

24          MR. NOLAN:  And I would argue that the sanction

25   depends on the prejudice, and so I think that's the

21

1    intermediate step is to determine what prejudice has been made

2    by the timing of the --

3            THE COURT:  Right.  There's some prejudice already.

4    The prejudice has been not only to defense counsel, but to the

5    Court.  I come out here this morning ready to hear arguments,

6    ready to hear testimony, if necessary, and ready to decide at

7    the end of those arguments and testimony the *Franks* motion.

8            Now, we have to put it over, and I have to go through

9    that again.  Mr. Almadani has to put additional time, which, I

10   assume, he bills to his client on this case now, because he

11   wasn't able to go over these materials earlier in connection

12   with the motion.  There's already some prejudice.

13           So I think you need to look seriously, if there's a

14   *Brady* violation, what is the sanction, and there's case law on

15   that, I'm sure.

16           Okay.  Mr. Almadani, how do you suggest we proceed

17   from here?

18           MR. ALMADANI:  Your Honor, I think it does then make

19   sense to put it over for us to be able to review, but I would

20   like to respond to a couple of the points Mr. Nolan was making,

21   because I don't think they are entirely fair.

22           First of all, your Honor, when the Government

23   represents that its gone over these notes, and there's nothing

24   inconsistent, and I don't find just one line, your Honor.  I

25   find line after line, item after item.  The point is that these

22

1    notes were made prior to the warrant being authored.

2         If we had these notes earlier, we could have

3    potentially brought a *Franks* motion quite a bit earlier.  As

4    the Court has noticed in their oppositions, they have been

5    trying to -- to just not even have a *Franks* hearing.

6         That's unfair for them -- in their opposition they

7    moved this Court to not even have a *Franks* hearing, to just

8    have a status conference before disclosing these notes.  That's

9    not okay for the Government to do, because we trust them to

10   give us -- to over-produce so that we can also make a

11   determination.

12        Clearly they've gone over these things, and they have

13   not understood what *Brady* is.  They have to err on the side of

14   caution.  My client's also prejudiced, your Honor, because she

15   has Speedy Trial rights.  That's why you have to go -- as a

16   former prosecutor, I was always taught to go over your file

17   before you indict.  You have the control -- the timing of the

18   indictment.  You have to go over your file.  You got to get

19   your *Brady* material together.

20        You can't be producing that a year later, a year and a

21   half later, because you have an obligation to bring the

22   Defendant to trial in 70 days.  Yes, we put it over a lot of

23   times for counsel to prepare, but that doesn't excuse their

24   violation, and the prejudice that occurs when this type of a

25   violation occurs, your Honor.

23

1          You know, the other thing is this notion, and this

2     idea that these things are disclosed in another report, they

3     are not, because the timing actually matters.  If there was an

4     interview of, let's say, Prakash or Alfredo done in September

5     of 2018, and something like this was disclosed in that

6     particular ROI, that is not -- that's still not a sufficient

7     disclosure, because the timing matters.  In order for us to

8     bring the *Franks* motion, we had to know these notes and this

9     interview took place earlier than the warrant.

10          So if they've disclosed it in an ROI, you know, two

11     years later he said the same thing, that's not sufficient, your

12     Honor.  This has been pretty significant.  You know, the other

13     part of it is, your Honor, that I have been asking them and

14     asking them, and I've been very nice about it, and very patient

15     about it.  They haven't even disclosed the unredacted report,

16     so we could actually have a meaningful cross-examination with

17     the name Prakash on there.  These reports refer to P.K. and

18     E.L., and L, and the Court has had discussions with them about

19     it.

20          We're entitled to that information.  There is no

21     witness safety issue here, your Honor, absolutely none, and so

22     we're entitled to have the reports.  We're also entitled to

23     have the unredacted reports, because this case is built

24     entirely on impeachable witness testimony.  It's all -- it's

25     these individuals who wanted immigration benefits, and they

24

1    have twisted and exaggerated stories to get them, and that's

2    why this woman is sitting here, and her life is turned upside

3    down because of that, and that's not fair.

4         And so we're entitled to investigate their witnesses

5    ourselves.  We're not going to go bother the witnesses, but

6    we're entitled to investigate who these people are that are

7    accusing her.  She's entitled to that, your Honor, and --

8         THE COURT:  So what is there about the reports that

9    prevents you from doing that?

10        MR. ALMADANI:  Because when we get a name -- when we

11   get a report that's saying E.L. said that, we don't know who

12   E.L. is, we'd like to be able to know who E.L. is.  What the

13   true name is so that we can run a -- you know, run our own

14   private investigator to check out who this person is, what this

15   person's representation is in the community.  This bears on

16   credibility of these witnesses apparently the Government has

17   banked its entire case on.

18        THE COURT:  Well, I'm not so sure that what you are

19   talking about here is *Brady* material.  The ability to

20   cross-examine a witness.

21        MR. ALMADANI:  That falls under Rule 16, your Honor.

22   I apologize --

23        THE COURT:  It does, but that's not *Brady*.  Some

24   courts have undertaken to review everything the Government has,

25   and go through it and decide what's *Brady* material and what

25

1    isn't.  I have never done that.

2            The one reason I haven't done it is I don't have the

3    time.  Another reason I haven't done it, is that I'm not as

4    familiar with the reports as the Government is.  I'm not as

5    familiar with the potential defenses, and it is almost

6    impossible for me to know what's exculpatory without knowing

7    more about the case, which I don't.

8            But the primary reason that I don't do that is I don't

9    think it's my job.  I think it's the United States Attorney's

10   job.  *Brady* says so much, and I insist that the United States

11   Attorney do his or her job.  That's the primary reason I don't

12   do it.

13           So I'm not going to take the Government's reports and

14   look at what they've redacted and decide whether it's *Brady*

15   material or not.  I'm not going to take the Government's

16   reports and look at things that they haven't turned over and

17   decide whether it's *Brady* material or not.  That's the

18   Government's job, and when you have a doubt, you turn it over.

19   That's the -- that's the only way it works.

20           So, I'm not going to order the Government to turn over

21   unredacted reports.  I've already ordered the Government to

22   turn over *Brady* material, and I'm going to have you brief the

23   question of whether there is a continuing *Brady* violation,

24   whether there has been a *Brady* violation in the past, and as

25   part of that question, I want to know what the sanctions are,

26

1    if there have been.  Now, it undoubtedly will depend on the

2    extent that the Court may or may not find a violation, but I

3    want to know that.

4            I believe all of that is a separate question from the

5    *Franks* hearing, which we're still going to go forward with.  So

6    I hate to have to do this again, but I'll let you file new

7    briefs on the *Franks* issue, and I'll ask that you put it all

8    together in one place, so I don't have to go back to the old

9    briefs and the new, and decide what's new and what isn't.

10   We'll start from scratch on the *Franks* motion.

11           We'll start with Mr. Almadani's brief, and then if you

12   need more time to make sure you've got all the material the

13   Government is going to give you, then I'll give you that time.

14   Then we'll have the Government's brief, and a reply, and then

15   we'll come back here for a hearing.

16           My position on the hearing was that if anybody wants

17   to call a witness, the Court will hear those witnesses in the

18   *Franks* hearing.  I know that there are courts that have said we

19   don't need a *Franks* hearing, and they've written long opinions

20   about why they do not, and sometimes those opinions are

21   affirmed.  Sometimes they are not.

22           But I always like to say that if the issue is serious

23   enough for us to be talking about it, it's serious enough for

24   me to hear whatever evidence one side or the other wants me to

25   hear on the motion.

27

1          So on the *Franks* motion, if either one of you wants to

2     call witnesses, I will hear those witnesses, and that will be

3     the *Franks* hearing.  Now at the same time, we might as well

4     have that *Brady* issue fully briefed so that we can decide that

5     at the same time, because we can't just keep going with this

6     case.  As you point out, Dr. Sheikh has a right to have this

7     case brought to trial, and brought to trial quickly.

8          Now, if I hear again that there's material that I find

9     to be *Brady* material that hasn't been turned over after this, I

10    guarantee you the sanctions are going to be as severe as the

11    law allows.  All right.  Suggest a briefing schedule.

12          MR. ALMADANI:  May I have a moment to look at my

13    calendar, your Honor?

14          THE COURT:  Yes.

15          MR. NOLAN:  May I ask a simple question on this in

16    terms that you talked about briefing -- redo the *Franks*

17    hearing, and I just want to be clear on that.  So this will be

18    as if it supercedes the last one; is that what you are saying?

19          THE COURT:  Yes, I want it all together in one

20    place.

21          MR. NOLAN:  Okay, so -- and then there is currently a

22    pending motion on discovery.  Would you want the Government to

23    respond to that motion that was filed last night by the

24    defense?

25          THE COURT:  Refresh my recollection.  Didn't I tell

28

1    you in this case I would hear discovery motions instead of the

2    Magistrate, or is that a different case?

3            MR. NOLAN:   I don't know if that's come up.

4            THE COURT:  Our local rules are the discovery motions,

5    in criminal or civil cases, are heard by our magistrate judges.

6    On some occasions, in order to simplify it, expedite matters,

7    and keep all the motions before me, I've said I would hear

8    discovery motions.

9            I don't know if I said that in this case.  If I

10   didn't, it's the magistrate judge that will hear it.

11           MR. ALMADANI:  Your Honor, may I address that?  Just

12   because of the history of this case, and what's gone on, and

13   the way that the Government has not disclosed matters, we would

14   prefer that your Honor hear these motions, but, of course, it's

15   up to the Court.

16           THE COURT:  I think that probably makes sense if, for

17   no other reason, besides what Mr. Almadani says, timing.  I

18   want to make sure that -- the way we do these motions makes

19   sense.

20           So what's the discovery motion?  Is that on file now?

21           MR. NOLAN:   Yes --

22           MR. ALMADANI:  It is on file, your Honor, and I just

23   had it open, I apologize.  Okay, here it is, your Honor.  So

24   we've made a discovery motion on the basis of not just *Brady*,

25   but Rule 16, Rule 26.2, and, well, *Giglio* and *Henthorn* are

29

1  related to *Brady*, so those would be part of the *Brady* motion.

2          But there is a motion on Rule -- on the basis of Rule

3  16.  That has to do with the -- the witness' names, your Honor.

4  There's no reason to have redacted witness names, because we

5  are entitled to know who these people are, who the accusers

6  are.

7          And especially given the fact that these witnesses,

8  based on the notes that we're getting now, and the reports that

9  we're getting, they are highly impeachable witnesses.  We're

10  entitled to do our own investigation on them.

11          We're not -- you know, there's no -- this is not a

12  gang case.  It's not a drug case --

13          THE COURT:  No minors involved?

14          MR. ALMADANI:  No minors involved, your Honor.

15          THE COURT:  When is that motion noticed for hearing?

16          MR. ALMADANI:  Actually, your Honor, we included it

17  with our sur-reply, but I can notice a brand new motion for

18  that if the Court would like.

19          THE COURT:  Make it separate.  Let's keep these things

20  separate.

21          MR. ALMADANI:  Sure, your Honor.

22          THE COURT:  Now there's three things.  There's the

23  *Franks* issue, the *Brady* issue, and now there's the discovery

24  motion.

25          MR. ALMADANI:  Yes, your Honor.

30

1          THE COURT:  Put the discovery motion on for hearing.

2     I think it makes sense before we go forward with the rest of

3     the *Franks* hearing.

4          MR. ALMADANI:  Yes, your Honor.

5          THE COURT:  So you've already got it.  When would you

6     like to -- how much time would you want to respond?

7          MR. NOLAN:  14 days.

8          THE COURT:  So it's on file now.  If you had 14 days

9     to reply, you'd have until about the second week in March.

10    I'll give you until March the 9th to respond.  Do you want to

11    reply?  Do you want a week to reply?

12         MR. ALMADANI:  Yes, your Honor.

13         THE COURT:  March the 16th, and then we can hear that

14    on March the 23rd, through the discovery motion, on March the

15    23rd.

16         MR. ALMADANI:  If your Honor can give me just a moment

17    to check my calendar.  March 23 sounds dangerous to me, but if

18    the Court could give me a second.

19         I apologize, your Honor, I have a case management

20    conference that day in Southern California.

21         THE COURT:  Do you want to put it over one week to

22    March 30th?

23         MR. ALMADANI:  That works for me.

24         THE COURT:  So that will be the order then.  Let's set

25    the *Franks* hearing for some time after that.  Now, the question

31

1   is, do you need to know what materials you are going to have

2   from the discovery motion before you brief the *Franks* motion?

3   I don't want to have to do it a third time.

4          MR. ALMADANI:  I agree, your Honor.  We -- I don't --

5   I just have not been given the materials, so I have no idea

6   what to expect --

7          THE COURT:  Okay.  Let's go back here a minute, and

8   ask whether you really need two weeks to respond to this

9   discovery motion.  Have you seen the discovery motion?

10          MR. NOLAN:  I read it through once last night.

11          THE COURT:  Does it look like you really need two

12   weeks, or does it look like you could do it in a couple days?

13          MR. NOLAN:  Well, because I would like to -- I don't

14   know if a couple of days, necessarily, just scheduling in other

15   cases --

16          THE COURT:  Let me see the discovery motion.  Do you

17   have a copy of it?  I have it right here.  Let me look.

18          MR. NOLAN:  It's specifically -- it's Section 3 is

19   what I was referring to last time.

20          THE COURT:  Well, it's two pages, but it covers a lot

21   of categories.

22          MR. ALMADANI:  Yes, your Honor.  It starts on page

23   four.  These are essentially renewed discovery requests.  These

24   are all things that they are obligated to produce without us

25   really asking for them.

32

1          MR. NOLAN:  If I could address that, your Honor --

2          THE COURT:  Well, they are not all things.  I'm just

3    looking at the title here, "Grand Jury testimony."  They are

4    not required to give you Grand Jury testimony, per se.

5          MR. ALMADANI:  Unless it falls within Rule 26.2, your

6    Honor.  That's all we're asking for.  If it falls within Rule

7    26.2, we're entitled to it.  Otherwise, the Court is correct.

8          MR. NOLAN:  That is why we would like the opportunity

9    to respond to it.  I do think there are things in there that we

10   either have done already, and would like to be able to point

11   that out, and go over that with defense counsel --

12         THE COURT:  You know, I don't care.  At this point,

13   unless we're talking about *Brady* --

14         MR. NOLAN:  Okay --

15         THE COURT:  -- I don't care about that you've done it

16   before.  They should have known.  These types of issues.  I

17   just want to know should I grant it, or should I deny it?  If

18   you've already done it, then you don't care whether I grant it.

19         And if there's some reason that you shouldn't be

20   required to turn it over, or you don't want to turn it over,

21   then I need to know that.

22         MR. NOLAN:  And that's what we'd like the opportunity

23   to do.  I just haven't had the opportunity --

24         THE COURT:  I'll give you one week.  How about one

25   week?  March the 2nd.

33

1          MR. ALMADANI:  That would make our reply, your Honor,

2    due on March 9?

3          THE COURT:  March 9.

4          MR. ALMADANI:  Yep.

5          THE COURT:  And then I could hear it on March the

6    16th.

7          MR. ALMADANI:  March 16 would work for us, your

8    Honor.

9          THE COURT:  Is that all right for you?

10          MR. NOLAN:  Can I double-check?

11          MR. ALMADANI:  As they are checking that, your Honor,

12    there is an issue with the *Brady*.  We believe there's still

13    outstanding *Brady* material, and before we brief the issue of

14    whether *Brady* was violated, we need that material, so they

15    would have to -- I think they have to make some supplemental

16    disclosures, but, you know...

17          THE COURT:  Well, no.  They've already been ordered to

18    turn over *Brady* material.  If they haven't, that's the

19    violation.  They don't get to keep coming back and saying:  How

20    much *Brady* do we give you now?  How much *Brady* do we give you

21    later?  When do we give it to you?  They don't get to do that.

22    They are representing to the Court that they've given you all

23    *Brady* material.  If that representation is false, we'll deal

24    with it.

25          MR. ALMADANI:  Yes, your Honor.

34

1            THE COURT:  So is the 16th okay?

2            MR. NOLAN:  We will make that work.

3            THE COURT:  All right.

4            THE CLERK:  Is that 9:00 o'clock?

5            THE COURT:  Well, that's the calendar.  Let me see

6    what else is on the calendar.  We may be able to have you come

7    in a little later since you're coming in from out of town.

8            THE CLERK:  Nothing right now --

9            THE COURT:  Okay, 9:00 o'clock.

10           MR. ALMADANI:  Yes, your Honor.

11           THE COURT:  And that's just the hearing on the

12   discovery motion.

13           MR. ALMADANI:  Yes, your Honor.

14           THE COURT:  Okay.  Is the schedule clear now?

15           MR. NOLAN:  The schedule is clear for the discovery,

16   and then I --

17           THE COURT:  Well, the schedule for everything else,

18   too.

19           MR. NOLAN:  And then at that time, is it at that time

20   that we'll then set out a schedule for *Franks*?

21           THE COURT:  Right.  We're going to break it down the

22   way I said.

23           MR. NOLAN:  I understand.

24           MR. ALMADANI:  Thank you, your Honor.

25           THE COURT:  All right.

35

1        (The proceedings adjourned at 9:48 a.m.)

2                    --oOo--

3    I certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5                        /s/ Tiphanne G. Crowe

6                        _____
                         TIPHANNE G. CROWE
7                        CSR No. 10958

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Ex. BBB

1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,                    No. 2:06-cr-0058-JAM-EFB P

12              Respondent,

13        vs.                                        ORDER

14    JAGDIP SINGH SEKHON, MANJIT
      KAUR RAI,
15
                Movants.
16

17

18           Movants Jagdip Singh Sekhon and Manjit Kaur Rai have filed  motions to vacate, set

19    aside, or correct their sentences pursuant to 28 U.S.C. § 2255.[1]  ECF Nos. 622, 627.  The court

20    has determined that two claims (presented in both § 2255 motions) merit an evidentiary hearing.

21    ECF No. 678.  The first of these claims alleges that government witnesses Carol Webster and

22    Ranbir Khera offered testimony which the government knew to be false in violation of *Napue v.*

23    *Illinois*, 360 U.S. 264 (1959).  The second is that the government failed to disclose that it had

24    offered Khera legal permanent residency in exchange for his testimony in violation of *Brady v.*

25    *Maryland*, 373 U.S. 83 (1963).  Movant Rai now asks the court for leave to conduct Khera's

26    deposition and to amend her § 2255 motion.  ECF Nos. 705, 710.  She has filed a proposed

27    _____

28        [1]   These motions were assigned, for statistical purposes, the following civil case numbers:
      No. 2:15-cv-2491-JAM-EFB and No. 2:16-cv-00067-JAM-EFB.

1    amended motion.  ECF No. 711.  Movant Sekhon has filed single-paragraph notices of joinder in

2    Rai's motion for deposition and motion to amend.  ECF Nos. 712, 713.

3    **I.      Background**

4           In 2009, movant Sekhon was convicted of a single count, and movant Rai of several, of

5    violating federal law in connection with the filing of fraudulent asylum applications.  In its

6    opposition to Sekhon's § 2255 motion, the government includes a brief summary of the facts of

7    the case.  The court reproduces this summary in part solely for background purposes.

8            Sekhon & Sekhon was founded in 1995 by Defendant and his younger
             brother, Jagprit Sekhon. ECF No. 504-11 at 54–57 (RT 6215–18).  The
9            firm focused on representing clients in immigration proceedings. Id. at 54,
             59 (RT 6215, 6220). The firm maintained offices in San Francisco and
10           Sacramento. ECF No. 502-9 at 46 (RT 652).  Defendant was based in the
             San Francisco office while Jagprit was based in the Sacramento office. Id.
11           Defendant specialized in asylum work. ECF No. 504-11 at 59 (RT 6220).

12           In 2002, a United States asylum officer, Mark Temple, became suspicious
             about asylum claims filed on behalf of Sekhon & Sekhon clients. ECF No.
13           502-7 at 50–51 (RT 455–56). The matter was referred to Immigration and
             Customs  Enforcement  (ICE)  Special  Agent  Carol  Webster  for
14           investigation. ECF No. 502-7 at 55–56 (RT 460–61). During the course of
             the investigation, Special Agent Webster had a confidential informant pose
15           as a potential Sekhon & Sekhon client. ECF No. 503-10 at 79–80 (RT
             2295–96). The informant recorded meetings with defendants Jagprit
16           Sekhon, Rai, Caza, and Harmath; those recordings were later played at
             trial. ECF No. 504 at 23–29 (RT 3487–93).
17

18   ECF No. 646 at 7-8.  At trial, the government introduced testimony and evidence from various

19   sources with the intent of proving that Sekhon & Sekhon was a "fraud factory" wherein "each

20   defendant played a different role in the process, but each was vital to the overall scheme, the

21   processing of fraudulent asylum claims."  Id. at 9-13; ECF No. 504-14 (RT 6680).

22           **A.      False Testimony**

23          Movants argue that the government knowingly presented false testimony from Agent

24   Webster and Ranbir Khera.  ECF No. 622 at 62-72; ECF No. 627 at 49-54.  As noted above,

25   Webster was an Immigration and Customs Enforcement agent who investigated Sekhon &

26   Sekhon for asylum fraud.  ECF No. 502-7 at 55-56 (RT 460–61).  Khera is an Indian national

27   who first sought immigration assistance from Sekhon & Sekhon's Sacramento office in 2000.

28   /////

                                              2

1   ECF No. 503-2 at 75-79 (RT 1633-1637). Khera testified that he met with Sekhon's brother

2   Jagprit, signed several documents, and subsequently received an asylum application from the firm

3   by mail. *Id*. at 76-84 (RT 1634-1642). He testified that the application contained several

4   statements which falsely described both his involvement with a Sikh separatist movement and

5   local police retaliation against him stemming from that affiliation. *Id*. at 85-90 (RT 1643-1648).

6   Khera testified that he called Jagprit Sekhon and informed him that, due to the falsity of those

7   statements, he would not attend his asylum interview. *Id*. at 92 (RT 1650). Khera would later

8   marry a United States citizen and seek renewed adjustment to his immigration status. *Id*. at 93-94

9   (RT 1651-1652). Officials referred him to the Sacramento Immigration Office sometime in 2005,

10  and he testified that he first met Webster at that time. *Id*. at 95 (RT 1653).

11       Both movants allege that, at trial, Khera and Webster misrepresented their interactions.

12  They state that both witnesses falsely testified about a 2005 meeting in Sacramento between

13  Webster, Khera, and his wife, Sarbjit Kaur, which actually never occurred. ECF No. 503-3 at 81-

14  85 (RT 1743-1747); ECF No. 504 at 53-54 (RT 3517-3518). Webster testified that, as a result of

15  observing the couple's interaction at this meeting, she was convinced that their marriage was

16  *bona fide*. ECF No. 506 at 47- 48 (RT 3804-3805). Webster would go on to maintain that she

17  had not promised Khera any favorable adjudication in exchange for his testimony and state that,

18  based on meeting the couple, she "was confident that he would have gotten his green card" on the

19  *bona fides* of the marriage. ECF No. 504 at 54-57 (RT 3518-3521); ECF No. 506 at 61-62 (RT

20  3817-3818). Movants argue that Webster's testimony was perjured and have provided

21  declarations from Kaur which state that she never met Webster or travelled to Sacramento with

22  Khera to discuss his immigration status with anyone. ECF No. 622-10 at 298; ECF No. 627-2 at

23  167. Movants emphasize that Khera and Kaur *did* attend an interview with a different

24  immigration official in San Francisco in 2003 to establish their marriage *bona fides*. After

25  meeting with the couple, that immigration official raised numerous concerns about the legitimacy

26  of the marriage. *See* ECF No. 622-3 at 44; *see also* ECF No. 627 at 36. Finally, movants point to

27  a 2006 memo from Webster to the Fresno office of Customs and Immigration Services requesting

28  that Khera's immigration status be adjudicated. ECF No. 622-3 at 29. The memo describes

1    Khera as a "key witness in an ongoing ICE criminal investigation regarding the preparers of his

2    asylum application" and notes that the information he provided was "crucial to the indictment of

3    three attorneys in an asylum fraud ring." *Id.* Movants contend that this language is indicative of

4    Khera being provided an adjudicative benefit for his testimony. *See* ECF No. 627 at 36.

5        Movants state that the foregoing discrepancies are material. They argue that they show

6    that Khera was not, as the government presented at trial, granted permanent residence as a matter

7    of course.[2] Rather, the movants contend that the fabrication of the 2005 meeting and the

8    weakness of the 2003 marriage interview both indicate that Khera could only have been granted

9    permanent residence in exchange for his trial testimony. Movants conclude that the revelation of

10   Agent Webster's alleged perjury in this matter would have undermined her overall credibility as a

11   witness and the government's case against them would have weakened significantly.

12       **B.    Failure to Disclose**

13       Movants also argue that the government violated its obligations under *Brady v. Maryland*,

14   373 U.S. 83 (1963) by failing to inform the defense that Khera had been granted lawful

15   permanent residence in exchange for his testimony. ECF No. 622 at 81; ECF No. 627 at 56-57.

16   The government maintains that Khera was not given anything in exchange for his testimony.

17   ECF No. 646 at 35; ECF No. 658 at 28-29.

18

19       [2] At trial, Judge Damrell noted his own concerns about the investigation into Khera's
20   marriage. He referenced the 2003 meeting with the San Francisco immigration official where
     concerns were raised about the legitimacy of Khera's marriage and stated:

21
                 All the documents seem to point to a problem. The interview points to
22               questions that the hearing officer had that apparently were not resolved at
                 the hearing.
23

24               …

25               My concern is it is left on the cliff anticipating something beyond that, and
                 the next thing that we know, the witness has got a permanent status.
26

27   ECF No. 503-3 at 102 (RT 1764). Government counsel agreed to look into the matter (*Id.* at 103
     (RT 1765)) but stated that "to [his] understanding" Webster had no influence on Khera's
28   adjudication. Webster confirmed that understanding in her testimony the next day. ECF No. 504
     at 53-57 (RT 3517-3521).

