1   Yasin M. Almadani (Cal. Bar No. 242798)
    ALMADANI LAW
2   14742 Beach Blvd., Suite 410
    La Mirada, California 90638
3   (213) 335-3935 | YMA@LawAlm.com

4   *Attorney for Defendant*

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:18-CR-119-WBS-1 |
| Plaintiff, | **DEFENDANT'S MOTION TO DISMISS INDICTMENT** |
| v. | Hearing Date: TBD |
| FIRDOS SHEIKH, | Time:          TBD |
| Defendant. | Trial Date: TBD |
| | Judge: Hon. William B. Shubb |
| | Courtroom:   Five (14th Floor) |

Defendant Firdos Sheikh, M.D. ("Dr. Sheikh" or "Defendant"), by and through her counsel of record, Yasin M. Almadani, hereby files its Motion to Dismiss the Indictment.

This filing is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 23, 2020                    Respectfully submitted,

                                         ALMADANI LAW


                                         ___*/s/ Yasin M. Almadani*_____
                                         Yasin M. Almadani, Esq.
                                         *Attorney for Defendant*

## TABLE OF CONTENTS

*MEMORANDUM OF POINTS AND AUTHORITIES* ........................................................................ 1

*I.    INTRODUCTION* ....................................................................................................... 1

*II.    Summary of the Arguments* ............................................................................. 3

   **A.    Sixth Amendment Speedy Trial Violation** ................................................ 3

   **B.    Prosecution's Reckless Disregard for Its Constitutional Brady Obligations** ..................... 5

   **C.    Outrageous Government Conduct** .............................................................. 7

*III.    Factual and Procedural History* ................................................................... 7

   **A.    Exculpatory/Impeachment Information Disclosed Late on February 25, 2020, in Violation of the Court's *Brady* Disclosure Order.** ................................................. 11

   **B.    Communications with the Government and Late *Brady* Disclosures Since the February 25, 2020 Hearing, in Violation of the Court's *Brady* Disclosure Order of July 2019** ............................................. 14

      1.    Failure to Disclose Agents' Pre-Warrant Knowledge of Cheap Eateries Within One to Three Miles of Dr. Sheikh's Ranch ................................................................. 15

      2.    False Immigration Certifications Disclosed on March 11, 2020, Only After a Specific Request by the Defense Along with an Explanation of the Defense's Impeachment Strategy ................................................. 16

      3.    Failure to Disclose Potentially Perjurious Conduct by Agent Webster in the Sehkon Case ................................. 20

      4.    Information Concerning Prakash and Alfredo's Local Contacts Disclosed on March 4 and 13, 2020, Only After a Specific Request by the Defense Along with an Explanation of the Defense's Impeachment Strategy ................. 22

      5.    Providing Misleading Information About the T-Visa Benefits in Violation of Brady .......................... 22

      6.    Failure to Disclose the Impeachable Close Relationship Between HSI and Opening Doors .................. 23

      7.    Additional Potentially Outstanding Brady Material ............................................... 24

*IV.    Legal Standards and Argument* .................................................................... 24

   **A.    The Government's Constitutional Obligations and Ethical Duties** ................................. 24

   **B.    The Court's Inherent Supervisory Power to Dismiss an Indictment** ................................. 26

**C.    Government Negligence in Violation of the Sixth Amendment Right to a Speedy Trial**.................. **28**

    1.   Legal Standard...................................................................................................................... 29

    2.   Analysis................................................................................................................................ 29

**D.    Reckless Disregard for Government's Constitutional Obligations** ................................................. **31**

    1.   Legal Standard...................................................................................................................... 31

    2.   Analysis................................................................................................................................ 32

**E.    Outrageous Government Conduct** ................................................................................................... **34**

**F.    Other Mitigating Factors** ............................................................................................................... **35**

***V.    CONCLUSION*** .................................................................................................................... ***35***

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

# TABLE OF AUTHORITIES

**CASES**

*Berger v. United States*,
 295 U.S. 78 (1935) ................................................................ 26

*Brady v. Maryland*,
 373 U.S. 83 (1963) ............................................................ 5, 25

*Cone v. Bell*,
 556 U.S. 449 (2009) ............................................................. 25

*Giglio v. United States*,
 405 U.S. 150 (1972) ......................................................... 5, 25

*Kyles v. Whitley*,
 514 U.S. 419 (1995) ......................................................... 5, 25

*United States v. Agurs*,
 427 U.S. 97 (1976) .............................................................. 25

*United States v. Alderdyce*,
 787 F.2d 1365 (9th Cir. 1986) ............................................... 25

*United States v. Alvarez*,
 86 F.3d 901 (9th Cir. 1996) .............................................. 25, 26

*United States v. Blanco*,
 392 F.3d 382 (9th Cir. 2004) ......................................... 6, 25, 28

*United States v. Chapman*,
 524 F.3d 1073 (9th Cir. 2008) .................................... *passim*

*United States v. Fulton*,
 475 U.S. 657 (1986) ......................................................... 5, 25

*United States v. Henthorn*,
 931 F.2d 29 (9th Cir. 1991) ................................................. 25

*United States v. Kojayan*,
 8 F.3d 1315 (9th Cir. 1993) ..................................... 4, 6, 8, 28

*United States v. Leslie*,
 759 F.2d 366 (5th Cir. 1985) ............................................... 26

*United States v. Mendoza*,
 530 F.3d 758 (9th Cir. 2008) ..................................... *passim*

*United States v. Restrepo*,
 930 F.2d 705 (9th Cir. 1991) ..................................... *passim*

**STATUTES**

28 U.S.C. § 2255 (2018) ....................................................... 20, 21

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   **INTRODUCTION**

**Issue.**  It is said that justice delayed is justice denied.  The government has delayed and denied justice to Defendant Firdos Sheikh, M.D. ("Dr. Sheikh") by its multiple negligent and reckless failures to disclose a number of significant *Brady/Giglio* items ("*Brady* material") for almost two years after indictment, despite several warnings by the Court and an *explicit* Order of the Court to have the items produced by the end of August 2019 (DE 63),[1] which would have still been over a year after the case was indicted.  As a result, Dr. Sheikh's speedy trial, due process, and confrontation rights have been substantially prejudiced.

**Available Sanctions.**  Under the Court's <u>inherent supervisory powers</u>, there are <u>at least three legal bases for dismissal in this case</u>:

(i) The prosecution's <u>negligent</u> disregard for its constitutional obligations under *Brady/Giglio* has deprived Dr. Sheikh of her <u>speedy trial rights under the Sixth Amendment</u>.  Under the factors prescribed by the Ninth Circuit in *United States v. Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008), this case must be dismissed.

(ii) The prosecution's <u>reckless</u> disregard for its constitutional obligations under *Brady/Giglio* has deprived Dr. Sheikh of her <u>right to due process under the Fifth Amendment</u> and <u>confrontation under the Sixth Amendment</u>.  The case must additionally be dismissed under *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008), because Dr. Sheikh has suffered substantial prejudice and no remedy short of dismissal would be sufficient to address the prejudice and to restore judicial integrity so that the Court's orders are followed with more diligence in the future.

(iii) The agents' <u>outrageous conduct</u> in ignoring a plethora of exculpatory evidence and providing objectively false certifications under penalty of perjury to help the alleged victims commit immigration fraud on the United States Customs and Immigration Services ("USCIS") in order to fabricate charges against Dr. Sheikh is conduct that offends a universal sense of justice.  The Court may thus use its inherent

---

[1] "DE" denotes "docket entry" followed by a docket control number.

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

supervisory power to dismiss the case under *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991).

**Continuing Violations and Lack of Reliability.**  The DOJ trial attorneys appear to be continuing their disregard of *Brady* obligations and this Court's long overdue order to have *Brady* material produced by August 30, 2019.  The U.S. Attorney's Office for the Eastern District of California (recently called upon to join the case) has confirmed, moreover, that it will *not* be able to sufficiently review the case (over 12,000 pages of discovery), including a number of outstanding *Brady* issues, to confidently represent that a complete *Brady* disclosure has been made in time for this briefing, which must move quickly given the constitutional speedy trial issues raised by Dr. Sheikh.  (*See* Ex. BBB-9).  The DOJ trial attorneys who indicted the case have clearly proven themselves to be unreliable, having made a number of false representations concerning the completeness of their *Brady* disclosure.  (*See infra*, pp. 8-24).  Meanwhile, Dr. Sheikh continues to suffer substantial prejudice in a case where the government appears to have ignored significant exculpatory evidence to begin with.

**Substantial Prejudice to Dr. Sheikh.**  Among the most salient forms of prejudice suffered by Dr. Sheikh are the following: (i) the Defense has been forced to reveal a significant portion of its impeachment strategy to the government in order to receive *Brady* material that should have been provided in the first place; having unfairly secured the Defense's strategic positions, the government can now use the information to make its own strategic choices about witness selection, preparation, and direct examination, and invariably violates Dr. Sheikh's due process and confrontation rights; (ii) without a timely *Brady* disclosure, Dr. Sheikh has not been able bring pre-trial motions with full information, which in turn has hampered her ability to take the case to trial as speedily as the Sixth Amendment guarantees; (iii) Dr. Sheikh was deprived of a significant impeachment opportunity in violation of her confrontations rights when the government called HSI Special Agent Carol Webster ("Webster") (now retired) to the stand as the key and sole prosecution witness in September and December 2019 without disclosing her I-914B certifications in this case; these certifications show (by all objective standards) that Webster knowingly made false statements under penalty of perjury and affirmatively helped Prakash and Alfredo commit immigration fraud; (iv) Dr. Sheikh has had to borrow and spend tens of thousands of dollars in legal fees and costs, bringing motions and making specific repeated requests to have the government

comply with its constitutional *duty* to disclose *Brady* material; (iv) if the case is not dismissed, Dr. Sheikh will have to spend tens of thousands of dollars more in additional legal fees and costs to re-brief issues that were unable to be fully briefed previously because the government had not timely made its *Brady* disclosures in compliance with the Court's July 2019 order; and (v) due to the unreasonable delays, Dr. Sheikh must now live with the fear of dying due to the COVID-19 pandemic without having a full opportunity to exonerate herself in this ill-charged case.

