McGREGOR SCOTT
United States Attorney
ERIC S. DREIBAND
Assistant Attorney General for Civil Rights
AUDREY B. HEMESATH
Assistant United States Attorney
WILLIAM E. NOLAN
DAVID REESE
Trial Attorneys, Civil Rights Division
United States Attorney's Office
Robert T. Matsui United States Courthouse
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:18-CR-00119 WBS |
|---|---|
| Plaintiffs, | **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT** |
| v. | |
| FIRDOS SHEIKH, | |
| Defendant. | |

## TABLE OF CONTENTS

I.   **BACKGROUND** .................................................................................................1

II.  **STATEMENT OF FACTS RELEVANT TO GOVERNMENT'S DISCOVERY**..................2

III. **DISCUSSION** ..................................................................................................4

    A.    The Government's Disclosure of the Agent's Notes of the Alfredo Interview
    After the Court's Deadline for Brady Disclosures Was Not a Violation of the
    Defendant's Constitutional Due Process Rights Under Brady v. Maryland......................4

    B.    The Remainder of the Defendant's Disclosure Complaints Involve Material
    That Was Disclosed Previously or Is Not Brady Material..................................7

        1.    Alleged Brady Material Contained in Rough Notes Produced by the
        Government Prior to the February 25, 2020, Hearing ...............................7

            a.    Alfredo's brother in Texas.........................................................7

            b.    The defendant "never raised a hand on anyone" .........................8

            c.    The defendant's age.................................................................9

            d.    Gildardo's statements.............................................................9

             e.    Gildardo's hours....................................................................10

            f.    Prakash's prior homelessness..................................................11

            g.    Prakash's friend in Fruitridge ..................................................11

        2.    Other Alleged Brady Material ...............................................................13

            a.    "Cheap eateries" within a mile of the defendant's ranch..........13

            b.    I-914 T-Visa Certifications......................................................14

            c.    Special Agent Webster's testimony in a separate criminal trial ...............14

            d.    Phone numbers......................................................................15

            e.    Government's description of a T-Visa.......................................16

            f.    Relationship between HSI and Opening Doors .........................16

            g.    The Agent's knowledge at the time of the search warrant
            affidavit................................................................................17

    C.    Neither This Court's Continuance of the Franks Hearing, Nor Any Other
    Delay In This Case, Violated the Defendant's Constitutional Speedy Trial
    Right....................................................................................................18

        1.    The Length of the Delay ........................................................................19

2.      The Reason for the Delay ...................................................................19

3.      The Defendant's Assertion of the Right .............................................21

4.      Prejudice ............................................................................................21

D.      The Defendant's Arguments Do Not Support Dismissal of the Indictment ....................23

IV.     **CONCLUSION** .........................................................................................24

**TABLE OF AUTHORITIES**

**CASES**

Barker v. Wingo, 407 U.S. 514 (1972)..................................................................18, 19, 20, 21

Berger v. United States, 295 U.S. 78 (1935) ....................................................................24

Brady v. Maryland, 373 U.S. 83 (1963) ....................................................................4, 5, 8

Doggett v. United States, 505 U.S. 647 (1992) ..........................................................18, 19, 22

Franks v. Delaware, 438 U.S. 154 (1978)..........................................................................3

Gonzalez v. Wong, 667 F.3d 965 (9th Cir. 2011)..................................................................7

Kyles v. Whitley, 514 U.S. 419 (1995)..................................................................5, 7, 17

Mays v. City of Dayton, 134 F.3d 809 (6th Cir. 1998)..........................................................17

Milke v. Ryan, 711 F.3d 998 (9th Cir. 2013) ..................................................................8, 12

Strickler v. Greene, 527 U.S. 263 (1999) ..................................................................5, 6

United States v. Aguirre, 994 F.2d 1454 (9th Cir. 1993)..................................................19, 21, 22

United States v. Agurs, 427 U.S. 97 (1976)..................................................................5

United States v. Aichele, 941 F.2d. 761 (9th Cir. 1991)..................................................9, 13

United States v. Alzanki, 54 F.3d 994 (1st Cir. 1995)..................................................13

United States v. Bagley, 473 U.S. 667 (1985) ..................................................... passim

United States v. Baker, 63 F.3d 1478 (9th Cir. 1995)..................................................20

United States v. Barton, 995 F.2d 931 (9th Cir. 1993) ..................................................5

United States v. Beamon, 992 F.2d 1009 (9th Cir. 1993)..................................................19, 22

United States v. Bibbs, 564 F.2d 1165 (5th Cir. 1977)..................................................13

United States v. Bradley, 390 F.3d 145 (1st Cir. 2004) ..................................................8, 12

United States v. Calimlim, 538 F.3d 706 (7th Cir. 2008) ..................................................9

United States v. Chapman, 524 F.3d 1073 (9th Cir. 2008)..................................................23

United States v. Colkley, 899 F.2d 297 (4th Cir. 1990) ..................................................18

United States v. Corona-Verbera, 509 F.3d 1105 (9th Cir. 2007)..................................................19, 21

United States v. Davenport, 753 F.2d 1460 (9th Cir. 1985) ..................................................6

United States v. Djoumessi, 538 F.3d 547 (6th Cir. 2008 ..................................................12

United States v. Drake, 543 F.3d 1080 (9th Cir. 2008) ..............................................20, 21, 22

United States v. Gamez-Orduno, 235 F.3d 453 (9th Cir. 2000) .........................................6

United States v. Gordon, 844 F.2d 1397 (9th Cir. 1988)...................................................6

United States v. Gregory, 322 F.3d 1157 (9th Cir. 2003)............................................19, 22

United States v. Griffin, 659 F.2d 932 (9th Cir. 1981).....................................................10

United States v. Kennedy, 890 F.2d 1056 (9th Cir. 1989)................................................15

United States v. King, 483 F.3d 969 (9th Cir. 2007)........................................................21

United States v. Loud Hawk, 474 U.S. 302 (1986) ....................................................19, 22

United States v. Mendoza, 530 F.3d 758 (9th Cir. 2008) ............................................19, 21

United States v. Michaels, 796 F.2d 1112 (9th Cir. 1986) ...........................................8, 17

United States v. Nance, 666 F.2d 353 (9th Cir. 1982)......................................................20

United States v. Price, 566 F.3d 900 (9th Cir. 2009).......................................................15

United States v. Sears, Roebuck and Co., Inc., 877 F.2d 734
    (9th Cir. 1989).......................................................................................19, 21, 22

United States v. Shetty, 130 F.3d 1324 (9th Cir. 1997)....................................................21

United States v. Si, 343 F.3d 1116 (9th Cir. 2003).........................................................5, 6

United States v. Simmons, 536 F.2d 827 (9th Cir. 1976).........................................19, 21, 22

United States v. Span, 970 F.2d 573 (9th Cir. 1992)..........................................................6

United States v. Tanh Huu Lam, 251 F.3d 852 (9th Cir. 2001)............................19, 21, 22

United States v. Warren, 772 F.2d 827 (11th Cir. 1985)...................................................13

United States v. Zuno-Arce, 44 F.3d 1420 (9th Cir. 1995) ...............................................5

**CONSTITUTION AND STATUTES**

18 U.S.C. § 1001 .............................................................................................................1

18 U.S.C. § 1590(a) .........................................................................................................1

18 U.S.C. § 1590(b) .........................................................................................................1

18 U.S.C. § 1589 ..........................................................................................................1, 8

28 U.S.C. § 2255 ............................................................................................................14

8 U.S.C. § 1324(a) ...........................................................................................................1

U.S. Const. amend VI ....................................................................................................................18

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 106-939 ..........................................................................................................8

**RULES**

Fed. R. Evid. 608(b)......................................................................................................................15

The United States opposes defendant's motion to dismiss (CR 95), as the defendant has failed to demonstrate either a violation of constitutional due process or speedy trial rights, or to provide any basis for this Court to find that the government's discovery process warrants dismissal of the indictment.

