1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF CALIFORNIA
2              --oOo--

3    UNITED STATES OF AMERICA,    ) Docket No. 18-CR-119
                                  ) Sacramento, California
4              Plaintiff,         ) May 26, 2020
                                  ) 10:00 a.m.
5         v.                      )
                                  )
6    FIRDOS SHEIKH,               ) Re: Motion to dismiss
                                  )
7              Defendant.         )

8

                 TRANSCRIPT OF PROCEEDINGS
9        BEFORE THE HONORABLE WILLIAM B. SHUBB
          UNITED STATES SENIOR DISTRICT JUDGE
10

     APPEARANCES (Via videoconference):
11

     For the Plaintiff:      HON. McGREGOR W. SCOTT
12                           United States Attorney by
                             MS. AUDREY BENISON HEMESATH
13                           Assistant U.S. Attorney
                             501 I Street, Suite 10-100
14                           Sacramento, CA 95814
                             MR. WILLIAM EDWARD NOLAN
15                           MR. DAVID NATHAN REESE
                             Assistant U.S. Attorneys
16                           950 Pennsylvania Avenue, NW
                             Washington, DC 20530
17

     For the Defendant:      ALMADANI LAW by
18                           MR. YASIN M. ALMADANI
                             14742 Beach Boulevard, Suite 410
19                           La Mirada, CA 90638

20           JENNIFER COULTHARD, RMR, CRR
                 Official Court Reporter
21            501 I Street, Suite 4-200
               Sacramento, CA 95814
22             jenrmrcrr2@gmail.com
                  (312)617-9858
23

24       Mechanical Steno - Computer-Aided Transcription

25

1          SACRAMENTO, CALIFORNIA TUESDAY, MAY 26, 2020

2                              --oOo--

3          (In open court.)

4          THE CLERK:  Please come to order.  This United States

5     District Court is now in session.  The Honorable William B.

6     Shubb, Judge presiding.

7          Your Honor, this is case criminal 18-119, the United

8     States v. Sheikh.

9          Counsel, your appearances, please.

10         MS. HEMESATH:  Good morning, Your Honor; Audrey

11    Hemesath, David Nolan and William Reese on behalf of the United

12    States.  And Mr. Nolan will be speaking for the United States

13    today.

14         MR. ALMADANI:  Good morning, Your Honor.  This is

15    Yasin Almadani for Dr. Sheikh.  And Dr. Sheikh is present here

16    also on our session.

17         THE COURT:  Very well.  The record will reflect that

18    we're conducting these proceedings via Zoom, which was

19    necessitated by the governmental response to the corona virus

20    epidemic.  I am in the courtroom.  I am the only one in the

21    courtroom.  The clerk is appearing by videoconference.  The

22    court reporter, likewise, is appearing remotely by

23    videoconference.  And, of course, counsel and the defendant are

24    also appearing remotely.

25         Mr. Almadani, have you gone over with Dr. Sheikh what

1    the proceedings are going to encompass and is she in agreement

2    that she can appear and have you appear remotely, as we are

3    presently doing?

4         MR. ALMADANI:  Yes, Your Honor.  We've spoken and

5    Dr. Sheikh is okay with that.

6         THE COURT:  I recognize Dr. Sheikh and I see her on

7    the screen.

8         Can you hear me, Dr. Sheikh?

9         All right.  Now, I can't hear her, but I understand,

10   and the clerk can correct me if I'm wrong, that there are

11   processes for Dr. Sheikh to confer with Mr. Almadani at any

12   time privately during this hearing if she wishes to do so.

13   Karen?

14        THE CLERK:  Yes, Your Honor.  That's correct.

15        THE COURT:  And has that been explained to you,

16   Mr. Almadani?

17        MR. ALMADANI:  It has, Your Honor.  I was just

18   wondering the procedure if Dr. Sheikh does want to speak to me

19   what signal should she give?

20        THE COURT:  That's between you and her.  Do you want

21   her to raise her hand?

22        MR. ALMADANI:  That would be fine, Your Honor.  Thank

23   you.

24        THE COURT:  All right.  So Dr. Sheikh, if you wish to

25   confer with Mr. Almadani at any time during this proceeding,

1   raise your hand and I leave it up to Mr. Almadani to bring that

2   to my attention so that I can recess the proceeding in order

3   for you to have that conversation.

4           Is that fair, Mr. Almadani?

5           MR. ALMADANI:  Yes, Your Honor.

6           THE COURT:  The monitor that I'm looking at is on my

7   left, the camera is a little bit off to my right, so it may

8   look like I'm not looking at you when I'm speaking or when

9   you're speaking.  That may be because I'm looking at the

10  monitor.  But we have a large screen where I can see each one

11  of you during these proceedings.

12          So Mr. Nolan was there anything else you wanted to

13  cover as a preliminary matter before we get into the hearing?

14          MR. NOLAN:  No, not as a preliminary matter, no.  I

15  think we're able to get into the hearing whenever the Court

16  wishes.

17          THE COURT:  All right.  So we can proceed.  I'd like

18  to clarify the scope of this proceeding today.  So as I

19  understand it, it is strictly to hear and for the Court to gain

20  all of the information that it needs in order to rule upon the

21  motion to dismiss, which, as I understand it, we're going to

22  treat separately from the motion to suppress and the *Franks*

23  motion.

24          Mr. Almadani, is that your understanding?

25          MR. ALMADANI:  That is my understanding, Your Honor.

1  Thank you.

2          THE COURT:  All right.  I have all the briefs on the

3  motion to dismiss.  I don't need to have you go over in detail

4  everything that's in your briefs.

5          How would you suggest we proceed, Mr. Almadani?

6          MR. ALMADANI:  However the Court wishes, Your Honor.

7  I can present an argument.  I think the government filed a

8  second opposition without leave of court, and in that second

9  opposition there are a number of troubling issues that I would

10  like to respond to on the record, Your Honor.

11          THE COURT:  All right.  I received that.  I didn't

12  bring it in because it wasn't part of the stack of materials

13  that I had for this, but I have somebody in my chambers that

14  can hear these proceedings and I'm going to ask him to bring

15  that response in to me while we're speaking.  So go ahead and

16  tell me what you had to say with regard to that.

17          MR. ALMADANI:  Okay, Your Honor.  I'll get into that

18  first, if the Court prefers.

19          So what the second opposition seems to be doing --

20  first of all, it's filed without leave of court essentially on

21  eve of the hearing after the Court set it.  It was filed on

22  March 19 after the government, I think, gave me very little

23  notice on that same day that they were going to file it.

24          It attempts to introduce hearsay evidence late and

25  after the witness, Carol Webster, is no longer subject to

1    cross-examination on the hearing, on the suppression hearing

2    that we previously went through, and we believe that the

3    government's arguments should be struck for that reason.

4    And there's also substantive issues with that

5    response, apparently, or with that opposition, the second

6    opposition.  The government seems to indicate that there is

7    some sort of a time stamp on an email at 2:00 p.m. that shows

8    that -- that supports Agent Webster's testimony that the agents

9    were there for two hours.  She said that they had left at

10   11:30.

11   Your Honor, there are many issues with that.  I think

12   the agent's credibility was impeached and the email could have

13   been sent via a BlackBerry.  Again, I wasn't allowed to

14   cross-examine her because they're just introducing this.  It's

15   very unusual to introduce evidence after a hearing is over, the

16   witness off the stand, no longer subject to cross-examination

17   and they're introducing these emails now.  So the email could

18   have been sent from a BlackBerry.

19   There's also the issue of time stamps on a desktop

20   computer.  Time stamps on a desktop computer can be changed by

21   human beings.  They're subject to errors because of the way

22   Daylight Savings Time can be set up.  So computer time stamps

23   on a personal desktop cannot be compared to the evidence that

24   we offered, which were actual phone records from AT&T.  And we

25   had a custodian of records authenticate those records and the

1   time stamps on those records showed that Agent Webster's

2   testimony was impeached.  And so for them to offer this now is

3   not proper, Your Honor.  And so that's one part of it.  The

4   other part --

5            THE COURT:  Well, do you want me to address that

6   first?  I now have the supplemental opposition before me, and I

7   think Ms. Hemesath signed it.  So even though Mr. Nolan is

8   speaking, Ms. Hemesath might want to tell the Court what it is

9   she intended to accomplish by this supplemental opposition and

10  why it contains matters that were not previously presented.

11           MS. HEMESATH:  Yes.  I can do that, Your Honor.

12           So the centerpiece of the defense's arguments thus far

13  have centered on the credibility of Special Agent Webster.  And

14  these are prior consistent statements that would support a

15  finding that she did testify credibly and that the ROIs are

16  accurate.  It's entirely within the discretion of the Court

17  whether or not to admit them as a supplemental to the record or

18  not, but we found them and we wanted to bring them to the

19  Court's attention because they are consistent with how she

20  testified.

21           THE COURT:  Well, whether they're consistent or not

22  would be a question.  I don't know what it adds to the record

23  and whether considering new materials is appropriate.  I have

24  some question about this.  And I don't know, Mr. Almadani, what

25  you would add by cross-examining Ms. Webster in light of this

1  evidence or not.  You're suggesting that if you had the

2  opportunity to cross-examine her, somehow it would add to the

3  record?

4         MR. ALMADANI:  Your Honor, what I am suggesting is

5  that the government's suggestion in their papers that these

6  emails somehow add credibility to Agent Webster's testimony is

7  incorrect and if I were able to cross-examine her on it, I

8  could have shown that and I could have actually impeached her

9  credibility even more had these records been provided to me,

10  Your Honor.

11         I will say that if the Court --

12         THE COURT:  But what is it -- what is it about

13  these -- I don't see anything about these records that she --

14  look, we heard evidence.  The government says it's undisputed

15  that the gates were chained and locked.  That may be true, but

16  now that we've seen the whole picture, we know that the gates

17  were not the only way you enter the property.  We know that

18  there are numerous other ways someone can come and go from the

19  property.  So the fact that the gates were chained and locked

20  is not going to be disputed, but we see it in context from the

21  evidence.  If you say it's undisputed that both victims

22  eventually escaped from the property by climbing over a fence,

23  all right, that may be undisputed.  But characterizing it as

24  "escaping" and characterizing it as climbing over a fence

25  doesn't accurately reflect the evidence that we now see from

1    the testimony and exhibits that were presented to the Court

2    during the hearing.  So these statements may not be disputed,

3    but they are put in context by the rest of the evidence.

4         You say the victims were locked in while they may have

5    been able to escape over a fence.  Well, locked in is hardly

6    consistent with the evidence that was presented at the hearing.

7    I don't know what is gained or not gained by this evidence that

8    you want to present now.  I've got the benefit of what I heard

9    at the hearing, and I can put it in context, so I don't want to

10   unfairly prevent the government from presenting this evidence,

11   but I don't want to prejudice the defendant by allowing the

12   evidence to come in without cross-examination.

13        You know, the frustration of the Court here is that

14   every single time we come in for a hearing or we brief one

15   issue, Mr. Almadani raises another issue that we have to then

16   go to in order to decide the previous issue.  That's how we got

17   to the motion to dismiss.  We had a motion to suppress.  In the

18   process of hearing the motion to suppress, the *Franks* issue

19   came up.  So they briefed the *Franks* issue.  In his reply to

20   the *Franks* issue Mr. Almadani raises the question of the Brady

21   violation, so we said we'll hear the Brady violation.  Now

22   we're here to hear the Brady violation and the question comes

23   up as to whether we should reopen the proceedings to add this

24   affidavit.  Now, if that's what you want to do, I want to give

25   everybody the opportunity to do it, but I'm really really

1 getting tired of having these proceedings diverted to some

2 other issue every time we sit down and think we're going to

3 decide a different issue.

4 MR. ALMADANI:  Yes, Your Honor.  May I speak to that?

5 THE COURT:  No.  I want to hear from Ms. Hemesath.  Do

6 you want to file this -- do you want to file this opposition?

7 MS. HEMESATH:  The audio cut out.

8 THE COURT:  Do you want to file this supplemental

9 opposition to the defendant's motion or not?  Do you think it's

10 that important that you want to file it?  Because if you do,

11 I'm going to give Mr. Almadani the opportunity to further

12 cross-examine the witness.

13 MS. HEMESATH:  I apologize.  The audio cut out for me

14 for a moment, but I heard that last critical question.