4

**II.**   **The Motion to Depose Ranbir Khera**

        **A.**   **Governing Law**

District courts may, for good cause, authorize parties to a § 2255 motion to conduct discovery "under the Federal Rules of Criminal Procedure of Civil Procedure, or in accordance with the practices and principles of law."  Rule 6, Rules Governing Section 2255 Proceedings; *United States v. Finkel*, 165 F. App'x 531, 532-33 (9th Cir. 2006); *United States v. Dollison*, No. 3:09-cr-00106-SLG-DMS, 2017 U.S. Dist. LEXIS 142584, at *17 (D. Alaska Sep. 4, 2017). Good cause under Rule 6(a) exists "where specific allegations before the court show reason to believe that the petitioner may, if facts are fully developed, be able to demonstrate that he is entitled to relief."  *Finkel*, 165 F. App'x at 533 (internal quotation marks and citations omitted). Discovery should not be granted "for fishing expeditions to investigate mere speculation" or "conclusory allegations."  *Id.*; *Dollison*, 2017 U.S. Dist. LEXIS 142584, at 17.  The Ninth Circuit reviews the district court's discovery determination for abuse of discretion.  *Finkel*, 165 F. App'x at 533.

        **B.**   **There Is Good Cause for the Deposition**

To determine whether there is good cause for the requested deposition, the court must ask whether movants have provided reason to believe that, with further factual development, they could make out their constitutional claims.  Those claims are brought under *Napue* and *Brady*.

The Supreme Court's decision in *Napue v. Illinois* holds that "a conviction obtained through use of false evidence, known to be such by representatives of the State" violates a defendant's rights under the Fourteenth Amendment.  360 U.S. 264 at 269 (1959).  *Napue* is also violated where "the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Id*.  *Napue* draws no distinction between false testimony that goes directly to a defendant's guilt and testimony that bears only on the credibility of a witness.  *Id*.  To prevail on a *Napue* claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material."  *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003).
/////

1  "In assessing materiality under *Napue*, we determine whether there is any reasonable likelihood

2  that the false testimony could have affected the judgment of the jury; if so, then the conviction

3  must be set aside." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (internal quotations and

4  citations omitted). "Under this materiality standard, the question is not whether the defendant

5  would more likely than not have received a different verdict with the evidence, but whether in its

6  absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

7  *Id*. Mere inconsistencies in testimony are insufficient to establish either that the testimony was

8  false or that the prosecutor knowingly used false testimony. *United States v. Croft*, 124 F.3d

9  1109, 1119 (9th Cir. 1997).

10     *Brady v. Maryland*, 373 U.S. 83 (1962) and its successors require the prosecution to

11  disclose evidence that is favorable to the accused, "either because it is exculpatory, or because it

12  is impeaching." *Strickler v. Greene*, 527 U.S. 263, 282 (1999). There is no violation under

13  *Brady* unless the evidence the prosecution failed to disclose prejudiced the accused – that is, that

14  there is a reasonable probability the suppressed evidence would have produced a different verdict.

15  *Id*. at 281.

16     In finding that movants are entitled to an evidentiary hearing on their *Napue* and *Brady*

17  claims, the court has already found that they have provided the court with specific factual

18  allegations which, if true, state claims on which relief under § 2255 could be granted. ECF No.

19  671 at 9-10. The court concluded that Sarbjit Kaur's affidavit did not simply imply that Khera

20  and Webster lied on the stand; instead, it flatly refuted their testimony about the 2005 meeting.

21  *Id*. at 9. It further found that the inconsistency between Kaur's account and that of the two

22  government witnesses was not explored at trial and that, "given the import of Webster's

23  testimony to the government's case, the court cannot simply dismiss her allegedly false testimony

24  as immaterial." *Id*.

25     Movants have provided additional evidence in support of these claims gathered in early

26  November 2017. ECF No. 714-1 (Decl. of Frank W. Huntington III); *see* discussion regarding

27  Motion to Amend, *infra*. At that time, Rai's attorney Kresta Daly traveled to New York City with

28  investigator Frank Huntington to investigate Rai's case. As part of the investigation, the two

6

1   located and interviewed Maribel Diaz, Khera's first wife.  *Id.*  Diaz told Huntington and Daly that

2   she had been paid to marry Khera and met him for the first and only time when they were married

3   at the Clerk's office.  *Id.*  This evidence contradicts Khera's trial testimony that he and Diaz

4   married because they were in love and various other representations about the marriage and

5   subsequent divorce.  ECF No. 714 at 1-2.

6          The evidence provided by movants, if it holds up, indicates that two government witnesses

7   – including the government's chief investigator – gave false or misleading testimony at trial.  If

8   Webster falsely testified about meeting Khera and Kaur to determine the bona fides of their

9   marriage, a reasonable inference from this fact would be that she was also willing to take steps to

10  influence the positive outcome of Khera's immigration petition, including overlooking his alleged

11  marriage fraud(s).  Obviously, the government disputes any these allegations and any such

12  inference.  But good cause has been shown to permit movants the discovery they seek on the

13  matter.  With further factual development (including deposing Khera to determine the extent of

14  his false testimony, whether any advantages were offered for false testimony, who offered such

15  advantages, etc.), movants may be able to show that the government knew or should have known

16  that it was presenting false testimony (*Napue*) and/or that it failed to disclose impeaching

17  evidence to the defense (*Brady*).

18         The government argues that movants already know what Khera will say at the deposition

19  because he will simply repeat his trial testimony.  The basis for this assertion is unclear,

20  especially since there are issues that were not explored at trial (e.g., the discrepancy between

21  Kaur's account of the marriage and Khera's and the discrepancy between Khera's and Webster's

22  account of the Sacramento interview and Kaur's declaration that no such meeting occurred).  The

23  government also argues that movants can develop their claims through resort to other evidence.

24  But Khera is certainly a valid and perhaps the best source of evidence regarding the veracity of

25  his testimony and whether he was induced to provide false testimony.  Thus, there is good cause

26  for Khera's deposition.

27  /////

28  /////

7

**III.    The Motion to Amend**

    **A.    Governing Law**

    Whether to allow amendment of a § 2255 motion is governed by Federal Rule of Civil Procedure 15.  28 U.S.C. § 2242 (providing that a petition for writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions."); Rule 12, Rules Governing Section 2255 Proceedings (incorporating the Federal Rules of Civil and Criminal Procedure to § 2255 proceedings to the extent not inconsistent with other statutory provisions); *Mayle v. Felix*, 545 U.S. 644, 654-56 (2005).  Where, as here, a responsive pleading has been filed, movants must obtain leave of court to amend, which should be freely given when justice so requires.  Fed. R. Civ. P. 15(a)(2).

    In the Ninth Circuit, courts consider five factors to determine whether to grant leave to amend: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the party has previously amended her pleadings.  *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).  The factors do not have equal weight, however: leave to amend may be denied solely on the basis of futility of amendment.  *Id.*

    The government opposes amendment.  It argues that amendment is futile because: (1) the proposed amendments are untimely under 28 U.S.C. § 2255(f) and do not "relate back" to the original claims under Rule 15(c), and (2) the amendments do not state viable claims or materially support the existing claims.

    **B.    The Factors Favor Allowing Amendment**

    Rai's motion to amend does not identify specifically what she is seeking to add to or change about the original § 2255 motion.  Similarly, Sekhon has simply filed a single-page notice of joinder in the motion for leave to amend, without any indication of how that joinder would operate, since his original § 2255 motion is separate from Rai's and the proposed amended motion concerns Rai only.  However, comparing their original § 2255 motions to the proposed amended motion reveals the following proposed changes.

    Rai's original petition (ECF No. 627) asserted four claims: (1) a *Napue* claim based on the alleged perjury of Webster, Khera, and another witness named Mojaddidi; (2) a *Brady* claim

based on the alleged perjury of Webster and Khera and potential deal between them to confer an immigration benefit on Khera; (3) an ineffective assistance of trial counsel claim based on counsel's failure to present as a witness Professor Smith, an expert in immigration law; and (4) a cumulative error claim.

Sekhon's original petition (ECF No. 622) also asserted four claims: (1) a *Napue* claim based on the alleged perjury of Webster, Khera, Mojaddidi, and another witness named Davinder Singh; (2) a *Brady* claim just like Rai's; (3) an ineffective assistance of trial counsel claim based on (a) counsel's failure to investigate the bona fides of Khera's marriage to Kaur and (b) counsel's failure to investigate the words or statements prosecution witness Mojaddidi attributed to Jagdip in an alleged conversation; and (4) an ineffective assistance of appellate counsel claim based on counsel's failure to raise two alleged sentencing errors.

Compared to the originals, the proposed amended motion is streamlined – it contains just three claims: (1) the *Napue* claim based solely on the alleged perjury of Khera and Webster; (2) the associated *Brady* claim; and (3) a claim of cumulative error. ECF No. 711. All claims of ineffective assistance are omitted, as are claims premised on alleged perjury by Mojaddidi and Singh, which are now abandoned.

The only addition is that Rai now argues that Khera lied on the stand not only about his marriage to Kaur, but also about his first marriage, to a woman named Maribel Diaz. *Id.* at 19-20. Rai argues that Webster knew or should have known that this first marriage was fraudulent but was either incompetent or chose to ignore it "because she needed Khera's testimony to obtain a conviction on the conspiracy count." *Id.* at 28. Rai argues that the evidence of the first marriage fraud is material because it would have undermined the government's position that Webster was an experienced and dogged immigration investigator. *Id.* at 30-31. Alternatively, it would suggest that such an experienced and dogged investigator was aware of the problems surrounding Khera's status but was willing to give him a break as compensation for his cooperation/testimony in the criminal case against the movants. Either way, it would have further undermined the credibility of various other witnesses whose cooperation was secured by Webster. *Id.*

/////

9

It is clear that the amended motion would supplant Rai's original motion if allowed. But it is not clear what result Sekhon seeks in "joining" Rai's motion to amend. At the hearing on the motion, Sekhon's counsel did not wish to dismiss claims advanced in his original motion but not included in Rai's proposed amended motion but also had not submitted a proposed amended pleading from which it could be determined how Sekhon wants to amend his § 2255 motion. Because the proposed amended motion concerns Rai only, and because Sekhon has not presented to the court a proposed amended motion nor points and authorities justifying such amendment, Sekhon's "joinder" in Rai's motion for leave to amend is denied without prejudice. Sekhon may file a motion for leave to amend, accompanied by a proposed amended motion, on or before January 17, 2018. Accordingly, the following analysis concerns movant Rai only.

### 1. <u>Timeliness</u>

The government first argues that amendment should not be allowed because the amendment is not timely. The original motion was timely, but the proposed amended motion was filed more than a year after Rai's conviction became final. There are two ways in which the amended motion might avoid a timeliness bar: (1) a start date for calculation of the limitations period of § 2255(f)(4), or (2) the relation back provisions of Rule 15(c).

28 U.S.C. § 2255(f) provides a one-year statute of limitations for motions brought under § 2255. The limitations period begins from the latest of:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Rai argues that the amended petition is timely under § 2255(f)(4) because the new facts supporting her claims were discovered, through the exercise of reasonable diligence, on November 6, 2017, when defense counsel located and interviewed Maribel Diaz.

10

"Due diligence" under 2255(f)(4) does not require "maximum feasible diligence" but rather "reasonable diligence under the circumstances." *Ford v. Gonzalez*, 683 F.3d 1230, 1235 (9th Cir. 2012) (evaluating the analogous provision of 28 U.S.C. § 2244(d)(1)(D)). The "due diligence clock" starts running "when a person knows or through diligence could discover the vital facts, regardless of when their legal significance is actually discovered." *Id.* Rai argues that she was reasonably diligent under the circumstances. She points out that she filed her original § 2255 motion pro se. She was appointed counsel after the court ordered an evidentiary hearing on the *Napue* and *Brady* claims, in December 2016. Counsel has been reviewing the discovery in the case, which is around 12,000 pages long and much of which was not produced by the government until May 2017. Since then, defense counsel and an investigator "have literally travelled around the country interviewing witnesses and locating records." ECF No. 710 at 4. Rai argues that, even exercising diligence, she could not have become aware of the facts showing that Khera was lying about his marriage to Diaz any earlier, but does not really explain why.

The government argues that Rai could have discovered the facts regarding the Diaz marriage at the time of trial. It argues that they knew at that time that Khera had been married twice and that, in fact, defense counsel questioned Khera about the marriage on cross-examination. The trial transcript does reveal that two of the defense attorneys (for Sekhon and for co-defendant Jagprit Sekhon) questioned Khera about his marriage to Diaz and that Khera's responses were such that would put a reasonable person on alert that the validity of the marriage was questionable. For example, Khera referred to Maribel Diaz as "Marble," going so far as to spell her name M-A-R-B-L-E. ECF No. 503-3 at 6-7. He testified that he married her three weeks after he arrived in this country, immediately afterward saw an immigration lawyer, and the marriage lasted only a few months. *Id.* at 6, 48. The court agrees with the government that, based on this testimony, along with Rai's suspicions regarding Khera's second marriage, Rai could have become aware of the facts surrounding the Diaz marriage earlier, with the exercise of due diligence. Accordingly, Rai cannot benefit from the later limitations period start-date under § 2255(f)(4).

/////

11

1       Nevertheless, the court agrees with Rai that the new factual allegations (the Diaz marriage

2 facts) relate back to the allegations in the original § 2255 motions and for that reason they are

3 timely under Rule 15(c)(1). Under that rule, a claim added to a timely-filed habeas petition after

4 the limitations period has run is considered timely only if it "relates back" – that is, shares a

5 common core of operative facts with one of the original, timely claims. *Mayle v. Felix*, 545 U.S.

6 644, 659 (2005). A new claim does not relate back "when it asserts a new ground for relief

7 supported by facts that differ in both time and type from those the original pleading set forth." *Id.*

8 at 650. The question before the court is whether the new allegations that Khera lied about his first

9 marriage present facts that are different "in time and type" from the old allegations that Khera

10 lied about his second marriage, that both Khera and Webster lied about the 2005 Sacramento

11 meeting, and that the government provided an immigration benefit to Khera in exchange for his

12 testimony that it failed to disclose to the defense.

13       The government contends that the "core of facts" here are the facts regarding Khera's

14 distinct marriages, and because there were two marriages, there are two distinct sets of facts – one

15 set of facts concerning the first marriage, which occurred a few years earlier in New York, and

16 another set of facts concerning the second marriage, which occurred in the early 2000s in

17 California. The court disagrees. The material facts undergirding movants' claims are not that

18 Khera was married and the various details about those marriages, but rather that Khera lied about

19 these underlying facts on the stand (and that, possibly, Webster knew or should have known that

20 the marriages were fraudulent and nevertheless facilitated the positive adjustment of Khera's

21 immigration status in exchange for his testimony). The facts about the marriages are relevant

22 only to show that perjury occurred. The "core of operative facts" are the facts of Khera's and

23 Webster's testimonies at trial. The facts supporting Rai's original § 2255 motion were that Khera

24 and Webster lied at trial to cover up an immigration benefit that Webster facilitated for Khera for

25 his testimony. The facts suggesting that the Diaz marriage was also a sham are related in both

26 time and type because they also support Rai's claims that the government knowingly presented

27 false testimony and provided an immigration benefit to Khera that he would not have been

28 entitled to otherwise.

*Mayle* is instructive about what kind of facts "differ in time and type." There, the habeas petitioner timely presented a claim that the introduction of videotaped testimony of a prosecution witness violated his Confrontation Clause rights under the Sixth Amendment. 545 U.S. at 648. After the limitations period expired, he sought to add a claim that the use of admissions he made in a coercive police interrogation violated his right against self-incrimination under the Fifth Amendment. *Id.* at 648-49. The Supreme Court held that the Fifth Amendment claim did not relate back, because it was based on a separate episode (introduction of his police interrogation) than the Sixth Amendment claim (which was based on the introduction of the videotaped interview of the prosecution witness). *Id.* at 660.

In contrast, Rai is not presenting a completely unrelated claim based on unrelated facts. Rather, all of Rai's new allegations are based on three episodes that were challenged in the original petitions: (1) Khera's trial testimony; (2) Webster's trial testimony; and (3) an immigration benefit provided to Khera and not disclosed to the defendants. *See also Nguyen v. Curry*, 736 F.3d 1287, 1297 (9th Cir. 2013) (holding that an ineffective-assistance-of-appellate-counsel claim related back to an original petition where the original petition alleged that the petitioner had been subjected to double jeopardy and the new claim alleged that appellate counsel should have raised the double jeopardy issue on appeal but hadn't done so, even though some facts supporting the IAC claim arose after the facts supporting the double jeopardy claim).

### 2.    Other Futility

The government further argues that, even if the court were to find the new allegations timely, it would be futile to allow the amendment because the facts of the Diaz marriage only impugn Khera's credibility and he offered no evidence against Rai. The government concedes, however, that "Khera's testimony was . . . relevant to Petitioners' convictions to the extent it related to Special Agent Carol Webster's credibility." That a person who allegedly has entered into two sham marriages for the purposes of remaining in this country was given legal status after meeting with Webster and shortly before testifying in this case raises a question about whether that legal status was legitimately conferred. The new allegations are relevant to the resolution of this question.

### 3. **Other Factors**

Lastly, the government argues that movants have unduly delayed their amendment and this delay prejudices the government. The government argues that the amendments are based on facts that movants have known since trial, but – although Khera's testimony should have put them on notice that there was something fishy about the Diaz marriage – there is no evidence that movants *actually* knew at that time that the Diaz marriage was a sham. Rai's counsel filed the motion to amend and the proposed amended petition almost immediately after her interview of Diaz in New York. The government argues that allowing the amendment will require more briefing and that the evidentiary hearing be rescheduled, which will inconvenience witnesses. These inconveniences are not uncommon in litigation and do not amount to prejudice – the government does not allege that allowing the amendment would impair its ability to litigate the merits of the motion.

Furthermore, there is no allegation of bad faith by Rai in bringing the motions, and this is her first amendment. Weighing all five factors – some delay, some inconvenience to the government that does not arise to legal prejudice, no bad faith, the amendment is not futile, and Rai has not previously amended her motion – the court finds that leave to amend, as provided by Rule 15(a), should be granted.

### IV. **Conclusion**

Accordingly, good cause appearing, IT IS HEREBY ORDERED[3] that:

1. The motion for leave to conduct the deposition of Ranbir Khera (ECF No. 705) is GRANTED. The deposition shall be limited to four hours at a time and place agreed to by the parties.

---

[3] The court has issued this order, rather than findings and recommendations, because "a motion to amend is not a dispositive motion because by its nature it only seeks to add or amend claims or parties rather than dismiss the action in its entirety." *Fernandez v. Nevada*, No. 3:06-cv-0628-LRH-RAM, 2011 U.S. Dist. LEXIS 6162, at *8 (D. Nev. Jan. 18, 2011); *accord Roberts v. Long*, No. 14-cv-0427-WQH (DHB), 2014 U.S. Dist. LEXIS 138322, at *9 n.4 (S.D. Cal. Sept. 29, 2014); *Butler v. Kelso*, No. 11cv02684 CAB(RBB), 2013 U.S. Dist. LEXIS 63863, at *29 n.4 (S.D. Cal. May 2, 2013); *Pat Pelligrini Flooring Corp. v. Itex Corp.*, No. CV 09-376-AC, 2010 U.S. Dist. LEXIS 25856, at *4 (D. Or. Mar. 16, 2010); *Everett v. Cherry*, 671 F. Supp. 2d 819, 820 (E.D. Va. 2009).

2.  Sekhon's joinder in Rai's motion for leave to file an amended § 2255 motion (ECF No. 713) is DENIED without prejudice.  If Sekhon wishes to amend his § 2255 motion, he must file a motion for leave to amend, supportive points and authorities, and the proposed amended § 2255 motion on or before January 17, 2018.

3.  Rai's motion for leave to file an amended § 2255 motion (ECF No. 710) is GRANTED, and the amended § 2255 motion (ECF No. 711) is accepted as the operative motion in this action.

4.  Respondent is directed to file a response to the Rai's amended § 2255 motion within sixty days from the date of this order.  Respondent shall include with any answer any and all transcripts or other documents relevant to the determination of the issues presented in the motion.  Rai's reply, if any, is due on or before thirty days from the date respondent's answer is filed.

DATED:  December 19, 2017.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

# Ex. CCC

**U.S. Department of Justice**

Civil Rights Division

JF:HA:WN:DNR:rc
50-11E-40

*Criminal Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*
*www.usdoj.gov*

*__Via Electronic Mail and Federal Express__*                    August 29, 2019

Yasin M. Almadani, Esq.
14742 Beach Boulevard, Suite 410
La Mirada, CA 90638

Re: *United States v. Sheikh*, 2:18-cr-119 (Discovery)

Dear Mr. Almadani:

This letter follows our correspondence of August 14, 2019, which responded to your letters dated August 8 and 9, 2019, concerning the extent and nature of redactions in the materials the government previously produced in discovery, and the government's duties of disclosure pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).

As promised in the August 14 letter, we are enclosing a new complete set of reports of investigation (ROIs) that contain fewer redactions (ROIs 11-75). These materials are Bates-numbered USA011183-11458.

Regarding the specific *Giglio* questions you raised in the August 8 letter, the government represents that the investigating agents did not discuss with or provide any benefits to either of the victims or other witnesses in exchange for cooperation, nor did the investigating agents discuss criminal histories or other legal consequences related to any individual's immigration status during the course of the interviews. However, the victims and some of the witnesses revealed that they did not have legal authority to be present in the United States. The agents did discuss immigration issues with those individuals when those individuals were provided with immigration benefits, as discussed below. The agents did not make any threats or promises to any of the individuals interviewed. During the course of the investigation, the government provided the victims and some of the witnesses in this case with immigration-related benefits and witness vouchers. Specifically, the government provided the following benefits to the following individuals:

1. **Victim E.L.**: On September 11, 2013, the government approved Continued Presence for E.L. for 1 year. The government renewed E.L.'s Continued Presence status in 2014 and again in 2015. On December 17, 2014, the government submitted an I-914 Supplement B Form on behalf of E.L., certifying that E.L. is a victim of human trafficking. E.L. received a T-Visa in 2016.

2. **Victim P.K.**: On September 11, 2013, the government approved Continued Presence for P.K. for 1 year. The government renewed P.K.'s Continued Presence status in 2014. On December 17, 2014, the government submitted an I-914 Supplement B Form on behalf of P.K., certifying that P.K. is a victim of human trafficking. P.K. received a T-Visa in 2015.

In addition to the above immigration benefits, the government victim-witness specialist provided P.K. with a referral for counseling services for victims of human trafficking.

3. **Witness G.M.** (ROI 8):  On October 31, 2013, the government approved Deferred Action for G.M. for 1 year, and renewed G.M.'s Deferred Action status annually from 2014 through 2018.

4. **Witness J.F.T.** (ROI 13):  On November 27, 2013, the government approved Deferred Action for J.F.T. for 1 year, and renewed J.F.T.'s Deferred Action status annually from 2014 through 2018.

5. **Witness R.O.A.** (ROI 18):  On May 7, 2018, the government approved Deferred Action for R.O.A. for 1 year, and renewed R.O.A.'s Deferred Action status in 2019.  Witness R.O.A. asked the government about receiving Continued Presence on behalf of herself and her husband (Witness J.A. noted below), but the government declined.

6. **Witness J.A.** (ROI 43):  On May 27, 2018, the government approved Deferred Action for J.A. for 1 year, and renewed J.A.'s Deferred Action status in 2019.

7. **Witness M.M.A.** (ROI 24):  On August 21, 2017, the government approved Continued Presence for M.M.A. for 2 years.  The government issued a T-Visa in 2018 to M.M.A. and the family members listed below (Witnesses J.G.F., J.G.M., E.G.M., B.G.M.) were beneficiaries of M.M.A.'s T-Visa.

8. **Witness J.G.F.** (ROI 44):  On August 18, 2017, the government approved Continued Presence for J.G.F. for 2 years.

9. **Witness J.G.M.** (ROI 50):  On August 18, 2017, the government approved Continued Presence for J.G.M. for 2 years.

10. **Witness E.G.M.** (ROI 42):  On July 25, 2017, the government approved Continued Presence for E.G.M. for 2 years.

11. **Witness B.G.M.** (ROI 49):  On August 18, 2017, the government approved Continued Presence for B.G.M. for 2 years.

12. **Witness C.E.** (ROI 11):  On May 7, 2018, the government approved Continued Presence for C.E. for 1 year.

13. The government provided witnesses **V.M.P.** (ROI 62), **K.S.V.** (ROI 63), **T.M.P.** (ROI 57), **A.F.** (ROI 68), **A.M.** (ROI 67), **C.C.** (ROI 36), and **S.A.** (ROI 38) with $40 witness vouchers, and travel reimbursement for those witnesses that traveled from outside of the Sacramento area.

14. **Witness B.S.** (ROI 37) received a parking ticket on the day he met with the agents in this case, and he asked the agent whether the government would pay for his parking ticket.  The government declined.

As you are probably aware, Continued Presence is a temporary immigration status provided to individuals identified by law enforcement as victims of human trafficking. This status allows victims of human trafficking to remain in the U.S. temporarily during the ongoing investigation into the human trafficking-related crimes committed against them.

A grant of deferred action indicates that the government has, temporarily, declined to exercise its authority to remove a particular individual from the United States. As such, the named individual may remain, provisionally, in the United States. Deferred action is a form of relief that is typically granted to individuals whose removal is not in the best interests of the U.S. government. It does not provide a pathway to permanent residency.