**Preserving Judicial Integrity and Preventing Future Misconduct.**  The Court has also been prejudiced.  Judicial integrity requires that the parties have full confidence that court orders will be followed with all diligence, especially in a criminal case where a court explicitly orders *the government* to take action.  Here, judicial integrity has been undermined by a lack of government diligence in complying with the Court's Order on July 29, 2019.  Precious judicial recourses have been wasted because a number of hearings have been continued; additional resources will be wasted because issues (*e.g.*, *Franks* and grand jury disclosure) will need to be re-briefed with the more complete information the Defense now has.

While dismissal of an indictment is admittedly a rare remedy, this case presents an unusual situation that merits the remedy—an egregious pattern of misrepresentations and violations of the Court's *Brady* disclosure order.  In addition to addressing the substantial prejudice to Dr. Sheikh, the Court has every authority to dismiss the indictment to ensure that judicial integrity is preserved and that this Court's orders are taken more seriously by the government in the future.  *See infra*, *Chapman*, 524 F.3d at 1085; *Kojayan*, 8 F.3d at 1323-1325.  Indeed, this Court would not be the first to dismiss a criminal case prior to trial for a *Brady* violation such as here.  *See infra*, p. 28, discussing *United States v. Theresa Green aka Tracy Tobin*, Criminal No. 2004 FEL 6457, Memorandum and Order (November 14, 2008).

## II.   SUMMARY OF THE ARGUMENTS

### A.   Sixth Amendment Speedy Trial Violation

The Ninth Circuit has held that significant delays in a case resulting from the government's negligence violate the Sixth Amendment and empower a district court to dismiss an indictment under its inherent supervisory powers.  *United States v. Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008).  And while

*Defendant's Motion to Dismiss Indictment*                           *Case No. 2:18-CR-119-WBS-1*

the government's negligence in *Mendoza* involved delays in apprehending the defendant, the rule pronounced by the Ninth Circuit was broader, empowering district courts to consider other forms of government negligence that cause delays. *See id*. A dismissal may be proper even if the defendant had waived speedy trial time. *Id*. Prejudice is presumed where the delay is over one year. *Id*.

The Constitution mandates *Brady/Giglio* material to be disclosed ***early*** and regardless of whether the defendant makes a request for it. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *United States v. Bagley*, 475 U.S. 667, 676 (1985). Early disclosure is crucial not only for trial but also for pre-trial motions, which a defendant has a right to bring promptly so that the case can proceed toward trial in a speedy fashion.

Dr. Sheikh has maintained all along that the government's case against her is unsupported. When the government indicted her back in June 2018, the Constitution entitled Dr. Sheikh to receive all *Brady* material early and mount a challenge to it as soon as possible. She has not been able to do that, however, because the government has been withholding *Brady* material. So, when it appeared that even over a year into the litigation, the government had not been *Brady* complaint, the Defense turned to this Court to set a *Brady* disclosure deadline. **The Court issued an order on July 29, 2019, that the government produce <u>all</u> *Brady* material by August 30, 2019**. The colloquy between the government and the Court is noteworthy given what occurred thereafter:

> MR. NOLAN: The government has already provided all of the material in this case. It's been basically open discovery.
>
> THE COURT: Okay. But there's a difference between what might be *Brady* material and open discovery. There can be something outside the file that might be *Brady* material that would not necessarily be covered by so-called "open discovery," so I want to make sure you don't get caught in some sort of a procedural trap. **Make sure you do the necessary inquiries to find out if there's any *Brady* material, either within or outside of the discovery that you've provided and, if so, make sure you provide that by the end of August**.

(R/T 7/29/19 at 26 (emphasis added); DE 63).

Thereafter, at multiple junctures, the government guaranteed that *now* all *Brady* material had been produced, but it had not and, in all likelihood, still has not been produced. (*See infra*, pp. 8-24). To make matters worse, despite the Court's order, prosecutors required Defense counsel time and again to reveal

---

4

1  the Defense's impeachment strategy before iteratively making various *Brady* disclosures.  By doing this

2  over and over, the government both unreasonably delayed the case and unfairly secured for itself a near

3  complete playbook of the Defense's cross-examination violating due process and confrontation rights.

4  By the time this motion is fully briefed (still awaiting a decision from the Court), it will have been

5  nearly nine months since the Court issued its order to produce all *Brady* material and the case will be

6  approaching two years with no reliable guarantee that all *Brady/Giglio* material has been produced.  The

7  delay here (almost two years) is presumptively unreasonable under *Mendoza*, even if caused only by

8  government negligence.  The case should thus be dismissed for a violation of Dr. Sheikh's Sixth

9  Amendment speedy trial right.  This would be a relatively mild sanction under the circumstances, because

10  it would only require a finding of negligent conduct, as opposed to reckless, intentional conduct, or

11  outrageous conduct.

12  **B.    Prosecution's Reckless Disregard for Its Constitutional <u>Brady</u> Obligations**

13  The Ninth Circuit has held that where there has been a "reckless disregard for the prosecution's

14  constitutional [*Brady*] obligations," the district court is empowered to dismiss the indictment.  *United*

15  *States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008); *see also United States v. Blanco*, 392 F.3d 382,

16  395 (9th Cir. 2004); *United States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir. 1993).  Moreover, a district

17  court is empowered to dismiss an indictment *not only to address the prejudice to the defendant <u>but also</u>*

18  *to prevent the government from engaging in similar conduct in the future*.  *Id*.  A district court has

19  tremendous discretion in this regard and may dismiss a case even if it can be tried with the disclosure.

20  *See id*.

21  In terms of *Brady/Giglio*, the prosecution holds the cards.  Hence, a prosecutor's representations

22  to the Court and Defense Counsel concerning *Brad*y disclosures must be reliable.  But here, the

23  government has proven itself to be unreliable providing one false promise and guarantee after another,

24  which has infected the integrity of the entire proceeding.

25  The government's conduct shows nothing less than a "reckless disregard for the prosecution's

26  constitutional obligations."  *Chapman*, 524 F.3d at 1085.  Because *Brady* is self-executing, the

27  government's *Brady/Giglio* disclosure obligation was triggered when the case was indicted in June 2018.

28

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

The government was already late when it failed to meet its obligation for over a year after indictment. When Defendant raised the issue with the Court in July 2019 after beginning to have doubts about the government's disclosure representations, the government misrepresented to the Court that it had "provided all of the material." (*See supra*, pp. 8-9). Nevertheless, the Court explained the government's *Brady* obligations to the prosecutors and ordered <u>all</u> *Brady* material to be produced by the end of August 2019. (*See infra*, p. 9). But the order had very little effect on the prosecutors. Eight months later, it appears the government still has not complied. Worse yet, not only did the government show insufficient diligence in response to the Court's order, the prosecutors appear to have somewhat disregarded it, turning *Brady* on its head by withholding important *Brady* material at multiple junctures and forcing the Defense to first reveal its thought process and cross-examination strategy with respect to a myriad of important impeachment issues. One of the greatest advantages of cross-examination is the ability to impeach an opponent's witness without the opponent seeing it coming. But by repeatedly requiring the Defense to first disclose its impeachment strategy before turning over *Brady* material, the government secured a tremendous advantage, which it will now be able to use to decide what witnesses to call and how to prepare and question those witnesses. This is a due process and confrontation violation that cannot be cured.

Furthermore, the government called Special Agent Carol Webster ("Webster") to the stand without disclosing significant impeachment material, including, *inter alia*, objectively false statements made by Webster under penalty of perjury in connection with this case. The certifications contain such objectively gross misstatements that it appears the agents in this case were actively helping the alleged victims commit immigration fraud. Webster appears to be under investigation for similar misconduct in a different case—yet another fact known to the government that was never disclosed.

The Court has given the government numerous opportunities and warnings to comply with *Brady/Giglio* even providing guidance back in July 2019. But based on what has happened since, it is clear that the government did not act with sufficient diligence on the Court's guidance and order. Anything short of dismissal would fail to address the significant prejudice to the Defense and to the Court or to prevent such conduct in the future. *See Kojayan*, 8 F.3d at 1325 ("the court before which the primary

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

1    misbehavior took place - may exercise its supervisory power to make it clear that the misconduct was

2    serious, that the government's unwillingness to own up to it was more serious still and that steps must be

3    taken to avoid a recurrence of this chain of events").

4        **C.    Outrageous Government Conduct**

5        "The court may exercise its inherent, supervisory powers to dismiss an indictment because of

6    outrageous government conduct." *Restrepo*, 930 F.2d at 712.  In addition to the prosecutorial misconduct

7    noted above, the agents themselves here appear to have condoned and committed perjury in helping the

8    alleged victims engage in immigration fraud in order to build an unsubstantiated case against Dr. Sheikh.

9    The prosecutors then intentionally tried to conceal evidence of the agent's perjury, which also comprises

10   one of the government's many violations of the Court's *Brady* disclosure order.  All this offends a

11   universal sense of justice.  Outrageous government conduct is thus an additional ground for dismissal.

12   **III.   FACTUAL AND PROCEDURAL HISTORY**

13       A complete review of the timeline in this case brings the misconduct and substantial prejudice

14   into focus.

15       On June 26, 2013, Homeland Security Investigations ("HSI") received a lead from "Opening

16   Doors" (an NGO that assists alleged victims of human trafficking apply for immigration benefits) that

17   workers living on Dr. Sheikh's property (a 20-acre ranch) were forced to work for little or no pay and not

18   free to leave.  (Ex. K at 1).

19       On July 1, 2013, HSI agents conducted a warrantless search of Dr. Sheikh's ranch by misleading

20   Dr. Sheikh into believing that there was a hostage situation on her property.  (*Id*.).  Agents spent at least

21   two if not six hours on the property conducting a "welfare check"; they found no workers on the property.

22   (*Id*.; R/T 9/30/19, 12/17/19, 12/18/19).[2]

23       On July 8, 2013, HSI Special Agent Eugene Kizenko ("SA Kizenko") obtained a search warrant

24   for Dr. Sheikh's home.  (Ex. W).  A search pursuant to that warrant was conducted on July 9, 2013.  (R/T

25   12/17/19 at 132:14-16).