## I.     BACKGROUND

On June 21, 2018, a grand jury in the Eastern District of California indicted the defendant on two counts of forced labor, in violation of 18 U.S.C. § 1590(a); two counts of alien harboring for financial gain, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) & (a)(1)(B)(i); obstruction of a forced labor investigation, in violation of 18 U.S.C. § 1590(b); and false statements, in violation of 18 U.S.C. § 1001. (CR 1).  In addition, the indictment contains a forfeiture allegation regarding nine real properties the defendant used to facilitate the charged crimes.  Id.

The charges arise from the defendant's scheme, plan, or pattern to harbor and compel the labor of two aliens from 2008 to 2013.  The two alien victims are identified in the Indictment by their initials as E.L. (who has been referred to by his first name, "Elfredo," or his nickname, "Alfredo," at various times during the prior filings and hearings before this Court), and P.K. (who has also been referred to by his first name, "Prakash," in prior filings and hearings).  At trial, the evidence will establish that the defendant illegally coerced the victims to maintain and improve her 21-acre ranch in Elk Grove, California, including the grounds of the ranch and a residence located on the property.  The defendant also had the victims care for animals kept on the ranch, as well as maintain and improve a number of properties she owned in the Sacramento area.  In addition, the defendant compelled one of the victims to perform housekeeping services, such as cooking and cleaning.

The defendant obtained the victims' labor and services through a combination of legally prohibited means to include the abuse or threatened abuse of the law or legal process, see 18 U.S.C. §§ 1589(a)(3) and (c)(1), and threats of financial harm, see 18 U.S.C. §§ 1589(a)(4) and (c)(2). Specifically, the evidence will show that the defendant engaged in a scheme, plan, or pattern whereby she enticed the victims to live on her property and work for her by promising to provide wages of approximately $400 per week, plus room and board, for approximately 40 hours of work per week and a minimum of one day off per week.  Soon after the victims came to work for her, the defendant refused to honor her original agreement, failed to pay the victims or at times paid them only $100 per week or less,

failed to provide food as she had promised, required the victims to work long hours seven days per week, and provided substandard living conditions that did not include reliable electricity or running water. When the victims complained about the back wages or room and board conditions, the defendant threatened the alien victims with arrest and deportation, while at the same time falsely promising to remedy their owed wages and living conditions in the future. By doing so, the defendant intended the victims to fear the legal harm associated with arrest and deportation, as well as the financial harm they would suffer by "walking away" from their earned back wages, and thus the victims continued to work for the defendant to avoid those harms. Further, when approached by Homeland Security Investigations ("HSI") Special Agents during a welfare check on July 1, 2013, the defendant made intentional and materially false statements and instructed one of the victims, P.K. ("Prakash"), to hide from the investigating agents.

## II.    STATEMENT OF FACTS RELEVANT TO GOVERNMENT'S DISCOVERY

Prior to indictment in this case, the government met with the defendant's counsel (attorney Clyde Blackmon) in November 2017. At that time, the government provided the defendant with approximately 40 investigative reports of investigation (ROIs), as well as a copy of the defendant's criminal history. See Bates USA000001-215. These ROIs consisted of, among other things, reports of initial and subsequent interviews of the victims, as well as reports of interviews of witnesses who corroborated the victims' accounts. In March and April 2018, the government provided additional pre-indictment discovery to the defendant. See Bates USA000216-277. This discovery included transcripts of monitored phone calls between the defendant and Prakash made on July 1, 2020, as well as additional ROIs. Id.

The grand jury indicted the defendant on June 21, 2018. (CR 1). Just prior to indictment, the defendant retained new counsel (attorney Tom Johnson). After the indictment issued, the government confirmed with new counsel that the prior counsel transferred discovery materials, and on July 17, 2018, the government produced to the defendant approximately 11,000 pages of additional discovery. See Bates USA000001-3019; 3029-10086; 10095-10208; 10220-10297; 10312-10689; and 10727-11114.

The defendant filed three unopposed motions to continue on July 30, 2018, (CR 14), January 15, 2019, (CR 18), and on April 18, 2019, (CR 31), and three pre-trial motions on April 8, 2019, (CR 28-

30).  On July 18, 2019, the defendant substituted new counsel.  (CR 58).  On July 29, 2019, this Court reset the evidentiary hearing for the defendant's motions to September 30, 2019.  (CR 63).  This Court also ordered the government to provide the defendant with all Brady materials by the end of August 2019.  Id.

Thereafter, the government conducted a Brady review as directed by this Court.  In addition, the government answered several specific discovery inquires by the defendant.  See CR 95, Ex. BBB-2.  The government produced additional materials to the defendant in August 2019.

On September 23, 2019, in anticipation of the September 30, 2019 suppression hearing, the government disclosed to the defendant as Jencks material Special Agent Webster's rough notes for the ROI pertaining to the events that were the subject of the hearing.  See Bates USA0011509-11514.  On September 30 and December 17-18, 2019, this Court held an evidentiary hearing in this matter pursuant to the defendant's motions to suppress evidence and statements arising from the July 1, 2013, welfare check at the defendant's residence.  (Dkts. 69, 77, 79).  This Court denied the defendant's motions.  (CR 79).

During the evidentiary hearing on December 18, 2019, the defendant alleged that the affidavit submitted in support of the search warrant executed on July 9, 2013, misrepresented material facts and omitted material information.  This Court directed the defendant and the government to submit briefs with respect to the defendant's Franks motion to suppress evidence, pursuant to Franks v. Delaware, 438 U.S. 154 (1978), and set an evidentiary hearing in this matter for February 25, 2020.  Id.

On February 19, 2020, six days prior to the Franks hearing, the government disclosed the agent rough notes of the ROIs that corresponded to the witness interviews noted in the search warrant affidavit.  See Bates USA0011516-11558.  The government took the additional step of specifically drawing the defendant's attention to a line in the notes as potential Brady information—namely, a conversation between Alfredo and the defendant—that was not included in the corresponding ROI.  The government discovered that this line in the rough note had not been included in the ROI when it re-reviewed the agents' notes pertaining to the search warrant affidavit as part of its continuing discovery obligations under Brady and the Jencks Act.  See CR 90, pp. 2-3.  Specifically, the line in the agent's notes read: "told Firdos I'm leaving a week ago / She said it was ok." (herein "the agent's notes of the

Alfredo interview"). This information concerning the conversation between Alfredo and the defendant is the only information the government believed to be potential <u>Brady</u> information not previously disclosed. The government notified the defendant the next day after noticing this information.

On February 24, 2020, the defendant filed a motion for additional discovery from the government. (CR 87). On February 25, 2020, this Court continued the <u>Franks</u> hearing, and ordered further briefing with respect to the defendant's discovery motion, <u>Brady</u>, and <u>Franks</u>, with the defendant's discovery motion to be addressed first. (CR 88). The government responded to the defendant's discovery motion (CR 90), and made additional disclosures consistent with its response. The government thereafter responded to additional discovery inquiries by the defendant via e-mail. On March 16, 2020, this Court ordered that the defendant's discovery motion was moot, and directed briefing with respect to the defendant's <u>Brady</u> motion. (CR 94).

## III. <u>DISCUSSION</u>

### A. The Government's Disclosure of the Agent's Notes of the Alfredo Interview After the Court's Deadline for Brady Disclosures Was Not a Violation of the Defendant's Constitutional Due Process Rights Under Brady v. Maryland.