15 THE COURT:  Well, let me say something else.

16 MS. HEMESATH:  No.  We can --

17 THE COURT:  Let me say something else.  Are you in

18 your office or are you at home?

19 MS. HEMESATH:  I'm at home, Your Honor.

20 THE COURT:  Well, if lawyers are going to appear from

21 home, they need to make sure they've got the facilities, the

22 Wi-fi connection if you're using Wi-fi, the direct line, the

23 microphone, the camera that you need in order to communicate

24 with the Court.  These proceedings are very effective but

25 they're not effective unless we have the technology to make it

1    work.

2            So is there --

3            MS. HEMESATH:  Yes, Your Honor.

4            THE COURT:  -- anything you didn't hear about what I

5    said?

6            MS. HEMESATH:  I heard the last critical question, and

7    it's about whether we want to file the supplement or not.

8            THE COURT:  Right.

9            MS. HEMESATH:  And I also heard what Your Honor said

10   about the issues tending to bleed together, and that circles

11   back to the motion to dismiss that's on calendar today.  That

12   is also centrally about the alleged lack of credibility of

13   Special Agent Webster.  We vehemently deny that she lacks

14   credibility on any topic, that she has made any false

15   statement.  These emails are prior consistent statements that

16   support our position on that.  But Your Honor's point is well

17   taken and I don't want to cause any further delay in

18   proceedings.  What I wanted to accomplish today is to set this

19   matter for trial and to set a motions cutoff deadline and

20   anything that gets in the way of that goal I'm not in favor of,

21   so we will withdraw.

22           THE COURT:  All right.  So this is withdrawn,

23   Mr. Almadani.  This is withdrawn.

24           MR. ALMADANI:  Thank you, Your Honor.

25           THE COURT:  So you were going to make your next point.

1    What were you going to say next?

2         MR. ALMADANI:  So, Your Honor, I'd like to be helpful

3    to the Court in terms of what the Court would like me to

4    address, and so I will take the Court's guidance or I can sort

5    of walk through my position and my filings and present them in

6    short form to what I've presented in the briefing.  I will note

7    for the Court that the government's opposition, time and again,

8    says that the government disclosed certain information in

9    various ROIs and in our reply, we've noted that the relevancy

10   of the material to the *Franks* hearing really has to go to the

11   agent's knowledge prior to the warrant being executed, prior to

12   July 9th.

13        Every single ROI that they have referenced are

14   interviews that postdate mostly and, for the most part by

15   years, interviews that were taken.  So I can't impeach in a

16   *Franks* hearing using an interview that the government conducted

17   two years later what they didn't disclose to us.  And that's

18   for the purpose of the *Franks* hearing, which -- to which *Brady*

19   material does apply, the *Brady* obligation does apply.  That's

20   under the *Barton* case cited on page 2 of our reply.

21        As to that, there were a number of outstanding issues,

22   Your Honor, that the government failed to disclose.  In our

23   reply brief I have noted eight of those issues.  When the

24   government -- if Your Honor remembers, the government came in

25   and told the Court here that there was only one *Brady* issue

1    that it failed to disclose, but I've noted 8 *Brady* issues that

2    it failed to disclose.  That's noted from pages 13 to 16 or,

3    I'm sorry, 13 to 17 of our reply brief.  And I can go over

4    those, Your Honor.

5            THE COURT:  No.  You don't need to go over it.

6            The government takes the position that with regard to

7    some of them the information that was provided either to

8    Mr. Blackman or to Mr. Johnson or to you earlier, they take the

9    position with regard to others that it's not *Brady* material.

10   And they take the position with regard to some of them that

11   they gave it to you, albeit later than they told me they were

12   going to give you the *Brady* material.

13           I suppose my question to you is, assuming that there

14   are some of these violations that you have shown, what is the

15   remedy?  The government has cited good Supreme Court case law

16   for the proposition that where there is not sufficient

17   prejudice by the failure to timely disclose *Brady* material,

18   there is, in fact, no *Brady* violation.  Most of the cases

19   dealing with *Brady* come up either after trial or at a point

20   where it's too late for the Court to remedy the violation.  I

21   frankly don't see that here.

22           The Court has the power to reopen any motion that I've

23   already heard.  I could even reopen the motion to suppress that

24   I already ruled upon.  We could reset the *Franks* hearing.  We

25   could give you the time you need.  I don't see this being a

1   situation where the Court cannot remedy the *Brady* violation.

2   Now, some of the things you point out are well taken,

3   and you can address them.

4   Dr. Sheikh has had to undoubtedly incur substantial

5   attorneys fees in litigating this that she wouldn't have had to

6   incur had the information been provided in a timely fashion.  I

7   don't know how the Court can remedy that.  I don't know that

8   the Court has authority to require the government to pay

9   attorneys' fees.  You can if you want.

10   In terms of the trial, because of the Corona virus

11   situation I don't know when we're going to get to trial anyway,

12   so I don't think that the delay in trial is really a factor

13   under the present circumstances.  So you can address that if

14   you want.  But my real concern is, assuming that some of these

15   violations are well taken, what is the remedy?

16   MR. ALMADANI:  Yes, Your Honor.  I'm happy to address

17   that.  So, Your Honor, I'll call the Court's attention and I'll

18   start with the prejudice question.  So I'll call the Court's

19   attention to page 8 of our motion and in there I cite the

20   transcript on July 29th, 2019, where we made the request.  I

21   noted that there were outstanding *Brady* materials missing and I

22   could see that.  And at that hearing the government told this

23   Court over and over again that it had provided all of the

24   discovery, it was basically open discovery.

25   The Court explained to the government that it needs to

1    go back and check again and there I'm going to cite from page

2    14 of the transcript.  I said to the Court, "I would prefer if

3    the Court would allow me to not telegraph my examination

4    because I do think that -- I think that there are things need

5    to be brought to the fore here.  And for the agent and the

6    government to have the benefit of my thinking on this would

7    hinder my ability to cross-examine."

8            And Your Honor, that goes straight squarely to *Chapman*

9    and to *Kojayan*, the two Ninth Circuit cases that control this

10   *Brady* issue.  And in those cases, in *Chapman* the district court

11   dismissed the case after -- during trial it came out, during

12   trial, that there was a *Brady* violation.  Only one.  Here

13   there's been numerous after the Court ordered the *Brady*

14   material.

15           And the Court in *Chapman* found that because the

16   government had now had the benefit of the defense's strategy,

17   of the defense's cross-examination, and because the government

18   could now go back and clean up its case and prep its witnesses

19   based on what, you know, the cross-examination was going to be,

20   that that was prejudice enough and that the Court, just like

21   here, could have reopened, could have retried the case with the

22   new *Brady* material but that the prejudice was significant

23   because they had the entire -- they had at least part of the

24   defense's strategy.

25           Now, in *Chapman*, the defense was actually able to make

1  somewhat of a record prior to the government -- prior to the

2  government having that perspective.  So there was some

3  impeachment record that the defense was able to make in

4  *Chapman*.

5          Here, Your Honor, what we had was the *Brady*

6  material -- I'm sorry.  I can't see the Court.  I'm seeing

7  Ms. Hemesath.  Is there a way --

8          THE COURT:  I'm there.

9          MR. ALMADANI:  Okay.

10         THE COURT:  I can see everybody.

11         MR. ALMADANI:  So I apologize, Your Honor.

12         THE COURT:  One of the things on Zoom -- one of the

13  things on Zoom is if you click the little box that has

14  everybody in it instead of just the people that are speaking,

15  you can see everybody.

16         MR. ALMADANI:  Okay.  Understood, Your Honor.

17         THE COURT:  Can you see all of us now?

18         MR. ALMADANI:  Yes.  Yes, Your Honor.  I apologize.

19         THE COURT:  It's important to see your client too, so

20  make sure you can always see her, in case she raises her hand.

21         MR. ALMADANI:  Yes, Your Honor.  So I will continue.

22         So, Your Honor, here what we have is a worse situation

23  because what should have happened is the government should have

24  disclosed all of the *Brady* material.  I mean, I had this for

25  five to seven (inaudible) before the United States; should have

1    been disclosed at the outset.  That's when we deserved it.

2    That's when the case law, and I believe that's the *Alderdyce*

3    case says that the *Brady* material should be disclosed early

4    without the need for a court order.  Now, that didn't happen.

5    Over a year into the litigation I still had to ask the Court to

6    make the order.  The Court made the order.  At that time the

7    government should have disclosed it, but that didn't happen.

8          What happened is the government required me to explain

9    each item, explain what my cross-examination strategy was going

10   to be with respect to the item, and then the government would

11   iteratively make these disclosures.  And we've briefed all of

12   that in our briefing, Your Honor.  So what I'm stuck with here

13   is now the government can make witness selection choices, can

14   prepare the witnesses for trial to take the sting out of

15   cross-examination, which was the problem noted in *Chapman*.

16         I haven't even made a first record being able to

17   cross-examine these witnesses without them seeing where I'm

18   coming from and that is the greatest tool that a defense

19   attorney has in terms of impeaching the credibility of a

20   government witness.  And so for them to require me to

21   iteratively ask and explain my cross-examination time and again

22   up until March 12 -- March 11th they were disclosing material,

23   there's still material that's outstanding, Your Honor.  Even

24   now, just now with their second opposition that was struck,

25   they've disclosed additional emails where the agent says that

1    she knew that these witnesses could have left over the fence

2    and they didn't disclose those certifications where she said

3    the exact opposite saying that Karki wasn't given a key and

4    therefore not freely able to leave the property.  Those were

5    statements she made under penalty of perjury.  She made the

6    same statement with respect to Alfredo.  I didn't have any of

7    these even on February 25.  I had to explain to the government

8    my exact cross-examination strategy in order to get these

9    materials, and now they can prep their witnesses based on them.

10   Should have been provided to us beforehand.

11        THE COURT:  Why do you say you had to disclose your

12   strategy and you had to disclose your cross-examination?  I

13   don't have a record that anybody forced you to do that.

14        MR. ALMADANI:  Your Honor, they did because -- okay.

15   The materials should have been disclosed at the outset without

16   the need for a court order.  Didn't happen.  So I asked the

17   Court for an order.  I thought maybe once the Court made an

18   order, they would take it seriously and disclose these items.

19   They didn't disclose them.

20        Then I made a specific request for -- and these are

21   all noted in our letters in the BBB series.  I made a specific

22   request for all the certifications.  They still didn't disclose

23   them.  Then I said please disclose these because I need -- they

24   said they're not -- they don't have an obligation to disclose

25   them.

1          At that point I explained why I needed them and had to

2     explain what my exact strategy was and also in order to make

3     the discovery motion to the Court, because the Court then asked

4     me to make a discovery motion.  So if we're going to contest

5     these issues, then I have to explain all of my

6     cross-examination strategy.  So on each issue I had to do that.

7          THE COURT:  Well, in order for the government to know

8     whether information is exculpatory, don't they have to know

9     what your theory is so they know whether it's relevant?

10          MR. ALMADANI:  Your Honor, no.  Because what *Brady*

11     requires, and that's the *Alvarez* case, is for the government to

12     err on the side of disclosure.  So it's the government's

13     obligation to go back because the government guards the hen

14     house.  So it's the government's obligation to review the

15     materials, to issue spot, and to disclose the materials erring

16     on the side of disclosure.  If they're going to --

17          THE COURT:  Yeah, right.  But before the government

18     knows that you're going to make a *Franks* motion, how does the

19     government know that the agent's state of mind or what

20     information an agent may have had when she sought a search

21     warrant is relevant?  It doesn't go to guilt or innocence.  It

22     goes to the question of the validity of a search warrant, and

23     that may or may not be exculpatory.

24          MR. ALMADANI:  Well, Your Honor, actually, the

25     government does know that statements made under oath by agents

1     go to their credibility.  So if the government -- let's say in

2     a scenario where the government produces certain reports that

3     were inculpatory and produces a search warrant but withholds

4     reports and notes that contradict the search warrant.  That's a

5     *Brady* violation because the government is withholding that

6     material.