A T-Visa is a temporary immigration benefit that enables certain victims of a severe form of human trafficking to remain in the United States for up to 4 years if they have assisted law enforcement in an investigation or prosecution of human trafficking. T-Visa nonimmigrant status is also available for certain qualifying family members of trafficking victims.

Additionally, the physical evidence obtained by the government as part of this investigation may be viewed at the offices of the U.S. Department of Homeland Security, Homeland Security Investigations (HSI), at 650 Capitol Mall, Sacramento, CA 95814. As part of our file review, we have also provided materials not previously disclosed, although these materials do not necessarily fall under Rule 16 or *Brady*. These additional materials are Bates-numbered USA011459-11508.

The government represents that it has complied with the court's order, Dkt. 63, which directs the government to provide all *Brady* materials by August 30, 2019. The government is aware, however, that our *Brady* obligations (which include our obligations under *Giglio*) are ongoing and we will continue to adhere to our *Brady* obligations throughout the course of this case.

Should you have any questions about the discovery, or if you wish to set a date and time to review physical evidence at the HSI office, please feel free to contact me by email at david.reese@usdoj.gov, or by telephone at (202) 514-3851. Thank you for your time and consideration.

Sincerely,

David Reese
Trial Attorney
Criminal Section

# Ex. DDD

7/2/13  1:30 pm  int.
Alfredo
Elisabet
AM
Carmen's husban CH:

Last Friday they picked him up
Monday 8 days ago - 6/24
C.H. helped Ciudardo pack up &
CH. gave bretgrand Storage unit
    leave
Alfredo left Friday 6/28
Jumped over back fence 9:30pm
to get out & meet them
on brant Line Rd
Juara Ciudado's wife called CH wife
(carmen) to translate
Alfredo's statement
Name - Elfego Lopez Ortiz  11/1/61
demeanor crying    aka Alfredo
Lady name Firdos Sheikh
Alfredo missing right index finger
met her thru pool business man
who he worked for - Knew Firdos

USA0011516

Alfredo first told her only could
work weekends

3-4 months only went to her
ranch weekends can 10p Sat & Sun

she didn't pay
him anything

M-F worked @ regular job
landscaping / concrete exchange for
it was for

after 4 months she asked her tom-f
work permanently $    in exchange
for rent

She asked him how much
he said $400/week - she said OK
She never paid him $400/wk
only $400/week

after a few months she would
deduct money & only pay him
$100 or $40 uh bits & pieces
Started Sept/Oct 2009 working for
She Started to not pay him Sept/Oct
w/o translated - no one                2010

her son speaks Spanish
who lives there now
last Thurs her parents arrived

guys name who cut the grass next door

USA0011518

Started 2009
weekends only → no pay / free rent
he lived there

In 2009 she paid him $400/mo
when he started working
cash, but not all at once
in piecemeal

- why not $400/wk
 She said She doesn't have
 money to pay him

- why not leave
 he didn't have a phone
 ( he didn't know anyone
 out off for not paying
 She would threaten Alfredo
 he planned to run away w/ someone
 else & she said she would
 call police or immigration
 She told his friends not to come
 over anymore - kicked them out
 the guy used to cut grass @
 property next door
 horse property

USA0011519

What about food
- Some times we didnt eat
1 soup per day
some bread
no lunch, no breakfast
job duties
at the beginning
only working @ property
after awhile a year
She would drive him to other
properties - cut grass
clean inside other house
" outside other houses
She drove him to the other property
She drove in a Lexus or black Marque
know where other houses are - yes
some are being rented
some unoccupied
Since the first day of being permanent
after 6 months only work for her
& then he couldn't leave

USA0011520

gate has always been closed
how did friend pick him up
Alfredo had a key to the gate
he would open the gate
for Firdos when she amved

She was already divorced
the house used to be a horse barn
& it was remodeled into
a house

what year remodeled - 2 - 2½ yrs
then she moved in

He was there alone at the begining
in the same trailer

Animals there? - She got from 1½ - 2 yrs ago
2 alpacas   2 emus   107 peacocks
5 parrots   20 cockatiels   1 horse
6-7 white peacocks

died? - 10 goats died baby goats
when there was a sick animal he
would tell her they need a vaccine
she said if an animal dies to
bury it   2013 - none
in one year - 10 birds died
was she upset? yes
put dead birds in garbage

USA0011521

why birds died
 she didn't feed them
 sn.wouldn't buy bird food

Oct 2012 — another employee started
 other workers                    people
 1 vietnamese family
 he went with her to pick them
 up
 they were there 1 month
 but left because she
 didn't pay them
 She picked them up in Snelo
10 Ⓑ months ago — before Pokash
 in what car — The Lexus
 brought a trailer w/ their things
 20 days in the 2nd floor
 She moved them to another house
 Firdos   in Wilton
 Alfredo     someone picked them up

Another lady in Wilton   2 ladies
 Mom & daughter @ the wilton property

USA0011522

Firdos pays the ladies $500/mo
→ Pakistanis
but there's no electricity
doesn't know address but knows
how to get there
they take care of property
- furniture
- Firdos is going to convert it to
a Care home
he last saw them 1 month ago

Pokash showed up -
Firdos said I'm going to
pay you $300 -
Why? There's no work to do
when cridardo & his wife came
↓ to $200/month
lowered Pkash's salary too - yes
why did Firdos need gate
she didn't say why
she would arrive late at night (1pm
and tell them what kind of work
when did chains go on gate -
as soon as gate went up

USA0011523

how did they know TV in trailer
- did she put cameras here?

USA0011524

back
gate too

When was back gate cut
   when he got there it was already
   like that
   someone else had shown the broken chain

Alfredo's possessions - he purchased
   TV, DVD, power washer
   were all here
cupy - dont know - when the
   cameras were installed she said
   all the things in the trailer
   were hers

Food
   was a verbal agreement she would

when
POCash arrived she said they have
   to provide their own food
   now. She would take them to the store
   drop them off & pick them up later

USA0011525

raining water
work news
force/fraud/coercian
family in Mex/here

Pokash cooked for her?
    yes - everyday

She did her own grocery shopping

Could they cook in her kitchen? no

left over party food
    a guest tried to give Pokash food
    & she said, no dont give
    them any food

Pokash knows some people who
    told him to leave in their
    language

last time went grocery shopping
    3 months ago
    Gil would help him & gave him
                                    food
    get sick - no never
        doctor role? no

Pokash got sick & she charged
him for the medicine
She gave him injections
Charged him $50   2 or 3 times

Alfredo lived in trailer
Pokash lived upstairs -
Slept on a Sofa
not the same apt.
when Hull came Pokash moved into
the trailer

When did Alfredo decide to leave
about a year ago, but was
afraid, didn't know anyone,
where was he going to go
told Fredos I'm leaving
a week ago
She said it was OK
asked her for pay? no

Last time   Erdos paid him
    $200 a month ago

he wanted to commit suicide
    about 3 months ago
    he told Erdos' son about it
    son told him dont do it,
      think about something else
son lives w/ father -
son told Alfredo to leave -
    he said if you dont like it you
can leave if your not happy
    Son said he would help but Alfredo
    said no, how could you.

Dumpsters docs from the clinics
    who brought them
    She did
Alfredo went to clinic to bring docs
    over there   back with a full of garbage
cups & under the trailer too 20 bags
    Gil was going to take them to the
    dump

USA0011529

Last week
name of clinics - Chain - cups
She told him to burn it - medical
records
at the ranch
no one else there - She picked it
up on Saturday & Sunday
last batch - the secretaries were there
Pokash was there @ last pickup
Clinic on Stockton Blvd / Laguna Park
@ 3 months ago
everything is still in the garbage by
the trailer
they pulled 10 or more bags of docs
didn't leave anything behind
worked @ clinic - to clean
Other people saw - no mgmt
with Po Kash  or on weekends

end of May last time he was paid $200 full amount
April - $200     7 day
hours per day  12-14 hours
7 days a week     he asked for day off
day off - no      & she would not give

Food

USA0011531

why the cameras - him & Pokash

She said they were stealing & giving stuff
to their friends

he said I have no friends

how many - 4
She watches from her phone & computer

when - 3 months

Camera installer
- why he went in trailer

Keys to house
no  only when she was around she would
call him over

Key to gate - no - at first she gave him the
when lemons she took from
She took the keys with her

he said what are we going to do if we
have an accident - she didn't answer

Pokash Keys?  he had a later she took them
back

6 mos ago she took keys back from Alfredo

USA0011532

told him not to talk to people

Family in Mexico - no phone tts
Coahulca

Running water -
not for last 2 years
Used a bucket to take to trailer

Alfredo went and bought the parts
to fix the plumbing for the
trailer
an electrician went to work @ property
Alfredo asked him to fix
electricity in trailer
he said get the parts & I'll fix it
got fixed - 1 yr ago got fix
winter
Threats call the police / more
about 30 times

USA0011534

Police @ house -
   dispute w/ neighbor about a gate
   she locked & police came

She told him what to say if LE came there
   don't say anything, don't talk

Other people @ house
   She told them not to speak to Alfredo
   She told Alfredo not to talk to them

Did she raise her hand to them
   She cursed @ Alfredo but never
   hands on anyone

Favoritism - no
   opportunity to call - no
      family in U.S. - Texas brother
   last time spoke to - 2 yrs ago

She first said she would pay for cellphone
   & then she didn't & didn't pay the
   bill & it got cut off

Federico J Estrada
he recorded the whole conversation
he can email
he recorded 4 conversations

She threatened him
to cut off his hands
she thought he was
giving the birds &
the feed to his friends

USA0011536

Birds would dies she got
mad, threaten them
that Pokash would go to India
& Alfredo to Mexico
the guy who took him to her told her
he was illegal

Other Indian guy who got Prakash
the job told her Pakash was
illegal

Johnny - friends who cut the grass
35 yr old

Jobs -

told him I don't want you
working here - no

Carmen Contact
████████████           Federico
                        Estrada
████████████           cell
                        Carmen
Firdos was calling her

# Ex. BBB

10454 ~~Meadows~~ ~~Melo~~ Menlo Oaks. Ct.
~~Menlo~~ EG CA 95 ~~634~~
95624

May - June 2013 there
Cleaning gardening
land / ravel / grassmos
lake / party area
rent it out for parties
2 others there
before him

Alfredo - Mexican ~40 yrs 3 1/2 yrs there
Prakash - Hindu ~40 yrs 8 months
it's Mexican too D.F.          916-837-0985

thru a Pakistani friend w/ Shake Firdos
needed a FT job w/ Firdos
shaikh
friend live on property

♂ lives alone - adult sons come to visit
Firdos - Shaikh age 50+

used to live in a trailer in W Sac.
now he w/ his wife in Galt
his wife was with him - not contracted to work
but sometimes she helped
Paki friend took him & his wife to Elk Grove

<u>Alfredo</u> -
        Firdos said he's crazy, don't talk to
        but he's not                              him

every 8 days went shopping for food
        "        to doctor

<u>Property</u>
<u>house not</u> close to gate
        gate always closed w/ lock
        Acero - gate
        he had a key to the gate
        pavement/asphalt driveway

        Firdos office? — no! downstairs
                                she works
        Separate apartments
        she has Lexus②, truck, SUV      4
        white Mercedes → drives the most   cars
                red BMW convertible
        Lona - black SUV
        Cars outside
<u>tell Alfredo</u>

USA0011539

Alfredo & Pakash
work every day   7 - 330
        Water plants
they don't have automatic sprinklers
garado - no      Aves -
Alpacas          Birds -
   2             Aviary -
ostrich 2

police - never been there

Pakistanie West Sac     Harbor Blvd
    Car dealership        & W. Sac
        near   Paletas business
          "    Other car lot
          "    Valero.

USA0011540

Firdos -
   has alot of properties - Galt & Wilton
   he was supposed to live in a diff house in Wilton
   she was remodeling for an care home
   he was was supposed to be a caretaker
   other Pakistanis lived there in the
     other houses
   She showed them the houses in March.
    wife was going to do cleaning
    he    "    "    "    rancho/gardening
   did id a repair on the gazebo at
    one of the house - by himself
   he drove his car
  Gazebo job March-April   3 weeks
    paid → $100/day (29 30) → 8 hrs/day  M-F
    was paid fairly for this job
    7am started $400/week was paid in cash each week ($50/day) $1200 suite total
  end of April they moved to Menlo Oaks Ct.
   trailers - lived there Alfredo
    him & his wife lived on 2nd fl.
  Firdo said don't talk to Alfredo
   - he's crazy

USA0011541

Who translated? —

- Gardening clean up area pull weeds
  Clean out

- Firdos said $50/day
  months
  May →
  Bank of America
    She deposited $ to his
    bank acct.
paid him 2 weeks cash
    then Started depositing

last Saturday -

things started out good  she paid him
  on time , construction $100
              non-const. less than $100 ($80)

May—

Didn't get paid for last week
  because he didn't do all the work
Saturday—June 22 had an argument - she
  didn't pay him for 2 weeks

USA0011542

Menlo Oaks
  2 Story - brown
  security cameras - for burglars
Alfredo & okash
  $200/month - not all at once

he asked Alfredo if he wants to go with
  him & Alfredo said after he
  gets paid - needs to finish out
  the month
Alfredo was crying
  he &his wife took pictures
rules - no

had a kitchen upstairs
downstairs party area
  during party they stayed in their room
  just got the party ready - cleaning
wife Juana Felix Trejo   ████████

USA0011543

She said he didn't do job
he said he didn't buy the machinery
& he had to do it all by hand
Sunday - he packed up his stuff
was trying to contact her
Monday also packed up

he had key for his own room
& the house
the other 2 guys didn't have a
key & couldn't leave


Alfredo teleforo -


mobile home - the white   15 ft small
electricity - yes
water - yes
they never leave, people afraid
not locked in
1 dog - locked up

USA0011544

How do they get food

Cigars

May - June $400/wk

Alfredo & Pakash   $200/month

- Started w/ $400/mo then lowered to $200/mo

- no car

- ~~Cigars swipe~~ ~~present~~

- ~~Eldos~~ buys the food

    Findes gave him $ for food

    last week didn't give it for food

Alfredo speaks a little English

    he's afraid

    doesn't have freedom

    no where to go

when they changed to $200 don't know

    Alfredo's phone #

        916 - 801 - 1178

    her phone - she looks at his calls

    & sees who he calls

She's there every Monday, gets back @ 3am
leaves around 9am
    the rest of the days

# Ex. FFF

7/1/13                          Boulder

- Prakash Karki
-

▮▮▮▮▮

- Came into US. 8/26/96 on visa
6 months. never renewed.
Via Indianapolis via JAPAN— Katmandu ⇒ Thaildy
ended up in Denver.
Had a Helping Hand (non-profit)
Sponsor. Volunteered for them in
Nepal for about 4 years.
Stayed 1 week in Denver then left
for Walnut Creek, CA Someone he met
in Nepal from a Trek. He was a
Chef so worked as a bus boy then
went to Mgr. after 1½ years.
- 2000 Went to Boulder, CO & Colorado
                                    1 month.
Springs worked for Dominos making
               Had about 8K saved
dough. ⇒ Boulder, CO. ⇒
   Worked w/ a Temp Agency
   Staffing Solution, Mark. in Roseville
          Arbys/                  9 stores
Sept 11, 2001— at owner's house
2002-2003      Manny Mesta owner

USA0011546

Can I have

My $?

money

Dr. Firdos Shaik

USA0011547

MESTA had 9 different stores
2001 2003.
After Arbys ± 2004 homeless
1 year.
then got a job in a liquor store
in Rio Linda.
Nu Way Market - 1½ years
then homeless again ± 2 months
± 2006 James Brewer picked him up
giving him work, cleaning etc
eventully wanted to open a restaurant.
He eventually offered him a place
in a camper at his place. plus $200
a month. stayed in camper ± 6 mos.
Restaurant has mini - storage next
to it listed stuff on craigslist.
Bobby (Firdos friend) Singh bought
freezer & other restaurant stuff.
Started talking to Bobby about work.
Bobby referred him to Firdos.

USA0011548

One week before Christmas he moved
to Frdays place.
    Telefonic agreement
    Not that much work, just 3 days a
    week  work @ rental properties + 3 days.
    mainly cooking + cleaning and very
    little work outside
    One day off  (Sat. or Sun.)
She picked him up @ his friends apt. on
Fruitridge.

1st week— nothing to do just follow
        behind Alfredo.
She didn't provide any food so he felt bad
cause he didn't have any food + had to
eat from his food.
                        Pradeep Sharma
2nd week— Flamingo Banquet hall
        1 night $ 50 paid
3rd week  She said that dropping off
+ picking up wasn't going to work so
she said that he was going to work
only for her for $300 monthly salary

USA0011549

plus room + place to stay. but she
would only spend $80 a month

She eventually raised $400 monthly but
than they would have to buy their own food.

end of Jan. $300 cash

end of Feb $100 cash

about Feb

In Feb. he got $100   1st week
                $100   2nd week
              $100   last week of month
He told her he needed to pay his child
support. (ruse)
She told him that she couldn't because
they would leave
        Got paid $400 March  - started having to
                                    buy own food.
She owes $100 - April   owes $400 - June
She owes $150 = May    Total $650

USA0011550

She would always (too many Amy to count) especially when we'd ask for our $.

I Know a congressman, senator, mayor the cops and I'll call immigration and they'll send you back to Kathmandu.

Worked 7 days a week not less than 10.

Why didn't you Leave. She said she had wireless surveillance cameras watching them everywhere.

Why didn't you just leave you've done it many times from similar scenarios.
I had 6-7 hundred dollars in my pocket, I don't have a penny where am I gonna go w/nothing.

USA0011551

· Urdu for
Nokur- Slave

I got 4 Nokurs in my
house and I got a messed up
house.

USA0011552

I'm finding a place to
stay in Sacramento

I will call you later
to so you

I will call you and
tell you where you
can bring me my
money.

She owes you $1450 for work

USA0011553

You owe me

$ (650)

and my friend
knows a lawyer
that will help
me.

USA0011554

1- Wilton house has cameras
   for elder care

Cameras installed @ Menlo Oaks
last month, but doesn't Know
if they're Monitored.

3 of 5-6 Cameras were on him + Alfredo's
trailer

Then ± 3 days I stayed on trailer
then 1 facing front of property
& one facing back of property.

Sharon — (916) 837-0965
        —                     (Alfredo
                              friend)

USA0011555

- Medical records
- 2½ months
- Elk Grove office (main)
- went into office
- 20 bags
- right behind the house
- in black trailer / blue tarp
- cardboard
- supposed to go last week
- Elder Creek
- past Florin Perkins
- resident of Elk Grove could dump for free
- test results
- referrals
- patient history
- used to have bookkeeper
- fined for taxes EOD
- Doc for took over
- already dumped records
- Elk Grove - downstairs - poor people
- upstairs - fancy

USA0011556

7/1
- set up apt. w/ Alfredo
- Opening Doors
- open Case Firdos Shaikh
- left msg. Nivav Desai
- s/c - 3½ hours

7/2 - email Nivav Desai
    - phone Renata Al Maw ████
    - Sector
  - FPS
  - 152 Operator -
  - HSI aadling
      4483 Red Cliff Prive
      ██████████████
  contacted SA Richardson (duts)
  Jason Hildebrand Hildebrand acting GS
  cleaning crew
      contacted FPS
  - SA Collins (conf. call)
  - w/ Maximino Espinoza Melo

USA0011557

3/9/2015   Expiration
Maximmo Espinoze Ac

_____

Chris Collns
- Nirav -
- Renata
- David Kvach (HHS - OIG)
- Kyle Reardon -
(916) 554 - 2782

# Ex. GGG

(Curriculum Vitae and Selected Awards)

## FIRDOS SHEIKH

**SUMMARY:**

A trusted physician passionate about providing optimal healthcare and medical management with cutting edge technology and medicine that achieves healthier results for patients. Seeking a challenging new opportunity in which to play a key role in developing innovative and cutting edge medical solutions for patients' healthcare challenges and overall betterment of society. Extensive experience in treating and understanding pain and looking to implement a comprehensive and complete program to address pain in its totality and implement safe and effective non-invasive treatment protocol to improve optimal health and improve quality of life aspects. Passionate about society awareness and changing fabric, identifying weakness in community building, citizen building, overall betterment of humans above and beyond the medical box. Educating and keeping abreast of newer technology, and implementing education in all walks of life. Passionate about helping develop programs and protocols to better children and youth with neurologically sound brains and personalities' to help build a strong society

**LICENSE / CERTIFICATIONS:**

- California State License # 050704
- United States Medical Licensing Examination - Steps I, II, III passed
- Board Certified American Board of Neurology & Psychiatry (2000-Active)
- Board Eligible American Board of Electrophysiology (1995-Active)
- Administrators License for CCLD    ( 2009-Active )

**EXPERIENCE:**

**1995-**          **TEACHING EXPERIENCE : Taught Medical students**
**Current**

**1995 -1999**    **Taught & Trained UCDMC medical students**

**1999 to 2015**   **Taught & Trained Residents in Methodist Hospital**

**2-2015 to**     **Assistant Clinical Professor in Neurology California Northstate University**
**Current**       **Assistant Clinical Professor in ElectroDiagnostic Medicine  California Northstate University**

**2015-2019**     **NFL players:  Principle investigator in evaluating, rating and assessing cognitive damage**

04/2015 to       **NIH NATIONAL INSTITUTE OF AGING**, Fremont, CA
Present          Clinical investigator
- Clinical Investigator GCP certified AZD3293 in Early Alzheimer's Disease (AMARANTH)
- IDEAS research study Principle Investigator

2015 to
present          **MAPS** fellowship programme **(Medical Academy of Pediatrics for Special Needs)**

1998 to
present          **COMMUNITY SERVICE :**
- LOAVES & FISHES
- A 1000 meal drive. 2015 Christmas to feed the poor at Loaves and Fishes. Communications Director American Muslim Voice.
- Volunteer, Donator and main spokesperson for the event. Participated in Gathering volunteers, arranging for food and helping in preparing and serving a 1000 meals
- ASHA FOUNDATION : Provides free medical care for the needy in villages

**Firdos Sheikh**
**Page 2**

- SHIFA CLINIC – Sacramento  Free clinic for the uninsured run through UCDMC affiliation Served for over 10-12 years

**NEURO-NURTURE MASTER MIND ABACUS**, Sacramento, CA

2015 to Present    Country Franchisee for United States

- Collaborating with Master Mind Abacus. Realizing the changing fabric with an increase in Autism, with a perception of what the future holds. I started analyzing the "normal children" in the context of where we stand with world competition. I see our children here in United States failing in reaching their full potential.
- Also understand by observing my own children that they don't have adequate stimulation and development of the right and left brain. As a Neurologist and understanding the ramifications of this I have been involved in Establishing Brain Development Program. Master Mind Abacus in United States.  Have prepared an FDD and filing it.
- Also have done extensive research and reviewed product. Played a key role in product development. Have revised text books and upgraded them to meet the aesthetic and quality standards of US. Have been involved in improving the syllabus and bringing forth trainers and a team to help implement with a passion and goal in mind to empower our children and bring them to the forefront with cutting edge education tools and techniques
- Establishing ENGAGE an extension of Master Mind Abacus, bringing in 19 products for all age groups starting from 3 yrs. and up.
- Kiddie arts: to start the process of developing creative and right side of brain along with stimulation of left brain
- Naughty math's: A start up course and early establishment of neuronal wiring in terms of setting the foundation to build intellect. Sharpening the focus, concentration, grasping power, retention and recall modes. The stepping stone for higher intellect
- Write Right: A fabulous course in Calligraphy to start building finer wiring and finger dexterity as well as strengthening the brain motor co-ordination
- Vedic math: Establishing faster and quicker ways of calculations and thereby absorbing and creating dense neuronal networks
- Abacus: A mathematic tool used to now strengthen, progress, and speed the pathways between right and left brain. A tool that will now help bilateral brain involvement and build a balanced intelligent and healthy brain
- Speed Reading
- All above products are being finalized and developed for US market under the banner of ENGAGE to help children from ground up establish a very strong foundation on which intelligence will be tapped to its maximum and help them evolve as successful individuals ready to conquer the world and step up to the ever demanding environment

2015    **AMERICAN MUSLIM VOICE,** Sacramento, CA
Director of Communications

- Master of Ceremonies for a PEACE CONVENTION held in Sacramento to spread harmony peace and religious Tolerance. Attended by 500 plus people.
- Joined American Muslim Voice. An organizing that focuses on spreading a culture of peace, harmony and Love. Its mission: From Fear to Friendship

- **PEACE CONVENTION:**

- https://www.youtube.com/watch?v=CzYNhmgCE7Y

- https://www.youtube.com/watch?v=C7BbFdNBcSE

- https://www.youtube.com/watch?v=V603SHOzm8o

- https://www.youtube.com/watch?v=X6R0Iu8j1Y4
- https://www.youtube.com/watch?v=wozZgVfZvB0

| | |
|---|---|
| 2015 | **HANDS AROUND THE MOSQUE , SYNAGOGUE,TEMPLE,CHURCH,GURUDWARA** |

Hands around the mosque: Developed and was brain child in creating a concept and theme for this project. Wrote an Anthem. Developed an elaborate and extensive concept of bringing in specific religious color facts and creating a rainbow with those colors to combat the battle of colored humans.