26       The case was indicted almost five years later on June 21, 2018, just avoiding the statute of

27
28
---
[2] "R/T" refers to "Record Transcript" followed by the date of the hearing followed by the page
and line numbers, *e.g.*, "R/T 12/17/19 at 135" refers to Record Transcript from 12/17/19 at page 135.

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

limitations.  (DE 1).  DOJ trial attorneys Nolan and Reese received press coverage *by name* spurred on by their own press release.  (*See* Ex. JJJ).  Thereafter, the government produced heavily redacted discovery in June 2018 and represented that all discoverable materials had been produced.  (*See, e.g.*, Ex. AAA-1: R/T 7/29/19 at 12-13).  (After this initial discovery, nothing more was produced until August 29, 2019, in response to the Court's *Brady* disclosure order.).

In April 2019, Dr. Sheikh filed a motion for disclosure of grand jury proceedings and suppression of evidence and statements.  (DE 28-30).  **Significant *Brady* material relevant to these motions remained undisclosed**.  In June 2019, the Court denied the motion for disclosure of grand jury proceedings. (DE 53). (**However, as a result of the government's failure to produce *Brady* material, the Defense and Court were deprived of complete information and the Defense was unable to brief all legal bases for disclosure.**  If the case is not dismissed, the issue will need to be re-briefed in light of the newly discovered material.).

In July 2019, Dr. Sheikh made a request for all *Brady* material.  The purpose of making a general request and not itemizing *Brady* issues was to avoid revealing the Defense's cross-examination strategy.[3] Defense Counsel could not have been clearer about this concern:

> MR. ALMADANI:  This report actually has some very serious issues that I would like to examine the officer about, and I would prefer if the Court would allow me to not telegraph my examination because I do think that -- I think there are things that need to be brought to the fore here.  And for the agent and the government to have the benefit of my thinking on this would hinder my ability to cross-examine.

(Ex. AAA-1: R/T 7/29/19 at 14).

The colloquy between the government and the Court later in the hearing (also noted above) is important to the sequence of events that followed:

> MR. NOLAN:  The government has already provided all of the material in this case.  It's been basically open discovery.
>
> THE COURT:  Okay.  But there's a difference between what might be *Brady* material and open discovery.  There can be something outside the file that might be *Brady* material that would not necessarily be covered by so-called "open discovery," so I want to make sure you don't get caught in some sort

---

[3] Throughout this litigation, the Defense has desired to keep its cross-examination strategy confidential.  For example, at the hearing on September 30, 2019, the Defense declined to give its exhibit binder to the government in advance in order to preserve the impeachment value.  (R/T 9/30/2019 at 61).

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

of a procedural trap. **Make sure you do the necessary inquiries to find out if there's any *Brady* material, either within or outside of the discovery that you've provided and, if so, make sure you provide that <u>by the end of August</u>.**

(Ex. AAA-1:  R/T 7/29/19 at 26 (emphasis added); DE 63).  At another point in the same hearing, the government had assured the Court that it was "certainly not hiding the ball in any shape or form and that all discovery [had] been provided."  (Ex. AAA-1 at 13).  **(As it was later revealed, the government's representations concerning the completeness of its production were untrue.)**

On August 8, 2019, the Defense sent a letter to the prosecutors expressing concerning about the heavily redacted discovery.  (Ex. BBB-1).  The Defense also highlighted the importance of a full *Brady* review including delving into immigration benefits and speaking with the agents to explore whether there was exculpatory/impeachment material not contained in the reports.  (*Id*.).[4]  The Defense again avoided itemizing *Brad*y material so to avoid detailing its cross-examination strategy, which the Defense understood it did not need to do because providing *Brady* material is the government's constitutional duty.  (*See id*.).  The Defense sent a follow-up letter on August 9, 2019.  (Ex. BBB-2).

On August 14, 2019, the government replied with a letter stating that it was conducting a full *Brady/Giglio* review consistent with the Court's order and would provide all such material to the Defense by August 30, 2019.  (*See* Ex. BBB-2).  With its letter, the government included discovery with "fewer redactions," but the discovery remained heavily redacted, including, as it turned out later, redactions of *Brady/Giglio* material.

On August 29, 2019, the government sent a follow-up letter representing that it had complied with the Court's *Brady* disclosure order.  (*See* Ex. BBB-3).  **(As it was later revealed, the government's representation was untrue.)**

On September 23, 2019, prosecutors sent an email representing that they had reviewed agent notes and found nothing noteworthy to produce except one set of notes that were coincidentally favorable to the government.  (*See* Ex. BBB-4).  **(As it was later revealed, the government's representation was**

---

[4] *See, e.g., United States v. Toilolo*, No. 11-00506 LEK, 2014 U.S. Dist. LEXIS 34571, at *19 (D. Haw. Mar. 17, 2014) ("While the initial statement was not memorialized in a written statement, report, or notes, it was known to law enforcement, and the Government's counsel should have disclosed this information by letter as *Brady/Giglio* material. Failure to notify defense counsel therefore constitutes a *Brady/Giglio* violation.").

9

untrue.)

On a break at the hearing on September 30, 2019, Defense counsel inquired in person about the completeness of the government's disclosure, and the prosecutors again confirmed that they had done a very thorough review and that there was nothing left to produce.  (Declaration of Yasin M. Almadani ("Almadani Decl.") at ¶ 5).  **(As it was later revealed, the government's representations and assurances were untrue.)**

On a break at the hearing on December 18, 2019, Defense counsel again inquired in person about the completeness of the government's disclosure, and the prosecutors again confirmed that they had done a very thorough review and that there was nothing left to produce.  (Almadani Decl. at ¶ 6).  **(As it was later revealed, the government's representations and assurances were untrue.)**

At the September 30 and December 18, 2019, suppression proceedings, the government had called Agent Webster as its sole and star witness; her credibility was at issue against several Defense witnesses. Yet, as will be demonstrated below, the government had <u>intentionally</u> withheld significant *Brady/Giglio* material concerning Agent Webster's veracity—to wit, objectively perjurious statements made by Webster in this case.  (*See infra.*, pp. 16-21).

At the same suppression proceedings, Dr. Sheikh presented evidence that the subsequent search of her home conducted on July 9, 2013 (pursuant to the July 8 warrant) was unconstitutional, because the warrant affidavit contained several material misrepresentations and/or omissions.  Upon Dr. Sheikh's presentation, the Court commented, "Well, the arguments that have been made are substantial, and I don't want either side to be prejudiced by the procedural posture of the case." (R/T 12/18/19 at 372:8-10).  The Court set a briefing schedule on the *Franks* challenge and a hearing was scheduled on February 25, 2020.

As it turns out, despite numerous confirmations to Defense Counsel and the Court that a full *Brady* review had been conducted and there was no *Brady* material left to disclose, the government had failed to disclose agent notes that have been in the government's possession for seven (7) years containing significant exculpatory and impeachment material.  A *Franks* hearing created risk that Defense Counsel (and the Court) may inquire about the review and content of agent notes.  Knowing this, instead of disclosing the notes prior to the *Franks* briefing, the prosecutors kept the notes undisclosed as they first

attempted to have the Court convert the *Franks* hearing into a status conference. (*See* DE 85 at 20 ("The government, therefore respectfully requests that this Court convert the February 25, 2020, *Franks* hearing to a status conference to schedule a trial date.")). The prosecutors then waited for the entire matter to be briefed. Three business days before the *Franks* hearing, when it became clear that the hearing would move forward, did the government finally disclose three sets of agent notes, representing that one exculpatory fact contained in the notes had not been previously produced. **The government's attempt to minimize its violation of the Court's *Brady* disclosure order, which the government also tried to repeat at the February 25 hearing, was a misrepresentation, as well.** (*See* Ex. AAA: R/T 2/25/20 at 13). As it turned out, several exculpatory facts had not been disclosed. Worse yet, had the hearing been cancelled per the government's request, the government may have escaped producing the notes altogether.

### A. Exculpatory/Impeachment Information Disclosed Late on February 25, 2020, in Violation of the Court's *Brady* Disclosure Order.

Contained only in the agents' notes and produced for the very first time on the eve of the *Franks* hearing were the following *Brady* facts:

1. On July 2, 2013, Alfredo informed agents that he told Sheikh that he was going to leave a week prior to actually leaving and she said it was fine. (Ex. DDD at 11528). This negates Alfredo's claim of forced labor and the government admitted that it was a *Brady* violation to not disclose it. (Ex. AAA: R/T 2/25/20 at 13).

2. On July 2, 2013, Alfredo informed agents that he had a brother in Texas who was a legal permanent resident. (Ex. DDD at 11535). The fact that Alfredo actually had family in the United States further negates the claim that Alfredo had nowhere to go and no one to turn to as alleged by him and the agents. Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* material for a *Franks* hearing and trial.

3. On July 2, 2013, Alfredo informed agents that Dr. Sheikh never raised her hand on anyone. (Ex. DDD at 11535). The fact that the alleged victim

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

admitted that Dr. Sheikh never hit anyone further negates the claim of forced labor.  Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* material for a *Franks* hearing and trial.

4.    On June 26, 2013, Gildardo informed agents that Dr. Sheikh was a woman over the age of 50 who lived alone, while Prakash and Alfredo (the alleged victims) were 40-year-old men.   (Ex. EEE at 11538).   The agents' knowledge of Dr. Sheikh's age is reflected nowhere in the reports.   In a forced labor case, the fact that there are agent notes showing that, prior to authoring the search warrant affidavit, agents were clearly informed by one of their own witnesses that the alleged victims were two men at least 10 years younger than the 50+ year-old woman (Sheikh) living alone who was allegedly their oppressor further supports the claim that agents were not entirely truthful with the magistrate.  This is fruitful impeachment material for a *Franks* hearing and trial.