There was no <u>Brady</u> violation in the United States' prompt disclosure of interview notes six days prior to the <u>Franks</u> hearing, where the government highlighted rather than suppressed the favorable content of the notes and where the defendant still had ample opportunity to make use of the notes at the hearing.[1] <u>Brady v. Maryland,</u> 373 U.S. 83 (1963).

The United States does not dispute that the agent's notes of the Alfredo interview[2] may constitute <u>Brady</u> material, but the disclosure of the notes after the Court's <u>Brady</u> deadline was not a

_____

[1] The defendant claims incorrectly that "the government admitted that it was a <u>Brady</u> violation." (CR 95 at 15). The transcript of the hearing, however, is clear that the government's position was that the material in question constituted <u>Brady</u> material, but its disclosure six days prior to the <u>Franks</u> hearing did not constitute a <u>Brady</u> violation. Again, while the government regrets its error in disclosing the material after the Court's deadline for <u>Brady</u> disclosures, the disclosure after the Court's deadline did not amount to a violation of the defendant's constitutional due process rights under <u>Brady</u>.

[2] The substance of this information was disclosed in part in November 2017, when the government disclosed that Gildardo reported that, around the time that Gildardo left the ranch in June 2013, Alfredo told the defendant "that he was leaving at the end of the month and that he wanted his money." <u>See</u> Bates USA000164-171 (ROI 32) (January 14, 2016 interview of Gildardo). This ROI reflected Gildardo's knowledge of Alfredo's conversation with the defendant, as opposed to Alfredo's own recollection of the conversation, which did not include the defendant's statements.

violation of the defendant's constitutional due process rights when because they were disclosed in a time and manner that made the notes still useful to the defendant.

Under <u>Brady</u>, the government must disclose evidence that is "material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. <u>Brady</u> requires disclosure at trial only of evidence that is both exculpatory and material to the defense. <u>Id.</u>; <u>United States v. Agurs</u>, 427 U.S. 97, 109-110 (1976). Evidence is material under <u>Brady</u> if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985); <u>see also</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34 (1995). The discovery obligations under <u>Brady</u> are applicable to pre-trial <u>Franks</u> proceedings. <u>United States v. Barton</u>, 995 F.2d 931, 935 (9th Cir. 1993) ("<u>Brady</u> and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant.").

In <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999), the Supreme Court explained that "the term '<u>Brady</u> violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence – that is, to any suppression of so-called '<u>Brady</u> material' – although, strictly speaking, there is never a real '<u>Brady</u> violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." <u>Id</u>. The Court held there are three components necessary for a <u>Brady</u> violation: "The evidence at issue must be [1] favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and [3] prejudice must have ensued." <u>Id</u>. It is the defendant's burden of showing a <u>Brady</u> violation. <u>United States v. Si</u>, 343 F.3d 1116, 1122 (9th Cir. 2003) (citing <u>United States v. Zuno-Arce</u>, 44 F.3d 1420, 1425 (9th Cir. 1995)). Defendant Sheikh cannot meet her burden because the second and third prongs of the <u>Strickler</u> test are not present in this case.

As to the second prong, suppression, the government did not suppress the agent's notes of the Alfredo interview. To the contrary, the government discovered the potential <u>Brady</u> information within the notes a week before the <u>Franks</u> hearing, and disclosed the notes to the defendant the next day. The government took the additional step of specifically pointing out the potential <u>Brady</u> information within

the agent's notes of the Alfredo interview that was not included in the corresponding ROI.  In cases such as this – when the disclosure is delayed but not suppressed, there is "no due process violation," so long as the disclosure is "'made at a time when disclosure would be of value to the accused.'"  United States v. Gordon, 844 F.2d 1397, 1403 (9th Cir. 1988) (quoting United States v. Davenport, 753 F.2d 1460, 1462 (9th Cir. 1985)).  The government's disclosure of the agent's notes of the Alfredo interview six days ahead of the Franks hearing does not amount to suppression.  The disclosure was made at a time when the agent's notes would be of value to the defendant.  Moreover, the government did not oppose the defendant's request to postpone the Franks hearing to have more time to fully incorporate the value of the material into her Franks motion.  The Court did, in fact, postpone the Franks hearing, and the defendant, therefore, now has ample time to make use of the agent's notes of the Alfredo interview at a Franks hearing and at trial.[3]  In United States v. Gamez-Orduno, 235 F.3d 453, 461-62 (9th Cir. 2000), the government disclosed Brady material during a pre-trial suppression hearing, and the district court continued the hearing for two months.  The Ninth Circuit affirmed, finding that the continuance afforded the defendant "ample time to prepare anew for the suppression hearing," and the "disclosure ultimately 'occurred at a time when it [was] of value to the accused.'"  Id. at 462 (quoting United States v. Span, 970 F.2d 573, 583 (9th Cir. 1992)).  The Court ruled that because district court continued the suppression hearing, "the government's actions could not have affected the outcome of the hearing," and the defendant's "due process rights were adequately protected."  Id. at 462.  Here, this Court's postponement achieved the same result.

Next, the defendant cannot establish the third element of prejudice.  Prejudice is established "only if the withheld evidence is material to the defendant's guilt or punishment, such that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Si, 343 F.3d at 1122 (quoting Strickler, 527 U.S. at 281-82, in turn quoting Bagley, 473 U.S. at 682).  Said another way, "[s]uppressed evidence is material if 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine

---

[3] The defendant's motion to suppress argues that the postponement of the Franks hearing violated her Sixth Amendment speedy trial right.  (CR 95 at 32).  The defendant's speedy trial right argument requires a different and separate analysis from that of whether there has been a Brady violation.  The government addresses the defendant's speedy trial right argument in Section III(C), infra.

confidence in the verdict.'" <u>Gonzalez v. Wong</u>, 667 F.3d 965, 982 (9th Cir. 2011) (quoting <u>Kyles</u>, 514 U.S. at 435). It is not possible for a Court to determine the prejudice in a <u>Brady</u> violation context while the case is in a pre-trial – or in this case a pre-hearing – phase, as prejudice can only be determined after the Court has ruled adversely to the defendant. Here, the Court has yet to rule on the defendant's <u>Franks</u> motion, and no verdict has been returned on the defendant's guilt to the charges in the Indictment. The defendant cannot, therefore, claim that the disclosure of the agent's notes undermines confidence in a ruling or verdict that a judge and jury has yet to deliver.

The government fulfilled its obligation of continuing to review materials in the United States possession and promptly disclosed and drew attention to the agent's notes of the Alfredo interview in time for the defendant to make use of those notes. This disclosure, though after the August deadline, did not violate the defendant's constitutional due process rights under <u>Brady</u>.

**B.     The Remainder of the Defendant's Disclosure Complaints Involve Material That Was Disclosed Previously or Is Not <u>Brady</u> Material.**

The remaining material identified by the defendant do not constitute <u>Brady</u> violations because the material: has been previously disclosed by the government prior to the Court's August 30th <u>Brady</u> disclosure deadline; is not <u>Brady</u> material; or (like the agent's notes of the Alfredo interview discussed above) has not been otherwise suppressed so as to deprive the defendant an opportunity to use the information at a time it has value.

**1.     Alleged <u>Brady</u> Material Contained in Rough Notes Produced by the Government Prior to the February 25, 2020, Hearing**

**a.     Alfredo's brother in Texas**

Defendant complains that the government disclosed for the first time on February 19, 2020, that Alfredo told agents on July 2, 2013, that he had a brother in Texas. (CR 95 at 15). This information, however, was previously disclosed to the defendant, and is not <u>Brady</u> material. The fact that Alfredo had a brother in Texas, and reportedly had a phone number for him, was disclosed to the defendant in November 2017. <u>See</u> Bates USA000205-207, p. 3 (ROI 46) (interview of witness F.E.).