7              Now, I'm in the dark because, you know, we don't have

8     the same sort of discovery tools that you do in civil discovery

9     where I can ask for the government-- the government needs to

10    make a full review and disclose its materials.  So if I have to

11    start guessing what might be out there and start explaining to

12    the government that you need to disclose this to me because I

13    think that I might have cross-examination here and

14    cross-examination there.  And, in fact, the I-914B

15    certifications to the Court -- I'm sure the Court has read

16    them -- they contain a myriad of false statements by the agent

17    when the agent knew that those weren't true.  And those are

18    Exhibits LLL and MMM.  The government, actually, Mr. Reese in

19    his letter said that he reviewed those and they withheld those

20    all the way up until March, I believe, 11 and disclosed them

21    either -- yeah.  March 11.  They withheld them and I needed --

22    they forced me to explain my cross-examination step by step

23    before they did it, and they're not allowed to do that.  That's

24    the whole point is that *Brady*'s self-executing and the Court

25    explained this to the government, I mean, a number of times.

1  This Court actually said, "I want to make sure that you don't

2  get caught in some sort of a procedural trap.  Make sure you do

3  the necessary inquiries to find if there's any *Brady* material,

4  either within or outside of discovery that you provided; and if

5  so, make sure you provide it by the end of August."  The Court

6  said that in July.  The government still didn't provide it.

7  And then the Court told the government on February 25,

8  "Well, you see, you have to err on the side of disclosing too

9  much if you're going to do it that way," which is what the

10  government was doing.  It was cherrypicking evidence.

11  And the Court then said when the government tried to

12  explain that, you know, they didn't have an obligation to

13  disclose these things, the Court said, "No, that's not the way

14  *Brady*'s supposed to work.  Mr. Almadani stated it correctly.

15  You don't need to have an order from the Court in order to be

16  required to disclose *Brady*.  I don't often even make an order

17  because sometimes I simply say the government knows its

18  obligations, and the Court expects them to comply.  Now, you

19  don't have to wait to hear from Mr. Almadani to know what

20  constitutes *Brady* material."  That's this Court's statement,

21  and it's right.  It's consistent with Ninth Circuit law.  They

22  don't have to wait for me to tell them what's *Brady*.  They

23  should know that.  That's a prosecutor's duty.  And when they

24  violate that duty and when they force me to iteratively explain

25  my cross-examination over and over again -- they have my entire

1   defense playbook now, Your Honor.  Their witnesses are going to

2   be prepped and ready to go, and that shouldn't have been the

3   case.

4           Even, for instance, phone numbers that are disclosed

5   in the reports.  These are the sort of gems that defense

6   attorneys look for that the agents knew that Alfredo had a

7   local phone number for a friend and they redacted that phone

8   number.  They redacted that Alfredo had a local phone number

9   for a friend, and the agents knew that as of July 1st.

10          THE COURT:  Why do you cite the -- why do you rely

11  upon *Chapman* to support your position here?

12          MR. ALMADANI:  Because Your Honor, in *Chapman* the

13  Court found -- and Kojayan also -- the district court in

14  *Chapman* dismissed the case because the district court said:

15  Look, I can retry this case -- now you have the *Brady* material,

16  I can retry this case but it wouldn't be fair to the defense

17  because you have their strategy and government, you can now

18  clean up your case and you shouldn't have the benefit of

19  cleaning up your case because you failed to disclose *Brady*

20  information.

21          And the same thing is present here.  It's just that I

22  haven't now -- it's not that they -- they haven't seen me

23  cross-examine the witness, and that's even more beneficial to

24  them.  Now they know my cross-examination before I even do it.

25  So the witness is going to be ready to go, you know?

1    The surprise that you see on a witness when you catch

2    them, whether it's the government or the defense, is priceless

3    to the Court and to the jury.  And I basically have been --

4    Dr. Sheikh doesn't have the opportunity to do that on a myriad

5    of issues now, Your Honor, because they forced me to do this.

6    Now, if I had sat back, Your Honor, and not made these

7    requests and thinking to myself, oh, you know, I'm going to

8    catch them after trial, that would set up a very odd incentive

9    scenario, Your Honor.

10   What we tried to do is be proactive and catch these

11   things beforehand.  But before I had to explain everything, I

12   did my best to have the Court admonish them time and again to

13   get these materials to me.  They ignored the Court's order and

14   didn't get them to me, and now they have the benefit of my

15   entire cross.

16   And so the Court asks why is *Chapman* and why is

17   *Kojayan* important, and those are important because --

18   THE COURT:  How could -- okay.  They have the benefit

19   of your entire cross, but I'm not sure that's true because we

20   haven't had the *Franks* hearing yet, have we?

21   MR. ALMADANI:  We haven't had the *Franks* hearing, Your

22   Honor, but I have had to disclose to them what issues are going

23   to be important --

24   THE COURT:  Okay.

25   MR. ALMADANI:  -- and why I need those materials, so

1    they know what I'm going to ask in advance now.

2         If they had disclosed those --

3         THE COURT:  I don't know if they do.  I don't know

4    whether they do or not, but how can your cross-examination be

5    any better?  Facts are facts.  You think she's going to lie

6    because she knows what your questions are going to be?

7         The idea of cross-examination is not to -- you know,

8    not just to play games, but it's to get to the truth.  Now,

9    *Chapman* says this is a drastic remedy, dismissal, based on a

10   *Brady* violation.  I would really have to know how your

11   cross-examination is going to be substantially affected by

12   their knowing that this is an issue.

13        MR. ALMADANI:  Okay.  Your Honor, there are two

14   things.  First of all -- and I'll point the Court back to --

15   I'll give the Court an example of how something came up at a

16   hearing exactly similarly where the government didn't have the

17   benefit of what my cross was going to be.  It was at the first

18   suppression hearing.  The agent got up on the stand and

19   testified that she had received a particular call on her desk

20   phone and I got her to admit that and then I impeached her

21   saying that it was on her cell phone that she actually got the

22   call, which shows that she could have been on Dr. Sheikh's

23   property.  That was something that she was caught with, and

24   that impugned her credibility.  And that would happen in front

25   of the Court, that would happen in front of a jury.

1      Now, if the government had not disclosed that to me

2  and if the government had had me write letters saying, "Hey, I

3  need this particular report because I'm going to ask the agent

4  whether she got a call on the desk phone or the cell phone,"

5  then she could have come in here and said, "Oh, I made a

6  mistake on my" -- you know, they could have prepped her on the

7  original cross.  She would have said, "Oh, yeah, I got the call

8  on the cell phone and, yeah, I made a mistake in my report."

9      It takes away my ability to catch her offguard and it

10  takes away my ability to show that her memory is not good and

11  her -- and she may be not credible.  She's telling the Court

12  something on the stand that's not true.

13      And see, those type of -- those type of golden

14  opportunities are now lost because the government, what they're

15  going to do -- and they do have the benefit of my cross because

16  the Court can see it.  If the Court looks through the B series,

17  I've written letter after letter explaining it because the

18  government wouldn't give me the materials.  So they have the

19  benefit of my cross.  It's all in the record.

20      And so now the government can prep their witnesses

21  and, you know, I mean, what is it that prosecutors say, they

22  head off the cross-examination by fronting it.  That's what

23  it's called, "fronting it."  They can front these things for

24  the Court, for the jury, and now at trial, you know, it's not

25  going to be as much of a sting because they can front these

1   issues.  Even at the *Franks* hearing they can front these issues

2   because the agent's not going to be surprised by my cross.  The

3   surprise of cross is important and that's what -- i*n Chapman*

4   the Court found that the defense was not going to be able to

5   surprise with the cross anymore because the government could

6   clean up its case.  That was the --

7           And *Chapman* and Kojayan also had two other factors,

8   Your Honor, that are very important here that we can't miss.

9   It's not just prejudice, but the Ninth Circuit says that there

10  are three factors.  It's also to preserve judicial integrity

11  and to prevent future misconduct.  Here the government -- here

12  we had to have the Court make an order, which we shouldn't.

13  And even after the order, nine months later the government

14  hadn't produced all the materials.

15          So in *Kojayan*, actually, the Ninth Circuit reversed

16  the district court and -- because the district court didn't

17  dismiss on the *Brady* violation and the Ninth Circuit found that

18  the repeated violations over time and the repeated violations

19  of the government not disclosing the materials over time was

20  sufficient for a dismissal even to preserve the judicial

21  integrity and to prevent future misconduct, Your Honor.

22          Here, if the Court had made the order and the

23  government had complied, fine, that would have been one thing,

24  but we're here nine months later and there's still material

25  outstanding and they have provided late material, they haven't

1  taken the Court's order seriously.  So what's going to prevent

2  the government from doing that in the future when this Court

3  makes a *Brady* disclosure order and says, "Government, you got

4  to provide the material by X date"?  They just simply ignore

5  it.

6          THE COURT:  What other *Brady* material do you think is

7  still out there?

8          MR. ALMADANI:  I will tell you, Your Honor.  One,

9  they've refused to provide us any details with respect to what

10  the agents knew about restaurants within 3 miles of

11  Dr. Sheikh's ranch, 1 to 3 miles.  They basically said that

12  there was a, you know, a strip mall, but they won't provide

13  details.  We're entitled to those details and --

14          THE COURT:  Okay.  But the government takes -- that's

15  one the government takes the position that defendant knew where

16  the restaurants are on the strip mall.  *Brady* doesn't cover

17  information that the defendant already knows.

18          MR. ALMADANI:  But, Your Honor, the government's wrong

19  there because it's the agent's knowledge prior to authoring the

20  warrant that's at issue here, it's not the defendant's

21  knowledge.

22          So if I am to impeach -- if the agent writes in his

23  warrant -- and this goes the *Franks* issue.  If the agent writes

24  in his warrant that these people are being starved and they

25  have nowhere to go to eat, that makes it seem like there's this

1    locked off ranch that's secluded somewhere and they can't walk

2    off and just grab food from, you know, Taco Bell that's like a

3    mile away or whatever.

4          And so the agent's knowledge as to that particular

5    issue is highly relevant because if they're telling the

6    magistrate these people can't go get food anywhere and they're

7    locked into this property and it turns out that the agents know

8    that -- which it did turn out that the agent know that they can

9    walk off the property very easily through those slats and, you

10   know, within a mile they basically have fastfood restaurants

11   that they can go to and they're being paid hundreds of dollars

12   a month and they have these accommodations with, you know, the

13   trailer and all.  They don't have any other necessary expenses.

14         So for the government to tell the magistrate that they

15   have nowhere to go to get food, and then for the agent to go

16   file a certification under penalty of perjury saying the same

17   thing, is highly impeachable.  None of that stuff was disclosed

18   to us.  And still there's -- you know, the details concerning

19   these eateries has not been disclosed to us.  The HSI has

20   operational plans where they actually document these things.

21         Other information, Your Honor, that we haven't gotten

22   from the government.  The government, in its letter to us, said

23   that the T-Visa benefits that these witnesses are getting is a

24   temporary and that, you know, it's a temporary benefit for just

25   four years, it's a T-Visa.  Turns out the T-Visa is much more

1  expensive than that, that if these witnesses continue to

2  fabricate, you know, these stories and continue to characterize

3  theirselves as these severe victims of human trafficking, then

4  they will get permanent residency.  I found that out

5  independently and the government is still not willing to

6  confirm that that is the expectation of the witnesses.  They're

7  still not willing to confirm that.  And that's another *Brady*

8  issue.

9      Another *Brady* issue --

10  THE COURT:  The issues that you're raising primarily

11  relate to the *Franks* issue and your ability to cross-examine

12  the government's witness at that hearing.  You may be making

13  some arguments also about your ability to cross-examine at

14  trial.

15  MR. ALMADANI:  Correct, Your Honor.

16  THE COURT:  But with regard to the Franks hearing, the

17  government cites a couple of cases here that I'd like you to

18  address.  One of them is *Kyles*, I think the other one is *Mays*

19  *v. City of Dayton*, *United States v. Colkl*ey, for the

20  proposition that the government does not have a *Brady*

21  obligation with regard to what it puts in a declaration in

22  support of a search warrant or any other warrant.  It says that

23  the duty does not require a prosecutor, prior to a *Franks*

24  hearing, to question an agent about his or her knowledge of

25  every conceivable fact favorable to the defense not included in

1  the search warrant affidavit.  Are those cases distinguishable,

2  or what's your response to that?