- Hands around the mosque article
- http://www.dailydemocrat.com/events/20160111/hundreds-gather-to-dispel-fears-of-islam
- Helped bringing in the concept of a Spiritual confluence of humans as opposed to a Religious strife and to appreciate religion more as different means of praying for the same common purpose of attaining spiritual confluence and peace. Attended by almost 80 top officials from Woodland California and over 400 people. Shared the Master of Ceremonies with the National President of American Muslim Voice in the capacity of Communications Director

| | |
|---|---|
| 2009 to 2016 | **BIRD OF PARADISE MANOR**, Sacramento, CA |

Administrator /President
- Certification for RCFE Administrative license
- Established Bird of Paradise Manor LLC. Successfully running an operating Residential Care facility for the elderly, trained staff members, performed medication training, also set up an operation protocol.
- Obtained Dementia Waiver and Hospice waiver for Bird of Paradise Manor LLC RCFE

| | |
|---|---|
| 2007 to 5-31-2019 | **SOUTH SACRAMENTO NEUROLOGY MEDICAL ASSOCIATES,** Sacramento, CA |

CEO Medical Director President - Private Practice Physician
- Developed a viable interventional pain management practice from the ground up. Developing a comprehensive goal and objectives protocol and continue to help my patients have a better understanding of their medications, pain attitude and behavior as well as helped build endurance
- Save the Medical Industry countless dollars
- Fewer ER visits, fewer MRI , and making myself available 24/7 for crisis intervention and counseling
- Have managed to implement multi-modality intervention with timely trigger points, occipital nerve blocks etc. Neuromuscular Stimulation and reeducation techniques and massage therapy along with pain modifying non-narcotic medications which has helped me maintain them on their current narcotic usage without increasing or successfully decreasing it
- Pain management care for patients with complex and highly sensitive pain issues. Providing compassionate care, I communicated professionally and effectively with patients with a variety of health issues to ensure they received optimal care

| | |
|---|---|
| 2007 to 2012 | **NEURO-NURTURE.COM   AUTISM**, Sacramento, CA |

Administrator
- Biomedical training in Autism and also listed as a certified expert in Autism Research Institute. A mission to educate myself and be aware of the developing protocols in tackling the Illness.
- Understanding that Medical approach was not sufficient and having the desire and passion to learn and understand other modalities present in the market and the need for making myself well informed. That drove me to become a DAN doctor. Implement only what I feel is necessary and very sensitive about parental concerns and dilemma pertaining to the endless treatments offered for Autism
- Certified and Implemented Sensory Learning protocol as a non-invasive and beneficial  tool in helping sensory perception issues in Autistic children

**Firdos Sheikh**
**Page 4**

- Complex issues with Balance and sensory impairment issues were successfully addressed and treated along with vision therapy in collaboration with a Developmental Neuro-Optometrist Certified in HBOT: Hyperbaric Oxygen Therapy

1998 to 2008      Worked as a volunteer in Shifa clinic . A UCDMC student run free clinic for the indigent and needy

2006 to current

### CERTIFICATION MEDICAL AESTHETICS

- Trained in laser/derm abrasion.
- Facial Rejuvenation
- Therapeutic and Cosmetic Botox
- Vanquish Me  Trained in fat burning with electromagnetic wave therapy
- Smart Graft – Hair transplantation
- Z-wave therapy

2016          Director of Communication
- Participated in raising funds for Mariko Yamada, Don Saylor, Dave Jones, Darrel Steinberg, Steve Ly and many in promoting dialogue, tolerance and better understanding of different cultures and helping blend the differences.
- Invited by Dr Maria Armstrong (Superintendent Heads 16 schools in Woodland Unified School District) to brainstorm and implement methods to decrease unrest in schools and help bring focus and harmony amongst students across the school communities.
- Invited by Jon Fish CEO Sacramento Interfaith to speak on Women of Faith and also to work on a project: Freedom of Faith

- INTERFAITH

- Speaker Woman of Faith
- Woman of faith
- https://youtu.be/XRMUwVhqT1c
-

1998 to       **RIVER CITY MEDICAL GROUP**, Sacramento, CA
2009          Medical Advisory Board Member
- Utilizing my wealth of knowledge in patient care and pain management, I provided clinical product feedback for the development of an extensive pain management and patient care protocol. Also participated in QA.

1997 to       **SOUTH SACRAMENTO NEUROLOGY MEDICAL ASSOCIATES**, Sacramento, CA
Present       CEO Medical Director President
- Established South Sacramento Neurology Medical Associates Private Practice
- Responsible for training residents at my office from the Family Practice Residency Program at Methodist Hospital which was affiliated with University of Davis Medical Centre. In this position, I was also responsible for the mentoring training and supervising residents.
- Certified in Medical Aesthetics. Well trained in Laser/Dermabrasion/Skin care/Obagi trained/PPL skin care trained. A quest for helping people build their self-esteem and self-worth as an extension of my healing mission

**Firdos Sheikh**
**Page 5**

- Obtained 100 CME hours of training and workshops in Pain Management to better assist my patients in dealing with their Pain
- Worked as a Neurologist on call for Acute care hospital Kindred/Vibra caring for very complex patients. Following trauma, intracranial bleeds, Strokes etc.

1995 to
Present

**UNIVERSITY OF DAVIS MEDICAL CENTER**, Sacramento, CA
Chief Resident - Department Neurology
- Well versed in Electrophysiology with a Fellowship training, extensive experience in EMGNCS with research experience and publications in this field.

# Awards and Honors :

**NMKRV College**
**Bachelors in Science BSc degree**

Honors & 1st Rank in Botany, Chemistry, and Zoology
N.M.K.R.V. College, Bangalore, India: 1978

**Kasturba Medical College**
**M.B.B.S degree**

Honors & 1st Rank in Botany, Chemistry, and Zoology
N.M.K.R.V. College, Bangalore, India: 1978
Honors in Anatomy, Physiology and Biochemistry
Kasturba Medical College, Mangalore, India: 1981
Honors in Forensic Medicine, Preventative and Social Medicine
Kasturba Medical College, Mangalore, India: 1983
Honors in Ophthalmology and ENT
Kasturba Medical College, Mangalore, India: 1984
Honors in Surgery
Kasturba Medical College, Mangalore, India: 1985

2-22-2020       **Awarded " Bharat Ratna " Dr Radhakrishnan Gold medal Award in Chennai India**
**Given to 25 selected candidates from all over India . Select 2 candidates per state Nationwide**

3-8-2017        **INDIAN ACADEMY AWARDS on International Women's Day award in New York**
**for " Professional Excellence " . Audited by Ernst & Young**

https://siliconeer.com/current/women-empowerment-sacramento-neurologist-honored-at-indian-

academy-awards/

3-26-2017       **INDIRA GANDHI GOLD MEDAL AWARD recipient on International Women's Day by GEPRA**
**NEW DELHI   For Individual accomplishment & National Development**

**Firdos Sheikh**
**Page 6**

**1994**　　　　　　**Chief Resident Neurology :  University Davis Medical Centre**

1980-1984　　　Medical School: Kasturba Medical College, Mangalore, India: 1985
　　　　　　　　Was crowned " **Freshie Queen** "
　　　　　　　　Was crowned a "**Versatile Genius** "

1977-1980　　　Undergraduate: N.M.K.R.V. College, Bangalore, India: 1980
　　　　　　　　"**Literary Champion**". Won many contests in arts and science and bagged the championship based on
　　　　　　　　Highest number of awards

1970　　　　　　Sacred Hearts Convent
　　　　　　　　**School President**


# <u>Publications</u> :

Sheikh, F, Maselli R.: Unsuspected V Nerve lesion resulting from perineural cancer spread
detected by blink reflex.
AAEM abstracts of 18th Annual meeting, Montreal, 1995, pg. 133


Maselli R., Sheikh F., Niazi W., Cappazzoli N, et al: Electrophysiology of botulism of
suspected wound origin.
AAEM abstracts of 18th annual meeting, Montreal, 1995, pg. 75

ARTICLES PUBLISHED

https://siliconeer.com/current/tag/dr-firdos-sheikh/

https://siliconeer.com/current/author/firdos-sheikh/

https://siliconeer.com/current/tag/firdos-sheikh/

https://siliconeer.com/current/the-opioid-saga-harnessing-pain-management/

https://siliconeer.com/current/a-doctors-battles-the-keystroke-vs-the-scalpel/

https://siliconeer.com/current/dissecting-the-indian-brain-bank-aimas-3rd-u-s-india-conference/

https://siliconeer.com/current/women-empowerment-sacramento-neurologist-honored-at-indian-academy-awards/


# <u>Certifications:</u>

**<u>Board Certified Neurology & Psychiatry:  (June 2000 Recertified in February 2014-2024)</u>**
**<u>American Board of Neurology & Psychiatry</u>**

# <u>Internship</u>:

Bowring and Lady Curzon Hospital, Bangalore, India: 1985-1986

**Firdos Sheikh**
**Page 7**
Achar Neuroscience Center, Bangalore, India: 1986-1987
*House Officer in Neurology*
VA Medical Center, Boise, Idaho: 1990-1991
*Internal Medicine*


## Residency:

Anesthesia; St. Martha's Hospital, Bangalore, India: 1986-1987
Neurology: University of California, Davis, CA: 1991-1993
        *Resident*
Neurology; University of California, Davis, CA: 1993-1994
        *Chief Resident*

## Fellowship:

Clinical EMG and Electrophysiology, University of California, Davis: 1994-1995
*Fellow Associate*

## Clinical Appointments

University of California at Davis, Sacramento: 1995- October 1999
*Assistant Clinical Professor of Neurology*
Private Practice: Present Day

California Northstate University  Elk Grove –Ca – 2017-2021
*Assistant Clinical Professor of Electrodiagnostic Medicine*

California Northstate University  Elk Grove –Ca – 2017-2021
*Assistant Clinical Professor of Neurology*

## Licensure:

 California

## Societies

American Academy of Neurology: 1995
American Academy of Electrophysiology: 1995


## Affiliations:

Board of Directors UCDMC Alumni Association 2011 to 2015
Medical Director Interim Healthcare 2014
Autism Research Institute
MAPS fellowship programme (Medical Academy of Pediatrics for Special Needs)

**Firdos Sheikh**
**Page 8**

## *How have I made an impact to the world?*

Was School President Sacred Hearts Convent in India 1974

Literary Champion and College President in My Bachelor's Degree College 1979

Medical School I was crowned the Freshie Queen and a Versatile Genius. It's a huge accomplishment. The whole town waits to see who the winner is. 1980

UCDMC medical Residency I was the Chief Resident of Neurology 1993

UCDMC was a Fellow of Electro diagnostic Medicine 1994

I have been Assistant Clinical Professor in UCDMC

I have been an interviewer for selection of medical students MMS (Mini medical interviewer) selection committee in UCDMC 2017

Board of Director Alumni Association UCDMC 2016-2018

Assistant Clinical Professor of Neurology in California North State University 2017-2021

Assistant Clinical Professor of Electro diagnostic medicine in California North State University2017-2021

Indian Academy Award for Professional Excellence. Rated top 10 Indian American Achievers in all of the US audited by Ernst & Young firm and was selected for the women empowerment award 2017

Was given the Indira Gandhi Gold medal award again for Professional Excellence by India  2017

Was given the Bharat Ratna Dr Radhakrishna Gold Medal Award by India 2020  ( I was invited to receive this award on 2-22-2020  and because of this case Have not travelled )

Currently completing the MAPS fellowship (Medical Academy of Pediatric Special Needs fellowship) 2015-current

Rated as an Expert Clinician in Autism Research Institute in San Diego 2009

Dan biomedical trained for Autism 2008

Trained in medical aesthetics 2006

Work with interfaith Councils 1988-current

Work with many non profit and volunteer 1988-current

Contribute monthly to Loaves & Fishes

Contribute monthly to Shriners Hospital

Contribute monthly to Sankara eye Foundation

Was Communication Director for American Muslim Voice 2017

Was Medical Director for Interim Hospice2016





The American Board of Psychiatry and Neurology

Incorporated 1934
Member of the American Board of Medical Specialties

hereby declares

Firdos Sameena Sheikh, M.D.

maintained certification in Neurology

on February 3, 2014

as a Diplomate of the American Board of Psychiatry and Neurology
Ongoing certification is contingent upon meeting the requirements of
Maintenance of Certification

Certificate No. 48694

Certification is subject to the continued unlimited license
to practice medicine in the United States of America or Canada.

# University of California, Davis

## School of Medicine

*This certifies that*

*Firdos Sameena Sheikh, M.D.*

has satisfactorily served as

## Resident in Neurology



from ___July 1, 1991___ to ___June 30, 1994___

IN WITNESS WHEREOF, we hereunto affix our signatures

this ___30th___ day of ___June___, 19 _94_









CALIFORNIA NORTHSTATE
UNIVERSITY
COLLEGE of
MEDICINE

# California Northstate University
# College of Medicine

*Hereby appoints*

## FIRDOS S. SHEIKH, MD

*As a member of the clinical faculty with the academic rank of*

*Clinical Assistant Professor of Electro-Diagnostic Medicine and*
*Neurology in the department of Neurology*

ALVIN CHEUNG, PharmD, MHSA
CNU PRESIDENT

JOSEPH SILVA, MD
COLLEGE OF MEDICINE DEAN

GORDON A. WONG, MD
SENIOR ASSOCIATE DEAN OF CLINICAL MEDICINE

VALID UNTIL: 2021













# Ex. HHH

(39 Letters of Support from Community Leaders)



**Capital Orthopedics**
ORTHOPEDIC SURGERY & SPORTS INJURIES

**Diplomates**
American Board of
Orthopedic Surgery

**Fellows**
American Academy
of Orthopedic Surgery

**Qualified Medical
Examiners**
State of California

March 6, 2020

**PURPOSE:**

Letter of Recommendation for Firdos Sheikh, MD.

To Whom It May Concern:

I have been associated with Dr. Sheikh in a professional capacity for decades and at this time I am delighted to provide a Letter of Recommendation regarding her general and professional ethics and capabilities.

Dr. Sheikh has had a neurological practice in the South Sacramento area and has worked at Methodist Hospital, where I have also worked, from 1999 to 2015. Dr. Sheikh provided a significant contribution to the community because neurologists are in short supply and she provided a necessary service to the community. In addition to doing hospital rounds at all hours of the day and night, she would also not limit her practice to only insured cases, but would take on indigent cases and any person that needed neurological services regardless of their status.

Dr. Sheikh always conducted herself in a professional manner, always provided care within the appropriate ethical standards of the American Medical Association and had a collegial rapport with all of the other physicians on staff at Methodist Hospital.

Dr. Sheikh was convivial and outgoing, and had an excellent rapport with her patients. It is my understanding and belief that there was never a disappointed patient in all of our referrals to Dr. Sheikh for neurological care.

Harry A. Khasigian, M.D.  •  **(916) 525-0620**  •  (916) 525-0639 Fax
7551 Timberlake Way, Suite 200  •  Sacramento, CA 95823  •  www.capitalspineandortho.com

The loss of Dr. Sheikh's services in the community at this time is devastating because of the lack of service to needy patients and the increased difficulty in finding other neurological services.  Dr. Sheikh was always available and open to patient consultations regardless of time, place or circumstances.  The loss of this availability is difficult to overcome, particularly with the burgeoning population in respect to diminished neurological services at this time.

Dr. Sheikh was always extremely professional in her behavior and interactions with staff, colleagues and patients.  In addition, she has a pleasant and outgoing personality that is particularly endearing to her patients, many of whom she treats on a lifetime basis because of the nature of a neurological practice.

I have no reservations in my recommendation for Dr. Sheik as a highly skilled and competent physician.

Sincerely,

HARRY A. KHASIGIAN, M.D.
DIPLOMATE, AMERICAN BOARD OF
ORTHOPAEDIC SURGEONS

HAK:lz

**Dignity Health.**

Mercy Hospital of Folsom
Emergency Room
1650 Creekside Drive
Folsom, CA 95630
*direct* 916.983.7470
*fax*    916.983.7540
mercyfolsom.org

March 8, 2020

To Whom It May Concern:

I have been asked to provide a letter on behalf of Firdos Sheikh, M.D. It is my pleasure to write this letter to describe my professional relationship with Firdos.

I am presently an Attending Staff Physician in the Emergency Department (ED) at Mercy Hospital of Folsom (MHF), in Folsom, California. I have practiced Emergency Medicine in the Sacramento area for over 25 years. And, I have had the pleasure of working with Dr Sheikh - primarily between 1999, and 2015. My professional relationship with Firdos began in the Emergency Department at Methodist Hospital of Sacramento, where Neurology consultations are frequently requested. I always found Dr. Sheikh to be available and helpful with patient care.

Over several decades of clinical practice, I have worked with many medical specialists, and colleagues. Compared to most, Dr. Sheikh consistently demonstrated an unsurpassed level of excellence and competence in her role as a neurology consultant. Firdos has always been a hard-working, available, and reliable consultant for the years that we worked together. Often, Firdos could be found caring for patients in the hospital late into the evening, after her long day in the office. Moreover, throughout those years, I have always found Dr. Sheikh to be a kind and caring provider for patients. And, in a medical setting (the ED) where payment and insurance is often absent, Firdos always cared for patients without regard to ability to pay.

My experience with Firdos has always been positive. I have only found Dr. Sheikh to behave in a professional manner while in the workplace. On a personal level, in my experience, Firdos is articulate, confident, honest, and approachable. I would support Dr. Sheikh's integrity and character, and ability to practice medicine, without reservation.

Please feel free to contact me with any further questions, or concerns.

Ronald R. Flores, M.D.
Mercy Folsom Hospital
Staff Physician, Emergency Department

4

# Sierra Hematology & Oncology
Medical Center, a Professional Corporation

March 7, 2020

**To Whom This May Concern:**

Re: Dr. Firdos Sheikh

I have known Dr. Firdos Sheikh for over 30 years as a friend of the family and as a colleague.

She is an outstanding member of the community: always gracious and considerate, kind and generous. She has supported many charitable efforts in our community. She is honest and has high ethical standards.

I have high regard for her as a physician. I am impressed that she maintains an active Neurology practice and has also raised two wonderful children and taken care of her aging parents.

I recommend her without reservation.

Please call me if there are any questions.

Sincerely,

R Lalchandani, MD

Ram Lalchandani, MD
Cell phone: 916-601-7530
Office phone: 916-962-1544



**Mercy Medical Group.**
A Service of Dignity Health Medical Foundation

Dignity Health Medical Plaza
8220 Wymark Drive, STE 200
Elk Grove, CA 95757
direct  916.663.0500
fax     916.663.0232

Wajahat Khon, M.D.
Dignity Health Medical Foundation
8220 Wymark Drive Ste. 200
Elk Grove, Ca 95757

03/06/2020

To whom it may concern,

Dr. Firdos Sheikh is a colleague of mine who I have known for the last ten years. She specializes in Neurology and we share some mutual patients.

I have found Dr. Sheik to be very professional and is thorough in her knowledge. She has excellent communication skills, is honest, hardworking and humble. I also have seen her very active in the commuity and has been a participant in community events regulariy.

Dr. Sheikh is highly self-motivated and well capable of achieving any goals she sets her mind to. If you would like additional information about Dr. Sheikh please contact me by telephone (760) 413-8702.

Sincerely,

Wajahat Khan, M.D.

Scanned with CamScanner

Scanned with CamScanner

UNIVERSITY OF CALIFORNIA, DAVIS

BERKELEY · DAVIS · IRVINE · LOS ANGELES · RIVERSIDE · SAN DIEGO · SAN FRANCISCO  SAN JOAQUIN · SANTA CRUZ

CARDIOVASCULAR MEDICINE
SCHOOL OF MEDICINE
AMBULATORY CARE CENTER
4860 Y STREET, SUITE 9-0B3
SACRAMENTO, CALIFORNIA 95817
(916) 734-3762

UC DAVIS MEDICAL CENTER

March 6, 2020

Re: Dr. Firdos Sheikh

To Whom It May Concern

I feel privileged to write about Dr. Sheikh's ethics, philanthropy, public service and her interactions with people according to my direct observations.

Dr. Sheikh was a faculty member and colleague of mine at UC Davis Medical Center Sacramento in the late 1990s and was held in high regard by patients, co-workers and trainees.

Later, she went into private practice and in spite of being very busy with her work and binging up her family, she took time out volunteer her time and capital in a free community clinic, "The Shifa Clinic" in Sacramento. She was instrumental in the start and growth of the clinic and has been admired for her civic work.

Dr. Sheikh has been the first to show up for help and spiritual uplift amongst those affected by sickness and disease in her broad community. I can attest that she arranged social and religious events, provided meals and invited many friends to visit my seriously ill wife. There are many cases of her generosity and concern for others well-being. I attended one of her lectures where she exhorted community members to get more involved in social service. She has inspired others to be socially involved in creating a better society. I am proud that there is such a caring individual in our midst and hope more will follow her example.

Sincerely,

Zakauddin (Zak) Vera MD

Professor Emeritus, UC Davis.

Saturday March 8, 2020

To Whom This May Concern,

My name is Erum Tariq. I have been working as a Primary Care Physician at Kaiser Permanente since 2019. Prior to that I worked at Sutter Health Urgent Care for over 15 years.

I have personally known Dr. Firdos Sheikh for 5 years as a close friend and community member.

During my relationship with Dr. Sheikh, I have experienced a kind person who always carries themselves in a polite and respectable manner. She is a community minded individual who regularly puts the needs of others before her own– best evidenced through her substantial community work, both professionally and voluntarily. You will always find her present at any charity event, fundraiser, cultural banquet, political rally, etc. She is an incredibly active member of our community and I am always impressed by her efforts and dedication towards uplifting those around her. I believe her to be an honest individual who strives to support those in need, whether that be through her mentorship, charity, or friendship. I believe Dr. Sheikh to be an honorable individual, a highly valued member of our community, and a good hearted person.

I, without hesitation, can vouch for Dr. Firdos Sheikh's character. Please feel free to contact me if you should require any further information.

Best,

Erum Tariq
916-230-5571
erumtariq7863@gmail.com

3/8/2020                                          Gmail - Good standing Friend Dr. Firdos

 Gmail                              firdos sheikh <fpfamir@gmail.com>

**Good standing Friend Dr. Firdos**
1 message

Shaku Shankar <shakushankar@gmail.com>                     Sun, Mar 8, 2020 at 3:19 PM
To: fpfamir@gmail.com

I am Shaku Shankar ,My husband Dr.Shankar and I have been in Sacramento for more than 48 years. We have known
Dr. Firdos for more than 20 years, Professionally and personally.
We always  admired her thoughtfulness and honesty.  We are very well aware of her kindness, compassion and helping
nature. She has contributed to the community in all levels, professional guidance and monetary help to the needy. She is
very well liked, admired and respected in the community.
She is always smiling, kind and goes out of the way to help somebody in need.                        We are so glad
we have been friends and admirers of Dr.Firdos.

**ASISH GHOSHAL, MD**
DIPLOMATE OF THE AMERICAN BOARD OF NEUROLOGY

6601 COYLE AVENUE
CARMICHAEL, CA 95608
(916) 967-1288
FAX (916) 967-0518

NEUROLOGY
ELECTROMYOGRAPHY
EVOKED POTENTIALS
ELECTROENCEPHALOGRAPHY

3/8/2020

## TO WHOM IT MAY CONCERN

## Reference: Dr. Firdos Sheikh

Gentlepersons:

I am writing in support of Dr. Firdos Sheikh whom I have known both personally and professionally over the last 30 years. Dr. Sheikh is a hard-working and kind individual, and highly regarded in the community as being generous, honest, and having a helping nature to others. She has been a practicing neurologist for many years, and highly regarded by her colleagues and her patients.

Sincerely,

A. Ghoshal MD.

Shaista Rauf

7652 Polo Crosse Ave.

Sacramento CA 95829


To whom it may concern.

March 6th, 2020


Dear Sir/Madam:

It is with great pleasure that I write these few words for Dr. Firdos Sheikh, who I proudly call a friend. I have known her since 2000. She is kind, generous, loving, and intelligent and a very sincere person. It is not by her words but by her actions that she proved to be a model citizen. She is very generous and regularly donates to various charities and also devotes her time for good causes. She is a champion of fighting for inequality.

It was a huge surprise for me to learn about the false allegation and accusations that are being made against a person of such high credibility.

She always goes the extra mile to help her patients, friends or even strangers. She is a devoted daughter a loving mother, caring physician and incredibly strong person.


Sincerely,

Shaista Rauf, MD

*Anne Kjemtrup, DVM, MPVM, Ph.D.*   1118 Decatur Court, Davis, CA 95618

March 8, 2020

To Whom It May Concern:

I am writing this letter to attest to the upstanding and respectable stature of Dr. Firdos Sheikh in the Sacramento community. I know Dr. Sheikh from her years as a valued member of the Sacramento Area League of Associated Muslims (SALAM). During my continuing tenure as part of the management team, including two years as chairperson, I knew I could count on Dr. Sheikh to provide financial and moral support to our institution.

Over the past 15 years, I have enjoyed getting to know Dr. Sheikh. She generously opens her beautiful home and property to us, whether we need it for a small management retreat or a larger community-wide event.

Despite the stress and strain she has been put under last year, I am touched with how she puts her religious beliefs and her community first. She organized bed-side prayers for an ailing woman who was a community leader. Many people heeded Dr Sheikh's call to support this woman, giving joy to this woman in her last days.

Last summer Dr. Sheikh spear-headed a fundraiser at a colleague's home for SALAM's Community Center refurbishing. Dr. Sheikh's passionate pleas to support our organization inspired many to support our center. She is a role model for our community.

I know it was difficult for her when she was forced to give up her practice, leaving many of her patients at a loss for not only care but the compassion she offered them. I can only imagine the sadness it must have caused her to give up her life's passion of medicine. Yet, despite these hardships, she has continued to support the community and does so with a smile.

Please feel free to contact me if you require any more information on Dr. Sheikh's leadership role in the community.

Sincerely

Dr. Anne Kjemtrup
530-574-1278
akjemtrup@alumni.ucdavis.edu

3/9/2020                                    Gmail - Letter of support

 Gmail

firdos sheikh <fpfamir@gmail.com>

## Letter of support

**Stephen Magagnini** <magagninireport@gmail.com>                  Mon, Mar 9, 2020 at 11:04 AM
To: firdos sheikh <fpfamir@gmail.com>, Steve Magagnini <stmagagnini@ucdavis.edu>

March 9, 2020

To whom it may concern:

As the Sacramento Bee's longtime senior diversity writer, I worked with Dr. Firdos Sheikh until my retirement in May 2018 after 30 years. In more than a dozen professional interactions, I found Dr. Sheikh to be a compassionate, concerned community advocate who worked diligently to help me tell true stories about American Muslims in the region, from their successes to their tragedies. It is hard for me to imagine that she ever intentionally violated any law. She always exhibited a strong social conscience and a passion for justice. To the best of my knowledge, she has been a force for good in Sacramento.