5.    On June 26, 2013, Gildardo informed agents that Dr. Sheikh was not present at the ranch six days out of the week from 9 a.m. to 3 a.m.  (Ex. EEE at 11545).  The fact that Dr. Sheikh lived alone and was at the property only six hours a night, six days out of the week begs the question when she would be around to enforce the draconian schedule alleged by Prakash and Alfredo.   This vitiates the claim of forced labor, and thus falls under *Brady/Giglio*.  Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* material relevant both to a *Franks* hearing and trial.[5]

6.    On June 26, 2013, Gildardo informed agents that Alfredo and Prakash would work from 7:30 a.m. to 3:30 p.m., which appear to be reasonable

---

[5] The government had previously disclosed that the witnesses had stated that Dr. Sheikh was gone from the property six days a week from 9 a.m. to after midnight, but the Defense would submit that the fact that the government knew that she was gone an entire third of the night (until 3 a.m.) is significant and has a greater impact on the fact finder in terms of a forced labor charge.

12

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

work hours.  (Ex. EEE at 11540).  Moreover, this information directly contradicted Alfredo and Prakash's ridiculous claims (**and Agent Webster's certification under penalty of perjury**) that they worked 12 and 14 hours a day in order to cast themselves as victims of "severe" human trafficking, which is the type of hardship required to obtain a T-Visa.  In this way, the alleged victims could help the government prosecute this unsupported case.  Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* material relevant to both a *Franks* hearing and to trial.

7.    On July 1, 2013, Prakash informed agents that prior to his work with Dr. Sheikh, he was homeless for two months after which he took up employment with a man named James Brewer; Brewer gave Prakash a place in a camper and $200 per month, and Prakash voluntarily worked there until Brewer had no work remaining; Prakash was then referred to Dr. Sheikh.  (Ex. FFF at 11548).  The fact that Prakash was voluntarily working for lower pay with Brewer and sought a referral to Sheikh further negates the claim of forced labor.  It should be noted that Dr. Sheikh had no obligation to house or employ any of these men, and it is clear from their own statements and the photos of the open ranch that they were free to leave at any time.  Agents' knowledge in this regard prior to the warrant affidavit being authored is likewise *Brady* material for a *Franks* hearing and trial.

8.    On July 1, 2013, Prakash informed agents that he had a friend living nearby in Fruitridge, CA.  (Ex. FFF at 11549).  The fact that Prakash had a friend living nearby further negates the claim that Prakash had nowhere to go and no one to contact, and thereby negates the claim of forced labor.  Agents' knowledge of this fact prior to the warrant affidavit being authored is likewise *Brady* material for a *Franks* hearing and trial.

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

Even if the Court finds any one of these facts by themselves to not be sufficiently significant, their combination and, more importantly, the agents' pre-warrant knowledge of these facts in combination with other exculpatory facts (*see generally* Declaration of Former Supervisory HSI Special Agent David Wright ("Wright Decl.")) is certainly quite significant under *Brady/Giglio*.  Furthermore, the fact that the agents sought a warrant to invade Dr. Sheikh's home and privacy yet hid a plethora of exculpatory material from the magistrate is itself impeachment material for trial.

At the hearing on February 25, 2020, the government acknowledged a single *Brady* violation while trying to minimize others.  Thereafter, the Court had to repeatedly explain the government's *Brady* obligations to the prosecutors as they tried to make excuses to cover their violations.  (Ex. AAA: R/T 2/25/20 at 15, 25).  The Court found that Dr. Sheikh, Defense Counsel, and the Court had already suffered prejudice as a result of the government's admitted *Brady* violation as of the February 25 hearing. Importantly, the Court stated:

> As you point out, Dr. Sheikh has a right to have this case brought to trial, and brought to trial quickly.
>
> Now, if I hear again that there's material that I find to be *Brady* material that hasn't been turned over after this, **I guarantee you the sanctions are going to be as severe as the law allows**.

(Ex. AAA: R/T 2/25/20 at 27) (emphasis added).

The Court later reiterated the point:

> They've already been ordered to turn over *Brady* material.  If they haven't, that's the violation.  They don't get to keep coming back and saying:  How much *Brady* do we give you now?  How much *Brady* do we give you later? When do we give it to you?  They don't get to do that.  **They are representing to the Court that they have given you all *Brady* material. If that representation is false, we'll deal with it.**

(Ex. AAA: R/T 2/25/20 at 33) (emphasis added).  **As it turns out, the government's representation to the Court concerning the completeness of its *Brady* disclosure was false even on the February 25, 2020.**

**B.    Communications with the Government and Late *Brady* Disclosures Since the February 25, 2020 Hearing, in Violation of the Court's *Brady* Disclosure Order of July 2019**

Since the February 25, 2020 hearing, the Defense has had to insist and explain its impeachment

14

strategy for any *Brady* items the Defense seeks from the government.  The resulting due process and confrontation violations have been unfair.

       *1.*      ***Failure to Disclose Agents' Pre-Warrant Knowledge of Cheap Eateries Within One to Three Miles of Dr. Sheikh's Ranch***

As discussed at the February 25, 2020 hearing, exculpatory/impeachment information relevant to both the *Franks* issue and trial falls within the ambit of *Brady/Giglio*.  As such, the agents' knowledge of exculpatory facts prior to the warrant being executed was relevant.

One salient allegation in the government's warrant narrative (Ex. W) was that Prakash (Witness 2) and Alfredo (Witness 3) were being starved by Dr. Sheikh and did not have sufficient access to food. The agents' pre-warrant knowledge of three key facts taken together would completely undercut this allegation in a *Franks* analysis and would serve as impeachment for trial: (1) The ranch was very easy to leave, and Dr. Sheikh was almost never there; (2) Dr. Sheikh paid the men $300-$400 per month and the men were free to walk off (as they eventually ended up doing) and earn money elsewhere; and (3) there was a strip mall with cheap eateries and a convenience store within about a mile of the ranch and other fast food establishments within three miles of the ranch that agents would need to pass on the way to the ranch.

It is the agents' pre-warrant knowledge of this third fact, the nearby cheap eateries, that government failed to disclose despite having the information and despite understanding that the fact was important to one of Dr. Sheikh's *Franks* arguments.  Indeed, the Defense raised the precise issue in its *Franks* motion (DE 84) suspecting it to be true, but there was nothing in the discovery with which to cross-examine or impeach the agents on this fact.  The agents' knowledge of the surrounding area and their operational plans (both within the government's possession) would provide the cross-examination material for the *Franks* hearing; this was exculpatory/impeachment material that needed to be disclosed under *Brady*, at least in letter form after a review of operational plans and sufficient conversation with the agents.[6]

Under *Kyles*, this *Brady* material should have been disclosed soon after the case was indicted, but

---

[6] *See, e.g., Toilolo*, No. 11-00506 LEK, 2014 U.S. Dist. LEXIS 34571, at *19 (D. Haw. Mar. 17, 2014) (material need not be memorialized to be discoverable under *Brady/Giglio*).

*Defendant's Motion to Dismiss Indictment*                                 *Case No. 2:18-CR-119-WBS-1*

1 | certainly no later than the August 30, 2019 deadline set by the Court's July 2019 order.   To date, the

2 | DOJ trial attorneys have provided insufficient information in this regard.  (*See* Ex. BBB-8, ¶ 4).

3 |           **2.      *False Immigration Certifications Disclosed on March 11, 2020, Only After a***

4 |                     ***Specific Request by the Defense Along with an Explanation of the Defense's Impeachment Strategy***

5 |           Agent Webster's central role in the charges against Dr. Sheikh cannot be overstated.  (*See* DE 92

6 | at 6-7).  Indeed, she was the government's star witness at the proceedings in September and December

7 | 2019 and is likely to be a key trial witness.

8 |           On March 6, 2020, the Defense independently learned that a Magistrate Judge in this District has

9 | ordered discovery on what appear to be credible allegations of perjury against Special Agent Webster in

10 | another matter for helping an alleged victim commit immigration fraud.  *United States v. Sekhon*, et al.

11 | Case No. 2:06-CR-0058-JAM-EFB P.  Yet the government had failed to disclose this very serious issue.

12 | On this basis, on March 6, 2020, the Defense wrote the government a letter insisting that it produce, *inter*

13 | *alia*, HSI's I-914B certifications in support of the alleged victims' T-Visa applications in this case; it

14 | appears there should be seven (7) such certifications for the seven (7) alleged victims who have received

15 | T-Visas.  (Ex. BBB-5 at ¶ 7).  The certifications should have been produced under *Brady/Giglio* and this

16 | Court's July 2019 order.

17 |           Instead of following the Court's order, however, the government required the Defense to first

18 | provide its impeachment positions and Defense strategy before disclosing two certifications without

19 | providing any indication whether there are more. (See Ex. BBB-5 at ¶ 7; Ex. BBB-6).  These certifications

20 | were disclosed on March 11, 2020, only after the Defense had filed its discovery reply.  The certifications

21 | contained objectively (or at least arguably) perjurious statements by Agent Webster in support of the T-

22 | Visa applications for Prakash and Alfredo.

23 |           As to Prakash, Agent Webster certified under penalty of perjury (on October 6, 2014) the

24 | following statements despite clear evidence to show that the agent knew the statements were false and

25 | exaggerated (*see* **bold** portions):

26 |           "[Prakash Karki] worked ten to **twelve hours a day, seven days a week** for very little pay. . . .

27 | **The gates to the property were secured with chains and padlocks**.  [Prakash] was not given a key

28 |

*Defendant's Motion to Dismiss Indictment*                              *Case No. 2:18-CR-119-WBS-1*

therefore **not able to freely leave the property**.  Sheikh often threatened [Prakash] with deportation.  On July 1, 2013, [Prakash] **escaped with the help of HSI** who found him hiding **_on_** the property during a welfare check."  (Ex. LLL at 12348 (emphasis added)).

As to Alfredo, Agent Webster certified under penalty of perjury (on October 6, 2014) the following statements despite clear evidence to show that the agent knew the statements were false and exaggerated (*see* **bold** portions):

"[Alfredo][7] worked **twelve hours a day, seven days a week** for very little pay. . . .  **The gates to the property were secured with chains and padlocks.**  He was not given a key, therefore, **could not freely leave**.  [Alfredo] was often hungry and had **no means to leave to purchase food**.  Sheikh threatened Alfredo with deportation. . . .  On June 24, 2013, [Alfredo] **escaped with the help** from a previous employee."  (Ex. MMM at 12351 (emphasis added)).