Moreover, the defendant's motion to dismiss fails to mention that immediately following the information about Alfredo's brother in the agent's rough notes, the notes read: "Last time spoke to -- 2

years ago / She first said she would pay for cellphone & then said she didn't & didn't pay the bill & it got cut off." CR 95, Ex. DDD, Bates USA0011535. Taken in context, Alfredo's statement to agents that he had a brother living over a thousand miles away is neither exculpatory nor material. Rather, is consistent with Alfredo's statements that he had lost his phone contacts and did not have the means for contacting anyone outside the property. See, e.g., Bates USA000088-94 (ROI 15) (interview with Gildardo, disclosed in November 2017) (Alfredo told Gildardo "that he had lost contact with all friends and family during his time on [the defendant's] property.").

"Under Brady, the government is obliged to produce exculpatory evidence which is 'material to guilt or to punishment.'" United States v. Michaels, 796 F.2d 1112, 1115 (9th Cir. 1986) (quoting Brady, 373 U.S. at 87). Exculpatory evidence is evidence favorable to the accused "that would tend to call the government's case into doubt." Milke v. Ryan, 711 F.3d 998, 1012 (9th Cir. 2013). "Evidence is material if there is a reasonable probability that its disclosure would have affected the outcome of the proceedings." Bagley, 473 U.S. at 674 (1985). That Alfredo had a brother in Texas he had not spoken to in two years would not tend to call the government's case into doubt.

Even if this information is both favorable to the accused and material under Brady – like the agent's notes of the Alfredo interview discussed supra – the material is presently available to the defendant at a time when it is of value, i.e., prior to the Franks hearing and trial.

### b. The defendant "never raised a hand on anyone"

Defendant complains that the government disclosed for the first time on February 19, 2020, that Alfredo told agents that the defendant "never raised her hand on anyone." (CR 95 at 15). Given that the government has never alleged that the defendant used force or physical restraint as the prohibited means to compel the labor of her victims, this information is not exculpatory or material. The federal forced labor statute, 18 U.S.C. § 1589, prohibits multiple means to compel a person's labor and encompasses "a broad array of harms…both physical and nonphysical," including "not only physical violence, but also more subtle psychological methods of coercion" and threats of inflicting dire consequences "by means other than overt violence." United States v. Bradley, 390 F.3d 145, 150 (1st Cir. 2004) (quoting H.R. Conf. Rep. No. 106-939 at *100-01 (2000) and upholding forced labor conviction

under Section 1589), vacated on <u>Booker</u> grounds, 543 U.S. 220 (2005); <u>see also</u> <u>United States v.</u>

<u>Calimlim</u>, 538 F.3d 706, 712 (7th Cir. 2008) (emphasizing that Section 1589 covers nonviolent

coercion).  The evidence that the defendant did not engage in conduct she is not charged with

committing is not exculpatory or material.

Even if this information is both favorable to the accused and material under <u>Brady</u>, the material

is presently available to the defendant at a time when it is of value, <u>i.e.</u>, prior to the <u>Franks</u> hearing and

trial.  Additionally, a similar statement from Prakash was previously disclosed to the defendant in

November 2017.  <u>See</u> Bates USA000156-163 (ROI 31) (interview of Prakash), p. 6 ("Sheikh never

physically hit him, but she did get angry.").

### c.    The defendant's age

Defendant complains that the government disclosed for the first time on February 19, 2020, that

on June 26, 2013, witness Gildardo informed agents that the defendant was a woman "over the age of 50

who lived alone, while Prakash and Alfredo . . . were 40-year-old men."  (CR 95 at 16).  The defendant

is aware of her age and the approximate age of the victims.  <u>Brady</u> does not require such a disclosure.

<u>See</u> <u>United States v. Aichele</u>, 941 F.2d. 761, 764 (9th Cir. 1991) ("When, as here, a defendant has

enough information to be able to ascertain the supposed <u>Brady</u> material on his own, there is no

suppression by the government.").  The defendant implies that her age is relevant to show that she could

not physically overpower the victims, but given that the government has never alleged that the defendant

used force to compel the labor of her victims, this information is not exculpatory or material.

Additionally, as the defendant is aware, by July 2, 2013, agents had met in person with the defendant

and the two victims.  It may reasonably be inferred that the agents were aware of both the defendant's

and victim's ages at the time the agent drafted the affidavit for the search warrant.

### d.    Gildardo's statements

Defendant complains that the government disclosed for the first time on February 19, 2020, that

on June 26, 2013, Gildardo informed agents that the defendant was not present six days out of the week

from 9:00 a.m. to 3:00 a.m. (CR 95 at 16).  However, this information was produced to the defendant in

discovery provided prior to her indictment.  The ROI memorializing Gildardo's June 26, 2013 interview,

which the government produced to the defendant in November 2017 (and which the government produced again in subsequent rounds of discovery), specifically notes that Gildardo "stated that SHEIKH was usually home on Mondays and would usually leave between 9:00 and 11:00 a.m. on the other days of the week and would come home late every night, usually after midnight."). <u>See</u> Bates USA000048-52 (ROI 8) (interview of Gildardo), p. 4.  Another ROI produced to the defendant in November 2017 further makes clear the agents' knowledge of the defendants' late hours. <u>See</u> Bates USA000022-29 (ROI 4) (interview of Alfredo), p. 5 ("She usually arrived [home from work] very late, between 11:00 p.m. and 1:00 a.m.").

Finally, this information is not exculpatory or material, as the government has never alleged that the coercive means employed by the defendant required that the defendant be present on the property by the early evening of each day.  Even if this information is both favorable to the accused and material under <u>Brady</u>, the material is presently available to the defendant at a time when it is of value, <u>i.e.</u>, prior to the <u>Franks</u> hearing and trial.

### e.    Gildardo's hours

Defendant complains that the government disclosed for the first time on February 19, 2020, that on June 26, 2013, Gildardo informed agents that Prakash and Alfredo worked for the defendant from 7:30 a.m. to 3:30 p.m.  (CR 95 at 16).  The defendant is misreading the agent notes.  The agent notes state: "7 - 330," and when compared to the ROI memorializing Gildardo's June 26, 2013 interview, the notes are referring to Gildardo's work schedule, and not the hours worked by Prakash or Alfredo. <u>Compare</u> CR 95, Ex. EEE, Bates USA0011540 <u>with</u> Bates USA000048-52 (ROI 8) (interview of Gildardo), p. 4 ("The RP explained his work schedule was generally Monday through Friday 7:00 a.m. to 3:30 p.m.").  This is an example of the limited evidentiary value of rough notes, as they are often "not complete, are truncated in nature, or have become an unsiftable mix of witness testimony, investigator's selections, interpretations, and interpolations." <u>United States v. Griffin</u>, 659 F.2d 932, 937 (9th Cir. 1981).  Additionally, Gildardo elsewhere stated that Alfredo worked 12 hours a day, seven days a week. <u>See</u> Bates USA000164-171 (ROI 32) (January 14, 2016, interview of Gildardo, disclosed November 2017), p. 5.  Other witnesses have corroborated the victims' long hours. <u>See</u>, <u>e.g.</u>, Bates USA000183-

188) (ROI 37) (interview of witness B.S., disclosed November 2017), p. 37 (Alfredo worked "7 days a week from 7:00 a.m. to 11:00 p.m."); Bates USA000095-100 (ROI 16) (interview of witness N.R., disclosed November 2017) (Alfredo "was a hard worker who worked from sunrise to sunset usually from 7:00 a.m. to 8:00 p.m." and Prakash "worked extremely long hours going to as late as 9:00 p.m.").