3          MR. ALMADANI:  Yes, Your Honor.  Those cases are

4  distinguishable because we're not -- we're not asking to have,

5  you know, a detailed conversation about every single aspect,

6  but what we are saying is that the issues that we've raised,

7  the government had an obligation to at least question the

8  witnesses about that.  And so these items that weren't

9  disclosed to us -- the problem is that they didn't disclose

10 these items without first having the benefit of our

11 cross-examination strategy.

12         So the government, Your Honor, if this is allowed to

13 persist, what the government can basically do is withhold *Brady*

14 material, not disclose, as the constitution requires, not

15 disclose it even if the Court orders it and require the defense

16 to write letters explaining the cross-examination strategy over

17 and over again, iteratively disclose these materials and then

18 prep their witnesses based on what the cross-exam is going to

19 be.  That's really what's happened here.

20         And so we're not saying to go, you know, interview the

21 witness on every possible theory, but the fact that there are

22 operational plans -- we believe there are operational plans

23 that show that the agents had knowledge of these eateries, that

24 the agents passed these eateries.  These are obvious questions

25 that the prosecutors should be asking, especially when we've

1  challenged the issue of whether these folks were being starved

2  or not, and the government knew that.

3      Also, the idea -- credibility is always at issue.  So the

4  idea that the agent made these statements that the government

5  also knows belie the evidence, belie the record that these

6  folks are locked in, the gates of the property are secured with

7  chains and padlocks; Karki was not given a key, therefore, not

8  able to freely leave the property.  That was a statement that

9  the Agent Webster made under penalty of perjury.  I should have

10 had that statement at the suppression hearing to be able to

11 impeach her, at the previous one.  I should have had it

12 prior --

13      THE COURT:  Well, she's already impeached.  She's

14 already impeached now.

15      You know, I'm the one that has to make the decision at

16 the *Franks* hearing.  That argument is well taken by the Court.

17 You don't need to further cross-examine her about that.  I saw

18 the evidence.

19      MR. ALMADANI:  But, Your Honor --

20      THE COURT:  The evidence impeaches -- the evidence

21 impeaches her testimony.

22      MR. ALMADANI:  Yes, Your Honor.

23      THE COURT:  So, I mean, I just don't see why -- I just

24 don't see why -- anyway.

25      MR. ALMADANI:  The reason is because eventually if

1  this case goes to trial, you know, I would have been able to --

2  if they had provided the material, I wouldn't have had to

3  disclose what my cross-examination was going to be.

4  Now they can go prepare Agent Webster on these issues

5  and she can, you know, try to know what the questions are

6  beforehand and come up with, you know, her answers where on the

7  stand if, let's say, that they had produced this material, I

8  wouldn't have had to make a *Brady* motion, the Court didn't have

9  to order anything, I could have come in with all of this

10 ammunition on credibility and surprised the agents time and

11 again on the stand in front of the jury where their expressions

12 would have changed and they wouldn't have been ready to give an

13 answer.  Now I can't do that.  That's exactly the problem that

14 happened in *Chapman*.

15 And Your Honor, on top of that, there is something to

16 be said for judicial integrity and for following the Court's

17 orders and that's the reason that *Kojayan* was reversed by the

18 Ninth Circuit because in *Kojayan* the government did not follow

19 the Court's orders.  And because of that, there was an issue

20 with judicial integrity, there was an issue on -- you know,

21 with respect to deterrence for in the future and those are all

22 issues that are present here, Your Honor.  And we would pray to

23 the Court that the Court would issue this remedy because our

24 cross-examination is exposed and in the future the government

25 should be deterred from doing this.

1     Plus, Dr. Sheikh has suffered, you know, several other

2  prejudices.  I mean, if they had disclosed the material early

3  on in the case, we could have -- we may have been done with

4  trial already.  We weren't able to and we've had to delay the

5  proceedings over and over again and now we've got this pandemic

6  and why?  Because the government didn't do its duty.

7     The case in *Mendoza* says that if the government is

8  even negligent and the case is unreasonably delayed as a result

9  of that then that requires dismissal.  Here the government's

10 been reckless, Your Honor.  In fact, they intentionally

11 withheld the I-914B certifications, which completely eviscerate

12 credibility.

13    And on top of that, Your Honor, we have outrageous

14 government conduct.  That's the *Restrepo* case that we've cited

15 where we've got an agent who's essentially allowing these

16 witnesses -- the Court's seen the evidence.  The Court's seen

17 it and it knows the agent is impeached.  Essentially allowing

18 these witnesses to commit immigration fraud saying they're

19 victims to severe human trafficking completely belies the

20 record.  They're getting these immigration benefits and a poor

21 woman is here sitting as a defendant as a result of that.  That

22 is outrageous government conduct, Your Honor, and it offends

23 the universal sense of justice.  Why is this all happening?

24    And, you know, recently I received this material from

25 the government and it's in their opposition -- the second

1    opposition that was struck.  The agent, in an email on July

2    5th, says Sheikh is a practicing M.D. neurologist and according

3    to open source information is affiliated --

4         THE COURT:  Slow down.  Slow down for the reporter.

5         MR. ALMADANI:  I apologize, Your Honor.  Sheikh is a

6    practicing M.D. neurologist and, according to open source

7    information, is affiliated with well-known hospitals in the

8    Sacramento area and has a private practice.  They are going

9    after Dr. Sheikh because she's a juicy target.  Hey, we're

10   going to get this neurologist, who's well-known in the area, on

11   human trafficking.

12        They've got these news articles that they've come out

13   with, you know, impugning Dr. Sheikh and charging her when we

14   know now that the agent was impeached on these issues time and

15   again and that these witnesses, Prakash and Alfredo, are

16   essentially lying about what's going on because their

17   statements are belied by the entire record, including their own

18   statements, which I've pointed out, Your Honor.  So this is --

19   I mean, if there's any outrageous government conduct, this is

20   outrageous government conduct.

21        And this is not the only case where this is happening.

22   Judge Brennan, in the *Ciccone* case, has ordered discovery into

23   that case because there are affidavits supporting the

24   proposition that Agent Webster may have suborned perjury and

25   helped one of her witnesses commit immigration fraud in that

1    case.

2         This issue, any side we look at it from, Your Honor,

3    whether it's the *Brady* disclosure, whether it's outrageous

4    government conduct, whether it's the delay in the proceedings

5    that's now caused and now with the pandemic we have no idea

6    when we are going to trial, this is -- Dr. Sheikh does not

7    deserve this, Your Honor.  If there's a case where this remedy

8    is appropriate, it's this case, Your Honor.  It's this case.

9    And the Court dismissing this case will not do any injustice.

10   The Court can see it for itself.  It's -- I'm sorry.  It's a

11   ridiculous case.  This is not a case.  This is not -- I

12   apologize, Judge.  I shouldn't say that.  It is a case that's

13   not meritorious.  I'll take that back.  It is a case that is

14   not meritorious, Your Honor.

15        THE COURT:  What you may be saying is that it's a case

16   that would not be prosecuted if the government attorneys had

17   known what they know now about what the facts really were.

18        MR. ALMADANI:  Yes, Your Honor.

19        THE COURT:  So let's hear from Mr. Nolan now.

20        MR. NOLAN:  Thank you, Your Honor.  There's a lot

21   there to address.  I think I will start with the fact that

22   Dr. Sheikh is not being prosecuted because she is some sort of

23   juicy target I believe was the defendant's phrase.  She's being

24   prosecuted because she is, in fact, guilty of forced labor and

25   alien harboring as well as the other charges.

1          I think to get to some other points directly that the

2     Court was inquiring about, I'll begin with a couple of other

3     points in terms of the advocacy and the word choice by the

4     defense attorney.  The government has not ignored the Court's

5     orders.  The government has never forced the defense attorney

6     to do anything in terms of revealing a cross-examination

7     strategy.  We have not required them, we have not even asked

8     them.

9          What I think --

10          THE COURT:  That's what I asked him about.  But what

11     he's saying is that you didn't turn this information over and

12     the only reason he finally got you to turn it over was that he

13     told you what his strategy was and then you conceded that the

14     information should be turned over.  But his point is that he

15     shouldn't have to reveal that to you in order for you to

16     realize that this is potentially *Brady* material.

17          MR. NOLAN:  And that would be true, Your Honor, if it

18     were accurate, but it's not accurate.  The defendant has not

19     revealed any strategy here.  And that's the omission that the

20     Court can see for itself in the briefs.  This grand

21     examination, this grand strategy of impeachment that needs to

22     be revealed, it has not been articulated in the briefs.  I

23     still don't know exactly what it is, so it's very difficult for

24     me to counter to the Court and say, "Oh, that didn't happen"

25     because the defendant has not articulated exactly what he has

1 had to reveal and why the revelation of such has --

2 THE COURT: He had to reveal his theory that the

3 affidavit in support of the search warrant was packed with

4 lies.

5 MR. NOLAN: Right. And that's --

6 THE COURT: You didn't know -- you didn't know that he

7 was even going to file a *Franks* motion even to the point where

8 he filed his original motion to suppress because the original

9 motion to suppress, if you recall that far back, wasn't even

10 based on *Franks*. It was based on lack of consent. So you

11 didn't know that he had a *Franks* motion until he revealed that

12 to you. That's his point.

13 MR. NOLAN: And that's -- and the point is, in terms

14 of those specific items that have been revealed, that have been

15 disclosed, that are the basis of the *Franks* hearing or the

16 *Franks* motion, those items, Your Honor, are not meritorious

17 *Franks* motions. They're based on the -- they're based on the

18 premise that the agent is lying, that the agent is not being

19 truthful and that the agent has perjured herself. That is not

20 true. These materials in the statements that are made by

21 either Agent Webster or Agent Kizenko, who authored the search

22 warrant affidavit, are true.

23 THE COURT: No, they're not true.

24 MR. NOLAN: The defendants agree --

25 THE COURT: Listen, I've seen the evidence. They're

1    half-truths.  There are a lot of half-truths in there.  And

2    Mr. Almadani's point is that in the course of trying to

3    persuade you to turn over the materials that you ultimately

4    turned over shortly before the *Franks* hearing he had to reveal

5    to you his theory that these were not entirely truthful

6    statements in the affidavit.

7              MR. NOLAN:  Right.  Now that theory is going to be

8    revealed anyway as part of a *Franks* motion.

9              THE COURT:  He didn't even know he was going to make a

10   *Franks* motion.

11             MR. NOLAN:  But then I -- that's the response, Your

12   Honor.  The response is if he's -- these issues don't become

13   material until he makes a *Franks* motion.  And then when he

14   does, he says this is what -- these are the omissions, these

15   are the misstatements and then it's up to the government to

16   respond to that and then it's up to the Court to make a

17   determination of whether they are material.  And if they are

18   material, then the Court will have an evidentiary hearing and

19   hear that out.

20             THE COURT:  You know, it's really annoying.  Why did

21   you wait until the time that you did to turn that information

22   over just before the hearing?

23             MR. NOLAN:  Which information are we speaking of?

24             THE COURT:  Ms. Hemesath is on the line here.  I've

25   never had this happen in a case that was handled by the United

1  States Attorney in this district.

2      MR. NOLAN:  I'd ask the Court to clarify because I

3  want to address the Court's concern, absolutely.

4      THE COURT:  There's *a Brady* violation here.  There's a

5  *Brady* violation.

6      MR. NOLAN:  Yes.

7      THE COURT:  And I've never had that happen before.

8      MR. NOLAN:  Okay.  So I believe what the Court is

9  addressing is why did we not turn over the line of the rough

10  agent notes corresponding to a single ROI, and we did that five

11  days before the *Franks* hearing, and why was that not turned

12  over.

13      THE COURT:  Right.

14      MR. NOLAN:  And that is a good question.  And I

15  addressed that in the last hearing; I will absolutely address

16  it again now.  We missed that line in the first review.  In our

17  first review of the agent's notes, we did not see that that

18  particular line, which is admittedly favorable to the defense,

19  was not included in the corresponding ROI.  When we found

20  that --

21      THE COURT:  But you know what you told me before that?

22  What you told me before that was that you had made completely

23  open discovery.  You had given everything to the defense.  That

24  wasn't true either, was it?