Yours in justice and understanding,

Stephen Magagnini
Independent Journalist
Continuing Lecturer, University Writing Program, UC Davis

[Quoted text hidden]

# CISA
### Center for Interfaith Studies in America

To Whom It May Concern:                                        March 2020

    Re: Dr. Firdos Sheikh

I have known Firdos for several years now, and have found her to be anxiously engaged in many good causes. She is a doer – something I've always admired about her.  She is passionate about home country causes, home fires/motherhood causes, neighborhood and civic causes as well as many other important topics and circumstances she has approached, spending times that enrich all of us in small ways and large.

She is a deeply religious woman. She is a good thinker and a friend to many.

We have worked closely on several issues dealing with interfaith topics and directions and she is generous with her time and is always willing to help others about her.

For further questions or comments you can reach me at boutfohr48@gmail.com or at 916-801-8883.

    Respectfully,

    *Jon*

    Jon B. Fish
    Chief Executive Officer and Co-Founder
    The Center for Interfaith Studies in America

**Mariko Yamada**
**Assemblymember, 4ᵗʰ District (Ret.)**
**mmyamada@pacbell.net**

March 8, 2020

TO WHOM IT MAY CONCERN

**RE: DR. FIRDOS SHEIKH**

I am writing to provide a personal reference for Dr. Firdos Sheikh, whom I have known since 2016 through our mutual human relations and civil rights advocacy work in the greater Sacramento region.

Dr. Sheikh was Sacramento Communications Director for American Muslim Voice (AMV) when the Woodland Mosque hosted a community-wide interfaith gathering, "Hands Around the Mosque" on January 10, 2016.  This was the first time I met Dr. Sheikh.

This heartwarming and uplifting event, attended by over 250 community members, elected officials, and interfaith religious leaders, was intended to begin the 2016 New Year with a call for unity and understanding, peace and compassion, a positive response to the anti-Muslim sentiment that had become all too common in the political realm.  As one of the AMV spokespersons that day, Dr. Sheikh gave voice to the need for understanding and reducing fear through education.

Over the years, I have seen and interacted with Dr. Sheikh at numerous community gatherings as she continued her gracious work on behalf of the most vulnerable in our society.  Because of her humility, it was not until sometime later that I learned of her background as a highly trained and experienced neurologist.  By her very nature, she is a healer.

Thank you for the opportunity to share these observations.

Sincerely,

*Mariko Yamada*

Mariko Yamada, Assemblymember, 4ᵗʰ District (Ret.)

1230 Farragut Circle, Davis, CA 95618

In the Name of God, the Compassionate, the Merciful



**Council on American-Islamic Relations**
Sacramento Valley Chapter
717 K Street, Suite 217  Sacramento, California 95814
Tel 916.441.6269   Fax 916.441.6271  sacval@cair.com

March 3, 2020

To Whom It May Concern:

I am writing this letter to attest to the integrity of Dr. Firdos Sheikh. I have known Dr. Sheikh for the past sixteen years and can attest to her leadership and philanthropic endeavors in the Sacramento Valley.

As the Executive Director of the Council on American-Islamic Relations, Sacramento Valley Office (CAIR-SV), I have had the honor to work with Dr. Sheikh on numerous community projects. Dr. Firdos supports and volunteers  for many organizations and causes in the Sacramento Valley.  She spends most of her weekends in the service of the community, from feeding the homeless at Loaves and Fishes to mentoring students.  Doctors who are heavily engaged in the community at this level are rare to find.

When a colleague had a stroke, Dr. Firdos came immediately to the hospital to provide support and comfort to the family. She helped explain what is happening and the importance of remaining positive. Her advice had a tremendous effect in their recovery and rehabilitation process.

Dr. Sheikh regularly opens her private retreat for community functions and youth events. Dr. Firdos helped start the Shifa clinic which provides immigrants with language barriers and lower income families with free health services.

For her dedication to the Sacramento community and her outstanding achievements in the service of others, it is an honor to show my support for Dr. Firdos Sheikh.

Please feel free to contact me if you need any more information.

Sincerely,

Basim Elkarra
Executive Director
CAIR-Sacramento Valley

WASHINGTON D.C.
ARIZONA · CALIFORNIA · CONNECTICUT · FLORIDA · GEORGIA · ILLINOIS · KENTUCKY · MARYLAND · MASSACHUSETTS · MICHIGAN
MISSOURI · NEW JERSEY · NEW YORK · OHIO · PENNSYLVANIA · SOUTH CAROLINA · TEXAS · VIRGINIA · WASHINGTON



In The Name Of God, The Gracious, The Merciful

**S** acramento
**A** rea
**L** eague of
**A** ssociated
**M** uslims

### SALAM
Since 1987

Sacramento Area League of Associated Muslims

**Purpose**

**SALAM** is a nonprofit religious organization, incorporated in the State of California.

Its *purpose* is to promote Islamic teaching, understanding, and unity among all Muslims in the greater Sacramento area

**Address**

SALAM
4545 College Oak Dr
Sacramento, CA
95841-4515

(916) 979-1933 X3
www.salamcenter.org

Tuesday, March 10, 2020

**To Whom It May Concern:**
**Re: Dr. Firdos Sheikh**

Let me introduce myself.  My name is Metwalli B. Amer.  I have been on the Faculty of the College of Business Administration, at California State University, Sacramento since 1969.  I also served as Department Chairman for nine years during that period. Currently I am Professor Emeritus.

Also, I am the Founder of Sacramento Area League of Associated Muslims, known as SALAM, an Islamic Center which provides religious, educational and social services to its Muslim congregation and is heavily involved with interfaith work with the Sacramento community. Currently I serve SALAM Center as its Executive Director.

Dr. Firdos Sheikh asked me to write a letter about her personal qualities and characters. I welcome the opportunity to provide such a letter summarizing my knowledge of the qualities, characters and spiritual values that she possesses.

I have known Dr. Firdos Sheikh since she came to Sacramento in 1988. We have worked together in various projects to serve the community we live in including the congregation of SALAM Center. She is a family woman who raised well behaved daughter and son.

Dr. Sheikh is a very caring and sharing individual who has devoted a valuable time in her active life to help those who are in need. She used her medical profession to help patients freely in the SHIFA Clinic, a non-profit organization providing free medical services to the needy in the Greater Sacramento area. She served to help the needy through Loaves & Fishes and other service organizations.

She is a woman of deep faith, devoting part of her life to serve those in need. She is very active and well known in the community because of her trustworthiness, spiritual values, and her honest reputation among her peers and members of her congregation. She is highly regarded with the utmost respect due to her high morals and fine characters. She is a great problem solver and often called on to solve individual, family, and

community problems.

Please let me know if you need more information.


Sincerely:

*Metwalli B. Amer*

dramer69@comcast.net

916-456-9148

August 25 2016

8869 Marketta Court

Elk Grove, California 95624

*Exhibit AA*

To Whom It May Concern:

My father was in the care of Bird of Paradise Manor from late January 2015 until his death in January of 2016.  I found the facility to be clean and well appointed.  When I visited prior to placing my father, and every time after that, I found the facility to have maintained its cleanliness.  My father was well taken care of, he was clean and dressed each time I went to the facility until the end of his life.

I placed my father in Bird of Paradise Manor after he was a resident at Carlton Plaza in Elk Grove, California.  My father was a difficult resident.  He refused assistance, medication and even the simplest things.  He suffered from Dementia, but he was rarely docile or cooperative.  Dr. Sheikh and her team were able to manage my father.  Under Dr. Sheikh's direction, my father was always treated with love and respect, and they worked with him to manage his resistance to help.  My father came to trust and rely on them, especially Dr. Sheikh, as his condition deteriorated.

Unlike his previous place of residence, my father never "lost" anything.  His clothing and personal effects were cared and accounted for.  Dr. Sheikh often checked with me to verify what my father liked to eat, what types of things made him happy, and she did her best to provide those things.  As my dad's condition deteriorated, which was expected, the Bird of Paradise Manor staff did all that they could to preserve my dad's dignity and independence in any area which was reasonable.  They did a good job of ensuring his health and safety while he was a resident.

When my father could no longer go out of doors, they were sure to open the curtains so that he could see the beautiful grounds outside and the bunnies which would go through the property from time to time.  As long as he was able, they encouraged my dad to come out to the dinette and eat so he could socialize.

All in all, I was very satisfied with the care provided to my dad.  I never saw anything that would make me feel that the cleanliness was lacking, and I visited every room in the house with the exception of the room used by the overnight staff.

Finally, I have to say that Dr. Sheikh excels at dealing with very difficult residents.  When my father was at Carlton Plaza, he fell and had to be hospitalized three times.  They often called the ambulance to send my father to ER when there was nothing wrong with him except that he was being uncooperative.  At the end of his residency there, I had to pay for additional 24x7 care from an outside agency to come in to monitor my father for his own safety.  In addition to that, my father developed very serious ulcers on his legs from lack of care and attention to his swollen legs, even though I provided compression socks.  All of the time my father was at Bird of Paradise my father never had to go to the hospital, the ulcers on his legs healed, he maintained good health (under the circumstances), he never fell, and he was provided one on one care in a manner which did not make him feel that he was not in control. (which



was important to him)  While I am very sad that my father had to spend his final years in the throws of dementia and was unable to be in his own home; I am so grateful that Bird of Paradise was there to care for his day to day needs and provide for his dignity and happiness in his final months and days.  Dr. Sheikh provides a much needed service.

Thank you,

Mercedes L. Ray, daughter of

Arthur D. Nettles, Jr.

March 8, 2020

RE:  Letter of Reference

To Whom It May Concern:

I have had the privilege of knowing Dr. Firdos Sheikh for several years now. She is a reputable neurologist and well recognized in the medical field. Since meeting her, I have grown to respect and appreciate her professionalism.

I have had the opportunity to travel with her on an international humanitarian trip to visit needy regions of China. As a result, I have been witness to her professional conduct with patients. I have observed Dr. Sheikh to be a compassionate, caring, and ethical person. She is very humble, hardworking and eager to help other.

One notable thing that I noticed about Dr. Sheikh is that she devotes her time and energy towards helping people and promoting love and compassion in others. For example, Dr. Sheikh is a strong supporter of education and she donated over $20,000 to Salam Academy Elementary School to help the school transition their curriculum from California Standard to Common Core. She also takes time out of her busy schedule to work on bringing from India an afterschool and a math program called Abacus to assist local school students.

Dr. Sheikh is a strong advocate for peace and understanding. She works with several peace organizations and she used to be a board member of American Muslim Voice. She fosters friendships among all Americans and bridges the gap with Muslims and Non-Muslims in communities around the world.

Dr. Sheikh cared for her father up until he passed away and is still caring for her mother. She owned and operated a convalescent home for the elderly. As a result of what I have witnessed, I can personally attest that Dr. Sheikh has contributed to the community very positively. Dr. Sheikh is an asset to the Sacramento region. If there should be any questions, please contact me at 916-717-3827.

Regards,

Steve Ly

3/9/2020                                          Gmail - Letter

 Gmail                        firdos sheikh <fpfamir@gmail.com>

**Letter**
3 messages

ReNae Mathison <renaemathison@aol.com>                    Sat, Apr 13, 2019 at 8:29 PM
To: fpfamir@gmail.com

To Whom it May Concern,

This letter is in regards to my dear friend Firdos Sheikh, Doctor of Neurology.

Although Firdos is a great physician, loved by her patients and staff, she is also so much more!

I have known Firdos for so many years, over 25 years, and her frienship is priceless. She helped me through some of the hardest times in my life, both professionally and personally!

She makes the time to be there! My son had to have several surgeries for the removal of a "Giant Hairy Nevus" over a period of 3 years which was of great stress to me. I was also going through a divorce during the latter process of these surgeries and Firdos gave me the strength and encouragement to keep going when I wanted so very much to give up! Looking back, I wonder at times what I would have done without her help and support! The time she spent with me to comfort and reassure me! May God always bless her!

During the time of my divorce and while adjusting to being a single parent, Firdos was again a support. Even when I thought I was not going to make it through this time in my life there she was pulling me through! She even bought me a set of tires for my car because mine were balding and she was fearful for my children and myself driving on the busy California Highways, and she knew I was unable to purchase them at the time! Never asking for anything in return! She would take me to lunches and out to suppers at times. Great times, great pep talks! I knew she did it to get me out for some adult time, knowing being with kids all the or at work all the time I needed relaxation time too! She watched over me!

She would also take me, an RN, around with her in the Hospital at UC Davis Medical Center and mentor me on neurological tests and procedures which helped me, as I worked in the area of nerosciences. I can tell you that the patients and their families were always happy to talk with her because she gave them the time they needed and would explain in a way they could understand!

She would invite me to social functions as she knew I was alone with my children and didn't get out much! A lot of these were at her home where children were welcomed as well, so it would be fun for me and my kids to attend. I was able to know her parents, children, members of her family, which were all very caring individuals! My life has only been better for having been blessed enough to know and be a friend of Dr. Firdos Sheikh.

Although we now live in different states we continue to stay in touch and she continues to be a big support, someone I can turn to in a moment's notice!

**Golden Moments Care Home, Inc.**
2653 Armstrong Drive, Sacramento, CA 95825
(916)-979-9828          CA./ST. LIC # 347004862

August 26, 2016

To Whom It May Concern:

I met Dr. Sheikh approximately 3 years ago when she contacted me to tour my care home, as she stated she was opening her own care home, in the Wilton area. Upon the initial meeting with Dr. Sheikh, I sensed immediately that her heart was in the right place to open a care home to serve specifically dementia residents, and I felt it was a much needed service for our community. I marveled at the idea having such a resource in town, and contemplated further that having a care home available for potentially challenging seniors afflicted with alzheimers and dementia diagnoses, plus learning that she was a neurologist, I felt that she would be able to provide excellent oversight of this population and providing individual, compassionate, person-centered care plans for her residents for an optimal quality of life for them and their families.

I also thought what a selfless thing for her to do, open up her home to the patients that she serves in her medical practice. Albeit, she made it very clear that she would not be able to refer her own patients to her care home, due to the conflict of interest. It wasn't about monetary gain, but about making a difference and impact on the lives of this special and hard-to-place population, and allowing the opportunity for families to have the option of a more intimate environment with a Dementia trained staff, as opposed to ending up in a SNIFF somewhere.

Sincerely,

Denise Walker
CEO

 Gmail

firdos sheikh <fpfamir@gmail.com>

## Dr. Firdos Sheikh
1 message

Iyer, Gita <gita.iyer@intel.com>               Sat, Mar 7, 2020 at 10:35 AM
To: "fpfamir@gmail.com" <fpfamir@gmail.com>

To Whom It May Concern,

Dr. Firdos Sheik is one of the most compassionate, ethical, moral persons I have ever met! She takes time out of her busy schedule for the betterment of others regardless of whether they are from her background or not.

I continually reach out to her for friendship, wisdom, assistance and helping nature. She is always immediate to respond, and always helpful. She most likely has the most friends in the world because of capacity to be generous but also because she does not discriminate in her choice of friends or people she helps.

I am unable to put in words, the love and respect I have for Firdos. Please reach out to me at 916-768-8778 if you need more information.

Thank You,

Gita Iyer

Program Manager



3/7/2020

Shereen Rehman
3230 Arena Blvd #245-110
Sacramento, CA 95834

To Whom It May Concern,

My name is Shereen Rehman and I am writing to you to provide a character reference for Dr. Firdos Sheikh who has been my friend for the past 7 years. I provide this reference in full knowledge of Dr. Sheikh's charges of forced labor and alien harboring for financial gain.

I believe that there has been a confusion regarding these charges because Dr. Sheikh is the most kindest, generous, compassionate, caring, and ethical person that I know. She is a very humble, hardworking and devoted individual and she cannot hurt anyone. In the time that I have known her I have never seen her disrespect or treat someone badly because of their financial or social status, in fact I have witnessed her devote her time and energy towards helping people and promoting love and compassion in others. She definitely has had an impact on my life and I admire her and look up to her.

I first met Dr. Sheikh when my younger sister was diagnosed with terminal brain cancer. Although Dr. Sheikh was always very busy she made me feel worthy of her time. I began consulting with Dr. Sheikh often about my sister's diagnosis since she is reputable neurologist. Dr. Sheikh wasn't my doctor nor was she my sister's doctor but she always took time out of her busy schedule to counsel me, explain test and image results to me, helped me look for clinical trials that could help my sister, and she also consulted with her colleagues about my sister's condition – all this without any compensation. She also generously offered my sister the free use of her Hyperbaric Oxygen Therapy Chamber which improved her quality of life. After my sister passed away Dr. Sheikh was there to counsel me and my family and always gave me her shoulder to cry on.

However, it wasn't only me and my family that Dr. Sheikh showed so much compassion to, she is like this with everyone and that is why she is loved by so many people in our community and around the world. Below I would like to list out a few points that I have personally witnessed about Dr. Sheikh as it expresses the content of her character:

- Dr. Sheikh is very generous and a strong supporter of our community. In every fundraiser that I have attended in Sacramento where Dr. Sheikh is present I have personally witnessed her donate very generously and usually be the top donor of the evening.
- Dr. Sheikh is a strong supporter of child education and she donated a tremendous amount to Salam Academy Elementary school to help the school transition their curriculum from California Standard to Common Core, her donations also helped the school renovate their floors. Dr. Sheik is also working on bringing an after school math program from India called Abacus that will enhance math skills and empower children in helping develop and balance the right and left brain.
- Dr. Sheikh is devoted to feeding the homeless and is constantly donating to food banks in the Sacramento Community such as Loaves and Fishes and Al Razaq Food Bank. In fact, before she was indicted she was working on an app and developing a strategy to feed the homeless in all of Sacramento, she was also getting ready to fund the project.

- Dr. Sheikh is a strong advocate for Peace.   She works with several peace organizations and she used to be a board member of American Muslim Voice. She fosters friendships among all Americans and bridges the gap with Muslims and Non-Muslims in our communities and around the world.
- Dr. Sheikh hosts many gatherings on her expense just to unite the community.  Recently she hosted a Tony Robbins seminar for her friends and also the Elk Grove community.
- Dr. Sheikh is a great friend with a big heart and she will bend over backward sto put a smile on your face and to lift up your spirits.  She hosted a "Celebration of Life" event for her terminally ill friend Dr. Shereen Vera who was diagnosed with ALS.  She also hosted several prayer gatherings for Dr. Vera throughout her illness and visited her often.  Dr. Sheikh also hosted a community prayer gathering when Dr. Vera passed away.
- Dr. Sheikh looks after the elderly.  She took care of her father up until he passed away; she is still taking care of her mother, and she also owned and operated a convalescent home for the elderly.

I can say with full confidence that no one has contributed to this society in a way that Dr. Sheikh has and I vouch for the right character of Dr. Sheikh.  Not only do I feel that Dr. Sheikh is an asset to the Sacramento and Elk Grove community but she is an asset to the whole world.

I do feel that there is a confusion regarding her charges and I do feel that she has been wrongfully accused by people who are just trying to take advantage of her to gain immigration status.

I hope that this matter is dissolved or dismissed quickly in Dr. Sheikh's favor.


Sincerely,



Shereen Rehman

To whom it may concern:

Dr. Firdos Sheikh is an exceptional member in the Sacramento community. A passionate and trusted physician who's work stems beyond her medical practice. I am in complete disbelief about the accusations made against Dr. Sheikh. It is my every intention to extend my support to her during this devasting time.

Dr. Firdos Sheikh has proven to be a remarkable individual and showcases her ethics of generosity and compassion in her career and volunteer work. She has dedicated herself to finding innovating ways in improving accessibility and quality of healthcare for her patients. Her impact in the medical field reflects her hardworking dedication to the profession and to patients.

Dr. Sheikh service to the community is centered around society, spreading awareness, community building, and advocacy. For over 20 years, she has volunteered her time to Shifa Clinic, a volunteer run clinic who caters to the uninsured and needy, and Loaves & Fishes, a non-profit who is dedicated to feeding and providing shelter to the homeless.

Her remarkable dedication in the community also extends to strengthening interfaith understanding. In 2015 she was involved in Hands Around the Mosque, where she developed an elaborate and extensive concept of bringing in specific religious color facts. She helped with the concept of a spiritual confluence of humans as opposed to religious strife. In 2017, she also served as a director of Communication for American Muslim Voice to spread harmony, peace, and religious tolerance.

I have worked alongside with her on projects that involved Shifa Clinic, Interfaith related activities and many other social causes, all which better our local communities.

I am not surprised at all that she has won the hearts of countless people and has won many accolades. To name a few, in more recent years, she was awarded Indira Gandhi Gold medal award for professional excellence in 2017. This year she was awarded the Bharat Ratna Dr Radhakrishna Gold Medal Award by her home country of India. In 2017 she was selected for a Women Empowerment award by Ernst & Young Selection on behalf of Indian Academy Awards. She was also chosen as one amongst the top ten Indian American Women in honor of International Women's Day celebrations.

Dr. Sheikh works as an assistant clinical professor of Neurology and Electro diagnostic medicine for California North State University.

She is a remarkable leader who is committed to building a stronger society and a stronger community.

I extend my solidarity to her during this difficult time.

Thank you,

Kadi Menoufy
CEO/ President
Delegata Corporation

**Management & Operations LLC**

"Your Management & Accounting Solution"
Main Office  1556 Bell Avenue, Sacramento CA 95838
Phone (916)925-0577  *  Fax (916)333-2207

Dr Firdous Sheikh
9381 E Stockton Blvd #124
Elk Grove CA 95624

August 25, 2016
Re: Personal Reference

To Whom It May Concern,

I would like to provide a personal letter of reference for Dr. Firdous Sheikh. I have worked side by side with Ms. Sheikh for the last 5 years performing service for our local community.

We specifically worked on the project "1000 Meal Drive" that provided meals to the homeless and hungry. Not only did Ms Sheikh put in hours of service but she also contributed her own funds towards the cause.

We also participate together in the American Muslim Voice Foundation where we foster friendships among all Americans by bridging the cultural and religious gap by hosting open houses, peace picnics, cultural events and a peace convention. Ms Sheikh works tirelessly to bring people together in peace and harmony.

I admire her courage to do all this while helping her patients and running her own clinics and businesses. I have found her trustworthy and valued friend and associate.  Please feel free to contact me if you have any questions regarding Ms Sheikh.

Sincerely,

Mohammad Sattar
President

Mahnaz Padash
108 Ayhcat Way
Folsom CA, 95630
March 09, 2020

To whom it may concern:

I, Mahnaz Padash, retired Intel manager thought I was the most
honest and dedicated employee who sacrificed her life for the
best of the company. But after I met Dr. Firdos Sheikh and saw
her dedication and hard work, and motivation and love, both at
home for her elderly parents and at work for her employees,
meeting all assignments and dead lines and still finding time to
help the needy and teach the community by giving presentations
and encouraging them to participate and learn the different
criteria of living a healthy life, changed my view of myself.

I have known Firdos since 2003. We met at a presentation at
Salaam and somehow clicked and became real good friends. Firdos
in particular has been a shoulder to lean on right from day one.
She has been akin to the Rock of Gibraltar to me. Her good
nature, positive attitude, selflessness and jolly demeanor has
lent strength to me in my hours of need. These valuable qualities
of hers were not restricted only towards me. It was hard not to
notice that she spread joy and happiness towards one and all. No
function or party was complete without the presence of Firdos  as
her genuine happiness was very contagious. Her company was sought
by all. She never let me feel alone or an outsider.
I have seen Firdos as a dedicated family woman A loving mother to
her two kids , and her widowed mother. As the sole bread earner
of the family, she consistently worked over and beyond her
regular hours to maintain a harmonious family life. I have seen
her sacrificing her own desires to fulfill the needs of her
family and friends. She is very passionate about helping people
in need, whether family, friends or co-workers. Working in the
medical industry has been her overwhelming passion and she excels
at it. She has received numerous awards from the community for
her Leadership qualities, Team Work and Ethics.
I understand that Firdos is somehow implicated in a legal issue.
This is indeed shocking and beyond comprehension because she has
always been a simple, honest and hardworking woman. This is the
antithesis of what Firdos is and what her character is. In
summation, I hope i have done Firdos justice by I encapsulating
all the qualities that Firdos propounds as a model citizen.

Very truly yours,
Mahnaz Padash
(916)220-5122
Email mahnaz1916@yahoo.com

1

3/8/2020                                    Gmail - (no subject)

 Gmail                                    firdos sheikh <fpfamir@gmail.com>

## (no subject)
2 messages

**Nariman Abdel-Salam <didi_abdel_salam@hotmail.com>**          Sat, Mar 7, 2020 at 8:53 PM
To: "fpfamir@gmail.com" <fpfamir@gmail.com>

To Whom it May Concern

My name is Nariman El-Nakhal, a resident of Davis, CA and a long time friend of Dr. Firdos

Sheikh. I have none her for over a decade through many community events that featured diversity,

justice and civic engagement. Dr Sheikh has always been a community uniter,leader and a gentle

giving spirit. She is generous, humble and very kind-hearted. She has enriched the Sacramento

community with her leadership, foresight and service. We, as a community are indebted to her for

gracious generous spirit.