The false impression Agent Webster provided in her certifications was that of a <u>locked-down compound</u> with <u>production-ranch-</u> or <u>sweatshop-style work hours</u>, that <u>required outside assistance to escape</u>.  But as the Court has seen for itself, it is undeniable that this was a beautiful <u>*residential* ranch</u> that was <u>wide open and very easy to walk off of</u>.  (Ex. G-I).  The Court actually commented how easy it would have been to leave:

> **MR. ALMADANI**:  The Court itself saw in Exhibit G how easy it is to just walk across this little opening area here, Your Honor. . . . then to go over that little hurdle fence that was there and you're on Clark Lane; less than a mile and a half, you're at a strip mall.
>
> **THE COURT**:  You don't even have to go over the top; you can go right through the slats.

(RT 12/18/2019 at 368, lines 11-17).

Webster saw this for herself when she went to the property for a welfare check on July 1, 2013 and then again on July 9, 2013, to execute a search warrant that itself was obtained by misleading the magistrate (an issue to be briefed further if the case is not dismissed).  The agents also knew that there were cheap eateries a short distance away from the ranch; the agents' pre-warrant knowledge in this regard is *Brady/Giglio* material that was also kept from the Defense until March 2, 2020.  (DE 90 at 4-5;

---

[7] The government has recently disclosed that Alfredo's actual name is "Elfego-Lopez."  For purposes of continuity and to avoid confusion, the Defense will continue to use "Alfredo."

*Defendant's Motion to Dismiss Indictment*                    Case No. 2:18-CR-119-WBS-1

Ex. I).  Therefore, as demonstrated above, Webster knew quite well that both Alfredo and Prakash could easily walk off the ranch, had access to cheap eateries and a convenience store a short walk away; moreover, they had no rent or other necessary expenses and were admittedly receiving at least several hundred dollars a month.  These facts known to Webster demonstrate that she was not being honest when she certified that "[Alfredo] . . . had no means to leave to purchase food."

Furthermore, the statements that Alfredo "could not freely leave," needed help to "escape," and was being threatened with deportation are further belied by (the late produced) agent notes of Alfredo's own admission that he told Sheikh he was going to leave a week prior to actually leaving and she said it was fine; he then left without incident.  (Ex. DDD at 11528).  Webster also knew from Gildardo that Gildardo had twice previously asked Alfredo to leave and that Alfredo *chose to stay* hoping to make more money.  (Ex. T at 11169).

Moreover, only after a specific request from the Defense explaining its impeachment strategy, the government disclosed for the first time on March 4, 2020, previously redacted *Brady* material showing that Webster knew Alfredo had a friend with a *local* Sacramento area phone number that he could call, which demonstrated that Alfredo was lying when he said he had lost all phone numbers and had no one to contact, and Webster knew that.

The government's March 13, 2020 disclosure of previously redacted material (again, made only after the Defense explained the *Brady/Giglio* significance) shows that Alfredo used this local number to text message his friend on June 29, 2013 (the day Alfredo freely left); Alfredo was stealing from Dr. Sheikh and had attempted to sell her son's dirt bike just before he left.  (*See* Ex. PPP).  Agent knew about this and when Special Agent Reesch asked about the text message, Alfredo admitted to the theft, but said that he was doing it for food.  This explanation made no sense, however, because Alfredo was planning to leave that very day and he had informed Dr. Sheikh of such without any protest from her; his plan was to go to Opening Doors to try to secure immigration benefits, which agents knew he did.  There was no excuse for him to steal from Dr. Sheikh.  It is fiction to believe that the experienced human-trafficking agents in this case did not understand (as anyone would) that genuine trafficking victims of (presumably scared of their oppressor) do not voluntarily choose to stick around when having the option to leave, then

*Defendant's Motion to Dismiss Indictment*          *Case No. 2:18-CR-119-WBS-1*

tell the oppressor they are going to leave a week in advance, then try to steal and sell the oppressor's property on the day they plan to leave (because she is gone most of the time), and then leave freely without incident.  Special Agent Rachel Reesch (Reesch) (who was involved in the I-914B certification process with Agent Webster (*see* Ex. NNN at USA011499-011502), and who is believed to have testified before the grand jury) learned this additionally exculpatory information and yet allowed the immigration fraud to persist.  Webster certified these false statements under penalty of perjury, helping Prakash and Alfredo commit immigration fraud so they would continue providing the same story in this case, while Agent Reesch assisted despite knowing better.

Prakash's certification almost mirrors Alfredo's and is false for many of the same reasons as Alfredo's.  In addition, the Agent Webster's certification that Prakash was found hiding **"*on*"** the property and required HSI's help to "escape" is a complete lie.  Two separate HSI reports show that Prakash was easily able to leave the property and was found hiding **"*outside*"** the property.  (Ex. K and U).  Moreover, case reports and agent notes show that Webster knew that Gildardo, Alfredo, and another Vietnamese family did some work for Dr. Sheikh and then left her property freely without any incident.  (*See* Wright Decl.).  Prakash himself left without incident and when HSI asked him to place monitored calls to Sheikh on July 1, 2013, presumably to goad her into making threats, she was very nice to Prakash and never threatened him to come back, which completely undercut his story about deportation threats.  (Wright Decl. at ¶ g).

As for the exaggerated work hours ("twelve hours a day, seven days a week"), agent notes (produced late on February 19, 2020) in violation of the Court's *Brady* disclosure deadline further demonstrate the falsity of Agent Webster's perjurious certification.  On June 26, 2013, Gildardo had informed Webster that Alfredo and Prakash would work from 7:30 a.m. to 3:30 p.m. (Ex. EEE at 11540), which was a far cry from the "twelve hours, a day seven days a week" Webster had certified for both Prakash and Alfredo.  Gildardo had also informed Webster that Dr. Sheikh was a woman over 50 years old living alone who was not present at her ranch sixdays out of the week from 9:00 a.m. to 3:00 a.m. while the alleged "victims" were 40-year-old men.  (Ex. EEE at 11538 and 11545).  Prakash and Alfredo also confirmed that Dr. Sheikh was away from the ranch six days out of the week from 9 a.m. to past

midnight.  Under these facts, it is difficult to imagine how Dr. Sheikh would enfor the draconian work hours that Agent Webster certified knowing all of this.  Finally, Gilardo had also stated that the men would water the plants (i.e., turn on sprinkler valves) and feed 8-12 animals, mostly birds.  The idea that three men, two of them working 12-14 hours days, 7 days a week were needed to accomplish these tasks is laughable.  Most lay people, let alone an experienced agent, would understand this.  A review of the Wright Declaration, which carefully analyzes the agents' notes and reports, provides a detailed understanding of how no experienced agent could have objectively believed what Agent Webster certified under penalty of perjury.  This was immigration fraud plain and simple.

It is clear that the foregoing certifications created a grossly false impression based on Webster's knowledge evidenced in reports, agent notes, and elsewhere.  Had the government timely produced the *Brady/Giglio* material, the Defense would have been able to show on cross-examination (when Webster took the stand in September and December 2019 and her credibility was on the line against numerous Defense witnesses) that Webster had apparently made false statements under penalty of perjury.  The Defense was deprived of this important impeachment opportunity in violation of her confrontation rights.

**Moreover, the prosecutors were fully aware of these apparently false certifications**, as they are referenced in Mr. Reese's letter of August 19, 2019 (Ex. BBB-3, ¶ 1-2), as well as the T-Visa immigration applications of Prakash and Alfredo.  The immigration applications were produced in their entirety *with the exception* **of these certifications that appear to have been selectively omitted as the prosecutors continued to assure Defense and the Court that there was nothing more to see**.  (*See* Ex. NNN and OOO).

Finally, in its letter of March 11, 2020, the government seemed to indicate that, despite its numerous prior representations that a full *Brady* review had been completed by the Court set deadline of August 30, 2020, review of agent communications appears to be incomplete.  (*See* Ex. BBB-6 at ¶ 1 (review "will continue")).  Given the prosecutors poor track record, however, there is little faith that the review was or will be reliable or that material has been or will be appropriately disclosed.

### 3. Failure to Disclose Potentially Perjurious Conduct by Agent Webster in the Sehkon Case

Agent Webster's objectively false statements in this case show conduct similar to the perjury

20

allegations pending against her in *United States v. Sekhon*, et al. Case No. 2:06-CR-0058-JAM-EFB P, where Magistrate Judge Brennen has ordered discovery in the Section 2255 *habeas corpus* context. Securing a court's permission to move forward with discovery and investigation on a motion brought under 28 U.S.C. § 2255 is no easy task.  It requires specific, credible allegations with supporting facts sufficient to show significant constitutional violations resulting in prejudice.  (*See* Ex. CCC at 5-6). Prosecutors did not disclose this information.

Agent Webster's central role in the charges against Dr. Sheikh is significant.  Agent Webster was the supervisor and a lead agent in the case.  She authored numerous reports, and many of the charges filed against Dr. Sheikh, including the false statements charges, result directly from Webster's interviews and reports in the case.  Webster was also the agent that testified before this Court in September and December 2019, where she gave a starkly different account than the Defense witnesses whose accounts were all consistent with one another.  Webster's credibility was directly on the line and the Defense identified several areas where her credibility was impeached by conflicting evidence.

On March 6, 2020, the Defense learned for the very first time that on December 17, 2017, a court in this District had granted an evidentiary hearing on a Section 2255 motion and ordered investigation and discovery on the basis of what appear to be factually supported allegations that Webster may have committed perjury and overlooked the immigration fraud of one of her alleged victims, and the government may have elicited false testimony and failed to disclose *Brady* material in that matter.  (*See* Ex. CCC at 1, 6-7; Declaration of Yasin M. Almadani ("Almadani Decl.") at ¶ 2).  The allegations appear to be supported by a number of declarations before the court.

A finding of perjury against Webster in the *Sekhon* case, especially given the objectively false certifications in this case (noted above), will obviously have a direct impact on this case.  But it appears that the prosecutors in this case have not done their *Brady* due diligence relating to *Sekhon* case; there is information in that case that the government has access to and the Defense does not.  But instead of doing a faithful *Brady* review, the prosecutors appear to have intentionally concealed even the dubious I-914B certifications in this case, and have still not disclosed additional certifications that may exist or confirmed that they do not exist.