### f.      Prakash's prior homelessness

In Section III(A)(7) of the defendant's motion to dismiss, the defendant complains that the government disclosed for the first time on February 19, 2020, that during his July 1, 2013 interview, Prakash told agents that, in the years before he came to the defendant's property, he had been homeless, and then had worked for a man named James Brewer, where he was allowed to sleep in a camper and was paid $200 per month  (CR 95 at 17).  This information, however, was previously disclosed to the defendant, and is not Brady material.  The ROI of Prakash's July 1, 2013, interview, which was disclosed to the defendant in November 2017, states that Prakash had been homeless, and had worked for James Brewer before coming to work for the defendant.  See Bates USA000060-65 (ROI 10) (interview of Prakash), p. 4.  A subsequent ROI memorializing the January 6, 2016, interview of James Brewer (which also was produced to the defendant in November 2017), states that Brewer met Prakash at a homeless shelter, that Prakash lived in Brewer's camper for a while, and that Brewer paid Prakash $45 for a day's work.  See Bates USA000137-141 (ROI 28) (interview of James Brewer), p. 3.  Another ROI produced to the defendant in November 2017 states that, at the time he was referred to the defendant, Prakash was working two days a week for Brewer.  See Bates USA000142-148 (ROI 29) (interview of Prakash), p. 3.  Additionally, other materials produced to the defendant in July 2018 describe Prakash's homelessness and his work for Brewer.  See Bates USA009839-9996 (Prakash's handwritten journal), pp. 2-3; Bates USA009738-9764 (Prakash's T-visa declaration), para. 1.

Finally, Prakash's prior homelessness and part-time employment is not exculpatory.  Even if it were, the material is presently available to the defendant at a time when it is of value (i.e. prior to the Franks hearing and trial).

### g.      Prakash's friend in Fruitridge

Defendant complains that the government disclosed for the first time on February 19, 2020, that

during his July 1, 2013, interview, Prakash told agents that he had a friend living nearby in Fruitridge. (CR 95 at 17). The information was previously disclosed to the defendant in July 2018, and was already within the defendant's knowledge, because the defendant picked Prakash up from the friend's apartment. See CR 95, Ex. FFF, Bates USA0011549 ("She picked him up @ his friends apt on Fruitridge"); Bates USA009839-9996 (Prakash's handwritten journal), p. 5 (". . . She called and came to pick me up. That time I was living with my friend [sic] apartment at Stockton and Fruitridge."). Additionally, the fact that Prakash had friends living nearby is noted in multiple ROIs provided to the defendant in November 2017. For instance, James Brewer told agents that Prakash called him twice after he started working for the defendant, and during one of the calls Prakash told Brewer that he and another worker could not leave. See Bates USA000137-141 (ROI 28) (interview of James Brewer), p. 4. In subsequent interviews, Prakash referred to other friends he had in the area. See Bates USA000142-148 (ROI 29) (interview of Prakash), pp. 4-5 (referring to friend "Thoy," who lived approximately 25 minutes' drive from the ranch); Bates USA000156-163 (ROI 31) (interview of Prakash), p. 3 (referring to friend V.S.).

Moreover, this information is not exculpatory or material. The fact that Prakash had friends in the area does not mean that the defendant did not compel Prakash's labor. It does not "tend to call the government's case into doubt," Milke, 711 F.3d at 1012, nor would it affect the outcome of the proceedings. Bagley, 473 U.S. at 674. Like several of the defendant's other complaints addressed supra (e.g., Alfredo's brother and the defendant's age), the defendant argues that this fact demonstrates the victims' ability and means to escape her ranch. But again, the government has never alleged that the defendant used force or physical restraint as her prohibited means of compelling the victims' labor, and therefore, the victims' ability and means to physically escape is not exculpatory or material. Courts have consistently instructed juries in forced labor prosecutions that "the government need not prove physical restraint, such as the use of chains, barbed wire, or locked doors to establish the offense of forced labor;" and the fact that the victim "may have had the opportunity to flee is not determinative of ... forced labor if ... the defendant placed [the victim] in such fear or circumstances" the victim did not believe he could leave. Bradley, 390 F.3d at 153 (1st Cir. 2004) (quoting and affirming jury instructions); see also United States v. Djoumessi, 538 F.3d 547, 552 (6th Cir. 2008) ("Also unavailing

is [defendant's] contention that [victim] necessarily remained voluntarily at his home because he never physically restrained her ... and she never attempted to escape.  But opportunities for escape mean nothing if [defendant] gave her reasons to fear leaving the house—as indeed he did"); United States v. Warren, 772 F.2d 827, 834 (11th Cir. 1985) ("That the worker had the opportunity to escape is of no moment, if the defendant has placed him in such fear ... that he is afraid to leave."); United States v. Alzanki, 54 F.3d 994, 1000 (1st Cir. 1995) ("The government need not prove physical restraint"); United States v. Bibbs, 564 F.2d 1165, 1168 (5th Cir. 1977) ("[A] defendant is guilty of holding a person to involuntary servitude if the defendant has placed him in such fear of physical harm that the victim is afraid to leave, regardless of the victim's opportunities for escape.").

## 2.   Other Alleged Brady Material

In addition to information contained within the agents' rough notes, the defendant lists additional alleged Brady disclosures.  (CR 95 at 18-28).  Similar to the defendant's claims addressed above, these disclosures either have been previously disclosed by the government, are not Brady material, or have not otherwise been suppressed so as to deprive the defendant the opportunity to use the information at a time it has value.

### a.   "Cheap eateries" within a mile of the defendant's ranch

Defendant complains that the government failed to disclose agents' pre-warrant knowledge of "cheap eateries" within walking distance of the defendant's ranch.  (CR 95 at 19).  The government has stipulated to the agents' pre-warrant knowledge of the nearby strip mall.  See CR 90, pp. 4-5. Additionally, the government has made no attempt to hide the fact that, during his time at the defendant's ranch, Prakash went to a nearby gas station to purchase soda, bread, and cigarettes.  See Bates USA000142-148 (ROI 29) (interview of Prakash), p. 5; Bates USA000156-163 (ROI 31) (interview of Prakash), p. 5.  The ROIs containing this information were produced to the defendant in November 2017.

Further, the government has not suppressed this information, as the existence of the nearby "cheap eateries" is within the defendant's knowledge.  Aichele, 941 F.2d at 764 ("When, as here, a defendant has enough information to be able to ascertain the supposed Brady material on his own, there

is no suppression by the government."). Moreover, given that the agents traveled through the area when approaching the ranch, such knowledge may reasonably be inferred from the materials already produced in discovery.

This information is not material nor exculpatory, and to the extent it could be both favorable to the accused and material under <u>Brady</u>, the material is presently available to the defendant at a time when it is of value, <u>i.e.</u>, prior to the <u>Franks</u> hearing and trial.