25      MR. NOLAN:  No, that isn't exactly what I said.  And I

1  apologize if I was inartful in how I was saying this.  What

2  I -- what we had not included were the rough agent's notes.

3  And if I implied that, I apologize.

4         What we had disclosed was the reports themselves that

5  the notes correspond to.  We had reviewed the reports and we

6  had made a determination for those reports that they were --

7  there was nothing to disclose.

8         In the second review of those reports we found that

9  particular line and we disclosed it immediately.  And this is

10  what's important is that it was not suppressed.  It was the

11  government who found it, the government that disclosed it, the

12  government that pointed it out and brought it to the attention

13  of the defense attorney.

14         The government then came into court and acknowledged

15  the error to the Court and then the Court cured the error by

16  postponing the *Franks* hearing.  So the error has been cured

17  because of the postponement of the *Franks* hearing.

18      The prejudice argument that the defendant has raised is,

19  he's now or she has now been required to reveal aspects of the

20  cross-examination.  I reiterate the argument that I made

21  before.  I'm not sure that's completely articulated.

22      But the second issue I would also raise with that is, to a

23  great extent, this is part of the territory of engaging in

24  motions practice.  You engage in motions practice, you make the

25  motion, sometimes there's further discovery related to that

1   motion that now is material and then there's cross-examination

2   and direct examination of witnesses, and from time to time

3   there will be glimpses of trial strategy that will come up --

4   come out during that time.  Sometimes that strategy changes as

5   we move closer to trial, sometimes it doesn't.  But that's part

6   of engaging in motions practice.

7       Finally, I would say that the last piece as to that

8   prejudice is that this is not new and not something that has

9   been revealed.  The idea that the strategy here is that the

10  agents are exaggerating and that the witnesses are not telling

11  the truth in order to gain immigration benefits, well, that was

12  being discussed prior to indictment and that strategy, that

13  defense was fully fleshed out by the defendant's prior counsel

14  in meetings prior to indictment, so that's not new and that is

15  not a surprise.

16      The material, whether it's the 914B visa certification that

17  comes up continually or a lot of these other materials, they're

18  not exculpatory and they're not *Brady* material.  They would

19  have been disclosed, frankly, as *Jencks* material prior to

20  trial.

21      What I would also go to, Your Honor, what I think is

22  finally left undisclosed has to do with what was the agent's

23  knowledge of certain facts at the time of the search warrant.

24  Those are the only things that have not been disclosed.  And

25  what that would require the government to do is to essentially

1    depose our agent as to those facts and then disclose them to

2    the defendant.  But that's what the defendant does during

3    cross-examination.

4         THE COURT:  Yeah.  That's a good point.  I'll get back

5    to Mr. Almadani on that also.  Is the *Brady* obligation limited

6    to the prosecuting attorney, or does the *Brady* obligation also

7    extend to the agents?

8         MR. NOLAN:  It's the government.  So yes, to the

9    agents, to the government as a whole, yes.

10        THE COURT:  Okay.  So taking what you or Ms. Hemesath

11   said in the brief as true, the government attorney is not

12   obliged to cross-examine the agent for every detail in order to

13   determine whether some *Brady* material may be there.  But if the

14   obligation is upon the government, can't we fault the

15   government if the agent does not tell the United States

16   Attorney about this *Brady* material?  In other words, if the

17   agent knows there's *Brady* material out there and doesn't tell

18   the government attorney about it, is there a *Brady* violation or

19   not?

20        MR. NOLAN:  I think it would depend -- if it's --

21   yeah.  If we would all agree that it is *Brady* material and that

22   meaning that it's exculpatory or *Giglio* for impeachment and

23   that it's material and that it was suppressed, either because

24   it was withheld from knowledge by the agent or the prosecutor

25   and it caused prejudice, meaning it was not brought to the

1  defense attention at a time when it would be of value to

2  incorporate into his or her defense, then yes, you would have a

3  *Brady* violation --

4           THE COURT:  Okay.

5           MR. NOLAN:  -- but I don't believe that's what's

6  happened here.

7           THE COURT:  Does Brady also extend to pretrial motions

8  so as to apply where information that might have been favorable

9  to the defendant at the pretrial motion was not disclosed, or

10 does Brady only apply to information that would be favorable to

11 the defendant at trial?

12          MR. NOLAN:  No.  *Brady* -- there's Ninth Circuit cases

13 that make clear *Brady* applies to pretrial motions.  Now, there

14 is some -- maybe some question in light of recent Supreme Court

15 cases that bring that into question, but the government's not

16 pursuing that argument.  I think the Ninth Circuit case law is

17 clear that *Brady/Giglio* apply to pretrial suppression hearings.

18          THE COURT:  Okay.  Then taking what you've just said,

19 if the affidavit in support of the search warrant stated that

20 the gates to the property were chained and locked and that was

21 technically true but the agent knew that there were many many

22 other ways to get in and off the property without going through

23 the gates, and if the affidavit in support of the search

24 warrant said that neither of the victims had keys to the gates

25 and she knew that you didn't need a key to the gate to leave

1   the property and the affidavit in support of the search warrant

2   said that the victims eventually escaped from the property by

3   climbing over the fence and the agent knew that, in fact, the

4   fence was only the size of a hurdle and that anybody could

5   either get over it or through it, and if the affidavit said

6   that they had no money, no transportation, no telephone and

7   didn't know anyone that they could call for help and if the

8   agent knew that they did have money, that they did have the use

9   of a telephone and there were people that they could call for

10  help, if all that was true and she didn't disclose that to the

11  government attorney, which is you or one of the others, is that

12  a *Brady* violation?

13          MR. NOLAN:  I would say no, Your Honor, because I

14  think what we are doing in that case under that example is

15  we're intermingling *Franks* and *Brady*.

16          Everything that you have just put out as a series of

17  factual allegations that the defense is alleging were omissions

18  to the search warrant.  The way *Franks* works is the defendant

19  articulates those omissions and puts that before the Court and

20  says these motions are material, meaning they would have

21  changed the outcome of the magistrate judge's determination of

22  probable cause.  The government responds to that by saying --

23          THE COURT:  Well, there's a second prong.  There's a

24  second prong that those allegations are material and that the

25  agent withheld those --

1          MR. NOLAN:  Right.

2          THE COURT:  -- from the magistrate judge.

3          MR. NOLAN:  Right.  Exactly, yes.  Thank you, Your

4    Honor.

5          THE COURT:  But the hypothetical that I've given you,

6    under that hypothetical the agent did withhold that from the

7    magistrate judge.  Now, you've said that *Brady* applies to

8    pretrial hearings.  Wouldn't that be a *Brady* violation?

9          MR. NOLAN:  Right.  And again, I -- so -- and this is

10   where it gets difficult in the intermingling between *Franks* and

11   *Brady*.  And the government's response to that is because the

12   government -- now, I want to be careful in saying this because

13   it can be confusing.  Materiality under *Brady* is very similar

14   but not exactly defined the same way as materiality under

15   *Franks*.  But what's important is that the government's position

16   to the defendant's claims in terms of the motions is that they

17   were not material under *Franks*, so they're not necessarily

18   going to be material under *Brady* either.  So there's not going

19   to be the requirement of the government to disclose them ahead

20   of time as *Brady* material.

21         THE COURT:  Let me make sure I understand you here now

22   because I thought you said that *Brady* applied to pretrial

23   hearings, which would include a *Franks* hearing.  Now you're

24   saying that if information that might be material to a

25   defendant and helpful to a defendant at a *Franks* hearing is

1    withheld, that is not *Brady* violation?

2           MR. NOLAN:  No.  What I'm saying is that in order to

3    be *Brady*, it must be material and if it's not going to be --

4           THE COURT:  Material for a *Franks* hearing?  Is it

5    sufficient that it is material to a *Franks* hearing, or does it

6    have to be material to the elements of the charge?

7           MR. NOLAN:  I think -- I think both, Your Honor,

8    because I could imagine --

9           THE COURT:  All right.  But look, the agent's

10   knowledge of information that might help or controvert her

11   statements in the declaration is material to a *Franks* hearing,

12   is it not?

13          MR. NOLAN:  It is -- it is -- see, material has

14   different definitions under *Franks* and *Brady*, and that's why

15   it's --

16          THE COURT:  Okay.  That's why I asked the question.

17          MR. NOLAN:  I think you're using that --

18          THE COURT:  You're saying I know what material means

19   in the context of a trial, it means evidence that might either

20   support or negate an element of the offense charged in the

21   indictment.

22          MR. NOLAN:  Correct.

23          THE COURT:  That's what's material at a trial.  But

24   what's material in a *Franks* hearing is evidence that might go

25   to the question of whether the allegations in the declaration

1    in support of the search warrant were true and correct and

2    whether the agent knew that they were untrue or incorrect at

3    the time the declaration was made.  Those are different --

4    different tests, you're right, but I want to know is it a *Brady*

5    violation for the government to withhold information that might

6    be material to a *Franks* hearing?  And I thought you said yes,

7    but if you're saying something different, I'd like to know.

8             MR. NOLAN:  I want to be clear on that.  If the Court

9    could repeat that question.  I hate to make the Court do

10   that --

11            THE COURT:  That's okay.

12            MR. NOLAN:  -- but I want to be absolutely clear on

13   this.

14            THE COURT:  I know what is meant by evidence which is

15   material in the context of a trial.  That is evidence that will

16   tend to prove or negate one of the elements of the offense

17   charged in the indictment.

18            I also understand that there is a different test for

19   evidence which may be material at a *Franks* hearing, and that is

20   evidence that might tend to show or negate whether there were

21   facts which were false or facts which were omitted from the

22   declaration in support of the search warrant and whether the

23   agent knew that those facts were material and that they were

24   omitted from or misstated in the declaration.

25            So what is material in the context of a trial is

1 different than what is material in the context of a *Franks*

2 hearing.  My question to you is and was whether it is a *Brady*

3 violation for the government to withhold material facts that

4 might help the defendant in the context of a *Franks* hearing.

5 MR. NOLAN:  And the answer would be yes.  And it

6 hinges on whether those items, those materials are material,

7 whether the items are material under *Brady*, whether they are

8 material under *Franks*.

9 THE COURT:  All right.

10 MR. NOLAN:  If we are --

11 THE COURT:  So under the hypothetical that I gave you,

12 if you can remember all the way back.

13 MR. NOLAN:  Yes.

14 THE COURT:  There's a *Brady* violation there, isn't

15 there?

16 MR. NOLAN:  No, because those are not material.

17 THE COURT:  They are not material?

18 MR. NOLAN:  That's the government's position.

19 THE COURT:  Okay.  Then I'll give you one more chance

20 to explain why they're not material.

21 Remember what the hypothetical was.  The declaration

22 stated that the gates to the property were chained and locked

23 when, in fact, there were many, many ways to get in and out of

24 the property without going through those gates that had nothing

25 to do with gates being chained and locked;

1    Second, that neither victim had keys to the gates

2 when, in fact, you didn't need a key to the gate to get in and

3 out of the property;

4    Third, that both the victims eventually escaped the

5 from the property by climbing over a fence when, in fact, what

6 they're calling a fence is just a little thing that's a hurdle

7 that anybody can get over or get right through;

8    Next, that the victims had no money, no

9 transportation, no telephone and did not have anyone they could

10 call for help when, in fact, they did have money, they did

11 have -- at least some of them did have a telephone and they did

12 have people they could call for help.  Now, that's the

13 hypothetical.  So you tell me why that's not material.

14    MR. NOLAN:  Because I don't think those -- those are

15 not material under the sense of *Franks* because they're not

16 going to lead to suppression.  And if they are, that becomes

17 the contested question of a *Franks* hearing.  The idea that --

18    THE COURT:  Okay.  Now I understand.  I understand

19 you.

20    So when we have the *Franks* hearing, you're going to --

21 I don't want to get ahead of ourselves here, but theoretically

22 you would agree that all these things should have been in the

23 declaration for purposes of discussion; but even if they were

24 in the declaration, there would still be probable cause to

25 issue the search warrant?

1    MR. NOLAN:  Yeah.  Well, certainly with the second

2  part of that question, absolutely, there would still be

3  probable cause without those omissions.