Name    : Nariman El-Nakhal

Address : 1005 San Tomas St, Davis, CA 95618

**firdos sheikh <fpfamir@gmail.com>**                              Sun, Mar 8, 2020 at 2:46 PM
To: Nariman Abdel-Salam <didi_abdel_salam@hotmail.com>

Thank you Nariman So humbled and total love and respect for you
[Quoted text hidden]

**COUNCIL OF SACRAMENTO VALLEY ISLAMIC ORGANIZATIONS**

**P. O. BOX 660123, SACRAMENTO, CA 95866-0123**

March 8, 2020

**To Whom It May Concern: Regarding Dr. Firdos Sheikh**

My name is Dr. Irfan Haq. I serve as the President of the Council of Sacramento Valley
Islamic Organizations (COSVIO), an umbrella organization of the mosques and Muslim
organizations in the Greater Sacramento area.

I have known Dr. Firdos Sheikh for over 20 years. I have seen her in mosques
attending prayer services and at events of the Muslim community. I have always found
her very charitable, generous, kind and supportive of the needs of the poor and needy
of the community. She has stood for the rights of the underprivileged and spoken for
social justice.

I have also known her as a highly professional medical doctor, a specialist in neurology,
well liked and respected in the medical community.

As a person, Dr. Sheikh is a mother of two children and has been a valued member of
the community. People know her for her helping nature and her readiness to assist
others in any matter. Often people have found her as a resource for creative and useful
ideas in building a healthier, humane and better society.

If there is anything else you need to know, please do not hesitate to contact me. Thank
you.

Sincerely,

Irfan Haq, Ph.D.

President, COSVIO

(916) 832-9298

**M** Gmail

firdos sheikh <fpfamir@gmail.com>

---

## Reference Letter
1 message

**Sunita Kapoor** <kapoor264@gmail.com>                          Mon, Mar 9, 2020 at 7:45 PM
To: fpfamir@gmail.com

To Whom It May Concern:

My Name is Sunita Kapoor. I have lived in the Sacramento area for over 40 years. I am a retired Registered Nurse.

This note is to vouch for my friend, Dr. Firdos Sheikh whom I have known for over 15 years. Although I did not have an opportunity to work with Dr. Sheikh directly in a professional setting; on more than two separate occasions I contacted Dr. Sheikh to seek assistance where her professional expertise was needed. In my interactions with Dr. Sheikh I found her to be someone with enormous intellect, very high emotional intelligence, credible, compassionate, competent and above all generous with her time.

Additionally, I have had more contact with Dr. Sheikh personally and in social settings. I can confidently say that Dr. Sheikh is very well liked and has friends with diverse backgrounds. This is a testament to a person who connects well with people and is very reliable.

Dr. Sheikh's is multi-faceted person with tremendous physical and mental stamina. She is a true servant of humanity. This is evident in her pro-bono work, her involvement in the Muslim Community to build bridges with greater community and most recently in an inter-faith group to address religious freedom.

If you need to speak with me, please contact me at the phone number in my address block.

Sincerely,

Sunita Kapoor

(916) 335 - 8407

*You cannot control the wind but you can adjust your sails*

Mumtaz A. Qasmi
Imam of Muslim Mosque Association
411 V st. Sacramento, CA 95818
(916) 443-5167

To Whom It May Concern,

My name is Mumtaz A. Qasmi. I am the Imam (priest) of the Muslim Mosque Association of Greater Sacramento, located in Downtown Sacramento. I have been giving my services to the Muslim community for over 30 years of both Northern California and Canada. I am the Vice President of the Islamic Sharia Council of California and also offer my counseling and guidance to families and the youth of the Muslim community.

I have known Dr. Firdos Sheikh since 1988. She is very helpful and connected to community affairs and is always foremost and ready to volunteer.

She is also very generous in donating time, effort and money for many good causes such as funds for various calamities. She donated her time every Sunday for almost a decade caring for patients who had no insurance at the Shifa Clinic that operated close to the V Street mosque. She is always striving for equal civil rights for all and always demonstrates hands on involvement in all the projects.

She donated time and money to feed the homeless. She is widely well known not only in the muslim communities but also in the non muslim communities for her generosity, willingness to volunteer and hard work. She is involved in every event that involves the betterment of communities at large . She also worked hard to build bridges between people of different cultures and religions.

My son had the privilege of shadowing her in her medical clinic and was speaking highly of her hard work, her dedication and more importantly the love and respect he saw of all her patients towards her. He stated it was very inspiring.

I have known her for several decades. Dr. Firdos Sheikh is a hard-working, kind, caring, generous, honest, very ethical, compassionate, dedicated community member . She has demonstrated how to care for elderly by her devoted caring of her parents and is a role model for younger generations.

If you have any questions please contact me.

Thank you.

Mumtaz A. Qasmi

3 - 7 - 2020

# T. Sami Siddiqui

11937 Rising Sun Way
Gold River, CA 95670
916-420-0058

8/26/2016

To Whom it May Concern,

This letter is to attest to the character of the respected community member, Dr. Firdos Sheikh.

I have known Dr. Sheikh for over twenty years both in personal and professional capacity. Due to the nature of my volunteer activities, I always had to call on her to provide moral, financial and intellectual support and she always answered the call. In professional capacity, when mother and mother-in-law were sick, she was always there to support and visited with them late in the night after her regular professional calls. In fact, when my Mother-in-law was sick, she came and stayed with her for a few hours to monitor her and finally took her to the hospital to be admitted, spending most of the night by her side ensuring that she was well taken care of.

During the last twenty plus years, I learned about her medical practice, her character, her principles, her outlook on life and her giving back to community. Personally, I did not see a flaw. She has busy medical practice, she volunteers, she attends community events, she supports non-profit and helps the sick community members. Frankly, I do not know how she does it all. She is a leader.

She has garnered the respect of the community and will continue to do so.

Should you need more information, please feel free to contact me.

Sincerely,

*T Sami Siddiqui*

T. Sami Siddiqui
Real Estate/Loan Broker
Past Treasurer and Past Board Member, Elica Health Clinic, a Federally Qualified
Past Health Clinic Board Member, Shifa Clinic, a UCD Student run Clinic
Past President, Treasurer and Board Member for CAIR, a civil rights organization

3/8/2020                                    Gmail - Dr. Firdos Sheikh

 Gmail

firdos sheikh <fpfamir@gmail.com>

## Dr. Firdos Sheikh
1 message

Hamza El-Nakhal <helnakhal@hotmail.com>                             Sat, Mar 7, 2020 at 10:16 PM
To: firdos sheikh <fpfamir@gmail.com>


### To Whom It May Concern

My name is Dr. Hamza El-Nakhal. I am a retired professor of Microbiology. After retirement, I served in many non-profit organizations. I served on the Davis Human Relation Commission, Community Advisory Board to Davis Police Department, Multi Culture Community Council to Yolo County District Attorney, Vice President of Davis International House, President of Council on American-Islamic Relations on the larger Sacrament Valley (CAIR-SV), Board member of Davis Community Meals and Housing, President of Davis Islamic Center and other non- profit organizations.

I have known Dr. Firdos Sheikh for many years. She is very generous in donating time, effort and money for many good causes such as equal civil rights for all. She spoke for uniting children with their children at the southern borders. She donated time and money to feed the homeless. Also, she worked hard to build bridges between people of different cultures and religions.

Dr. Firdos Sheikh is a hard-working, generous, honest, very ethical, compassionate, dedicated community builder, and loves nature.

Hamza El-Nakhal

Davis, CA



March 7, 2020

To Whom it May Concern,

I am writing this letter on behalf of Dr. Firdos Sheikh. I am the co-founder and co-business owner of Sharif Jewelers in the Sacramento region.

I first met Dr. Firdos through the Muslim community over a decade ago. She has always carried herself with grace and compassion, and has always been wonderful with myself, my family and my relatives. She is a well-respected figure in our community.

Over time, Firdos became a true friend, especially during the years of my late mother's illness. My brothers and I turned to her for medical advice and she became my mother's most trusted doctor. She treated my mother with such kindness and was always willing to take our calls if we had a question or needed advice. She and my mother developed a special friendship and bond and even today, whenever I see Dr. Firdos we speak about the lovely time she and my mother spent together.

Dr. Fridos is incredibly trustworthy and caring, it is such qualities that made me feel so comfortable in having her take care of my late mother. And I would trust her with my own health, my wife's, my children's. She has spent time at my family's home on many occasions and we have visited her home and property many times as well. Throughout these years I have never witnessed or felt anything suspicious or out of the ordinary.

Dr. Firdos Sheikh is an incredible part of our community and greater Sacramento community — she's dedicated her life to bettering the lives of others through medicine. And my family has had a direct and positive impact from her.

Please feel free to contact me if you need any more information.


Sincerely,

Hazem Sharif

hazem@sharifjewelers.com
1001 K Street, Sacramento 95814
916-330-1977

March 7, 2020

To Whom it May Concern,

I have known Dr. Firdos Sheikh through the community for many years and she has been guest at my family's home many times. She is very kind and has always been a wonderful guest and dear friend.

I love how she interacts with everyone in the family and whenever we have other guests over at the house, everyone truly loves her. She is easy to talk to and truly feels like a member of our family when she visits us.

I know that Dr. Firdos is also an incredible doctor and she has helped my late mother-in-law, I have never seen a doctor interact with his/her patient as Firdos did. She showed so much compassion and patience in so many moments. We have been so thankfu to have Firdos a friend. I would absolutely trust her with my own care.

She is a wonderful person, friend, and an integral part of the greater Sacramento community.

Please feel to contact me with any questions.

Sincerely,

Sawsan Natsheh

916-791-3768
8140 Barton Road
Granite Bay CA 95746

To whom it may concern                                    3/7/2020
Dear or Madam

My name is Akram Keval and I am currently serving as a board Member with the
Interfaith Council of Sacramento representing the Muslim community in Sacramento
and also serving a Faith Committee Chair with Habitat for Humanity Sacramento
Chapter.
I have known Dr. Firdos Sheikh for many years, she is very active in the community
and has always volunteered her time at many events and organizations.
Dr. Firdos has always helped out in any way she can with her valuable time,
medical advice or financial assistance when and where needed.
She is a person of faith and integrity. She has always worked with various nonprofit
organizations in the Sacramento area with all faiths.
I can personally attest to her character as being honest, trustworthy and willing to help
anyone in need.
She has graciously opened her house to many community and organization retreats
and has earned high respect among many faith based communities, our family, mutual
friends and city elected officials.
Dr. Sheikh has also done a wonderful job raising two kids on her own while looking
after her parents.
I know for a fact that our family and our community can always count on her for
anything.

Please feel free contact me if you need any additional information

With best regards

Akram Keval

Board Of trustees
Interfaith Council of Sacramento

2200 Valley View Pkwy
El Dorado Hills, Ca 95762
3/9/2020

To whom it may concern,

My name is Seemin Hedayati, and I currently work for U.S. Bank in the
Government Banking division. I am writing this letter in regards to Firdos
Sheikh.

I met Firdos via my aunt. Firdos started coming to my aunt's house almost
everyday as she needed support and help while she was going through her
divorce. At the time, I was living with my aunt also and had a better chance
to get to know Firdos more.

Even after all of the hassles that were going on in her life, she always had a
positive attitude and was always friendly. I started to hear from my aunt
and outside community members how helpful she has been with everyone.
She was consistently giving her time and donations to people who needed
it the most. As a doctor, she was always willing to give her honest advice
and help everyone who came to her. That is not a very common thing
amongst most doctors in our community; very few are like Firdos to offer
that service at no cost.

I've come to find out she was also supporting both parents despite
everything that was going on at that time. My respect level for her
increased significantly as I had heard she had a brother who should've
taken most of the parents responsibility, or at least according to our
culture. Her being the daughter goes to show her upbringing in taking up
that responsibility.

She also had two kids who were going through a hard time as her divorce
was going on, but that didn't necessarily stop her. She worked with her kids
and made sure they were able to get through school successfully. She didn't

1



3/8/2020

To Whom It May Concern:

Ref: Dr. Firdous Sheikh

I, Lavanya Kailar MD, have known Dr. Firdous Sheikh for over 35 years. She was my medical school classmate from 1980-1985 at Kasturba Medical College in India and she has been a friend since then.

Firdous has been working as a neurologist for over two decades in Sacramento area and I am impressed by her generous listening skills and appreciative curiosity while I have called her to get her thoughts on how she would handle clinical scenarios. She has mentored numerous students and residents in her field and her passion for learning and teaching others is inspirational.

She has always impressed me by her generosity, compassion and willingness to help those who are less fortunate in various walks of life, her candor and enthusiasm in confronting the social issues and bridging various ethnic and religious groups to bring unity. I have read articles published in Silicon Valley Magazines regarding her grassroot community activities in Sacramento area.

Firdous has a great sense of humor and an ability to connect with people of all ages, especially the elderly and disabled, ability to have a social connection with everyone and building a community to support each other, community of healing and a sense of belonging. She has diverse interest in painting, gardening, farming and she is always connected to nature, describing the beauty of clouds comparing to how impermanent life is, marveling at the light and shadows, water, clouds, waves and storms.

It has been my pleasure and honor knowing Firdous as my classmate and friend.

Thank you!


Lavanya Kailar, MD, MPH, FACOEM

Saratoga, CA



# *Indus Valley American Chamber of Commerce*,

A Non -Profit Organization Since 2001
Corporation I.D. 2350078.  Fed. Tax ID # 77-0591748
9235 Cape may Court , Sacramento, CA, 95758, USA
Phone: 916-802-5776, Fax: 916-684-9581
Chainsukh@aol.com . www.induschamber.com.
_____

## *To whom it may concern*

*The Indus Valley American Chamber of Commerce was founded in 2001 by a group of philanthropistic and ambitious individuals who saw a gap in a business-oriented community that needed to be filled. They have undertaken this mountainous task and have exceeded not only the expectations of the founders but those of their well-wishers as well. Since the IVACC's inception, it's members have had the honor to directly participate in California's legislative process. They did this by entertaining and being entertained by California's most well-respected dignitaries in the political realm as well as in the social realm. IVACC has strategic alliances with the prominent South Asian community members at large as well as with prominent community members all across California. In 2005-2007 IVACC board members with Lieutenant Governor John Garamendi, shortly before his recent legislative victory.*

### *Objectives*

*Involvement in the IVACC is an excellent way to meet other business professionals and contribute to the economic growth of your business and your community.*

*At present, we have 500 members on our mailing list. Dr. Firdos Sheikh is a regular member of IVACC for the last few years. She has been very active in the affairs of the chambers. As a doctor, she has offered her serves to our community free of charge. Where ever and whenever our community needs, her she is a willing social worker. She has helped a few times with money also.*

*She has built a great relationship with IVACC members.*

*IVACC members are lucky that she is a part of our organization. We wish her best of luck in life. Thanks.*

*Sukh C. Singh- General Secretary*
*Indus Valley American Chamber of Commerce,*
*501(c) ID #31428*
*Phone 916 802 5776 Fax 916 897 8748*
*E mail :chainsukh@aol.com,www.induschamber.com*

# Ex. III

(Patient Testimonials)

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: *Shireen Leppke*

DOB: *6/18/54*

Review:

*She's the Best
Very helpfull*

Thank you
Dr Firdos Sheikh
Office Manager

*9381 East Stockton Blvd. Suite# 124 and Suite#.222 Elk Grove, CA 95624
Ph (916)681-2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

SSNMA                        South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name:
DOB:       4-6-66

Review:

DR Sheike, is The best Docter
I've Been to. she has always Taking
care of my Problems, very caring
Takes her time with every Patient
to Listen to all of our problems
~~them~~ I Wouldnt Change her
for any other Docter

Firdos Sheikh. M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: KEVIN MURPHY
DOB: 11-19-1970

Review: I AM VERY PLEASED TO BE A PATIENT
OF DR. SHEIKH. SHE LISTENED TO EVERYTHING
THAT I TOLD HER REGARDING MY MEDICAL
ISSUES & NEEDS AND SHE ADDRESSED IT
ACCORDINGLY WITHOUT A PROBLEM.
SO FAR THE SERVICE AND CARE I HAVE
RECEIVED HAS BEEN GREAT, THE OFFICE
STAFF IS PLEASANT & FRIENDLY, AND
SEEMS TO BE VERY ORGANIZED & THOROUGH.
I WILL DEFINITELY RECOMMEND & REFER
FRIENDS, AND OR FAMILY TO DR SHEIKH.

9381 East Stockton Blvd, Suite 110 and Sutter Gould 329 Lik Grove, Ca 95624
Ph: (916)681-2126

Firdos Sheikh, M.D.

SSNMA

Sierra Sacramento Neurology Association

DR SHEIKH would like to near from you about her care
Please take a few minutes to tell her

Name: Jaudee MMHS
DOB: 1-3-71

Review:

Dr. Sheikh is a amazing Doctor, She is my Doctor. I
Trust her with my life. She is strit to the point
Theres no none carts with her, She has holfed me
in So many ways. She has greatly improved
my life, and she contius to push Me to strive
for a Better health. it not easy to find a Doctor
like Doctor Sheikh. And I Dont take it lightly
When I say I Trust her wtth my life there no
other Doctor I say that ABout.

Thank You

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

**Name:** Sohail Aziz
**DOB:** 7/22/93

**Review:** Dr. Sheikh has been amazing and extremely
helpful Since I started seeing her. I will continue to see
her for as long as possible. Best Dr. in Elk Grove 100%.

Thank you
Dr Firdos Sheikh
Office Manager

*9381 East Stockton Blvd. Suite# 124 and Suite#;222 Elk Grove, CA 95624*
*Ph (916)681-2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Aaron Ramesh
DOB: 1-5-1972

Review: Dr Sheikh is Been our Family Doctor. For Couple Years and She is Been Very Good HelpFull Kind Caring And Always Ask about oo Patiums Condition. I woub highly Recomend

Thank you
Dr Firdos Sheikh
Office Manager

Her To Anyone -

2.26.19

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Liu Tcheng
DOB: 7/17/1951

Review: I like about Dr. Sheikh and she's
nice toward me. she prescribed the right
kind of medications that I need.

9257 Los Angeles Blvd Suite 12, and Suite#222 Elk Grove, CA 95624
(916)681-2246

Firdos Sheikh, M.D.
Consultant in Neurology

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Amelia Daniels
DOB: 11/28/1977

Review: My health has greatly improved
with the help of dr. Sheikh and
the therapy I recieve! There are days
I can feel knots in my back and when
I leave the office I feel like a whole new
person! not only that, I've been able to
decrease the amount of medication I was
previously taking. I have several drs
and its not all the time you find ones
who will treat you with kindness and
CARE, listen and make you feel like
you matter. As a patient I do feel
like I've had great improvements and
am continuing to work on moving forward
in getting better.     —Thank you.

9381 Laguna ... Blvd. Suite 122 and Suite 222 Elk Grove, CA 95828
Ph. (916) 684-2330

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to **hear** from you about her care
Please take a few minutes to tell her

Name: Jose A. Avila Jr.
DOB: 12/21/1984

Review: CARE WITH DR. SHEIKH IS EXCELLENT,
AND DR SHEIKH HAS ALWAYS GONE ABOVE &
BEYOND TO MAKE SURE I RECEIVED THE
CARE I NEED. I'VE BEEN TREATED FOR
MULTIPLE REASON IN REGARD'S TO
ISSUE'S I'VE NEEDED CARE FOR, AND
EVERY TIME I'VE RECEIVED PROPER &
ADEQUATE CARE.

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Amelia Daniels
DOB: 11/28/1977

Review: I've been a patient here for a few years
and I would rate my care very satisfactory.
I've been able to cut down on my meds where needed
and get physical therapy which has been a lifesaver!)
I think we've built a patient / DR relationship that
Im very comfortable with and feel like my needs are
being met.

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

**Firdos Sheikh, M.D.**
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Theresa Allen - Caulbey

DOB: 12/26/57

Review: Dr. Sheikh has been instrumental
in relieving me of my every day headaches.
I no longer have those. As for the
migraine her approach has been
invaluable to my treatment of them.
I hold Dr Sheikh in the highest
regard and would recommend her highly
to others. She has a whole person approach
method of treatment as well.
The wait for her is well worth
it, if you have to wait in the
Waiting room. Now that I've
found her, I do not want another

*9361 East Stockton Blvd. Suite# 124 and Suite#:232 Elk Grove, CA 95624*
Neurologist (916)681-5226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

**DR SHEIKH** would like to hear from you about her care
Please take a few minutes to tell her

Name: Dianne Ishimaru
DOB: 9/2/53

Review:

I have been seeing Dr. Sheikh for four months. I had been suffering from severe pinched nerve headaches, she has almost completely cured me with injections. I went to another neurologist and received injections and he made it so much worse. Dr. Sheikh injected me five days later and within hours I felt 100% better,

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226



Mohamed Saban

I love this doctor she has always been
my doctor. Dr. Sheikh
MOHAMED SAIBAN



Abdo Suban   Dr. Sheikh
In happy with this doctor I dont have
any issues with her Shes my family doctors.

Thank You Dr Sheikh
Since I have been coming to you,
your treatments have changed my life.
Thank you for caring for me and
being the caring doctor you are.
                              Mark Blair

Dr. Sheikh,
Thank you for all the long hours that
you dedicate to your clients.
Here's to a new year of excellent
care -

Firdos Sheikh, M.D.
Consultant in Neurology

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Ga's  Mosaddes,
DOB:

Review:

Besides  being  a  great  Doctor
She  is  also  a  Caring  human.
Doctors  now  days  are  business  men.  She
has  a  Special  heart  &  always  helping.
Blessed  to  have  her.  Thank  You

God  Bless !

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: George Fetter
DOB: 9-11-81

**Review:**

Dr. Sheikh is a Very Good at
Diagnosing each Time I had had Depression
and didn't Feel like Speaking w/ in
an hour she would make me feel
Comfterble enough To Talk eventaly I
Would relize how much Knowledge on
The Brain she had because in was
indefeniatly clear she help with my
mild Situations at The Time Because
I Snaped out of a deppression state

Thank you
Dr Firdos Sheikh
Office Manager

Twice after a amputation and then
PTSD, Thank you DR Sheikh.

9381 East Stockton Blvd. Suite# 124 und Suite# 222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Autumn Pearson (caretaker)
DOB:                          George Fetter

Review:

Dr. Sheikh has always helped and given the best care to our paitent and has worked with me to get him better!

great doctor!

Thank you
Dr Firdos Sheikh
Office Manager

*9381 East Stockton Blvd, Suite# 124 and Suite#:222 Elk Grove, CA 95624*
*Ph (916)681-2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: BRYANT ELDER
DOB: 7-28-59

Review: Doctor SHeiKh is a good
Doctor, all the problems
thats wrong with me, she
make sure everthing is
allright, and she precribe
my medicine For me to
make sure im allright.
she cares about her patients.
thank you For caring.
Bryant Elder

Thank you
Dr Firdos Sheikh
Office Manager

*9581 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624*
*Ph (916)681 2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: ⓄRyan Temple
DOB: 2/13/15

Review:

We have been coming to see Dr. Sheikh for almost 2 years now and we have recieved nothing but excellent ⨯service thus far. I'm really gratefully for the sensory therapay that she provided for my son it is One of only 3 in the states. After recieving the therapy I noticed a tremendous increase in his speech. He is 5 years old on the Autism spectrum.

Jerome Chi_____
1/7/19

Thank you
Dr Firdos Sheikh
Office Manager

*9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624*
*Ph (916)681-2226*

Firdos Sheikh, M.D.
Consultant in Neurology

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Jose Arriaga
DOB: 04/27/69

Review:

I want to thank Dr. Sheik
For treating me and helping me
with my nerve and muscle and
Joint Pains. Im very happy
to have her as my Doctor.
God bless you and thank yor Dr.
Sheik.

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Elizabeth Lamb
DOB: 7/7/1994

Review:

The Service I get is outstanding and amazing. Dr. Sheikh helped me find out what was wrong with my elbows and hands, I get 3 shots every 3 months for carpal tuneal in my elbows.

Thank you
Dr Firdos Sheikh
Office Manager

*9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624*
*Ph (916)681-2226*

Firdos Sheikh, M.D.
Consultant in Neurology

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: REX JACKSON
DOB: 5 / 15 / 57

Review: VERY Good docToR docToR Always GivE good Advice, Am VERY PlEASE wiTH HER WoRk.

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
Consultant in Neurology

SSNMA

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name:
DOB: 2/7/82

Review:

This Doctor is my favorite
Dr , Dr Sheik Understands
how to manage my situation
I am a ParaPhlegic and
without her under standing
how to treat me I'd
be miserable and wouldn't
be able to go forward
because of my paralysis
and Since Seeing her
I m able to Sleep better and I m
very happy she's my Dr

9351 Last Stockton Blvd, Suite 150, Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**                              South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: BelKiS NasiYi
DOB: 2-5-62

Review:  Dr shiKH is The Best Dr I Know
Since I AM Her Pation She Tkas care
Of All Her Paition verY good And I AM
Very HaPPY That I HAve Her As oF
MY Dr she is The Greatest Dr
I ever HAve

9561 East Stockton Blvd  Suite# 124 and Suite#222 Elk Grove, CA 95624
Ph. 916/681-2226

Firdos Sheikh, M.D.
Consultant in Neurosurgery

**SSNMA**                           South Sacramento Neurology Associates

**DR SHEIKH** would like to hear from you about her care
Please take a few minutes to tell her

Name: Gloria M. Kemp Van Ee
DOB: 12-08-1975

Review:

Dr. is very Nice, friendly, Caring, and concerned
about her patients. Great listener, Definetly Not
like every other Dr. and is very Commited to her
Job. I would recommend her to anyone else looking
for a Neurologist. :)

01|14|2019

9381 East Stockton Blvd, Suite 124 and Suite 212, Elk Grove, CA 95624
Phone (916) 2220

Firdos Sheikh, M.D.
*Consultant in Neurology*

SSNMA                              South Sacramento Neurology Associates

**DR SHEIKH** would like to hear from you about her care
Please take a few minutes to tell her

Name: Rosezetta Francis
DOB: 3/25/1944

Review: Dr. Sheikh does a wonderful
Job for me.