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

4.      ***Information Concerning Prakash and Alfredo's Local Contacts Disclosed on March 4 and 13, 2020, Only After a Specific Request by the Defense Along with an Explanation of the Defense's Impeachment Strategy***

As the Court is aware, the government produced heavily redacted discovery in this case, and despite the Defense's repeated requests, refused to provide unredacted discovery.  Intentionally redacted from the discovery was the agents' knowledge of impeachment information against Prakash and Alfredo's claim that they did not know anyone in the area and had nowhere to go in the area.  It turns out that on July 1, 2013 (the very first day agents came to Dr. Sheikh's property and found Prakash hiding in the bushes outside the property), Prakash had provided ***a local Sacramento area telephone number*** to agents where he could be reached, which impeached his claim that he had nowhere to go and no one to contact; this also contradicted what the magistrate was led to believe for the search warrant.   The information is important not only for cross-examination at trial but also for the *Franks* hearing, and it would not have been available to the Defense had the *Franks* hearing proceeded as last scheduled on February 25, 2020.   The government actually kept the information <u>intentionally concealed</u> (<u>by affirmatively redacting it</u>) requiring the Defense to first identify its impeachment value (and Defense strategy) before making the *Brady* disclosure.  (*See* Ex. BBB-7)

Finally, on March 4, 2020, the government disclosed to the Defense for the first time that on July 1, 2013, Prakash had provided agents with ***a local Sacramento area phone number*** for "a friend of Alfredo."  This completely impeached Alfredo's claim that he had lost all phone numbers and had no one to contact with the cellular phone Dr. Sheikh had provided.  According to agent reports, he was using the phone to steal and sell her personal property.  (Ex. PPP).

5.      ***Providing Misleading Information About the T-Visa Benefits in Violation of Brady***

In response to the Court's order to provide all *Brady* material by August 30, 2019, the government sent a letter on August 29, 2019, that contains misleading information.  In that letter, the prosecutor stated that seven of the government's witnesses had received "T-Visas" in this case.  (Ex. BBB-3).  The prosecutor went on to explain, "A T-Visa is a *temporary* immigration benefit that enables certain victims of a severe form of human trafficking to remain in the United States *for up to 4 years if they have assisted law enforcement in an investigation or prosecution of human trafficking*.  T-Visa nonimmigrant status is

*Defendant's Motion to Dismiss Indictment*                          *Case No. 2:18-CR-119-WBS-1*

also available for certain qualifying family members of trafficking victims." (Ex. BBB-3 at 3 (emphasis added)).  That was the full extent of the prosecutor's explanation of the benefit, which turned out to be misleading.  Defense counsel took the prosecutor at his word and understood the T-Visa benefit in this case would only allow for a *temporary* stay in the United States for up to four years.

However, on or about March 5, 2020, Defense Counsel coincidentally learned that the T-Visa can actually be converted to a permanent residency (green card) as long as the victim continues to assist law enforcement in the case and the prosecution of the alleged trafficker is completed.  (Almadani Decl. at ¶ 3).  This is a highly significant part of the benefit that would motivate the victims in this case to lie on the stand.  Nothing about this primary benefit and the motivation to lie was disclosed.  By affirmatively providing a misleading and incomplete description of the T-Visa benefit (omitting the most significant benefit), the government lulled the defense into a false impression.  To date, the full extent of the benefits available to the victims are unknown to the Defense.  (Ex. BBB-8).

When the government attorney takes it upon himself to explain a benefit, especially the complex immigration context, that description should be fully accurate, and the Defense should be able to fully rely on it.  For the government to have misled the Defense in this way is reckless.

### 6. *Failure to Disclose the Impeachable Close Relationship Between HSI and Opening Doors*

On March 9, 2020, the Defense independently learned for the first time that HSI and Opening Doors may have a long-standing relationship whereby Opening Doors helps HSI increase its prosecution statistics by finding and referring alleged victims, and HSI in turn gives significant sums of money to Opening Doors.  (Almadani Decl. ¶ 4).  The information remains unverified and the Defense remains unaware of the details of this relationship.  If true, this relationship naturally creates an illicit incentive to overlook exaggerated stories of alleged victims as HSI increases its prosecution statistics and for Opening Doors to collects grant money, each giving the other the appearance of legitimacy.

The impeachment potential is particularly significant in this case because an examination of the evidence here shows that HSI and Opening Doors together pushed through T-Visa applications of Prakash, Alfredo, and at least five other witnesses by rubber stamping obviously exaggerated stories of these individuals that significantly lacked credibility when compared with the full breadth of evidence

*Defendant's Motion to Dismiss Indictment*                     *Case No. 2:18-CR-119-WBS-1*

1  known to the government.  (*See* Wright Decl.).  The agents also omitted significant exculpatory

2  information to obtain a warrant.  In this context, the details of the close relationship between HSI and

3  Opening Doors, and the way that the statistics-money exchange works are grounds for impeachment.

4  This is *Brady* material within the government's possession that still has not been produced.

5            **7.**    **Additional Potentially Outstanding Brady Material**

6        At the hearing on March 16, 2020, the Court noted that the U.S. Attorney's Office ("USAO")

7  would be joining the case and the Defense could address its *Brady* requests to the new prosecutors.  The

8  Court also stated that the Court's intention was to have as complete a disclosure as possible but not to

9  sanitize the DOJ trial attorneys' conduct to date.  The Defense thereafter sent a letter to the USAO

10  concerning outstanding issues.  (Ex. BBB-8).  The USAO responded informing the Defense that given

11  the volume of discovery in the case, the USAO's very recent withdrawal of recusal, and the COVID-19

12  pandemic, it would not be possible for the USAO to address the Defense's concerns in time for this

13  briefing.  (Ex. BBB-9).  The Defense in turn responded that given the Sixth Amendment speedy trial

14  issue raised here, it would not be fair to give a second set of prosecutors more time for a second bite at

15  the apple.  (Ex. BBB-10).  The correspondence is attached for the Court's consideration.  (Ex. BBB-8-

16  10).

17  **IV.**    **LEGAL STANDARDS AND ARGUMENT**

18      **A.**    **The Government's Constitutional Obligations and Ethical Duties**

19        Under *Brady* and its progeny, the government is required to produce evidence that exculpates a

20  defendant when such evidence is material to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83 (1963),

21  and *Giglio v. United States*, 405 U.S. 150 (1972).  Because this is a Constitutional obligation, *Brady*

22  material must be disclosed **<u>early</u> and regardless of whether the defendant makes a request for it**.  *See*

23  *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *U.S. v. Bagley*, 475 U.S. 667, 676 (1985).

24        Under *Giglio* and its progeny, the government is required to produce material that impeaches a

25  witness.  405 U.S. at 154.  That is, "[t]he government has a duty to turn over to the defense in discovery

26  all material information casting a shadow on a government witness's credibility." *United States v. Blanco*,

27  392 F.3d 382, 397 (9th Cir. 2004) (internal citations omitted).  As with *Brady* material, *Giglio* material

28

*Defendant's Motion to Dismiss Indictment*        *Case No. 2:18-CR-119-WBS-1*

must be disclosed regardless of whether the defendant makes a request for it.  *Kyles*, 514 U.S. at 432-33.

The duty under *Giglio* includes a duty to check agent personnel files for impeachment information.  *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991).  Evidence of an alleged victim's criminal record must also be disclosed.  *United States v. Agurs*, 427 U.S. 97 (1976).  A prosecutor's pre-trial obligations to disclose favorable or impeaching evidence may arise more broadly under a prosecutor's ethical or statutory obligations.  *Cone v. Bell*, 556 U.S. 449 (2009).

**"If the prosecutor <u>delays disclosing information to which he or she has access</u>, or if the prosecutor is <u>aware of the existence of potentially exculpatory evidence</u>, but fails to take the most rudimentary steps to obtain access to, to preserve, or <u>to promptly disclose such evidence</u>, then he or she may be in <u>violation of the duty established under *Brady v. Maryland*</u>."**  *United States v. Alderdyce*, 787 F.2d 1365, 1370 (9th Cir. 1986)

Furthermore, because the government's failure to turn over exculpatory information in its possession is unlikely to be discovered and thus largely unreviewable, it is particularly important for the prosecutor to ensure that a careful and proper *Brady* review is done.  *United States v. Alvarez*, 86 F.3d 901, 905 (9th Cir. 1996).  It is not the role of the prosecutor to decide that facially exculpatory evidence need not be turned over because the prosecutor thinks the information is false.  *Id.*  "To the extent the prosecutor is uncertain about the materiality of a piece of evidence, 'the prudent prosecutor will resolve doubtful questions in favor of disclosure.'"  *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 108, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976)).

The prosecutor's early *Brady* disclosure duty is grounded in the principle that "[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . [W]hile he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  Being a prosecutor is a privilege "and this privilege requires federal prosecutors to adhere to the highest standards of fairness and

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

1  justice." *United States v. Leslie*, 759 F.2d 366, 373 (5th Cir. 1985) (citing *Berger*, 295 U.S. at 88).  The

2  rules of ethics also require a prosecutor to "[m]ake timely disclosure to the defense of all evidence or

3  information known to the prosecutor that the prosecutor knows or reasonably should know tends to negate

4  the guilt of the accused, mitigate the offense, or mitigate the sentence, except when the prosecutor is

5  relieved of this responsibility by a protective order of the tribunal."  Cal. R. Prof. Conduct 5-110(G).

6  **B.    The Court's Inherent Supervisory Power to Dismiss an Indictment**

7  District courts possess inherent supervisory power to dismiss an indictment for constitutional

8  violations.  (*See infra*, discussion of *Chapman*, *Kojayan*, and *Green*).  Moreover, nothing in the law

9  requires that a *Brady* violation be discovered at or after trial for a court to be able to exercise its inherent

10  supervisory powers to dismiss a case.  The law does *not* enjoin a district court from dismissing an

11  indictment for late *Brady* disclosures simply because the material can now be used at trial.  To the

12  contrary, the case law establishes that district courts have tremendous discretion in this regard and must

13  assess these matters on a case-by-case basis.  The Ninth Circuit's broad language shows that it is *not* the

14  timing of the *Brady* disclosure (pre- or post-trial) that controls.  Rather, what controls is the significance

15  of the prejudice suffered by the defendant and the need to deter future misconduct in order to preserve

16  judicial integrity.