### b.    I-914 T-Visa Certifications

Defendant complains that the government failed to produce Special Agent Webster's October 2014 I-914B certifications in support of the victims' T-visa applications, which the defendant claims contain false statements by Special Agent Webster.[4]  (CR 95 at 16-20).  An I-914, Supplement B certification is a USCIS immigration form in which a law enforcement officer attests that the T-visa applicant is a victim of a severe form of trafficking in persons.  The information stated by Special Agent Webster in the I-914B certifications is consistent with the ROIs previously disclosed to the defendant. Special Agent Webster's representations accurately reflect the substance of the victim and witness statements.  The only difference between the information in the I-914B certifications and the previously produced discovery is the exact location where the agents found Prakash, and this difference is not material.  The search warrant affidavit indicates that Prakash was found hiding in the bushes just outside the property, and the I-914B certification states that Prakash was found on the defendant's property.  <u>See</u> Bates USA000308, ¶ 15(m) (search warrant affidavit) ("[Prakash] ran from the SUBJECT PREMISES and jumped over a fence, where he hid in the bushes until he was contacted by the affiant.").  This is not, however, a material difference, and to the extent is could be considered as such, the material is presently available to the defendant at a time when it is of value, <u>i.e.</u>, prior to the <u>Franks</u> hearing and trial.

### c.    Special Agent Webster's testimony in a separate criminal trial

The defendant further states that the government did not inform the defendant of an allegation of dishonesty regarding Special Agent Webster in a separate habeas petition under 28 U.S.C. § 2255 filed in another criminal prosecution not involving the defendant.  (CR 95 at 20-21).  The petition in that case,

---

[4] The defendant states that "it appears there should be seven (7) such certifications."  (CR 95 at 20).  The government only provided certifications for the T-Visa applications of Prakash and Alfredo.

however, is still pending, and the court has not made any findings regarding the credibility of Special

Agent Webster's testimony.  The United States has denied the allegation of untruthfulness in that case as

it does in this one.  The allegation in the 2255 petition is an unsubstantiated allegation, and does not fall

within the government's disclosure obligations under Brady.  "To be material under Brady, undisclosed

information or evidence acquired through that information must be admissible," United States v.

Kennedy, 890 F.2d 1056, 1059 (9th Cir. 1989), or capable of being used "to impeach a government

witness."  United States v. Price, 566 F.3d 900, 911-12 (9th Cir. 2009).  The allegation contained within

the Section 2255 petition would not be admissible in this case, even for impeachment purposes.  Fed. R.

Evid. 608(b) (extrinsic evidence inadmissible to prove specific instances of conduct).  In any event, now

appears to be aware of this allegation in the unrelated § 2255 petition and no further disclosure is

required.

### d.    Phone numbers

Defendant complains that the government disclosed for the first time on March 4 and 13, 2020,

that on July 1, 2013, Prakash provided to agents a local Sacramento telephone number where, according

to the defendant, "he could be reached, which impeached his claim that he had nowhere to go and no

one to contact." (CR 95 at 22).  The telephone number provided by Prakash was not his number, nor a

number at which he could be reached (and the pertinent ROI does not say he described it as such).  The

local Sacramento telephone number that Prakash provided to the agents was the defendant's phone

number.

The defendant further complains that on March 4, 2020, the government disclosed for the first

time that Alfredo had a friend with a local Sacramento number that he could call, and that Alfredo used

this number to contact his friend and sell him a bike Alfredo and Prakash stole from the defendant (CR

95 at 18).  However, in July 2018, the government disclosed to the defendant ROIs describing how

Alfredo and Prakash texted the friend and sold him the stolen bike in order to get money to buy food.

See Bates USA009693-9694 (ROI 58) (interview of Prakash), p. 2; Bates USA009695-9696 (ROI 59)

(interview of Alfredo), p. 2.  While the friend's phone number in the July 2018 production was redacted

as personal identifying information (PII), the reports make clear that Alfredo and Prakash knew a worker

in the Sacramento area and sought his help.  It is this fact, rather than the area code of the friend's phone number, that is significant, and was previously disclosed to the defendant.

Moreover, this information is not material nor exculpatory, and to the extent it could be both favorable to the accused and material under Brady, the material is presently available to the defendant at a time when it is of value, i.e., prior to the Franks hearing and trial.

### e.  Government's description of a T-Visa

Defendant complains that the government mislead the defendant in violation of Brady, when it wrote in an August 29, 2019, letter disclosing the immigration benefits obtained by the victims in this case:

> A T-Visa is a temporary immigration benefit that enables certain victims of a severe form of human trafficking to remain in the United States for up to 4 years if they have assisted law enforcement in an investigation or prosecution of human trafficking. T-Visa nonimmigrant status is also available for certain qualifying family members of trafficking victims.

(CR 95 at 22-23).

The government's description of a T-visa is not misleading.  The description is accurate and consistent with the description used by the United States Citizenship and Immigration Services (USCIS). See "Victims of Human Trafficking: T Nonimmigrant Status," https://www.uscis.gov/humanitarian/victims-human-trafficking-and-other-crimes/victims-human-trafficking-t-nonimmigrant-status/victims-human-trafficking-t-nonimmigrant-status (last visited March 30, 2020).  Moreover, the legal definition of a T-visa provided by the government is not an evidentiary disclosure, and does not constitute Brady material.[5]

### f.  Relationship between HSI and Opening Doors

Defendant complains that the government has failed to disclose "the impeachable close relationship between HSI and Opening Doors."  (CR 95 at 23).  Citing the affidavit of counsel and

---

[5] The defendant's motion to dismiss states, "the prosecutor stated that seven of the government's witnesses had received "T-Visa" in this case."  The government's letter actually states that three individuals involved in this case received T-visas – Prakash, Alfredo, and a third individual.  Four family members of the third individual are beneficiaries of the individual's T-visa.  The August 2019 letter states that the government only submitted I-914B certifications for Prakash and Alfredo.

nothing else, the defendant alleges that "HSI and Opening Doors may have a long-standing relationship whereby Opening Doors helps HSI increase its prosecution statistics by finding and referring alleged victims, and HSI in turn gives significant sums of money to Opening Doors."[6]  (CR 95 at 23).  The defendant concedes that this information is "unverified," and the defendant is "unaware of the details of this relationship."  Id.

The possibility that "unverified" impeachment information might exist does not establish a Brady violation.  The defendant's mere speculation about materials in the government's files do not require the government or a court to make the materials available to the defendant for inspection. Michaels, 796 F.2d at 1116.

g.   **The Agent's knowledge at the time of the search warrant affidavit**

For several of the disclosures discussed above, regarding discovery ahead of a Franks hearing, the defendant argues that the government was not only obligated to disclose the facts in question (such as the location of food stores one mile from the ranch, the defendant's age, the existence and location of victims' friends and family members, the defendant's working hours, or the victim's prior homelessness), but that the government was required to disclose whether the agent knew of such facts at the time he drafted the affidavit for the search warrant.  Such disclosures are not required, however, as the underlying facts in question are not material – either as that term is defined by Brady or by Franks. While a "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf," Kyles, 514 U.S. at 437, that duty does not require a prosecutor prior to a Franks hearing to question an agent about his or her knowledge of every conceivable fact favorable to the defense not included in the search warrant affidavit regardless of materiality, and then disclose the catalogue of those findings to the defense.  The practical reality of such an exercise is that the list (unbound by materiality) would be endless.  Requiring a prosecutor to collect and disclose such information is analogous to requiring the agent to include such information in the affidavit – a requirement that has been rejected by the Sixth and Fourth Circuit.  As stated in Mays v. City of Dayton, 134 F.3d 809, 816 (6th Cir. 1998):

_____

[6] Opening Doors is a nonprofit, nongovernmental, charitable organization that, among other things, provides legal and humanitarian assistance to human trafficking victims.

To interweave the Brady due process rationale into warrant application proceedings and to require that all potentially exculpatory evidence be included in an affidavit, places an extraordinary burden on law enforcement officers, compelling them to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded. Under such a scenario, every search would result in a swearing contest with participants arguing after the fact over whether exculpatory evidence even existed.