4    THE COURT:  You know, that's like saying -- that's

5  like saying in the context of materiality in a trial that

6  you've got a bank robbery charge and that you had three victim

7  tellers, all of whom identified the defendant and the

8  government had exculpatory evidence that one of those tellers

9  was lying and it didn't disclose that.  And you're saying,

10  well, it's not material because he still would have been

11  convicted on the testimony of the other two.  It's like saying

12  that because what you're saying is, you're going to second

13  guess me and you're going to second guess the magistrate judge

14  and you're going to say that even if this information had been

15  disclosed to the magistrate judge, he or she would have still

16  issued the search warrant.  That doesn't mean it's not material

17  just because it may not finally influence the outcome.

18    MR. NOLAN:  If I can address that, Your Honor.  No,

19  that's not what I'm saying.  What I am saying is that the

20  materiality and anchoring the disclosures to a *Franks* hearing,

21  to materiality, is critical because if you don't have that,

22  then every potential omission in the world needs to be somehow

23  disclosed and then you would have a case where every case in

24  which there is a search warrant, the prosecutors are required

25  to conduct and depose the affiant as to everything that was not

1   included, not bound by materiality.

2           THE COURT:  No.  But you've got to -- I agree with

3   you.

4           MR. NOLAN:  Okay.

5           THE COURT:  And I agree with the cases that you've

6   cited, but you conceded that *Brady* extends to the affiant as

7   well as to the prosecutor.  If the affiant has the exculpatory

8   information, the fact that the prosecutor isn't required to

9   take the deposition of the affiant doesn't mean that there's

10  not a *Brady* violation.  The affiant has committed the *Brady*

11  violation.  Wasn't that what you said?

12          MR. NOLAN:  That is what I said.  And again, that is

13  technically true.  But the *Brady* material must be -- *Brady*

14  information must be material.

15          THE COURT:  Okay.

16          MR. NOLAN:  And that's where I think we differ.

17          THE COURT:  The test of materiality is not whether the

18  evidence would have affected the verdict or would have affected

19  the outcome of the hearing.  Isn't the test of materiality

20  whether it has a tendency to affect one of the elements that is

21  at issue in the hearing or the trial?

22          MR. NOLAN:  And in that regard then maybe the *Brady* is

23  a lower standard, to some extent, but I think it's -- again, it

24  still doesn't reach -- the issues, the examples we're talking

25  about still don't reach that issue; still don't reach that

1   threshold.

2          THE COURT:  Because why?  Maybe I didn't understand

3   you.  Why do you say it doesn't reach that level?

4          MR. NOLAN:  Because these omissions are not material.

5   So the omissions that are given in the hypothetical are not

6   material.

7          THE COURT:  Well, why does the agent include all those

8   facts in the declaration if she doesn't think they're material?

9          Why does she include the fact in the declaration that

10  the property was chained and locked?  Why does she include the

11  fact that the victims didn't have keys?  Why does she include

12  the fact that they escaped by climbing over a fence?  Why does

13  she say that they had no money, no transportation, no

14  telephone, if she didn't think they were material?

15         MR. NOLAN:  It's not what's included that is material,

16  it's the omissions that the Court has cited.  And that's the

17  position of the government is that the omissions are what's not

18  material, that the agent had knowledge that the fence was only

19  3 to 4 feet high but didn't put that into -- didn't put that

20  into the affidavit.

21         THE COURT:  Why isn't that material?  Why isn't that

22  material?

23         MR. NOLAN:  That's not material.

24         THE COURT:  Why not?

25         MR. NOLAN:  Because it's not going to change the

1    determination for probable cause that the defendant is -- was

2    committing alien harboring and forced labor.  And the reason

3    for that is that, one, the fact that they included the fact

4    that the gates were locked, that is true.  The gates were

5    locked.  The gates -- and the only way to leave this property

6    was over the fence.  That's not how human beings normally leave

7    property.  That's not how employers or employees come and go

8    from their employer's workplace.  They don't have to jump a

9    fence.  They don't have to climb a fence.  The height of the

10   fence is not material to probable cause of whether or not the

11   defendant was compelling the labor.

12           THE COURT:  So the height of the fence is not

13   material.  All right.  Go ahead.

14           MR. NOLAN:  Just to finish that thought, that was

15   not -- that has not been the theory of the government's case

16   that they were physically -- there was physical restraint.  But

17   the fact that the gates are locked --

18           THE COURT:  Then why does she -- you know, why does

19   she put -- here's the thing:  Presumably you could have

20   probable cause to believe that there was harboring going on at

21   this ranch if all you put in the search warrant was that there

22   were undocumented illegal aliens on the property who were

23   working for her.  That's enough.  That's enough right there --

24           MR. NOLAN:  That's correct.

25           THE COURT:  -- for a violation of section 1324, right?

1  MR. NOLAN:  That's true, Your Honor.  Yes.

2  THE COURT:  All right.  Why would she bother, then, to

3  put in all of this other information if she didn't want to

4  mislead somebody?  Why bother to put that in this?

5  MR. NOLAN:  They're putting the -- we're saying "she."

6  It's actually a different agent, Your Honor.  It was a he.  But

7  the reason the agent is putting that information in there is

8  the agent is reporting the facts as they are known to the agent

9  at that time.

10  THE COURT:  Reporting some of the facts.  This is not

11  a -- the reality of this case doesn't look anything like the

12  declaration once you know what was really going on.  Now, we'll

13  find out when we get to the declaration.  We'll find out when

14  we get to the *Franks* motion whether it makes a difference.  Was

15  there some reason --

16  MR. NOLAN:  And I think that's --

17  THE COURT:  Was there some reason --

18  MR. NOLAN:  Go ahead.  I'm sorry.

19  THE COURT:  -- why the picture was painted that these

20  people were virtually slaves?

21  MR. NOLAN:  I would say that that's not the picture

22  that was painted.  That is what the defendant is trying to

23  paint to the Court that the government has suggested over and

24  over again, and that's not the truth.  So the defendant is

25  building a strawman and then knocking it down, but that has not

1  been the government's case.  And that's what will come out at

2  the hearings and that's what certainly will come out at trial.

3  And that's come out to an extent as we've introduced it in the

4  briefs thus far of what exactly --

5  THE COURT:  Maybe there's some -- maybe there's some

6  administrative policy that you only go on certain types of

7  cases and she was trying to make this look like one of those

8  cases because my experience is there are thousands and

9  thousands of illegal aliens who are being paid by somebody to

10  work for them, but they're not all charged.  So was there some

11  administrative requirement that she had to make this look like

12  this was slave labor?

13  MR. NOLAN:  No, Your Honor, not at all.  If you're

14  suggesting that she is the agent, that is not it.  The agent

15  followed the facts of this case.  The facts of this case is

16  that the defendant employed undocumented aliens and did not pay

17  them a fair wage.  And more than that, the most serious

18  charge --

19  THE COURT:  Even if he did pay them a fair wage --

20  wait a minute.  Wait a minute.  Even if he did pay them a fair

21  wage, there's nothing in section 1324(a) that says it has to be

22  an unfair wage.

23  MR. NOLAN:  What I mean by that is that she profited

24  and that it was to her financial gain by not paying them.

25  THE COURT:  Right.  Right.

1    MR. NOLAN:  More importantly, she wasn't paying them.

2  What she was doing was promising them payment, promising them

3  certain things, not fulfilling those promises and then

4  compelling the labor through threats of deportation as well as

5  the idea of there's some cost of telling them "You're going to

6  get your money, I'm going to pay you, I'm going to do that,"

7  knowing that they have no recourse to that.  And so they are

8  either -- they're put in a position of either walking away from

9  this and losing all those free hours of labor they've

10  essentially given and not getting the wages that were promised

11  or stay and hope that the next day is the day they will

12  eventually get the payment that's due to them.

13    Couple that with the threats of deportation and the

14  defendant is doing these things with a particular pattern or

15  practice, which is compelling the defendant -- which is

16  compelling the victims' labor.  That's what also makes all of

17  these other facts relevant:  The idea that there are locks on

18  the gates, the idea that the defendant herself refers to one of

19  the victims using a term that means slave.  All of these

20  things --

21    THE COURT:  You say you don't take the position that

22  it's slave labor, and now you're telling me she refers to them

23  as slaves.  Didn't one of them say that he was paid?

24    MR. NOLAN:  They were paid -- they were paid some

25  amounts of money.  They were not paid what they were promised.

1     They were not paid anywhere near a minimum wage, and that is

2     how she profited from their labor.

3                THE COURT:  Didn't one of them say that he was going

4     to leave and she said that was okay?

5                MR. NOLAN:  Eventually he did leave and he told her he

6     was going to leave and at that time --

7                THE COURT:  How did he get out?  How did he get out

8     through these chained gates?  How did he get out?

9                MR. NOLAN:  He jumped over the fence.

10                THE COURT:  Oh.

11                MR. NOLAN:  Now, that is the facts and that is what

12     has been reported.  And these facts are not -- are not being

13     made up.  These facts are not lied to by the agent.

14                So to get back to the original argument --

15                THE COURT:  Okay.  You know, you make -- you just --

16     it bothers me that you seem to think that half-truths are

17     truths.  That bothers me.  It really does.  You keep coming

18     back to the point that these are all true, these statements are

19     all true.  Doesn't bother you at all.

20                MR. NOLAN:  But the -- categorizing them as

21     half-truths goes into the context of the facts, and that's a

22     fact finding and that's what will take place at hearings,

23     that's what will take place at trial.  So that's what's

24     important is the idea of categorizing them or making the

25     determination that that's only a half-truth is the Court's

1  function at hearings, and it's the jury's function at trial.

2  So we don't believe that these are half-truths, and we believe

3  that --

4       THE COURT:  All right.  That's what bothers me, but go

5  ahead.

6       MR. NOLAN:  Understandably that would bother the Court

7  if laid out without any context.  What I am trying to do is to

8  assure the Court that within context, within the totality of

9  all the circumstances, all of the facts and all of the evidence

10  that will be presented, the Court will see that these are not

11  half-truths.

12       And if the Court does determine at that point that

13  they are half-truths, that is absolutely within the Court's

14  priority to do.  That is absolutely the Court's prerogative, as

15  it will be all of the jurors who hear the evidence.

16       THE COURT:  All right.

17       MR. NOLAN:  To conclude, Your Honor, in terms of when

18  we were talking about prejudice and talking about remedy, the

19  Court has already, we believe, and stated in the brief,

20  remedied the situation by postponing the *Franks* hearing.  And

21  so all of this information is out there.

22       THE COURT:  You want to -- do you want to comment on

23  *Chapman*?  He's referred to that many times.

24       MR. NOLAN:  Right.  So thank you, Your Honor.  Yes.

25  This is clearly distinguishable from *Chapman*.

1        *Chapman* is a case that dismissed the indictment.  And

2    dismissal, as the Court is well aware, is extremely rare.  It

3    is reserved for the atypical case where no other remedy can

4    take place, no other remedy is appropriate.  And that's not

5    what's happened here.  What's happened here is the Court has

6    remedied the situation.

7        In *Chapman*, instead of one line from a rough agent's

8    notes corresponding to a single ROI, there's 650 pages of

9    material that's suppressed and that suppression comes to light

10   three weeks into the trial.  So these are extremely different

11   circumstances.  Further that, in *Chapman* the Court found that

12   the suppression was willful.  The Court found that the

13   prosecutors were acting in bad faith.

14       I would suggest that everything that we're doing in

15   this discovery process is not at all consistent with bad faith.

16   We were the ones who found the missing line in the ROI.  We

17   disclosed it immediately.  We were being diligent when we found

18   it on our second check.  We brought it to the defendant's

19   attention, we brought it to the Court's attention and the Court

20   cured it.

21       We have since been working with the defendant and the

22   Court has all of the defendant's exhibits, so it can read all

23   of the correspondence between the defendant and the government

24   and it can see that we are making every attempt to meet the

25   defendant's discovery requests.  The defendant made a discovery

1    motion.  We met all of that and the Court ruled that motion

2    moot.

3         We take our discovery obligations very seriously.  We

4    adhere to the Court's admonitions that the Court has made, and

5    we continue to take this very seriously.  So this is a very

6    different situation, what we are talking about here, both in

7    the nature of the material, of the disclosure, the volume of

8    it, the timing of it, and the good or bad faith behind it is a

9    completely different circumstances.  And *Chapman* made the

10   determination that that was the rare and atypical case, that no

11   other remedy could resolve this.

12        THE COURT:  Why does --

13        MR. NOLAN:  Here we have already remedied these

14   things.