1/14/19

9301 East Stockton Blvd. Suite# 124 and Suite# 222 Elk Grove, CA 95624
Ph (916)681-2726

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Amy Joun
DOB: 10/6/78

Review:

The office always seems clean. The front desk girls are always friendly and kind as well very helpful. Mona is always professional and makes my back feel a ton better after PT. As far as the office it's self.... sometimes it becomes very crowded and loud. At times the wait to see the doctor is really long. However the Doctor is worth the wait. She is friendly, kind, and very caring. She is a very good doctor who takes the times to listen to any concerns new or old. She will discuss a persons options for new or reused care. Hence the long wait times on some days.

9381 East Stockton Blvd. Suite #124 and Suite #222 Elk Grove, CA 95624
Ph 916/[illegible] 2220

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Heather Perkins
DOB: 7·18·68

Review:

She is a very good Dr.
She meets my need & Leasons too me
and helps me. She helps me
with my VNS. and my Seizures
I cant
say enough about
you you ARE
AMAZING

Thank you
so much

Thank you.
Dr Firdos Sheikh
Office Manager

*9367 East Stockton Rd # Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

SSNMA                          South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: ~~Edi~~ Graha—
DOB:
        8-19-47
Review:

I Edd Graham has come here to be
to Dr Sheikh for about 4 years and
~~has~~ N has not got Alther the whole
time,

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Olia Lathan
DOB: 12-22-1956

Review: 1-22-2019
I have been with Dr. Steikh for 4 years and my pain that all the other Dr.s said I would have to have surgery for has been Control from the medication and treatment that Dr. give me, Thanks !
Olia Lathan

I Really think she's a good Doctor, P.S

9381 East Stockton Blvd, Suite# 12 (and Suite#) 222 Elk Grove, CA 95624
Ph (916)681-2526

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

**DR SHEIKH** would like to hear from you about **her** care
Please take a few minutes to tell her

Name: Catherine Cole
DOB: 5/18/55

Review:

I have been Comming to the Doctor over 10 years. Her treatment plan has reduced my Pain level with Physical Therapy trigger pt. injections and medication.

I enjoy her pleasant attitude and Suggestions with my healing process.

If I lost my doctor it would be devasating to my Physical and mental Well being.

She is Competent and thorough.

9381 East Stockton Blvd. Suite# 124 and Suite#.222 Elk Grove, CA 95624
Ph (916)691-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Geary Kilmer
DOB: 2-26-51

Review:

Dr. Shiekh Has Taken Great Care
Of Me For 20 years she is the
Best Dr. Ive ever had By the Way
I HaVE No Legs.

01/22/19

9381 East Stockton Blvd. Suites 123 and Suite #232 Elk Grove, CA 95624
Ph: 916.681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Sheila Bilyeu
DOB: 12-08-1955

Review: The care i Receive here in Doctor Shei1Ch office
is great I'v been comeing here For years and other the
haveing to have to wait every now and then my medical
Attention treatment has been excellent

Signed
Sheila F Bilyeu

9351 East Stockton Blvd, Suite# 124 and Suite#222 Elk Grove, CA 95624
Ph 916/685 3226

Firdos Sheikh, M.D.
*Consultant in Neurology*

SSNMA                      South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Deborah Banks
DOB: 09-02-51

Review: I love Dr. Sheikh because she
it a good Dr. I am be seen her 4 years.
She take good care amme.

9581 East Stockton Blvd, Suite# 121 and Suite# 222 Elk Grove, CA 95624
Ph (916) 683-9526

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**                                      South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell **her**

Name: Maria Grijalva
DOB: 10 4 59
Review:

I am very thankful to have Dr Sheikh as my neurologist. Dr Sheikh is the only doctor that addresses my condition. I have severe orthopedic problems in my Back. I had 3 spine fusions & the pain from bones rubbing together is severe. I am due for a 4th surgery. I am thankful Dr Sheikh prescribes medication to allow me to function/walk, & sleep, her care is excellent. I recommend Dr Sheikh as a neurologist, she provides great care.

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name:
DOB:

Review:

*I've Been seeing Dr. SHeikh since 2004
SHe, there She is a good doctor/specelest,*
*SHe knows what is Doing.          Neuralogest*

*1/22/2019*

9881 East Stockton Blvd  Suite 124 and Suite 222 Elk Grove  CA 95624
Ph (916) 683-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: TAO TRUONG
DOB: 04|08|47 (M)

Review:

Dr. Sheikh good doctor. Helps my husband alot with his pain. She listens our concern. I would highly recommend her to my family & friends for her care. Thank you.

TT
01|22|2019

9381 East Stockton Blvd, Suite# 124 and Suite# 222 ER Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Koy Cho Saekee
DOB: 11/10/1939

Review: I feel she is very concern about
my needs she very helpful and
providing me the care I need.
Everything that she cares for me
I like it and would highly
recommed her to patients
that Needs this Kind of care

9161 Low Shorthow Blvd. Suite # 124 and Suite#122 Elk Grove, CA 95624
Ph :916.681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Denise Osborn Terry

DOB: 7-21-60

Review:

I have been A patient

Of Dr Sheika For mANy years

She Is the Very BEST PAiN MANjement

Doctr I have ever Encounter

So PleAse by All meAN

Necessary to Keep Her In this

Field For Helping Her patient.

Thank you very much

Denise Terry

Thank you!
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

SSNMA

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Salas  Castanon
DOB: 5-25-05

Review: I really like Dr. Sheikh very much, she is a very good
Doctor and always does her best to help me. The waiting
room is very confortable. I glad I get to come to
Dr. Sheikh's Office. I am very thankful for her
to take her time to talk to us and helping us for
much.

Thank you
Dr. Firdos Sheikh
Office Manager

9381 East Stockton Blvd, Suite# 123 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2220

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Jayden Cobbs
DOB: 1/21/07

Review: DR. SHEIKH'S care is fine, we have
never had any issues with medications
or treatment.

Thank you
Dr Firdos Sheikh
Office Manager

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Lailuma Ghasarshad
DOB: 4-6-66

Review:

I have Been seeing DR. Sheikh for 3 years She is The best Docter i have ever seen I am very happy with her I have Back Problem and anxiety she listen's to me and take care of my Problems I am very happy with her.

9861 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)683 2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Liew TcHENG
DOB: 7/17/1951

Review:

I have to say this is a good doctor such as she is very helpful and very good behavior So I very satisfied and I'm very appreciated!

Thank you
Dr Firdos Sheikh
Office Manager

Liu TcHENG

*9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

**DR SHEIKH would like to hear from you about her care**
**Please take a few minutes to tell her**

Name: Felix Bustamante
DOB: 06/23/1974

Review: her care is good.

Thank you
Dr Firdos Sheikh
Office Manager

01-07-19

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Wilford Paschall
DOB: 10-3-75

Review: Dr. Sheikh u have been so helpfull to me, ol have help me to know how to invent it. The office is great. I will not go to no one, but Dr. Firdos Sheikh as my Dr.

Thank you
Dr Firdos Sheikh
Office Manager

9383 Paff Sheldon Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

**DR SHEIKH** would like to hear from you about her care
Please take a few minutes to tell her

Name: Isela Q. Flores
DOB: 11-2-54

Review: Dr. Sheikh is a very good doctor
I've been with you for 15 or 20 years
And I would never get another doctor.
like you, I hope + pray that you
keep up the good work. And you will
never loss me for anything. I really
do apprecht evry thing. Thank you Dr Sheikh
for evry thing.

Thank you
Dr Firdos Sheikh
Office Manager

Isela Q. Flores
Jan 7, 19

9361 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

**Firdos Sheikh, M.D.**
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Lola Sloan

DOB: 5/31/58

Review: Dr Sheikh
is a very good Dr. she helps you
in any way possible. she's here
for you when you need her. she's my
favorite Dr.

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: *Vicki Bannister*
DOB: *8-14-48*

Review: *Since my last treatment*
*from you, I have been able*
*to sign my name. I haven't*
*been able to do that since the*
*mid '90s. I couldn't control*
*my muscles.*

Thank you.
Dr Firdos Sheikh
Office Manager

9481 East Stockton Blvd. Suite# 124 and Suite#:322 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Michael Wallander

DOB: 10/24/67

Review:

Dr. Sheikh has given me excellent care.
The VNS device has helped me a lot
with controlling my seizures. She is very
kind to me and I like her very much.

Firdos Sheikh
Dr Firdos Sheikh
Office Manager

*9381 East Stockton Blvd  Suite# 124 and Suite#:232 Elk Grove, CA 95624*
*Ph (916)681-2226*



Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Tracy Terry
DOB: 6-24-79

Review: I think she is a great Dr an is giving
me great care. She explains things so I understand
and takes the time to make sure I understand.
She's the only Dr that has figured out what
is wrong with me.

9341 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: P. CLAVERIE
DOB: 12/30/1932

Review:

She's very good and it seems to work. I
hope it gets rid of what ever I have.
real soon.

The front desk nurse is very nice.
The Doctor is very nice and is helping
everyone.

Thank you
Firdos Sheikh
Office Manager

9281 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

51

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

---

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: RACHEL BELL
DOB: 8/4/70

Review: DR. SHEIKH HAS GIVEN ME A NEW OUTLOOK on &
UNDERSTANDING OF MY MEDICAL ISSUES and NEW /ALTERNATIVE
METHODS FOR managing These issues And (allergies) .
THE OPPORTUNITY TO RETHINK MY THERAPY OPTIONS HAS
OPENED my mind and HELPED ME REFOCUS ON How . And WHY
WHY my problems OCCURE , PROMPTING ME TO SEEK ADDITIONAL
HELP E.G. DENTAL (JAW) ETC . . .

I REALLY APPRECIATE DR. SHEIKH'S OPTIMISM and
ABILITY TO THINK OUTSIDE THE BOX TO DELIVER VERY
SPECIFIC , PERSONAL SERVICE . I BELIEVE I AM ON
MY WAY TO A MORE EMOTIONALLY HEALTHY LIFESTYLE .

~ THANK YOU!

*Rachel Bell*

Thank you
Delinda Smith
Office Manager

*9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624*
*Ph (916)981-2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Walter Atkins
DOB: 01 — 07 — 1953

Review: She is very caring with my care.
And listens to you, unlike a lot of
Drs these days
I am thankful to be under her
care

Thank you,
Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#-222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name:
DOB:

Review: She is an awesome Doctor.
Knows what she's talking about. And takes
good care of me. I love and respect her.
More the Other Doctors Do ! ! !
Keep up the Great Work Doctor

Thank you
Dr Firdos Sheikh
Office Manager

9,381 East Stockton Blvd, Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)687-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Daud Ramish
DOB: 4/10/57

Review:

~~I am~~ few year Dr sheikh
is my Doctar she is very
good Dactar vary friemly
with patient and good Tak care
of me  I am vary happy
and she is The best ~~good~~ Doctar

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:322 Elk Grove, CA 95624
Ph (916)681-2226

55

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Jerry Visman

DOB: 6-5-55

Review:

She is wonderful she gets
you right in, very impressed, also
like her new approach to my headache.

Thank you
Dr Firdos Sheikh
Office Manager

9387 East Stockton Blvd. Suite# 124 and Suite#: 222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Ruth Rowse

DOB: 07/01/1956

Review: GREAT RESULTS WHEN I COME
IN DOING GREAT JOB ALWAYS VERY
PLEASANT SMILES GREAT ATTITUDE
POSITIVE OUTLOOK ON LIFE
ALWAYS AVAILABLE ANSWERS HER
PHONE CALLS

Thank you
Dr Firdos Sheikh
Office Manager

9367 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: John Dagel
DOB: 1/11/1947

Review: Its a blessing to Recieve Dr Sheikh
Kind Sweet and Kindness. That alone is Healing
to us all

thank you all
John Dagel

Thank you,
Dr Firdos Sheikh
Office Manager

9385 East Stockton Blvd. Suite#.124 and Suite#.222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Bridget McClain
DOB: 3-11-74

Review:

I have had great care
by dr Sheikh, I'm so glad she
came up here, all the tests
she does and Keeping me on my
normal medication, I hope she
stays for a long time. the only
thing I had a problem with
was having to wait for up to
2 hours for her to get into office
thats gotten better.

Thank you for being
my doctor

- thank you
Dr Firdos Sheikh
Office Manager

9581 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-3226

Hi Dr. Sheik.

I just want to Comment to let you know that I appreciate your concerns about my health. I know that you are a caring doctor because u r always curious about my weight and I know u know about me remember been a patient of yours for sometime now. Everybody have mood swings + is always good to talk things out. A know you listen to me cause nobody knows my body like me so I know what works but i like your style and you are getting better with you time of curving but for the most important fact is that u are a good doctor So just keep up your good work.

Thank You

Devon Mercer  ☺



Dr Chris,

You are a wonderful Doctor — I trust your Knowledge and insight completely — I've watched your front office experience so much change — but the past 22 times you have managed a Wonderful office — I pray that you remain to stay connected to Eugene — I look forward to the New Year with you — Thank you

Nancy Lovelace



very happy with the Doctor &
staff. I was able to get in very
quick. I hope she decides to
stay in Placerville.

Bonnie Heimberg

I was in severe pain for 6 months, then
my doctor finally referred me to Dr. Sheikh.
She gave me occipital nerve blocks and
the results have been unbelieveable. I can
go almost a week with no pain and now
I am taking hardly any pain pills.

Dianne Ishimaru



MAWALLIH MOSALEh

Dr. Sheikh has always beeny doctor. for life
for 5 years Im happy with Dr. Sheikh I love her
She's nice She helps people.
Dr. Abdelah



Yahya Saiban

Dr. Sheikh been my doctor for 4 years I
love This doctor I've never had any problems
with her.
Yahya Saiban



Fath Yahya Sabah
                Dr. Sheikh
I am happy for this doctor She Saved
My life this is my doctor forever and always
I love this docter I see her all the time
Fath Sabah



My name is Essa Karimi. I am
a pt for long time. I am very
happy, she always treats me very
good and she knows what she
is doing. She is GREAT DR.



TO: WHOM IT MAY CONCERN,

DR. SHEIKH HAS HELPED ME COPE
WITH MY PAIN AND ISSUES FOR THE LAST
3 YEARS. MY FAMILY AND I CANT THANK HER
ENOUGH. THANK YOU DOCTOR!

BEST REGARDS,
"JAY" JAVAIL NABIZADAH



NISS AZIZ

DR SHEIKH HAS BEEN BY FAR
THE BEST DOCTOR TO TREAT ME.
SHE HAS GREAT ATTENTION TO DETAIL
ONLY CHANGES I WOULD SAY IS
APPOINTMENT AVAILABILITY.

Dr Shiekh,
your still the best Doctor I've ever
had, I hope you have great holidays
and A happy New Year. Your Still My
Most beotiful Doctor including all the
ones at the Hospitals and the care home



I am a patient of Dr. Shah's for
nearly 10 years now. She has always
demonstrated a professional and
Courteous attitude towards me
for my Chronic pain she has me
doing Physical Therpy, injections
also pain mangement regarding
Medications.
              Sincerly Cathrine Cole

To Dr. Shah, She is the best Doctor I've
have ever seen She is my pain mangement Doctor
as well as my Nerve Doctor. I've been Seeing
her since 1999. She is the best
                          Cindy Desrayes



Dear Dr Sheikh
        I love you so much
I would not been one but you
                    Deborah Burks

Dear Dr Sheikh,
        We love you. You not only
Changed my life for the better but
my life style!
        Now, if you could make the
injection painless ...
                Floyd & Deb Klahand
              "Merry Christmas"



My name is Mr. Combs
I've Been With Sheikh
For 3 yrs now. She has
not only Been a great
Doctor but Also A friend
She's Been there for me
During the hardest time of
My life My Mom Passed
And She has Been Great
With talking With me When
I'm Having a Bred K down
I love this Doctor
M. Com



My Name is Jose Arriaga

I would like to take this
opportunity to express My
Thanks and Appreciation For
Dr. Sheik and her staff
For helping us in our Medical
needs and always being there
For us.

Thank You Dr. Sheik

Jose Arriaga    12/21/18

My name is Najibah Joshua

I'm writing this letter to show
my appreciation for Dr Sheikh
and her staff. I have been
to other Doctors because of
my health, but never been
served with the help that
I got from Dr Sheikh, she
is very proffesional and respectful
and I would refer her to all
that has medical problems.
10 out of 10
                    Najibah Joshua   12-21-18



My Name is TARA Stroud

I have had many problems
with my health & Mental Health. I have
Never Really been helped but Dr.
Sheikh is the First to give me
answers to what is wrong with
me. and I appreciate her and
her staff. I Finally am able
to Function better than
before.

Thanks A Bunch.



Sheila Brown

Dr. Sheikh has been
a Great Help with my
Health. She has been such
a Good Doctor

Thank you
Dr. Sheikh

Sheila Brown

Dr. Sheikh has been
a Great Help with my
Health. She has been such
a Good Doctor

Thank you
Dr. Sheikh

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

**DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her**

Name: Solique Webb

DOB: 12/14/68

Review: I have been seeing DR. Sheikh sense 1987. She has been treating me for several medical issues over the years and it has help the functioning of my every day life. with out my therapy and injections and proper medicine I would not be able to make it through the week. Her office is crowded but it is always worth the wait to be treated by a great Doctor.

Thank you
Dr Firdos Sheikh
Office Manager

*9351 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Felicia Hunt
DOB: 5/29/1966

Review: She a very nice doctor.
But sometime she late
but things happen And
we can't get upset over it

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**                South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Melissa Irwin
DOB: 6/17/80

Review: Dr. Sheikh is a very good doctor.
She listens to me & respects me as
her patient. She cares about my
severe chronic pain & fibromyalgia, & severe
depression & anxiety. I am
thankful she is my Dr. & I hope
to keep her as my Dr. for as long
as possible. She is worth the long
drive to get here & I appreciate
her very much. Thank you! ☺

9381 East Stockton Blvd, Suite 4-124 and Suite 222 Elk Grove, CA 95624
Ph (916) 686-2226

Firdos Sheikh, M.D.

SSN MA

DR SHEIKH would like to hear from you about our care
Please take a few minutes to tell her

Name: Sheron J. Hughes
DOB:

Review:

The Dr. has been giving to Treatment
for at least 10 years now. She knows what
she is doing and treat me good.
She has helped me alot. She has
alot of patients and got back up. But
she good

Sherry J. Hughes

SSNMA

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tel. her

Name: Coreena a Onate
DOB: 7/8/1962

Review:
your a good Dr, you lisen to what
I have to say about my pain and you
Really know what to DO for me -
Thank You- Coreena Onate

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**                          South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: *A Amador*
DOB: *11/03/70*

Review: *Knowledgable and to the point*

*01/29/19*

9381 East Stockton Blvd. Suite# 124 and Suite#:222 EB. Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

**DR SHEIKH would like to hear from you about her care**
**Please take a few minutes to tell her**

**Name:** Latrice Johnson
**DOB:** 2/25/82

**Review:** I find Dr. Sheikh to be a remarkable Doctor. She is a thorough and accurate as then most Doctor's; I've seen she has been my Doctor for over 10yrs and I have no problem recommending her to any body that need to see a neurologest. Very busy woman very knowledgeable.

Thank you
Dr Firdos Sheikh
Office Manager

_____
9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: ASHA EVANS
DOB: 5/27/53

Review:

I am happy with my care
Would appreciate if waiting time was shorter

Thank you
Dr Firdos Sheikh
Office Manager

Firdos Sheikh, M.D.
Consultant in Neurology

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Mohammed El-Khatib
DOB: 06-08-85

Review:

Dr. Sheikh is one of the best Drs
I have ever seen. She is very attentive
to my questions and always helps me
with all of my concerns, I really
appreciate her taking me on as a patient
for the 3 yrs.

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Wendy Kroessig
DOB: 9/9/1960

Review: I have been a patient of Dr Sheikh
since my injuries from multiple car accidents
and Anxiety. She carves out 30min from her
very busy schedule to check my condition and
I have tests in her office which is very convenient
nice. I dont need to go to another facility to
have test done. I have also had my physical
Therapy in the ElkGrove office. Dr. Sheikh is very
knowledgable in her field of Neurology and she has
a quiet piece quality that makes me feel like
everything is going to be ok. As busy as she and
her staff are somehow I get the feeling of being well
Thank you          taken care of. Thank you Dr. Sheikh!!
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-3226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**                              South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Somphong Lasack
DOB: 6/1/1988

Review:

Dr. Sheikh has been my doctor for a long time. I just want to say that she has been a good doctor to me. She always treated me with care. She is also a nice doctor. I also appreciate that she care for me and give me medication that i need. She also wants me to get better and i appreciate her concern for me. I also want say that she would also try to help me the best way that she can. That is all i can say. I can't think of anything else. Also her office is very nice and clean.

Thank you
Dr Firdos Sheikh
Office Manager

*9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**                                    South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Ariana N. Spaulding
DOB: 7-1-92

Review: Your care has been proficient.
The staff here has been great as
well. I have no complaints requarding
Dr. sheik's care.

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

**DR SHEIKH would like to hear from you about her care**
**Please take a few minutes to tell her**

Name: Cooks, Willie
DOB:

Review:

Dr. Sheikh is a nice and caring doctor. She
is patient and understanding.

Thank you,
Willie Cooks

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)687-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: DAVID Cooks
DOB: 11-09-1958

Review: DR, SHEIKH is a very good DR.
and Dr, Sheikh is also very
concern DR. I will alway want
DR. SHEIKH for my DR.

Thank you
Dr Firdos Sheikh
Office Manager

*9381 East Stockton Blvd. Suite# 121 and Suite#:222 Elk Grove, CA 95624*
*Ph (916)681-2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: VaRNELt SNEEDE
DOB: 8-28-61

Review: DR SHEIKH is ONE OVER A kind
and A veRy Good DR. and DR. SHEIKH
Is veRy concern,

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**                           South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Estella Sanchez
DOB: 1-5-54

Review:
Dr. Sheikh is been my Dr since
2000 she has be a good Dr. for me
She help me in many ways she understand
my pain get me therapy and shots that helps
my pain, alot. I'm glad that I Found her.
She is a good Neurology Dr. She Listens
to me when I am in. pain.

2-11-2019

9881 East Stockton Blvd. Suite# 124 and Suite#222 Elk Grove, CA 95624
Ph. (916)681-2246

Firdos Sheikh, M.D.
Consultant in Neurology

**SSNMA**                            South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Trina McCormick
DOB: 9-15-72

Review: Doctor Sheikh is an excellent doctor.
She really cares abouther patient's.
She get's to the problem right away.
NO giving you the runaround about
Your condition. I have only been seeing
her since August of 2018. But she has given me
more help and information, in that short time
than any other Neurologist I have seen. I really
like her as a person and doctor. The only
thing is the wait time and scheduling.
If you schedule for 9 or 10 am,
then we should been seen within
30 minutes of our appointment time.
Sometimes I have to reschedule this appt.
Or another to accomadate the waiting
period. You sit here sometimes for
2,3 hrs before you see the doctor.

02/04/19

9561 East Stockton Blvd. Suite # 124 and Suite # 122 Elk Grove, CA 95624
Phone: (916) 686-1326

Firdos Sheikh, M.D.

SSNMA

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: ERNEST Williams
DOB: 01/04/1952

Review:
Dr. SHEIKH's Care is good.
I have NO Complaints. The Physical
Therapy is very Helpful. With it Make
me feel alot better, until my Next
Appt.

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: *Shireen Leppke*
DOB: *6/18/54*

Review:

*Shes the Best
Very helpfull*

Thank you
Dr Firdos Sheikh
Office Manager

*9381 East Stockton Blvd, Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226*

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her,

Name: Banks, Deborah
DOB: 09/02/57

Review: I Love her as a great doctor
She's very knowledgeable.

Deborah Banks
02/19/2019

9521 First Sacshine Blvd. Suite# 124 and Suite#222 Elk Grove, CA 95624
Ph (916)681-2226

Firoos Sheikh, M.D.
Consultant in Neurology

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Johnson, Danny
DOB: 06/23/55

Review:

Waiting time is long but once she's here
she takes good care of me. She's a
great doctor, she knows how's my pain
and gives me the right medicines to
control my chronic pain. Very knowledgable

Danny Johnson
02/19/2019

9383 East Stockton Blvd, Suite 124 and Suite 222 Elk Grove, CA 95624
Ph (916)683-2226

2/19/2019                                              IMG_6130.jpeg

**Firdos Sheikh, M.D.**
*Consultant in Neurology*

**SSNMA**                          South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care.
Please take a few minutes to tell her.

Name: Michael Misch
DOB: 3/21/51

Reviews written by Michael's mom Valerie)

Dr B is a terrific guy she since Michael's injury in 1989 he has
been difficult at times. With Michael's brain injury he
suffers it is probably should have been seeing a neurologist
all along. His 40 minute grand mal seizure in July 2011
he saw a neurologist in Sacramento since there wasn't one
in El Dorado Co. Prescription change & CT scan/EEG —
And then Dr. Sheikh arrived in Placerville!! Yes, we were
not anticipating anything positive so were very pleasantly
surprised. Dr Sheikh listened to us and impressed on
Michael that it was important for him to continue his
anti-seizure meds. She is another big asset for a
will be seeing Michael's on a regular basis. Also as I
have noted over the years & Dr's staff is very
important too and Dr Sheikh's is exceptional. I add to
that the interesting conversations in the waiting room."
Thank you
Bonnie Sheikh
Valerie Misch

9381 East Stockton Blvd. Suite # 124 and Suite#, 232 Elk Grove, Ca 95624
Ph (916)681-1226

https://mail.google.com/mail/u/0/#inbox?projector=1                    1/1

Firdos Sheikh, M.D.
Consultant in Neurology

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Antonio Cardenas
DOB: 05/20/55

Review: coming to this office of Dr. Sheikh for last 3-yrs; she provides good care of my medical necessities, along with my pain medicines. Feeling alot better now and pain is controllable. Getting physical therap which is a great help.