17  For example, in *Chapman*, the district court dismissed the indictment after discovery of *Brady*

18  material <u>even though the case could have been re-tried with the benefit of the disclosed material</u>.  The

19  district court noted the unfairness of having the defense strategy previewed in the first trial only to have

20  the government clean up its case in the second.  *Chapman*, 524 F.3d at 1080.  A greater problem exists

21  in the present case—to wit, by withholding a significant amount of *Brady* material and forcing litigation

22  on the issue, the government has been able to extract almost the entirety of the Defense's cross-

23  examination even before a first trial.

24  In *Chapman*, the defendant was at least able to develop some impeachment testimony at the initial

25  trial without first detailing its strategy to the government.  Yet both the district and appellate courts found

26  that it was unfair to give the government a second chance to clean up its case.  *Id*.  Here, the prejudice is

27  greater because the government has secured a near-full preview of the Defense's case even before any

28

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

trial.  The government knows that *Brady* is self-executing and the government is not allowed to withhold *Brady* material or require the Defense to first itemize nd explain its impeachment value.  Doing so is a violation of due process that turns *Brady* on its head.  It also invades Sixth Amendment confrontation rights by depriving the Defense of one of the most significant benefits of surprise cross-examination.  Given the prosecution's significant invasion into Defense strategy and the unfair advantage of the government being able to select, prepare, and question its witnesses in light of previewing the Defense's case, a fair trial can no longer be ensured.

In addition, had the Defense here chosen to go through trial first and then moved for a mistrial on the basis of *Brady*, it would have been a tremendous waste of resources.  The Defense thus chose to be proactive.  Therefore, if this Court were to find that dismissal requires a *Brady* violation to be raised at or after trial, it would result in an unfair windfall to the government from the Defense's diligence.  It would set up an awkward incentive structure whereby defense counsel in the future would be encouraged to not proactively raise such issues with courts prior to trial, but rather allow resources to be wasted and raise the issue at or after trial.  Worse yet, it would encourage prosecutors to ignore court orders and use *Brady* material as a sword to preview the defense's strategy like the prosecutors have done here.  Such results would offend both judicial integrity and judicial economy.

The proper methodology then is to assess the sanction in relation to the prejudice suffered and to the need to prevent future misconduct, which is precisely the holding in *Chapman*.  524 F.3d at 1085 (a district court may dismiss an indictment to "remedy [] the violation of a recognized statutory or constitutional right," "to preserve judicial integrity," and "to deter future illegal conduct").

The holding in *Kojayan* leads to the same result.  After finding a violation of defendant's due process right based upon the government's failure to disclose *Brady* material, the Ninth Circuit vacated the judgment of conviction and remanded the case to the district court "to determine whether to retry the defendants <u>or dismiss the indictment with prejudice as a sanction for the government's misbehavior</u>." *Kojayan*, 8 F.3d at 1323-1325.  Like in Chapman, the defendant in *Kojayan* could have been retried with the newly disclosed evidence, but the Ninth Circuit found it important to highlight that dismissal with prejudice would be an appropriate remedy as "supervisory power may be used as a means of establishing

27

standards of conduct before the court." *Kojayan*, 8 F.3d at 1325 (internal quotations and citations omitted); *see also Blanco*, 392 F.3d at 395 (remanding to the district court for further factfinding to determine the full extent of the *Brady/Giglio* violations and consider a range of sanctions, including dismissal of the indictment for governmental misconduct).

The dismissal Dr. Sheikh seeks is not unprecedented.  On November 14, 2008, the Honorable Brian Holeman of the Superior Court of the District of Columbia dismissed with prejudice a robbery and assault case based on a *Brady* violation prior to trial.  *United States v. Theresa Green aka Tracy Tobin*, Criminal No. 2004 FEL 6457, Memorandum and Order (November 14, 2008).  The violation in *Green* was less egregious than the pattern of violations in this case.  Nevertheless, Judge Holeman wrote with undisguised dismay of the length of time that passed and the numerous court hearings that were held while the *Brady* information remained undisclosed: "The complaining witness gave her statement to the police on October 16, 2004, yet this information was not provided to Defendant until *a year and a half later*.  In the interim, there were eleven (11) status hearings, four (4) trial dates and a court order requiring that Government produce any additional *Brady* information."  *Id*. at 10 (emphasis in original).

Here, the government has had the exculpatory material for over five (5) to seven (7) years, the case has been pending for almost two years, there was a direct Court order eight (8) months ago (*with guidance*) to produce all *Brady* material by the end of August 2019, there have been twelve 12 days of hearings/status conference, several hearings have had to be continued, issues will need to be re-briefed due to the government's lack of compliance with the Court's *Brady* disclosure order, the government has unfairly gained tremendous insight into the Defense's strategy, and the case has languished unreasonably long due to the government failures.  Under these circumstances, the Ninth Circuit gives this Court at least as much supervisory authority to dismiss the case as Judge Holeman exercised in *Green*.  *See supra*, discussion of *Chapman* and *Kojayan*.

### C.  Government Negligence in Violation of the Sixth Amendment Right to a Speedy Trial

Under the standards set by the Ninth Circuit in *Mendoza*, Dr. Sheikh respectfully requests that this Court dismiss the indictment in exercise of the Court's inherent supervisory powers to remedy the constitutional violation of Dr. Sheikh's speedy trial rights that was compounded by the repeated violations

28

of Dr. Sheikh's constitutional *Brady* rights.  *See Mendoza*, 530 F.3d at 762-64.  <u>Negligence</u> on the part of the government suffices for dismissal.  *Mendoza*, 530 F.3d at 762.

### 1.    Legal Standard

In *Mendoza*, the Ninth Circuit underscored, "The Sixth Amendment guarantees that criminal defendants 'shall enjoy the right to a speedy and public trial . . . .'" *Mendoza*, 530 F.3d at 762 (citing U.S. Const. amend. VI).  To determine whether a defendant's Sixth Amendment speedy trial right has been violated, courts balance the following four factors: (i) length of delay, (ii) the reason for the delay, (iii) the defendant's assertion of her right, and (iv) prejudice to the defendant. *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

"None of these four factors are either necessary or sufficient, individually, to support a finding that a defendant's speedy trial right has been violated.  Rather the factors are related and must be considered together with such other circumstances as may be relevant.  Further, the balancing of these factors, and other relevant circumstances, must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." *Mendoza*, 530 F.3d at 762 (internal citations and quotation marks omitted).

### 2.    Analysis

***Length of Delay***. "For speedy trial claims, the length of the delay is measured from the time of the indictment to the time of trial.  If the length of delay is long enough to be considered presumptively prejudicial, an inquiry into the other three factors is triggered.  <u>Generally, a delay of more than one year is presumptively prejudicial</u>." *Mendoza*, 530 F.3d at 762 (internal citations and quotation marks omitted) (emphasis added).

The delay here, which is significantly over one year (approximately one year and eight months to date), creates a presumption of prejudice.  The investigation in this case began in June 2013.  It appears that nearly all facts upon which the indictment is based and all key government witnesses were known to the government by July 2, 2013, if not just a couple of months after that.  (*See generally* DE 1).  Nevertheless, the case was charged approximately five years later on June 21, 2018.  Since then, another <u>one year and eight months</u> have passed as the government continues to trickle out *Brady* material in

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

1    piecemeal fashion, unreasonably requiring the Defense to issue-spot exculpatory material for the

2    government and explain its impeachment value.

3         **Reason for Delay**.  The Ninth Circuit has held that prejudice may be presumed when the delay

4    results from *negligence* on the part of the government.  *Mendoza*, 530 F.3d at 762 (prejudice was

5    presumed upon a finding that government acted with negligence in locating the defendant) (emphasis

6    added).

7         In this case, negligence is a foregone conclusion because the government's misconduct here

8    (discussed above) is at least reckless.  Furthermore, the violations here—repeated failures to disclose

9    *Brady* material despite a Court order and repeated warnings—is far worse a reason for delay than is

10   negligence in locating a defendant, which was the error found to be sufficiently prejudicial in *Mendoza*.

11   *See id*.  This factor establishes severe prejudice and heavily favors dismissal.

12        **Defendant's Assertion of Speedy Trial Right**.  This factor is somewhat odd to consider in the

13   context of this case.  Dr. Sheikh's constitutionally guaranteed speedy trial right attached at indictment,

14   and whenever she waived time, it was under the good-faith belief that the government understood its

15   *Brady* obligations and had expeditiously produced *Brady* material.  It turns out, however, that the

16   government had been holding on to *Brady* material and still may be holding on to *Brady* material.  In this

17   context, the waivers are a bit meaningless.

18        **Prejudice**.  As discussed above, prejudice may be presumed when the delay results from

19   *negligence* on the part of the government.  *Mendoza*, 530 F.3d at 762.  Because the government's *Brady*

20   violations here went far beyond negligence, prejudice is presumed and no further discussion is needed.

21        Nevertheless, for purposes of completeness, it should be noted that the Supreme Court has

22   recognized three additional "forms of prejudice that can result from post indictment delay: (1) oppressive

23   pretrial incarceration, (2) anxiety and concern of the accused, and (3) the possibility that the [accused's]

24   defense will be impaired by dimming memories and loss of exculpatory evidence."  *Mendoza*, 530 F.3d

25   at 764.  While the first of the three factors is inapposite, the latter two are present here.  It goes without

26   saying that a person of Dr. Sheikh accomplishments, stature, and position within the community has

27   suffered and continues to suffer incredible anxiety and embarrassment as the government persists in its

28

---

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

1    irresponsible indictment.  In addition, the possibility of memories being dimmed and loss of exculpatory

2    evidence (especially in light of the government's already known reckless actions) is ever looming.

3            Finally, at the February 25, 2020 hearing, as to prejudice, the Court also underscored:

4                There's some prejudice already.  The prejudice has been not only to
                defense counsel, but to the Court.  I come out here this morning ready to
5                hear arguments ready to hear testimony, if necessary, and ready to decide
                at the end of those arguments and testimony the *Franks* motion.  Now, we
6                have to put it over, and I have to go through that again.  Mr. Almadani has
                to put additional time, which, I assume, he bills to his client on this case
7                now, because he wasn't able to go over these materials earlier in
                connection with the motion.  There's already some prejudice.