See also United States v. Colkley, 899 F.2d 297, 302 (4th Cir. 1990) ("We must be cautious, however, about importing the panoply of Brady protections from trial practice into warrant application proceedings).

In this case, the disclosure of the underlying facts and the defendant's ordinary preparation of her defense provided the basis for the claims she raised in her Franks motion. If this Court finds that the claims amount to a material omission, then the Court will provide the defendant an evidentiary hearing, at which the defendant will have an opportunity to question the affiant as to his knowledge of the claims that formed the basis of the motion. The government is not required under Brady or Franks to depose the affiant as part of the discovery process in every criminal case involving a search warrant, in order to prove the negative proposition that the affidavit was free of any material omissions.

### C. Neither This Court's Continuance of the Franks Hearing, Nor Any Other Delay In This Case, Violated the Defendant's Constitutional Speedy Trial Right

The defendant claims that the delay between the indictment on June 21, 2018, and the filing of her motion on March 24, 2020, has violated her Sixth Amendment right to a speedy trial. (CR 95 at 32-35). The defendant's argument omits several facts pertinent to a constitutional speedy trial analysis, such as the fact that her motion constitutes her first assertion of her speedy trial right, and that the 21-month delay in this matter primarily is the result of the defendant's filing of four motions to continue, three motions to suppress evidence, and one motion to obtain grand jury testimony, as well as the substitution of her retained counsel. For the reasons set forth below, the defendant has not suffered a violation of her constitutional right to a speedy trial, and this Court must deny her motion to dismiss.

 "The Sixth Amendment guarantees that '[i]n all criminal prosecutions the accused shall enjoy the right to a speedy . . . trial. . . .'" Doggett v. United States, 505 U.S. 647, 651 (1992) (quoting U.S. Const. amend VI). "Such a right is fundamental and exists not just to ensure 'that all accused persons be treated according to decent and fair procedures,' Barker v. Wingo, 407 U.S. 514, 519 (1972), but also

because 'there is a societal interest in providing a speedy trial which exits separate from, and at times in opposition to, the interests of the accused.'" United States v. Tanh Huu Lam, 251 F.3d 852, 855 (9th Cir. 2001) (quoting Barker, 407 U.S. at 519).  Courts evaluate a defendant's constitutional speedy trial right claims by applying a balancing test of the four factors set forth by the Supreme Court in Barker v. Wingo, 407 U.S. 514, 530 (1971).  The four factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice to the defendant. Id.  "None of these four factors are either necessary or sufficient individually, to support a finding that a defendant's speedy trial right has been violated."  United States v. Mendoza, 530 F.3d 758, 762 (9th Cir. 2008).  "Rather, these factors are related and must be considered together."  United States v. Simmons, 536 F.2d 827, 829 (9th Cir. 1976).

### 1.     The Length of the Delay

Under Doggett, evaluating the first factor is a two-step process.  As explained in United States v. Beamon, 992 F.2d 1009, 1012 (9th Cir. 1993):

> To trigger a speedy trial inquiry, an accused must show that the period between the indictment and trial passes a threshold point of "presumptively prejudicial" delay. [Doggett, 505 U.S. at 652].  If this threshold is not met, the court does not proceed with the Barker factors.  Id.  If, however, the threshold showing is made, the court considers the extent to which the delay exceeds the threshold point in light of the degree of diligence by the government and acquiescence by the defendant to determine whether sufficient prejudice exists to warrant relief.

Id.  See also United States v. Aguirre, 994 F.2d 1454, 1456 (9th Cir. 1993).  The Supreme Court in Doggett marked the threshold point as those delays approaching one year.  Doggett, 505 U.S. at 652; United States v. Corona-Verbera, 509 F.3d 1105, 1114 (9th Cir. 2007); United States v. Gregory, 322 F.3d 1157, 1161-62 (9th Cir. 2003); Beamon, 992 F.2d at 1012-13.  The defendant in this case has yet to go to trial.  A grand jury in the Eastern District of California indicted the defendant on June 21, 2018, approximately twenty-one months ago.  (CR 1).  Exceeding the one-year mark, this time period requires further consideration of the three remaining factors.

### 2.     The Reason for the Delay

The second of the Barker factors is the "focal inquiry."  United States v. Sears, Roebuck and Co., Inc., 877 F.2d 734, 739 (9th Cir. 1989) (citing United States v. Loud Hawk, 474 U.S. 302, 315 (1986)

("The flag all litigants seek to capture is the second factor, the reason for the delay.")).  The reason for the delay in this case can primarily be attributed to the defendant's four motions to continue, substitution of retained counsel, and the filing of four pre-trial motions.  This factor weighs against the defendant.

As noted above, the grand jury indicted the defendant on June 21, 2018.  On July 30, 2018, the defendant filed her first motion to continue.  (CR 15).  The government did not object to this continuance.  Id. at 2.  This Court continued the status hearing originally scheduled for August 6, 2018, to December 3, 2018.  (CR 16).  On January 15, 2019, the defendant filed her second motion to continue.  (CR 18).  The government did not object to this continuance.  Id. at 2.  The Court continued the status conference and motions hearing scheduled for March 4, 2019, to May 20, 2019.  (CR 19).  On April 8, 2019, the defendant filed three pre-trial motions.  (CR 28-30).  On April 18, 2019, the defendant filed her third motion to continue.  (CR 31). The government did not object to this continuance.  Id. at 2.  This Court continued the status conference and motions hearing scheduled for May 20, 2019, to June 24, 2019.  (CR 33). [7]  At the June 24th hearing, this Court scheduled an evidentiary hearing for the defendant's motions to suppress for July 29, 2019.  (CR 53).  On July 16, 2019, the defendant filed a motion to substitute her retained counsel, (CR 57), which this Court granted on July 18, 2019.  (CR 58).  On July 18, 2019, the defendant filed her fourth motion to continue.  (CR 59).  On July 29, 2019, the Court continued the motions hearing to September 30, 2019.  (CR 63).  The motions hearing took place over three days on September 30, December 17, and December 18, 2019.  (CR 69, 77, 79).  On December 18, 2019, this Court scheduled a hearing for the defendant's fourth pre-trial motion for February 25, 2020.  (CR 79).

While the government "bears the 'ultimate responsibility' for justifying the delay," United States v. Drake, 543 F.3d 1080, 1085 (9th Cir. 2008), the record here does not disclose any "deliberate attempt to delay the trial in order to hamper the defense."  Barker, 407 U.S. at 531.  Instead, as in Drake, the

---

[7] In granting the defendant's motions to continue, this Court tolled the time for calculating the time to trial for purposes of the Speedy Trial Act.  (CR 16, 19, 33, 53).  While the analysis for the Speedy Trial Act is different than that for a constitutional claim for a violation of the Sixth Amendment right to a speedy trial, the Ninth Circuit has noted that because the Speedy Trial Act affords greater protection to the speedy trial right than that of the Sixth Amendment, "it will be an unusual case in which the time limits of the Speedy Trial Act have been met but the sixth amendment right to speedy trial has been violated."  United States v. Nance, 666 F.2d 353, 360 (9th Cir. 1982); see also United States v. Baker, 63 F.3d 1478, 1497 (9th Cir. 1995).

delay stems from the defendant's motions to continue, pre-trial motions, and change in counsel.  Drake, 543 F.3d at 1085-86.  See also United States v. King, 483 F.3d 969, 977 (9th Cir. 2007) (defendant's continuances weighed "heavily against finding a Sixth Amendment violation"); United States v. Shetty, 130 F.3d 1324, 1331 (9th Cir. 1997) (reversal of conviction on speedy trial grounds not warranted where defendant stipulated to continuances).  As such, this factor must weigh against the defendant.