15        THE COURT:  Why did the Court in *Chapman* conclude that

16   a new trial couldn't remedy it?

17        MR. NOLAN:  Based on those things that we've just

18   said.  So the fact that --

19        THE COURT:  No, but was it because the strategy was

20   revealed or was it because of some other reason?

21        MR. NOLAN:  No.  That was absolutely a part of it.

22   That was absolutely a part of it and that is why the defendant

23   is saying, hey, this is the same thing as *Chapman*; the strategy

24   was revealed and the government is acting in bad faith.  And

25   we're saying that's not this at all.

1          You know, there is a case, *Chapman*, in which a *Brady*

2     violation led to the dismissal of the indictment but it is one

3     case and the reason they got to that was because the facts were

4     so atypical and the disclosure and the conduct was so egregious

5     that there was no other remedy.  This is very different.  This

6     is not at all what happened in *Chapman*.

7          What we have here is very similar to the case that the

8     government cited in its brief, *United States v. Gamez-Orduno*

9     and not at all dissimilar to cases that happen in the ordinary

10    course of discovery.

11         In Gamez-Orduno, the *Brady* material in question in

12    that case was disclosed during a pretrial suppression hearing.

13    The Court postponed the hearing or continued the hearing in

14    order to give the defendant enough time to incorporate that

15    material into his defense.  That is the same thing that's

16    happened here.  The material was disclosed ahead of the

17    suppression hearing and the Court postponed the hearing in

18    order to give the defendant enough time to incorporate it into

19    her defense and into her motion and her hearing.

20         So this is a very different than *Chapman*, and it's

21    very similar to Gamez-Orduno.  Completely different

22    circumstances.  And the Court has found a remedy that is

23    appropriate and has cured this issue, so dismissal is not at

24    all warranted.

25         THE COURT:  All right.  Mr. Almadani, I'll give you

1    ten minutes to rely.

2          MR. ALMADANI:  Thank you, Your Honor.  I'm going to

3    start first with I don't understand why Mr. Nolan thinks that

4    it's okay to tell the Court one thing one day, another thing

5    the other day -- another day, one thing one minute, another

6    thing another minute.

7          Mr. Nolan said that:  I'm sorry I must have implied

8    that I disclosed everything.  That's not true at all and the

9    Court is correct.  I'll cite to the record.  It's in my papers.

10   These are Mr. Nolan's words:  "The government wants to be

11   clear" -- this is on July 29th -- "government wants to be clear

12   we're certainly not hiding the ball in any shape or form and

13   that all discovery has been provided."  That's what Mr. Nolan

14   said on July 29.

15         Again in that same hearing, Your Honor, Mr. Nolan

16   said, "The government has already provided all of the material

17   in this case.  It's basically been open discovery."  We now

18   know that's not true.

19         The Court then explained *Brady* to the government.  The

20   government promised to provide the material.  It didn't.  Still

21   hasn't.

22         I will point the Court to my reply on page 3 and page

23   6.  Then the Court on -- you know, on page 6 it continues.

24   This is on February 25 now when we learned that the government

25   hasn't complied with its *Brady* obligation or the Court's order

1  on the *Franks* issue.  And on that *Franks* issue, Your Honor, I

2  want to be clear -- I'm going to divert for a second -- I want

3  to be clear that Mr. Nolan allowed a confusion to persist when

4  the Court was examining Mr. Nolan, and he shouldn't.

5       The warrant, let's be clear, was based on a forced

6  labor charge, not on a harboring charge.  There is no harboring

7  charge contained within the warrant.  That is their sort of

8  backup charge that they've included in the indictment, but the

9  warrant was based on forced labor and forced -- and that's why

10  they put in all these egregious statements and the half-truths

11  that Mr. Nolan is now saying that it was okay, but Your

12  Honor --

13       THE COURT:  Why do you think -- Mr. Almadani, why do

14  you think they went on that theory when they got the warrant?

15  Why didn't they just go on a simple harboring theory, which

16  wouldn't have required nearly a fraction of those facts?

17       MR. NOLAN:  I'll tell the Court.  And I was an AUSA at

18  the time too, Your Honor, and I think I have a good idea why.

19  Remember what time we're in at this point, July of -- or June,

20  July of 2013 and the enforcement priorities were very

21  different, Your Honor.  The government would prosecute a forced

22  labor case during those times but not a very simple harboring

23  case.

24       And so when Mr. Nolan said there was no administrative

25  requirement, the Court can recall, you know, what -- when

1   administrations changed there were different enforcement

2   priorities at the time.  So I don't think this case would have

3   gotten past the prosecutive guidelines, you know.  And the

4   Court has had experience at the U.S. Attorney's office too.  So

5   when Mr. Nolan says that in 2013 a simple harboring case would

6   have been sufficient for his office to prosecute, that's not

7   true.

8          Plus, Your Honor, look at what section he's coming

9   from; the civil rights division.  They don't prosecute simple

10  harboring cases.  They prosecute forced labor cases.  It's

11  completely wrong for Mr. Nolan to say that to the Court.  And,

12  you know, we can't prove it because -- obviously, but the Court

13  knows.  The Court has experience in how the justice department

14  works and what the enforcement priorities are and what

15  departments prosecute what.  That's why this was written as a

16  forced labor case.

17         And this harboring charge is a throw-away charge and

18  in fact, Your Honor, it belies the record also because

19  according to their own late-disclosed material, Alfredo told

20  Dr. Sheikh that he was going to leave.  Did she threaten

21  deportation?  No, she didn't.  When they had four separate

22  monitored calls with Prakash, they were listening.  Dr. Sheikh

23  didn't know they were listening.  She didn't threaten

24  deportation once because she wasn't doing that.  So their

25  evidence doesn't even match up.

1    But anyway, coming back to this, I want to be very

2  clear that the warrant is about forced labor, it's not about

3  harboring.  And this harboring charge is just a throw-away

4  charge or, you know, a back-up charge that they've put in

5  there, and I don't think the evidence even supports that

6  charge.  But in any case, the enforcement priorities were

7  different than back then, and I think we all know that.

8    The idea, then, Your Honor, and I'll go to what the

9  Court said to Mr. Nolan.  The Court explained back in February,

10  Your Honor, of this year.  And that's after we had to delay the

11  proceedings because they didn't produce the materials.  "Well,

12  you see, you have to err on the side of disclosing too much if

13  you're going to do it that way."

14    The Court goes on to say, "Now, you don't have to wait

15  to hear from Mr. Almadani to know what constitutes *Brady*

16  material.  That's your job."

17    The Court goes on to say, "There's some prejudice

18  already.  There's been prejudice not only to counsel but to the

19  Court."

20    The Court goes on to say that "I think you need to

21  look seriously if there's *a Brady* violation what the sanction

22  ought to be."

23    The Court goes on to say that "They are representing

24  to the Court that they've given you" -- "they" meaning the

25  government -- "they've given you all the *Brady* material.  If

1    that representation is false, we'll deal with it.  Now, if I

2    hear again that there's material I find to be *Brady* material

3    that hasn't been turned over after this, I guarantee you the

4    sanctions are going to be as severe as the law allows."  And

5    the law allows -- they have forced us to disclose our

6    cross-examination strategy.  Under *Chapman* the law allows for

7    that sanction, Your Honor.  And that's not the only basis.

8         And the Court also said that about Dr. Sheikh has a

9    right to be brought to trial quickly.  They should have

10   disclosed this at the inception of the case.  She didn't get a

11   chance to do that, now she has to wait.  Nobody knew a pandemic

12   was going to hit, but that's why *Brady* needs to be disclosed

13   early.

14        So, Your Honor, the other point I'll move on to is

15   that Mr. Nolan has said that he hasn't required us to disclose

16   our cross-examination strategy, and he keeps referring to one

17   line in the notes that was missing.  And that one line was that

18   "Alfredo had told Dr. Sheikh I'm going to leave and she said

19   fine."  In fact, Dr. Sheikh had told the agents that she was

20   telling Alfredo to leave because she thought he was stealing

21   from her.  And now in the agents' reports we know that the

22   agents knew that he was stealing from her.  He was trying to

23   sell her bike.  He was trying to sell her bicycle the day that

24   he left.

25        We also know from the reports, Your Honor, that

1    Gildardo had asked him a couple of times:  Hey, do you want

2    to -- I can come get you.  He says, no, I'm going to stick

3    around.  I want to see if she pays me.

4         She doesn't have an obligation to employ these people.

5    And so Your Honor -- but that wasn't the only thing that was in

6    the notes that weren't disclosed.  There were eight items that

7    we noted, and we had to note those for the Court because the

8    government wasn't coming clean with the Court about it.  And in

9    noting those items we had to disclose our cross-examination

10   strategy because we had to look at the notes and we had to say:

11   Your Honor, this was another *Brady* item because we could have

12   impeached the agent this way.  Your Honor, this is another

13   *Brady* item because we could have impeached the agent that way.

14        Those notes should have been disclosed and we should

15   have had the opportunity to surprise the agent with that

16   impeachment.  That's *Chapman*.

17        So Your Honor, the second information is that Alfredo

18   had said that he has a brother in Texas.  I think that that's

19   relevant if he's saying he has nobody to contact.

20        Your Honor, the third piece of information that wasn't

21   disclosed.  That was in the notes.  They didn't have to go

22   depose the agent for that.

23        A third thing, Your Honor, that Dr. Sheikh never

24   raised a hand on anyone.

25        If we read the warrant, Your Honor, it makes it look

1   like she's engaged in this forced labor. They even put in the

2   warrant somewhere that she's threatening to cut off their

3   hands. And so the fact that the witness is also telling the

4   agents that she's never raised a hand is pretty relevant. I

5   think the magistrate is entitled to that information. That

6   wasn't disclosed. It's in the notes.

7           Another line that's -- another item that's missing,

8   Your Honor, is that she was -- the agents knew that she was

9   over 50 and these victims, alleged victims are two men who are

10  40. That is -- for a magistrate to be thinking whether it's a

11  forced labor case, whether this woman, who's over 50 is going

12  to be able to overpower these two men under 40. And there is

13  indication in the warrant of these physical restraints. It's

14  all over the warrant, Your Honor. When the Court reads it, it

15  says, you know, there's physical restraint or this or that.

16          Fourth, Your Honor -- or, I'm sorry. Fifth, Your

17  Honor, is the issue of her not being there, Your Honor. Isn't

18  the magistrate entitled to know that she's not there from 9:00

19  a.m. to 3:00 a.m. six days out of the week? I mean, she's a

20  bad human trafficker if she's not even there six days out of

21  the week from 9:00 a.m. to 3:00 a.m. We were entitled to know

22  that.

23          And it's also, Your Honor, qualitatively different, I

24  would argue, than what was sort of minimized in the report. In

25  the report they said 9:00 a.m. until after midnight. But the

1   fact that a witness had told the agents that it was 9:00 a.m.

2   all the way to 3:00 a.m. six days out of the week, that's a

3   third of the night that she's not even there.  When is she --

4   when does she have time to force these people to do anything?

5           Okay.  The next part --

6           And that was in the notes, not in the reports.

7           The next item, Your Honor, and this is -- this is

8   really -- I'd like the Court to take a look at this.  This

9   really goes to sort of what type of positions the government

10  prosecutors are taking in this case, Your Honor.  If the Court

11  looks at my reply on page 15, if the Court can turn to that,

12  the defense's reply, that's document 98.

13          THE COURT:  Yep.

14          MR. NOLAN:  Okay.  Page 15.  "June 26th the agents

15  knew and Gildardo had informed the agents that Alfredo and

16  Prakash worked for 7:00 a.m. to 3:30 p.m."  This is very

17  different from what the agent is telling the magistrate and

18  also in the certifications, that they're working 10 to 12, 10

19  to 14 hours a day, right, 7 days a week.  That's very

20  different, these hours that Gildardo is reporting and the

21  government is trying to say that the notes don't reflect that.