Antonio Cardenas
02/19/2019

9381 East Stockton Blvd. Suite# 124 and Suite#123, Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
Consultant in *...*

SSNMA                    South Sacramento Neurology Associates

$2-19-2019$

DR SHEIKH would like to hear from you about her care.
Please take a few minutes to tell her

Name: Catherine Cole
DOB: 5/18/55

Review:

I would like to say as of the 1st of Jan 2019
I had enrolled in Blue Shield Blue Cross SNP,
the Representative over the phone told me my Dr. Sheikh
was covered under this plan. Cause it was essential
I would be able to continue seeing her.
After my 1st appt. last month I found
out Dr Sheikh is not covered under the plan I
had accepted. I was devastated. And after
having to pay cash for my pain medication,
as soon as I got home. I called Blue Shield
and immediately disenrolled from Blue Shield / Blue Cross.
and went back to my previous Ins.
This is how important staying a patient with
the Doctor means to me!!!!

Catherine Cole

9744 Elk Grove Florin Blvd. Suite 120 · Elk Grove, CA 95624-3250 · Phone 916-714-2100
(916) 714-2250

SSNMA

DR SHEIKH would like to hear from you and other care
Please take a few minutes to tell her

Name: Justin Allen
DOB: 2/2/81

Review:

The doctor is very professional, consistent and prompt. The office is extremely efficient. I find her very concerned with my quality of life and we share in my opinion an very personal and thorough exchange. Coming here is a pleasure.

Thank You

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her GReat

Name: LawRenau FeRNande Z
DOB:

Review: 8-3-61
¡ gReat Doc toR

9281 East Stockton Blvd. Suite# 124 and Suite#222 Elk Grove, CA 95624
Ph:9169684-2226

SSNMA

DR SHEIKH would like to hear from you and of her care
Please take a few minutes to tell her

Name: Alexander Snitrciow
DOB: 10/16/1992

Review: I have been coming to see Dr. Sheikh for almost
two and a half years now, when she still had her San Leandro
office. I drive an hour to specifically see Dr. Sheikh
because she is familiar with my conditions/issues and listens
to how I'm feeling not just from my medication regiment, but
also from life in general. She understands the delicate
balance between life's demands and having an ailment
which requires daily attention, and the difficulty that comes
with it. I have never left the office feeling like my
needs or issues have not been addressed. The only real
downside is how crowded it can get, especially when
there are people that do not respect that there is a
line, and we all have been ~~waiting~~ waiting patiently. Aside
from that, I have no other complaints at this time.

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: JANET CARTER

DOB: SEPT 1, 1951

Review: JANET IS HAPPY WITH THE RESULTS
OF WHAT SHE IS GOING THROUGHOUT THROUGH
WITH DR. SHEIKH

Thank you
Dr. Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite # 124 and Suite # 222 Elk Grove, CA 95624
Ph (916)681-2226

**Firdos Sheikh, M.D.**
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Berniece Kay Rogers
DOB: 3/24/59

Review:

Dr Sheikh is a very
thorough, kind and
intelligent Doctor

Thank you
Kay Rogers

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

**DR SHEIKH would like to hear from you about her care**
**Please take a few minutes to tell her**

Name: Kameron whitems

DOB: 8:11.71

Review: I am very happy with the
services that Dr Sheik. She has been
very kind to me as well as her staff.
Timing is a bit tough with scheduling.

Thank you,
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:222 Elk Grove, CA 95624
Ph (916)681-2226

105

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Colette Wheeler

DOB: 9/16/1962

Review:

I think she's great. Been
testing me in ways no one else
has. I look foward to every
a appointment. she's kind and
knows her stuff.

Thank you
Firdos C. Sheikh
Office Manager

9,181 East Stockton Blvd. Suite# 124 and Suite# 222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Joanne Sayegh
DOB: 11-8-58

Review:

I have seen Dr. Sheikh for 9.5 years.

The Doctor is very good at understanding my conditions and helping to find the apprate medications to help me live with the cronic pain and caused by them. She lisens to my concerns and dose her best to assit me with her medical expertise.

Thank you

Joanne

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#.222 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: ___JOHN MUELLER___
DOB:

Review: GREAT DOCTOR, SOMETIMES LONG
WAITS.

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:232 Elk Grove, CA 95624
Ph (916)681-3226

108

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Flippen, Donna
DOB: 4-14-1959

Review:

Dr. Sheikh has always been there for me she even has given me her cell phone number and has helped me several times after hours. I have been with her for quite some time and wouldn't like to ever change doctors because She is the most understanding and intelligent doctor ~~that~~ of nuerology that I have had and I have had others. She explains why she wants you to lower and increase or change a drug that you are taking and wants to know any life changes. She can just look at me and know if I'm okay or not. I love Dr. Sheikh she's a great Doctor. I always refer anyone that needs a nuerologist to her.

Thank you
Dr Firdos Sheikh
Office Manager

9367 East Stockton Blvd Suite# 124 and Suite#:322 Elk Grove, CA 95624
Ph (916)681-2226

Firdos Sheikh, M.D.
*Consultant in Neurology*

**SSNMA**

South Sacramento Neurology Associates

DR SHEIKH would like to hear from you about her care
Please take a few minutes to tell her

Name: Dianne Ishimaru
DOB: 9 12 53

Review:

Before the occipital injections I was so unhappy, depressed and just plain didn't feel like I had a "life". Now, I can go to Hawaii for two weeks and be happy. I am so grateful to Dr. Sheikh for the injections that make me feel normal again.

Thank you
Dr Firdos Sheikh
Office Manager

9381 East Stockton Blvd. Suite# 124 and Suite#:322 Elk Grove, CA 95624
Ph (916)681-2226

Ex. W

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR A SEARCH WARRANT

I, Eugene Kizenko, being duly sworn on oath, depose and say:

1. I am a Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), presently assigned to the Office of the Assistant Special Agent in Charge Sacramento, California. I have been employed as a Special Agent for the Department of Homeland Security for more than 10 years. I was previously employed with the United States Immigration and Naturalization Service (INS) as a Special Agent for more than 10 years. My duties as an HSI special agent include the investigation of criminal violations relating to among other things, the investigation of human trafficking and forced labor.

2. The affiant submits this application and affidavit in support of a search warrant authorizing the search of 10454 Menlo Oaks Court, Elk Grove, CA (hereinafter "SUBJECT PREMISES"). SUBJECT PREMISES is the residence of Firdos SHEIKH (hereinafter "SHEIKH"), and is located in the Eastern District of California, as further described in Attachment A. The affiant believes that located within the SUBJECT PREMISES is evidence, fruits, and instrumentalities relating to forced labor, in violation of 18 USC § 1589; and involuntary servitude, in violation of 18 USC §1584. The affiant requests authority to search the entire SUBJECT PREMISES, to include all rooms, attics, basements, and all other parts therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the SUBJECT PREMISES, and any computer and computer media located therein, where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of the crime. I request that the search warrant authorize the search of vehicles located at or near the SUBJECT

1

PREMISES which fall under the dominion and control of the person or persons associated with the SUBJECT PREMISES. The search of these vehicles is to include all internal and external compartments and all containers that may be associated with the documents or evidence of the hiring of employees for work at the SUBJECT PREMISES.

3. The statements in this affidavit are based in part on information provided by other law enforcement agents, as well as my own investigation. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violation of and 18 USC §§ 1584 and 1589 are present at the SUBJECT PREMISES. Specifically, there is probable cause to believe that from approximately September 2009, to July 1, 2013, SHEIKH did intentionally and knowingly to commit an offense against the United States, that is to hold individuals in a condition of forced labor and involuntary servitude. SHEIKH knowingly obtained the labor and services of individuals by one or more of the following means:

a. by means of force, threats of force, physical restraint, and threats of physical restraint;

b. by means of serious harm and threats of serious harm;

c. by means of the abuse and threatened abuse of law and legal process; and

d. by means of a scheme, plan and pattern intended to cause individuals to believe that if they did not perform labor and services, they would suffer serious harm and physical restraint.

///

///

///

2

USA000301

## STATUTES

4. The following criminal violations are at issue in this affidavit:

   a. **18 U.S.C. 1584:** Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held, shall be fined under this title or imprisoned not more than 20 years, or both

   b. **18 USC 1589:** Whoever knowingly provides or obtains the labor or services of a person by any of one, or by any combination of, the following means

      i. by means of force, threats of fore, physical restraint, or threats of physical restraint to that person or another person;

      ii. by means of serious harm or threats of serious harm to that person or another person;

      iii. by means of the abuse or threatened abuse of law or legal process; or

      iv. by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

   shall be punished in accordance with the statute.

## BACKGROUND RELARTING TO FORCED LABOR/INVOLUNTARY SERVITUDE

5. Through my own investigation and speaking with other law enforcement officers in the field, I have become familiar with the practice of persons who engage in forced labor and involuntary servitude.  Such persons control their workers through force, threats of force, or threats of legal coercion.  In addition, such persons will obtain labor services of their workers through physical restraint or by means of a scheme, plan or pattern intended to cause the worker to believe that if he or she did not perform labor or services, that person would suffer harm of physical restraint.  Such

3

USA000302

persons often take steps to control their workers by limiting, monitoring, and otherwise surveilling their movements and use of time.

6. Such persons will also cause their workers to perform labor and services but not pay their wages, or make deductions from wages so that the workers are left with little or no money.  Oftentimes employers will keep records of hours worked by employees or deductions made to their wages, as well as wages owed and employment agreements.  As it concerns these records and other evidence of employment, it is my experience and the experience of other agents with whom I have spoken, that:

    a. persons involved in the forced labor and involuntary servitude will maintain records utilizing computers, compact discs, digital video discs and other electronic devices such as cellular phones, palm pilots, pagers and tape recorders; and

    b. these records include, but are not limited to correspondence, notes, daily planners, business and financial transaction records such as ledgers, journals, spreadsheets, receipts, phone and address books, notes, pay/owe slips, receipt books, bank statements for personal and business checking and savings accounts, deposit and withdrawal slips, canceled checks, check registers, money order receipts, cashier's checks, and wire transfer documents.

7. Many times such persons control their workers' freedom by installing chains and locks on doors and gates so the workers are not able to leave freely.  Such persons may also have electronic surveillance cameras in place to monitor their workers' movements.

8. Such persons often maintain control of the workers' identity and travel documents to prevent their freedom of movement.

9. Oftentimes such persons will take steps to isolate their workers by preventing their association with other individuals.  Such persons will also often limit or monitor their workers' communications.

4

## FACTS ESTABLISHING PROBABLE CAUSE

*Statement of Witness 1*

10. In furtherance of the investigation, at or about June 26, 2013, HSI Sacramento received information from an individual (hereinafter identified as "WITNESS 1"), who previously worked for SHEIKH at the SUBJECT PREMISES. WITNESS 1 reported the following:

    a. SHEIKH had employed illegal aliens and paid them little or no wages with poor working conditions.

    b. WITNESS 1 claimed that he had been employed by SHEIKH from April through June 2013. WITNESS 1 provided information that two other individuals, WITNESS 2 and WITNESS 3, had also been employed full time by SHEIKH, but that they were only receiving $200 per month. WITNESS 1 also said that WITNESS 2 and 3 were living in a trailer on SHEIKH's property and were afraid to leave.

*Welfare Check at SUBJECT PREMISES*

11. On July 1, 2013, HSI agents along with two Sacramento County Sheriff's Officers went to the SUBJECT PREMISES to conduct a welfare check on WITNESSES 2 and 3. The property was fenced and had a large gate and two pedestrian gates that were locked with chains and padlocks. SHEIKH allowed the officers to enter the property.

12. Upon entering the property, the affiant observed a long driveway which led to a residential dwelling. The property consisted of a very large manicured acreage with a lake, several aviaries, pens for animals, a horse, long footpaths lined with flowering plants, several gazebos and patios, tables, a large grassy area, a two-story residence, several sheds and an RV trailer parked next the front patio. A public records database indicated that the property was approximately 21 acres.

5

USA000304

13. SHEIKH allowed HSI agents entry into the trailer where WITNESSES 2 and 3 were believed to have resided. There were no individuals present in the trailer, but it appeared to have been recently lived in and hastily abandoned. Of note, there were dishes in the sink, bread on a table, and beds that appeared to have been recently slept in. After not locating any of SHEIKH's employees on the SUBJECT PREMISES, SA Kizenko contacted a telephone number that had provided to him by WITNESS 1 for WITNESS 3. WITNESS 3 did not answer the phone, but WITNESS 2 did. WITNESS 2 agreed to meet with HSI agents.

*Statement of Witness 2*

14. I met with and interviewed WITNESS 2. During an initial interview at the SUBJECT PREMISES, he told to me the following:

    a. WITNESS 2 said that he was not at the trailer at the time of the welfare check, and that he had been hiding in the bushes on the property because several minutes earlier SHEIKH told WITNESS 2 that Homeland Security had come for him and that he had to get out of the trailer. WITNESS 2 was not feeling well, and had only eaten minimal food of questionable quality in the last couple of days. I noted that WITNESS 2 appeared dehydrated, gaunt, and hungry.

15. WITNESS 2 was transported to the HSI in Sacramento, and was interviewed by HSI SA Ann Marie Del Castillo and HSI SA Kizenko. WITNESS 2 reported the following:

    a. WITNESS 2 entered the United States from Nepal in 1996 and was in the country illegally.

    b. WITNESS 2 said that he spoke with SHEIKH in December 2012 regarding potential employment at the SUBJECT PREMISES and other properties owned by SHEIKH in the surrounding area. SHEIKH told him that the job was going to be six days a week and would involve cooking and cleaning and a

6

little outside work. SHEIKH also promised him one day off a week either Saturday or Sunday. WITNESS 2 agreed to these conditions of employment with SHEIKH.

c. WITNESS 2's first week of work at the SUBJECT PREMISES consisted mainly of following around WITNESS 3, who was already employed by SHEIKH. SHEIKH did not provide any food to WITNESS 2 that week so WITNESS 2 had to share food with WITNESS 3.

d. On the second week of WITNESS 2's employment with SHEIKH, WITNESS 2 worked one night at a banquet hall to which he was driven by SHEIKH. However, SHEIKH told him that she would no longer be transporting him to that job, and told WITNESS 2 his job was only going to be working for SHEIKH. SHEIKH told WITNESS 2 that his salary would be $300 a month, plus room and board. SHEIKH only spent $80 a month for food for WITNESS 2, which according to WITNESS 2 was not enough.

e. WITNESS 2's work for SHEIKH involved taking care of animals, mowing the lawn, taking care of plants, housework, fixing machines, painting and other work that SHEIK needed done at the SUBJECT PREMISES.

f. WITNESS 2 was paid $300 cash for his work each month in January and February 2013. His salary was raised to $400 a month in March but he had to buy his own food. However, in April 2013 he was paid $300. He received $250 in May. He has not received any salary for June.

g. WITNESS 2 complained to SHEIKH about her failure to live up to his agreed salary and the sporadic payment schedule. SHEKIH told WITNESS 2 she was connected politically and that if he continued to complain she would have him deported back to Kathmandu (Nepal). SHEIKH also advised him that she had wireless cameras watching WITNESS 2 and WITNESS 3.

7

USA000306

h. WITNESS 2 said that he worked a minimum of 10 hours a day, seven days a week. There were occasions when he had to work in excess of twelve hours a day. WITNESS 2 never received a day off for holiday or if he was sick. SHEIKH would provide him with little or no assistance even if WITNESS 2 felt ill and unable to perform his duties. For example, on the previous weekend, WITNESS 2 had to work in temperatures exceeding 90 degrees although WITNESS 2 had told SHEIKH he was too ill to work. (It should be noted that, according to National Weather Service data from Sacramento Executive Airport, the high temperature on June 27, 2013, was 98 degrees. Between June 28, 2013, and July 1, 2013, high temperatures were above 100 degrees.)

i. WITNESS 2 stated that there were cameras installed at the SUBJECT PREMISES around May 2013. Five or six cameras were installed and three were pointed at the trailer, where WITNESS 2 and WITNESS 3 lived. That was later changed to one camera pointed at the trailer and the others were moved to different locations, one facing the front of the property and the other camera facing the back of the property.

j. SHEIKH told WITNESS 2 that the surveillance cameras were to watch their work and to make sure they wouldn't leave from the SUBJECT PREMISES. WITNESS 2 was prepared to leave the SUBJECT PREMISES but had not been paid in June and was still owed money for previous months of working for SHEIKH.

k. SHEIKH referred to WITNESS 2 "nokur", which he said was the Urdu word for "slave."

l. WITNESS 2 told SHEIKH and her parents, who had recently moved into the SUBJECT PREMISES, that he was going to leave SHEIKH's employ.

8

USA000307

However, WITNESS 2 felt he could not leave until he received the money that was owed to him as he had no family or friends who could support him.

m. On the morning of July 1, 2013, WITNESS 2 had not received payment and was told by SHEIKH to leave because Homeland Security was there for him. As a result, WITNESS 2 ran from the SUBJECT PREMISES and jumped over a fence, where he hid in the bushes until he was contacted by the affiant.

### Statement of Witness 3

16. On July 2, 2013, WITNESS 3 was interviewed by SA Del Castillo and Group Supervisor Carol Webster regarding his employment by SHEIKH. According to GS Webster, WITNESS 3 was gaunt, emotional and appeared visibly traumatized when recounting his experiences with SHEIKH. WITNESS 3 stated he was unlawfully present in the U.S. There are no known records to the affiant that indicate WITNESS 3 has legal status to be in the United States. WITNESS 3 reported the following:

a. WITNESS 3 was introduced to SHEIKH in 2009 by an individual that WITNESS 3 had worked for previously. WITNESS 3 began working for SHEIKH on the weekends in approximately September 2009 and lived on the trailer at the SUBJECT PREMISES. WITNESS 3 was the only person on the property at that time, as SHEIKHS's residence was being built. Initially he worked for her on weekends for several months as he continued working at his other job, Monday through Friday. During this time, WITNESS 3 received no pay but was allowed to stay at the SUBJECT PREMISES in exchange for working there two days a week.

b. In approximately September 2010, WITNESS 3 and SHEIKH came to a verbal agreement where he would work on a permanent basis for SHEIKH. She agreed to pay him $400 per week. However, WITNESS 3 never received that

9

amount. The highest salary he received during his employment for SHEIKH was $400 per month.

c. After a few months, SHEIKH began taking deductions from WITNESS 3's salary for various fees and would pay him in increments of $40 or $100. WITNESS 3 would complain about SHEIKH's lack of pay for his efforts. SHEIKH told WITNESS 3 that she didn't have the money to pay him.

d. WITNESS 3's responsibilities for the first year consisted of maintaining the over 20 acre property, feeding the animals and landscaping. After that, SHEIKH would drive WITNESS 3 to her other properties and have him cut grass and clean up in and around the residences that were located on the other properties.

e. When WITNESS 3 first began working at the SUBJECT PREMISES, no one lived on the property besides WITNESS 3, and the structure that is now the main residence was a horse barn. About two years ago, the barn was remodeled into a residence where SHEIKH resides.

f. For the first two years that WITNESS 3 lived at the SUBJECT PREMISES, the trailer where he lived did not have electricity or running water. WITNESS 3 used the funds from his small wages to purchase the equipment needed to install electricity and plumbing last year.

g. SHEIKH threatened WITNESS 3 with contacting the police or immigration authorities if he performed poorly or if she suspected he was planning to run away with someone. WITNESS 3 stated that SHEIKH made this threat about 30 times. SHEIKH considered leaving, but didn't have the means of contacting anyone outside of the property and he wouldn't know who to call even if had the ability to do so.

h. WITNESS 3 had a friend who cut the grass for a neighbor and would come over and visit him. However, SHEIKH kicked WITNESS 3's friend off the

10

SUBJECT PREMISES and told WITNESS 3 that he could have no more
visitors.

i.  WITNESS 3 felt isolated because he didn't have a telephone for the majority of
his employment with SHEIKH. Initially, he had a mobile telephone and
SHEIKH promised that she would keep his payments up to date. SHEIKH
did not pay for his phone service and it was disconnected. WITNESS 3 lost his
phone contacts after his phone was disconnected.

j.  Although SHEIKH promised to provide room and board, she would only
provide WITNESS 3 with one meal a day, often consisting of a ration of soup
or sometimes bread. WITNESS 3 would typically not have breakfast or lunch.

k.  Since WITNESS 3 began working for SHEIKH, the gates have been closed
and locked, WITNESS 3 had a key to the padlock on the gate, but
approximately six months ago, SHEIKH took away the key and WITNESS 3
didn't feel he could leave at will.

l.  SHEIKH was always accusing WITNESS 3 of stealing her birds and other
property at the SUBJECT PREMISES, and giving the stolen items to his
friends. WITNESS 3 told SHEIKH he didn't have any friends and was always
on her property. On one occasion, SHEIKH threatened to cut off WITNESS
3's hands because he was stealing so much.

m.  WITNESS 3 developed a friendship with WITNESS 1 during the course of
WITNESS 1's employment in 2013. WITNESS 1 worked for SHEIKH and
stayed in an apartment with his wife on the second floor of her residence.
WITNESS 1's wife worked for SHEIKH for a brief period of time, but stopped
working when SHEIKH refused to pay her, saying that the fact she could live
at the residence and that SHEIKH paid her husband should be enough.
WITNESS 1 left the SUBJECT PREMISES in June 2013 over a lack of
payment. WITNESS 3 was in contact with WITNESS 1 after he left and

11

USA000310

WITNESS 1 agreed to assist him if WITNESS 3 was able to leave the
SUBJECT PREMISES. WITNESS 3 made arrangements with WITNESS 1 to
leave, and on June 28, 2013, WITNESS 3 jumped over the back fence.

17. SHEIKH was interviewed by GS Webster on July 1, 2013, regarding her employees
at the SUBJECT PREMISES. This interview consisted of a personal meeting at the
SUBJECT PREMISES, as well as follow up email and telephone calls throughout
the day. SHEIKH told GS Webster the following information:

  a. SHEIKH denied that the workers lived in the trailer located on the SUBJECT
     PREMISES near the main residence.

  b. SHEIKH initially denied having an employee named WITNESS 2, however,
     after agents recovered WITNESS 2's identification documents from the trailer,
     SHEIKH stated that he had worked for her intermittently.

  c. SHEIKH stated she paid WITNESS 3 and WITNESS 2 in cash for each job
     that they performed and that they did not live on the property or work for her
     full time. SHEIKH said that they had no set work schedule.

  d. SHEIKH told GS Webster that she is a Medical Doctor with a specialty in
     Neurology. (According to open source information, SHEIKH is board certified
     in Neurology and is affiliated with well-known hospitals in the Sacramento
     area and has a private practice.)

  e. SHEIKH said that the gates on her property were locked to keep out intruders
     and to deter her employees from stealing.

  f. SHEIKH stated that she had video surveillance cameras installed on her
     property in order to prevent the employees from stealing.

  g. During the interview at the SUBJECT PREMISES, SHEIKH retrieved a
     computer. SHEIKH claimed not to reside at the residence from where she
     retrieved the computer. SHEIKH claimed to live in a separate house on the

12

USA000311

property toward the east. That residence was not visible from where the interview with SHEIKH took place.

h. SHEIKH alleged that her employees stole birds, goats, palm trees and tools from her and said that if the employees wanted to leave they had to ask her for the key to unlock the gate. SHEIKH believed that WITNESS 3 was stealing things from the SUBJECT PREMISES and told him that if he continued to work for her, she would deduct money from his wages for the items that had been taken.

i. SHEIKH stated that she treated the employees on the SUBJECT PREMISES well and that although WITNESS 3 and WITNESS 2 didn't live on her property, she took them to Winco on several occasions and paid for their clothing and accessories. SHEIKH stated that she could produce a receipt from Winco for those purchases and that she scans all her receipts on to her laptop computer. SHEIKH was asked to provide the receipt that day but was unable to retrieve it.

j. SHEIKH stated that WITNESS 3 used to work for her and she paid him $400 a month, but that he longer worked for her. SHEIKH stated that about three months ago, she told WITNESS 3 that he wasn't employed by her and she couldn't pay him but that WITNESS 3 would show up and work anyway. SHEIKH said she still paid him from time to time so that he could buy food and find a job. A couple of weeks ago, WITNESS 3 told SHEIKH that he had "no food" so SHEIKH gave WITNESS 3 some bread and gave him $25 a couple of days after that.

18. A public records database indicated that the SHEIKH family trust owns three properties in Elk Grove, California; three in Sacramento, California; and one in Wilton, California.

13

USA000312

# Ex. B



United States v. Sheikh

**DEFENSE EXHIBIT B**

Case No. 18-CR-119-WBS











Case 2:15-cv-00618-WBS Document 48-1 Filed 03/18/20 Page 342 of 348



USA00768

# Ex. G



United States v. Sheikh
**DEFENSE EXHIBIT G**
Case No. 18-CR-119-WBS

# Ex. H



Google

United States v. Sheikh

**DEFENSE EXHIBIT H**

Case No. 18-CR-119-WBS

# Ex. I



Case 2:18-cr-00119-WBS Document 96 Filed 08/20/20 Page 348 of 348

10454 Menlo Oaks Ct, Elk Grove, CA 95

Subway Restaurants, 8995 Grant Line R

Add destination

Leave now

OPTIONS

Send directions to your phone

via Menlo Oaks Ct and Grant Line Rd    9 min
Fastest route    1.3 miles

DETAILS

via Menlo Oaks Ct and Grant Line Rd    26 min
1.3 miles

**Explore Subway Restaurants**

Restaurants   Hotels   Gas stations   Parking Lots   More

United States v. Sheikh
**DEFENSE EXHIBIT I**
Case No. 18-CR-119-WBS