8    (Ex A. R/T 2/25/2020 at 21).

9            Additional substantial prejudice is noted in the subsequent section.  (*See infra.*, pp. 33-34).  Thus,

10   for the foregoing reasons, the indictment should additionally be dismissed on Speedy Trial grounds under

11   *Mendoza*.

12           **D.      Reckless Disregard for Government's Constitutional Obligations**

13           Under the standards set by the Ninth Circuit in *Chapman*, Dr. Sheikh respectfully requests that

14   this Court dismiss the indictment in exercise of the Court's inherent supervisory powers to remedy the

15   flagrant misbehavior by the government in recklessly disregarding Dr. Sheikh's constitutional *Brady*

16   rights; a dismissal would to preserve judicial integrity of these proceedings and deter future misbehavior.

17   *See Chapman*, 524 F.3d at 1085.  <u>Recklessness</u> on the part of the government suffices for dismissal.  *Id.*

18           *1.      Legal Standard*

19           In *Chapman*, the Ninth Circuit reiterated that a district court may exercise its supervisory power

20   "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve

21   judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury;

22   and to deter future illegal conduct." *Chapman*, 524 F.3d at 1085 (quoting *United States v. Simpson*, 927

23   F.2d 1088, 1090 (9th Cir. 1991).  "However, because dismissing an indictment with prejudice encroaches

24   on the prosecutor's charging authority, this sanction may be permitted only in cases of flagrant

25   prosecutorial misconduct."  *Chapman*, 524 F.3d at 1085 (9th Cir. 2008) (internal citations and quotation

26   marks omitted).

27           For a district court to find "flagrant misbehavior" on the part of the government, <u>the court need</u>

28

31

1  not find intentional misconduct; rather, a finding of "***reckless disregard for the prosecution's***

2  ***constitutional obligations***" is sufficient for dismissal.  *Chapman*, 524 F.3d at 1085 ("We have never

3  suggested, however, that 'flagrant misbehavior' does not embrace reckless disregard for the prosecution's

4  constitutional obligations.") (emphasis added).

5        A court may dismiss an indictment under its supervisory powers only when the defendant suffers

6  substantial prejudice and where no lesser remedial action is available.  *Chapman*, 524 F.3d at 1087.

7          **2.**    ***Analysis***

8        **Flagrant Misbehavior.**  For the Court to find "flagrant misbehavior," the Court must find that

9  the government either **reckless*ly*** *or* **intentionally** disregarded its constitutional obligations.  *Chapman*,

10  524 F.3d at 1085.  The *Brady* violations here are numerous and flagrant.  A key flagrancy is that at

11  multiple junctures (almost reaching double digits) the government falsely represented to the Court and to

12  the Defense that all *Brady* material had been produced.  Even after being explained the *Brady* obligation

13  repeatedly and being given multiple chances to become compliant, the government did not take heed.

14        The government had not made full *Brady* disclosures over a year into the indictment, yet it

15  represented multiple times that it had.  When the Court explained the *Brady* obligation to the government

16  and ordered all *Brady* material to be produced by August 30, 2019, the government did not take the order

17  sufficiently seriously.  It produced some *Brady* discovery on August 29, 2019, but intentionally omitted

18  the most significant impeachment material, which showed that Agent Webster had provided false

19  statements under penalty of perjury (this disclosure was made on March 11, 2020, only upon the

20  Defense's insistence after revealing cross-examination strategy).  The government also purposely

21  redacted phone numbers showing that the alleged victims were clearly lying (this was disclosure made

22  on March 13, 2020, again, only upon the Defense's insistence after revealing cross-examination strategy).

23  The government had reviewed agent notes containing significant exculpatory material yet chose to

24  withhold those notes; the prosecutors tried to have the *Franks* hearing cancelled so that the notes would

25  not need to be disclosed; and they disclosed the notes essentially on the eve of the hearing only when it

26  became clear that the subject of the notes may come up at the hearing.  The government also chose to

27  withhold information about the agents' knowledge of cheap eateries nearby that would impeach the

28

*Defendant's Motion to Dismiss Indictment*        *Case No. 2:18-CR-119-WBS-1*

agents' claim that the alleged victims had nowhere to eat.  The list is large and there are issues that remain outstanding, but one thing is clear: the government was at least reckless in disregarding its constitutional obligations.

**Substantial Prejudice.**  The prejudice here is substantial and list is long.

(i)      The Defense has been forced to reveal a significant portion of its impeachment strategy to the government in order to receive *Brady* material that should have been provided in the first place; having unfairly secured the Defense's strategic positions, the government can now use the information to make its own strategic choices about witness selection, preparation, and direct examination, which inevitably results an uncurable violation of Defendant's due process and cross-examination rights;

(ii)      Without a timely *Brady* disclosure, Dr. Sheikh has not been able bring pre-trial motions with full information, which in turn has hampered her ability to take the case to trial as speedily as the Sixth Amendment guarantees;

(iii)      Dr. Sheikh was deprived of a significant confrontation opportunity when the government called HSI Special Agent Carol Webster ("Webster") (now retired) to the stand as *the* key and sole prosecution witness in September and December 2019 without disclosing her I-914B certifications in this case; these certifications show (by all objective standards) that Webster knowingly made false statements under penalty of perjury and affirmatively helped Prakash and Alfredo commit immigration fraud;

(iv)      Dr. Sheikh has had to borrow and spend over $30,000 of dollars in legal fees and costs, in bringing motions and making specific repeated requests to have the government comply with its constitutional *duty* to disclose *Brady* material (Almadani Decl. at ¶ 7);

(iv)      If the case is not dismissed, Dr. Sheikh will incur tens of thousands of dollars more in additional legal fees and costs to re-brief issues that were unable to be fully briefed previously because the government had not timely made its *Brady* disclosures consistent with the Court's July 2019 order (Almadani Decl. ¶ 8);

(v)      Because of the unreasonable delays, Dr. Sheikh must now live with the fear of dying due to the COVID-19 pandemic without having a full opportunity to exonerate herself in this ill-charged case;

(vi)      Judicial integrity has been undermined by a lack of government diligence in complying

*Defendant's Motion to Dismiss Indictment*                              *Case No. 2:18-CR-119-WBS-1*

with the Court's Order on July 29, 2019.

(vii)    Scarce judicial recourses have been wasted because a number of hearings have needed to be continued; and

(viii)    Additional resources will be wasted because issues such as *Franks* and grand jury disclosure will need to be re-briefed with the more complete information the Defense now has.

**No Lesser Remedial Action is Sufficient.**  Given the significant prejudice, nothing short of dismissal will suffice.  The government has unfairly withheld *Brady* material to secure a near complete view of the Defense's cross-examination strategy on a myriad of fronts, which it can now use to select, prepare, and examine its witnesses.  This unfair advantage to the government offends Defendant's due process and confrontation rights.

Dr. Sheikh was deprived of a significant confrontation and cross-examination opportunity of Agent Carol Webster in September and December 2019; now that the government has seen the Defense's hand, the prejudice cannot be reversed even at trial.

The government's reckless disregard for its constitutional obligations has and is continuing to cost Dr. Sheikh tens of thousands of dollars; every defendant must fund her defense, but it is not fair for the government to bankrupt a defendant by refusing to comply with its own constitutional obligations.

There are outstanding *Brady* issues and the prosecutors have proven themselves unreliable to address them.  Substituting in new prosecutors is unfair to Dr. Sheikh and would only exacerbate the Sixth Amendment speedy trial violation caused by the government's conduct.

The government's significant disregard of Court's disclosure order has already undermined judicial integrity.  The Court warned the government that the **severest of sanctions** authorized by law would be levied if it were discovered that the government had still not produced all *Brady* material after February 25, 2020.  Significant violations have come to light since then.  Therefore, the only way to restore the judicial integrity and prevent such conduct in the future is to follow through.

### E.    Outrageous Government Conduct

"The court may exercise its inherent, supervisory powers to dismiss an indictment because of outrageous government conduct."  *Restrepo*, 930 F.2d at 712.  "The defense applies only to conduct

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*

which is so grossly shocking and so outrageous as to violate the universal sense of justice." *Id*. The grossly false certifications provided by the Agent Webster under penalty of perjury and overlooked by Agent Reese show that agents have been helping the alleged victims commit immigration fraud to build an unsupported case against Dr. Sheikh. (Compare Ex. LLL and MMM to Wright Decl.). Moreover, the fact that the prosecutors have received positive press coverage in this case and then intentionally tried to conceal the false certifications adds considerably to the shock of what has occurred here. (See Ex. JJJ). Examined from an objective standard, the agents' conduct in ignoring a large amount of exculpatory evidence and helping the alleged victims commit immigration fraud on the USCIS does violate a universal sense of justice. The action should additionally be dismissed for outrageous government conduct.

Indeed, at least one former supervisory agent with the Department of Homeland Security Investigations ("HSI"), David Wright, looking at this case with fresh eyes has opined that under the HSI's investigatory standards in 2013, this case should have been closed based on what the agents saw and learned at the "welfare check" and interviews they had conducted by July 2, 2013. (*See* Wright Decl.).

### F.    Other Mitigating Factors

When it comes to human trafficking, forced labor, and indentured servitude, Dr. Sheikh is not the usual suspect. She is a highly decorated physician. (Ex. QQQ). She is well-respected by colleagues and community leaders. (Ex. RRR). And she is beloved by her patients. (Ex. SSS). Given the significant weaknesses of the case and the more significant constitutional violations that have occurred, justice will be served only by a dismissal on any and all grounds the Court deems appropriate.

## V.    CONCLUSION

For the foregoing reasons, Dr. Sheikh respectfully requests that the Court dismiss the indictment with prejudice.

Dated: March 23, 2020

Respectfully submitted,
ALMADANI LAW


*/s/ Yasin M. Almadani*
Yasin M. Almadani, Esq.
*Attorney for Defendant*

*Defendant's Motion to Dismiss Indictment*                    *Case No. 2:18-CR-119-WBS-1*