### 3.    The Defendant's Assertion of the Right

The Sixth Amendment speedy trial clause "primarily protects those who assert their rights." Aguirre, 994 F.2d at 1457.  As the Supreme Court made clear in Barker: "We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."  Barker, 407 U.S. at 532; see also Simmons, 536 F.2d at 831 ("defendant's assertion of the right is entitled to strong evidentiary weight," whereas "failure to demand a speedy trial will make it difficult for him to prove that there was an abridgment of this guarantee").

Here, the defendant asserted her speedy trial right for the first time in her motion to dismiss. This factor does not weigh in favor of the defendant.  Sears, 877 F.2d at 740 (defendant's "failure to assert its right to a speedy trial in a timely fashion also weighs heavily against dismissal"); Mendoza, 530 F.3d at 764 (Because defendant "did not assert his right to a speedy trial until after he made numerous requests for continuances and delayed the trial date by over a year," this factor did not weigh in favor of the defendant).  See also King, 483 F.3d at 976 (finding that although defendant at times asserted his right to a speedy trial, at other times he acquiesced and sought continuances, and, as a result, the third factor "does not strongly counsel in favor of finding a Sixth Amendment violation").

Additionally, because the defendant's assertion of the right came after she sought four continuances, the defendant's assertion deserves little weight in the Barker balancing.  Corona-Verbera, 509 F.3d at 1116 (defendant only asserted his right to a speedy trial after he had asked for eight continuances); Lam, 251 F.3d at 859 (Defendant's "successive requests for continuances considerably diminish the weight of [the defendant's] assertions of his speedy trial right.").

### 4.    Prejudice

In analyzing the Supreme Court's decision in Doggett, the Ninth Circuit stated that "whether the

defendant must show actual prejudice depends on whether it is he or the government who is responsible for the delay." Aguirre, 994 F.2d at 1456.  The Court in Aguirre continued, "we should assume prejudice only if the defendant is not responsible for the delay." Id. at 1457.  "If, on the other hand, the defendant is responsible for the delay in his trial, then he carries a heavy burden of demonstrating actual prejudice to succeed on a speedy trial claim." Lam, 251 F.3d at 859.  For the reasons stated above, the defendant is largely responsible for any delays in this case.  Additionally, the length of delay in this case – 21 months – is not so extreme as to relieve the defendant of her burden to show actual prejudice. Beamon, 992 F.2d at 1014 (finding that if a 20-month delay was "sufficient as a matter of law to relieve the defendant of the burden of coming forward with any showing of actual prejudice, the presumption of prejudice would be virtually irrebuttable."); Gregory, 322 F.3d at 1163 (finding that a 22-month delay "is not long enough to excuse [defendant] from demonstrating actual prejudice to prevail on his claim."). The defendant, therefore, bears the burden of proving actual prejudice, which she cannot do.

"Actual prejudice can be shown in three ways: oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired." Beamon, 992 F.2d at 1014 (citing Doggett, 505 U.S. at 654).  Here, the defendant has not been incarcerated for any period of time pending trial.  Next, the defendant claims that she has suffered anxiety concerning her reputation as a result of the charges.  The defendant's anxiety over a 21-month period, however, is "no more than any criminal defendant experienced before trial." Drake, 543 F.3d at 1086 (2-year delay between indictment and trial); Simmons, 536 F.2d at 831-32 ("Conclusory allegations of general anxiety and depression are present in almost every criminal prosecution.").  Finally, the defendant claims she will be prejudiced at her eventual trial because memories will be dimmed and exculpatory evidence will be lost.  As the defendant has not yet been tried, these claims are speculative and do not establish actual prejudice. Loud Hawk, 474 U.S. at 315 (mere possibility of prejudice is insufficient in the Sixth Amendment speedy trial context); Lam, 251 F.3d at 860 ("Lam's contentions regarding alleged defects in witness testimony or lost evidence amount at most to speculation and fail to demonstrate any actual prejudice to his defense."); Sears, 877 F.2d at 740-41.

The balancing of the Barker factors in this case weigh heavily against a finding of a Sixth Amendment speedy trial violation.  The defendant is primarily responsible for the delay; she only

asserted her right for the first time in her motion to dismiss, and has suffered no actual prejudice.

### D.   The Defendant's Arguments Do Not Support Dismissal of the Indictment

Dismissal of the indictment is not appropriate in this case.  The alleged <u>Brady</u> information that is the subject of the defendant's motion either was previously disclosed to the defendant, is not <u>Brady</u> material, or has not been otherwise suppressed so as to deprive the defendant an opportunity to use the information at a time it has value.  The Court has remedied any claimed prejudice to the defendant by postponing the <u>Franks</u> hearing, thereby providing the defendant an opportunity to fully make use of any disclosed evidence at the <u>Franks</u> hearing or for her defense at trial.  Nor does the delay violate the defendant's Sixth Amendment right to a speedy trial.

The Ninth Circuit has held that a court may dismiss an indictment if (1) "outrageous government conduct" amounts to a due process violation; or (2) pursuant to the court's supervisory powers, the court has otherwise found "flagrant prosecutorial misconduct."  <u>United States v. Chapman</u>, 524 F.3d 1073, 1084-85 (9th Cir. 2008).  "Flagrant prosecutorial misconduct" may comprise either the prosecution's intentional withholding of exculpatory information, or the "reckless disregard for the prosecution's constitutional obligations."  <u>Id</u>. at 1085.  Dismissal is appropriate, however, "only when the defendant suffers 'substantial prejudice,' . . . and where 'no lesser remedial action is available."  <u>Id</u>., 524 F.3d at 1087.

The government's conduct is not "outrageous," nor has the government acted with "reckless disregard" of its constitutional obligations.  Rather, the government, pursuant to its ongoing discovery obligations, re-reviewed previously undisclosed materials ahead of the Franks hearing, and when the government identified potential <u>Brady</u> information that was previously undisclosed, it immediately disclosed it to the defendant.

With respect to the prejudice suffered by the defendant, the defendant complains that she "has been forced to reveal a significant portion of its impeachment strategy . . . in order to receive <u>Brady</u> material that should have been provided in the first place."  (CR 95 at 33)  However, as this Court has already observed, the government's February 19, 2020 disclosure of potential <u>Brady</u> information was prompted not by the defendant's requests, but the government's independent review of agent rough

notes.  Moreover, much of the remaining material that is the subject of defendant's motion was previously produced.  Furthermore, the defendant cites no legal authority to support her claim that the denial of surprise cross-examination constitutes prejudice under Brady, let alone prejudice sufficient for dismissal.  Brady protects the due process principle of ensuring fair criminal trials.  Bagley, 473 U.S. at 675.  It places the burden of disclosure on the prosecutor because of "the special role played by the American prosecutor in the search for truth in criminal trials."  Berger v. United States, 295 U.S. 78, 88 (1935).  Courts have emphasized Brady as a means to ensure truth and fairness in criminal trials, but never addressed Brady in terms of tactical advantage by counsel.

Finally, a "lesser remedial action is available" and has been implemented by this Court – the continuance of the Franks hearing.  Nothing about the government's conduct or the circumstances of this case warrants the extraordinary action of dismissal requested by the defendant.  This Court should deny the defendant's motion.

**IV.** **CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny the defendant's motion to dismiss the indictment.

Dated: April 6, 2020

McGREGOR SCOTT
United States Attorney

ERIC S. DREIBAND
Assistant Attorney General for Civil Rights

*/s/ Wm. E. Nolan*
WILLIAM E. NOLAN
DAVID REESE
Trial Attorneys, Civil Rights Division
AUDREY B. HEMSATH
Assistant United States Attorney