22          If the Court turns to the next page, I actually put a

23  picture in there because the government is relying on the Court

24  actually not going to the evidence, I think.  Because what's

25  here is that -- this is Alfredo and Prakash -- work every day

1    7:00 to 3:30.  Says it right there in the notes.  If the Court

2    goes to page 16 of document 98 I even put a picture in there

3    for the Court to see the sort of disingenuous positions that

4    the government is taking.  The government is taking the

5    position that these are Hildardo's hours, not Alfredo and

6    Prakash.  I'm entitled to cross-examine on that.

7             If the government's going to say now that these notes

8    don't reflect Alfredo and Prakash's hours when they clearly

9    seem to indicate that and they're going to say it's Hildardo's,

10   well, I think that impeaches everyone's credibility, the

11   government prosecutors and the agent's credibility and the

12   Court is entitled to take make that determination.  The

13   government can't make that determination and say, hey, it's not

14   material because we think that it refers to Gildardo.  We are

15   entitled to our own cross-examination, and that's the *Alvarez*

16   case.

17            Your Honor, seventh, that Prakash -- this is also in

18   the notes, not in the reports.  Prakash was working for a man

19   on lesser terms voluntarily prior to coming to Dr. Sheikh and

20   Prakash asked that man to recommend somebody and that man

21   recommended -- that was Mr. Brewer -- recommended Dr. Sheikh

22   and Dr. Sheikh gave him some work and he was working on lesser

23   terms.  To now say that -- now he's turning around and saying

24   that he was being forced into that.  No.  This man was just

25   looking for work.  He's throwing Dr. Sheikh under the bus

because he wants these amazing immigration benefits. Permanent residence, Your Honor, it turns out. They told us it was four-year temporary. I think it's permanent residency and they haven't even -- they haven't disclosed that yet fully.

Okay. Your Honor, eighth and last thing -- and this is just referring to those notes. We haven't even gotten into the other issues that they haven't disclosed. Eighth, that Prakash had a friend living in Fruitridge, close by. They're saying that they have no one to contact. Then, Your Honor, it turns out, in the warrant Your Honor will read, that Alfredo has no one to contact, he doesn't have a telephone, he doesn't have -- you know, he's lost all of his contacts. Turns out that they've redacted this information from the reports. Purposefully the government attorneys redacted this information.

I will call the Court's attention to -- and Mr. Nolan is not -- I don't think Mr. Nolan is being accurate when he says that I didn't have to divulge my cross-examination strategy. Having gone through these eight points already, Your Honor, these are gems that you pick out notes or reports that you can cross-examine a witness on and they don't see it coming. They have this cross-examination now because I've had to explain it. That's *Chapman*.

Now, if the Court goes to my letter to the government, that's Exhibit BBB5. BBB5, Your Honor, I list out one, two,

1    three, four, five, six, seven different categories that I'm

2    begging the government to give me the information on.  And in

3    that I've asked the government -- this is a letter dated March

4    6th, Your Honor.  This is after the hearing on the 25th when

5    the Court said that if I find out there's one more *Brady* item,

6    I'm going to make the most severe sanctions.

7         Look, Your Honor, No. 7 says -- I'm divulging this to

8    the government.  I've had to -- this is the sort of frustration

9    I have here and I've had to go through here.  Bates numbers,

10   you know, 1499 to 1502 contain discussions involving HSI Agent

11   Carol Webster, Eugene Kizenko and Rachel Reesch, who were

12   supposed to provide Opening Door organization with I-914B

13   certifications in connection with Prakash, Alfredo and another

14   visa application.  I have not seen these certifications.  I

15   believe they're important because of the rubber stamping of the

16   increasing exaggerated stories and inconsistent stories

17   presented by the alleged victims in their immigration

18   applications.

19        You can see the obvious impeachment implications on

20   both the government's victim witnesses as well the agents, as

21   stories in the visa applications are quite a bit exaggerated,

22   given what the agents knew at the time.

23        So I'm explaining how I'm going to cross using these

24   certifications that should have been disclosed in the first

25   place for them to finally give them to me -- only two of them.

1   They haven't even given me all of them yet, Your Honor.  And

2   these are certifications made under penalty of perjury.  I had

3   to explain the cross-examination strategy.  Then -- on top of

4   all the others I had to explain.

5          Then on BBB7, Your Honor, BBB7 there is another list

6   of one, two, three, four, six items where I explain -- and

7   please read these, Your Honor.  You'll see how I had to explain

8   and try to get the government to comply with its obligations

9   when the Court already told the government that's not how *Brady*

10  works.  I shouldn't have to do their job.  So this is that

11  phone number, item 3 I will call the Court's attention to.  I

12  have to tell them, "Please take a look at page 182 at the very

13  top.  I'm attaching it here.  On July 1st, Prakash provides a

14  phone number to the agents for a friend of Alfredo.  The

15  government intentionally redacted this number from discovery.

16  If the phone number of Alfredo's friend belonged to someone in

17  the Sacramento area, meaning having a local area code, then

18  this would impeach Alfredo's claim that he lost all the phone

19  numbers and had no one to contact, which is what the magistrate

20  was led to believe.

21         "The area code of the phone number, which was also

22  redacted without need, could also be very telling in this

23  regard.  Since Alfredo is your witness to whom you're providing

24  immigration benefits in exchange for assisting you with this

25  case, since you've chosen to keep his true identity completely

1  hidden from the defense in your heavily redacted discovery

2  despite our repeated requests for it and since you choose to

3  redact the entire phone number then it was your duty under

4  *Brady/Giglio* to provide this information to the defense at

5  least in a letter." At least in a letter. Again, you have --

6      So I go on to explain exactly what the impeachment of

7  that phone number would be. Again, Your Honor, if I'm a

8  defense attorney and this would be a golden opportunity for me

9  to say, "Hey, didn't you know that he had a local contact here,

10  it says in your report?" But I was deprived of that

11  opportunity because they redacted the phone number.

12      So Your Honor, time and again I've had to disclose my

13  defense strategy. In BBB8, Your Honor, please read that.

14  That's an email to Mr. Talbert telling the government basically

15  that, you know, *Brady* material doesn't have to be memorialized

16  in a report for it to be discoverable. So the idea of the

17  cheap eateries, right, in the area, I understand that HSI has

18  operational plans which would include that information and the

19  Court also knows that if the agent has information that it

20  tends to exculpate or tends to contradict what the magistrate

21  was told, that these people had no place to get food, when the

22  agent on the way over to the house has actually passed fastfood

23  restaurants close by and there's a strip mall within a mile and

24  the agent knows there's fast food restaurants, that should have

25  been disclosed, Your Honor. That's not -- we're not asking the

1    government to do some sort of deep investigation and depose the

2    witness.  This is pretty basics stuff and they know that

3    because it's our theory.  We've disclosed it and it's their

4    theory in the warrant that they were starving, they had no

5    place to go eat.  And so when Your Honor takes a look at this,

6    Your Honor --

7         Also, T Visa application fees.  I asked the government

8    for -- you know, who paid the fees, these are like thousand

9    dollar fees?  They haven't disclosed that to me yet.

10        There's a funding situation set up between this

11   Opening Doors organization and HSI where HSI gets prosecution

12   statistics and Opening Doors gets millions of dollars in grants

13   and they're rubber stamping these obviously false cases, at

14   least for Prakash and Alfredo, which has to do with our case.

15   This is information we're entitled to.  We still haven't gotten

16   it.

17        I've had to disclose my entire strategy to them to get

18   them to give me basic information, Your Honor.  It's

19   *Brady/Giglio*.  That is the fault here.  And so -- excuse me,

20   Your Honor.  I have a couple of more points to make.

21        So, Your Honor -- okay.  And then I will go, Your

22   Honor, to both the *Chapman* case and the *Kojayan* case where both

23   of these cases --

24        THE COURT:  Well, you've already -- you've already

25   discussed those, unless you have something else to add.

1    MR. ALMADANI:  Absolutely, Your Honor.  So then I will

2   point the Court also to Exhibits LLL and MMM, which I've

3   discussed briefly, but the agent left -- the agent basically in

4   the immigration applications -- these are the T-Visa

5   certifications -- has certified -- in order to keep these

6   witnesses here, in order to keep this case going, in order to

7   keep this case being prosecuted and going because they need

8   these witnesses, basically, they have stated that the gates

9   were secured with chains and padlocks, they're not able to

10   leave.  The agent -- the Court knows and we know now that

11   that's -- the agent knew that was false.  That they're not able

12   to get any food anywhere.  That on July 1st Karki escaped with

13   the help of agents who found him hiding -- who found him hiding

14   on the property during a welfare check.  So it makes it seems

15   like he can't escape.  We know in many reports and emails now

16   that the agent knew he was found outside the property, agent

17   knew that he could be leaving.  These are all -- this is

18   certification made to USCIS under penalty of perjury.

19        And then you have the second certification in MMM.

20   That's Alfredo's certification, Your Honor.  And if the Court

21   reads that certification, the Court will see that this

22   certification, these certifications, please, Your Honor, read

23   them, they're made under penalty of perjury by the case agent

24   in order to keep these witnesses here, in order to keep the

25   case going against Dr. Sheikh and these are objectively false.

1        Yeah, I know the government's saying that half-truths

2    don't matter but they do.  You can't leave these type of false

3    impressions because they're certifying that these are victims

4    of severe human trafficking, Your Honor.  That is also -- so

5    aside from *Chapman*, Your Honor, under *Restrepo*, that is

6    outrageous government conduct.  Why are they going after

7    Dr. Sheikh in such a way in keeping these witnesses here and

8    suborning perjury, essentially, for these witnesses and the

9    agent herself committing perjury here by certifying these very

10    objectively false statements?  Read them, look at the evidence,

11    Your Honor.  There is outrageous government conduct.  This is a

12    case that really, Your Honor, merits dismissal.

13        I mean, when you have *Brady* violations to this extent

14    when we've read in *Chapman* and in Kojayan, even of somebody who

15    is obviously guilty, a drug dealer or somebody like that, a

16    bank robber, and you have these *Brady* violations, in order to

17    keep the government honest and to keep this from happening

18    again, courts tend to use this remedy.  Here, Your Honor, it's

19    happened time and again in a case that's not even meritorious.

20        Your Honor, please, we request the Court let

21    Dr. Sheikh go home at this point, Your Honor, because it's just

22    not fair.  It's not fair.

23        THE COURT:  Thank you.  If the Court grants the

24    motion, of course there will be no further proceedings in this

25    court.  If the Court denies the motion, will we go next to the

1    *Franks* hearing?

2         MR. ALMADANI:  Yes, Your Honor.  We would have to do

3    that.  And we would also have to potentially rebrief -- if the

4    Court recalls, there was a motion to disclose grand jury

5    testimony and in that motion at the time we didn't have the

6    benefit of all the *Brady* material we have now where we see the

7    sort of misleading and half picture that was presented to the

8    magistrate, to USCIS, and there is case law to support that if

9    a grand jury is misled then that is another cause for

10   dismissal.

11        And I believe we can brief for the Court a compelling

12   argument that we need the grand jury materials to see how the

13   grand jury was potentially misled in this case, which forms

14   another basis for dismissal in this case, Your Honor.

15        So we'd need to do the *Franks* hearing, we would want

16   to brief the issue of the grand jury disclosure now with the

17   benefit of this new information that we have for the Court and

18   we also have to set a trial date if, you know, the case is not

19   dismissed then we have to set a trial date because Dr. Sheikh

20   is anxious to get done with this.

21        THE COURT:  All right.  Very well, then.  I will take

22   the motion under submission and we'll proceed from there.

23        Anything else before we adjourn?

24        MR. ALMADANI:  Thank you, Your Honor.  Not from the

25   defense.

1          THE COURT:  All right.

2          MS. HEMESATH:  Your Honor, is it -- oh.

3          THE COURT:  Yes.  Go ahead.

4          MS. HEMESATH:  Is it possible to set a motions cutoff

5    date in this case and possibly a trial date also today?

6          THE COURT:  I don't want set a motions cutoff date

7    until I know how I'm going to rule on this motion that's before

8    me.  So if I deny it, then maybe when we next appear I can set

9    a date.

10         MS. HEMESATH:  All right.

11         THE COURT:  Thank you.  Court is adjourned.

12       (Concluded at 11:00 a.m.)

13

14                C E R T I F I C A T E

15

16      I certify that the foregoing is a true and correct

17    transcript of the record of proceedings in the above-entitled

18    matter.

19
       _/s/ JENNIFER L. COULTHARD_                June 23, 2020
20                                                 DATE

21

22    JENNIFER L. COULTHARD, RMR, CRR
      Official Court Reporter
23

24

25