UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>FIRDOS SHEIKH,<br><br>        Defendant. | No. 2:18-cr-00119-WBS<br><br>MEMORANDUM AND ORDER RE:<br>AMENDED MOTION TO SUPPRESS |

----oo0oo----

On June 21, 2018, defendant was indicted and charged with two counts of trafficking with respect to forced labor under 18 U.S.C. § 1590(a), two counts of harboring for financial gain under 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (a)(1)(B)(i), one count of obstruction of a forced labor investigation under 18 U.S.C. § 1590(b), and one count of false statements under 18 U.S.C. § 1001.  (Docket No. 1) The charges arise out of allegations that

1

1  defendant harbored two aliens ("Alfredo" and "Prakash")[1] and
2  forced them to work on her property between 2008 and 2013.
3  Defendant now moves to suppress evidence arising out of the
4  search of her property on July 9, 2013, based upon alleged
5  violations of Franks v. Delaware, 438 U.S. 154 (1978), in
6  obtaining the warrant.  (Docket No. 110.)  The court held an
7  evidentiary hearing on the motion on August 11, 12, and 13, 2020,
8  hearing the testimony of the warrant affiant, Agent Eugene
9  Kizenko.

I.   Brady Order

    The court previously held that the government had failed to disclose certain evidence as required by Brady v. Maryland, 373 U.S. 83 (1963).  (Docket No. 104.)  Specifically, the court held that the government suppressed the following evidence:

    (1)  On July 2, 2013, Alfredo informed agents that he told defendant he was going to leave a week prior to leaving and she said it was "ok".

    (2)  On June 26, 2013, another worker at defendant's home, Gildardo, told agents that defendant was not present at the ranch six days a week from 9 a.m. to 3 a.m.

    (3)  On June 26, 2013, Gildardo informed agents that

---

[1] The defendant employed another individual, "Gildardo," during some of the same time as Alfredo and Prakash.  Gildardo made several statements to government investigators which are relevant to this motion and the allegations against defendant, though the government has not asserted any charges against defendant based on any conduct with respect to Gildardo.

2

1   Alfredo and Prakash would work from 7:30 a.m. to 3:30 p.m.[2]

2              (4) The fact that notwithstanding its locked gate, the
3   ranch was easy to physically escape given the low height and
4   modest structure of the fence.

5              (5)  The fact that there was a strip mall with
6   inexpensive restaurants and a convenience store within a mile of
7   the property and other places within three miles.

8              (6)  On July 1, 2013, Prakash informed agents that he
9   had a friend living nearby in the Fruitridge area of Sacramento,
10  and that Alfredo had a friend with a local phone number.
11  (Docket No. 104 at 7-8.)

12             The court found these details to be material on the
13  issue of whether the government agent intentionally or recklessly
14  made false or misleading statements or omissions in the warrant
15  application.  In particular, this evidence tended to refute the
16  warrant application's allegations of physical force, restraint,
17  and harm and threats of physical force, restraint, and harm,
18  which played a key role, if not the main role, in the warrant
19  application.  (Id. at 6, 8.)  However, the court expressed no
20  opinion as to whether there would still be probable cause with
21  the addition of this information in the warrant application.[3]

---

[2]    The government claims that these hours refer to Gildardo's work hours, not those of Prakash and Alfredo, as made clear by the official report based on those notes.  (See Opp'n 28 (Docket No. 111).)  The court does not resolve this dispute.

[3]    The court denied the motion to dismiss based on Brady because the evidence was disclosed to the defendant at a time when the materials were still of value to the accused.  In finding that dismissal was inappropriate under Brady, the court noted that "the government attorneys do not appear to have

3

II.   Franks Standard

In order to prove a Franks violation, defendant must show that (1) the government intentionally or recklessly made false or misleading statements or omissions in its warrant application and (2) these false or misleading statements or omissions were necessary to finding probable cause. See United States v. Perkins, 850 F.3d 1109, 1116 (9th Cir. 2017) (citations omitted).  Probable cause exists where there is a fair probability that a search will result in evidence of a crime being discovered.  Illinois v. Gates, 462 U.S. 213, 238 (1983). If the defendant proves both Franks requirements, the search warrant must be voided and the fruits of the search must be excluded.  Perkins, 850 F.3d at 1116.

III.      Intentional or Reckless Omission

Read as a whole, the warrant affidavit paints a picture of forced labor via use of physical force, restraint, and harm and threats of physical force, restraint, and harm.  The affidavit describes Prakash and Alfredo being restrained by a fence and locked gate and surveillance cameras on the property, without enough food to eat, portraying almost a jail-like situation where the victims were forced to work in sweltering conditions all day long without any way to escape or obtain food or help.  While these allegations were somewhat tempered by other facts set forth in the affidavit, it does not include the omitted

---

intentionally or recklessly made any false or misleading statements to the court."  (Docket No. 104 at 13.)  However, the court did not express any opinion regarding the warrant affiant's knowledge at the time the government sought and obtained the search warrant.

4

1  facts discussed above in connection with defendant's Brady
2  motion, which tend to undermine significantly the warrant
3  affidavit's portrayal of the situation.  In fact, contrary to the
4  intimations of the affidavit, at almost any time, the alleged
5  victims could have walked off the property by stepping or jumping
6  over the relatively short fence and could have obtained food at
7  the shopping center down the road.
8         After hearing the testimony at the Franks hearing, the
9  court is also gravely concerned by the affidavit's omission of
10 any information about the benefits alleged victims of forced
11 labor receive or may receive from the government or from the
12 organization Opening Doors.  At the hearing, Agent Kizenko
13 acknowledged that these alleged victims are often provided food,
14 housing, and temporary status while they cooperate with the
15 government, and may eventually receive permanent residency with
16 the support of the government.  Although it is not clear whether
17 Gildardo, Prakash, or Alfredo had received any benefits or were
18 aware of the potential for such benefits when they gave their
19 statements to Agent Kizenko, the potential for these benefits,
20 not ordinarily enjoyed by witnesses in criminal investigations,
21 casts some doubt on their credibility, as these benefits may have
22 created an incentive to exaggerate or fabricate their conditions.
23 The court believes the potential benefits to the victims should
24 have been disclosed to the Magistrate Judge to enable him to
25 fairly assess whether there was probable cause.
26        While the court does not find that Agent Kizenko
27 intended to mislead the Magistrate Judge, the court concludes it
28 was reckless to omit the above-mentioned facts from the

5

affidavit.  Simply put, Agent Kizenko should have known that his affidavit overstated the gravity of physical force, restraint, and harm or threats of physical force, restraint, and harm faced by Prakash and Alfredo.  Accordingly, defendant has established the first step of the Franks analysis.

IV.  Probable Cause to Establish Other Crimes

The court therefore proceeds to the second step of the Franks analysis: whether the false or misleading allegations or omissions were necessary to a finding of probable cause.

The government contends that in determining whether allegations or omissions were necessary to a finding of probable cause, the court may look to whether there is probable cause for crimes not listed in the warrant application.  In other words, the government contends that the warrant affidavit need only provide probable cause for any crime, regardless of what crimes are specifically identified.[4]  This proposition has some support in the case law.  In United States v. Meek, 366 F.3d 705 (9th Cir. 2004), the Ninth Circuit found that there was probable cause for a search warrant where the warrant listed one California offense and the warrant affidavit listed another.  The Meek court explained that "[b]ecause the affidavit established probable cause as to a violation of California law and the items sought under the warrant application corresponded to that probable cause determination, the statutory variance in the affidavit is not

---

[4] The court rejects defendant's contention that the government may not raise any new arguments on rebriefing of the Franks motion.  The court imposed no limits on rebriefing in any of its oral discussions with the parties regarding rebriefing nor in any of its written orders.

6

fatal to the warrant's validity." Id. at 713.  In doing so, the court cited Judge Kozinski's concurrence in United States v. Koyomejian, 970 F.3d 536, 548 (9th Cir. 1992), where he stated "I am aware of no constitutional requirement that an applicant for a warrant specify, and the judge determine, the precise statute violated; all authority is to the contrary."

Judge Kozinski's statement in Koyomejian was also cited with approval by the Ninth Circuit in United States v. Hill, 55 F.3d 479 (9th Cir. 1995).  There, the warrant application apparently did not identify any particular statute that had been violated but recounted reports of gunfire, testimony from a witness who claimed to have seen the defendant holding a gun after hearing the shots, and prior history that the affiant had confiscated over 20 firearms from the defendant's home the previous month, and state law authorized the seizure of property used or possessed for the purpose of committing an offense.  The Hill court explained that while "neither the affidavit nor the search warrant identified the specific offense to which the objects listed in the warrant were believed to be related, courts have demanded specification of the particular offense only when required by statute or when necessary to identify the objects to be seized with sufficient particularity." Id. at 481.  Under that principle, because possession and use of firearms was "subject to extensive civil and criminal regulation" by both the state and locality, including discharging a firearm within city limits, "the failure to specify an offense did not render the warrant invalid." Id. at 480-81.

Nevertheless, this court is unaware of any case holding

that a warrant may establish probable cause for an unrelated offense when another offense is specifically identified in the warrant application, especially where the defendant alleges a Franks violation.  Accordingly, the government's reading of the case law appears to be overbroad.  The court questions the fairness of the government being able to identify, after the fact, other potential crimes, such as violations of the Fair Labor Standards Act, not envisioned by either the affiant or the Magistrate Judge, to justify a finding of probable cause.  That said, the court need not decide this issue if the affidavit still provides probable cause under Franks for a violation of the forced labor statute, 18 U.S.C. § 1589, the very statute identified in the warrant affidavit, under a theory other than one of physical force, restraint, or harm or threats of physical force, restraint, or harm.

V.   Forced Labor

The forced labor statute, 18 U.S.C. § 1589, punishes, among other things, knowingly obtaining the labor of a person "by means of force, threats of force, physical restraint, or threats of physical restraint to that person"; "by means of serious harm or threats of serious harm to that person"; "by means of the abuse or threatened abuse of law or legal process"; or "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm."[5]

---

[5]   The warrant application also references the involuntary

8

            Here, as discussed above, the omissions discussed in the court's ruling on the Brady motion seriously undermine the allegations that defendant obtained the labor of Alfredo and Prakash by means of force, threats of force, physical restraint or harm, or threats of physical restraint or harm.  However, the forced labor statute and the warrant application also apply to other types of harm.  Section 1589(c) explains that:

> (1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.
>
> (2) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

            These provisions have been interpreted broadly to cover harm such as failure to pay wages or threats of immigration harm.  In United States v. Dann, 652 F.3d 1160 (9th Cir. 2011), the court explained that a reasonable juror could find that failure to pay a victim, where the victim had no access to funds "to leave or live," was sufficiently serious to compel the victim to continue working.  Id. at 1171.  The Dann

---

servitude statute, 18 U.S.C. § 1584, which punishes anyone who "knowingly and willfully holds [any person] to involuntary servitude or sells into any condition of involuntary servitude." However, the government does not claim that there was probable cause for this crime, and thus the court does not address whether there was probable cause under § 1584.

9

court also explained that threats to send an immigrant back to her country could constitute serious harm under § 1589.  Id. at 1172 (citing United States v. Calimlim, 538 F.3d 706, 712 (7th Cir. 2008) (immigrant victim "did not have an exit option: because the threats in her case involved her immigration status, she could not freely work for another employer in order to escape the threatened harm")); United States v. Djoumessi, 538 F.3d 547, 552 (6th Cir. 2008) (defendant's threats to send victim back to Cameroon were coercive in light of victim's special vulnerability as illegal immigrant)).

Here, the warrant application noted that Section 1589 includes obtaining the labor of another by means of serious harm or threats of serious harm, abuse or threatened abuse of the legal process, or "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person . . . would suffer serious harm."[6]  (Aff. ¶ 4 (Docket No. 111-1).)  As discussed above, this harm has been interpreted to include financial and immigration harm.  There are also numerous allegations in the affidavit that together raise a fair probability that a search of defendant's property would result in evidence of forced labor via financial or immigration harm.  See Gates, 462 U.S. at 238.  Specifically, the affidavit

---

[6] The warrant affidavit did not limit the theory by which defendant allegedly violated § 1589.  Rather, the affidavit listed all the means by which someone may violate § 1589 and alleged that defendant "knowingly obtained the labor and services of individuals by one or more" of the listed means.  (Aff. ¶ 3.)

alleges, among other things that:

(1) Gildardo, who previously worked for defendant, stated that defendant "had employed illegal aliens and paid them little or no wages with poor working conditions" (Aff. ¶ 10(a));[7]

(2) Gildardo stated that Alfredo and Prakash "had also been employed full time by [defendant], but that they were only receiving $200 per month." (Aff. ¶ 10(b));

(3) Gildardo stated that Alfredo and Prakash "were living in a trailer on [defendant's] property and were afraid to leave" (Aff. ¶ 10(b));

(4) Prakash stated he entered the United States from Nepal in 1996 and was in the country illegally (Aff. ¶ 15(a));

(5) Prakash stated he was told by defendant that his job would be six days a week (Aff. ¶ 15(b));

(6) Prakash reported that he worked one night at a banquet hall to which he was driven by defendant during his second week with defendant, but defendant told him she would no longer transport him to that job and that his only job would be working for her (Aff. ¶ 15(d));

(7) Prakash reported that defendant told him his salary would be $300 a month plus room and board, but she only

---

[7] Among other things, defendant contends that the warrant affidavit should have disclosed that Gildardo moved into "very nice living quarters" and that Gildardo and defendant had a dispute about pay and that he freely left.  However, the affidavit already explained that Gildardo "stayed in an apartment with his wife on the second floor" of defendant's home, and that he left "over a lack of payment".  (Aff. ¶ 16(m).)  In other words, the affidavit made no representation of forced labor as to Gildardo and already presented a possible source of Gildardo's bias due to the alleged lack of payment.

11

spent $80 a month for food for him, which was not enough (Aff. ¶ 15(d));

(8) Prakash reported that (a) he was paid $300 in January 2013 and $300 in February 2013, (b) his salary was raised to $400 in March 2013 but he would have to buy his own food, (c) he was paid $300 in April 2013 and $250 in May 2013, and (d) he received no payment for June (Aff. ¶ 15(f));

(9) Prakash reported that he complained to defendant about her failure to live up to his agreed salary and the sporadic payment schedule, and in response she told him "she was connected politically and that if he continued to complain she would have him deported back to Kathmandu (Nepal)." Defendant "also advised him that she had wireless cameras watching" Prakash and Alfredo (Aff. ¶ 15(g));

(10) Prakash stated that (a) he worked a minimum of 10 hours a day and sometimes more than 12 hours, (b) he worked 7 days a week with no days off, and (c) he received little or no assistance if sick and sometimes had to work on extremely hot days (Aff. ¶ 15(h));

(11) There were cameras installed at defendant's property, and defendant allegedly told Prakash that the cameras were to watch their work and make sure they would not leave. (Aff. ¶¶ 15(i-j).) Defendant also told the affiant that she had video surveillance cameras on the property to prevent employees from stealing (Aff. ¶ 17(f));

(12) Prakash claimed that he "was prepared to leave the [property] but had not been paid in June and was still owed money for previous months of working" for defendant (Aff. ¶ 15(j));

12

1           (13) Defendant allegedly referred to Prakash as "nokur", "which he said was the Urdu word for 'slave'" (Aff. ¶ 15(k));

            (14) Prakash allegedly told defendant he was going to "leave [defendant's] employ" but "he felt he could not leave until he received the money that was owed to him as he had no family or friends that could support him" (Aff. ¶ 15(l));

            (15) Prakash reported that he had not received payment on the morning of July 1, 2013, when defendant told him to leave "because Homeland Security was there for him," at which time he jumped over a fence and hid in the bushes until law enforcement found him (Aff. ¶ 15(m));

            (16) Alfredo stated he was in the United States unlawfully, and there were no known records to the affiant that he had legal status to be in the United States (Aff. ¶ 16);

            (17) Alfredo reported that he began working for defendant for two days a week for no pay but was allowed to stay on the property during that time.  They later came to an agreement that he would work for her for $400 a week, but the highest salary he received from her was $400 a month.  (Aff. ¶¶ 16(a)-(b));

            (18) Alfredo claimed that after a few months, defendant "began taking deductions from [his] salary for various fees and would pay him in increments of $40 or $100," and he would complain about the lack of pay for his efforts, but defendant told him "she didn't have the money to pay him" (Aff. ¶ 16(d));

            (19) Alfredo reported that for the first two years he lived in defendant's trailer, he did not have electricity or

running water and used funds from his wages to purchase the equipment to install electricity and plumbing (Aff. ¶ 16(f));

(20) Alfredo claimed that defendant threated him about 30 times with "contacting the police or immigration authorities if he performed poorly or she suspected that he was planning to run away with someone" (Aff. ¶ 16(g));

The court agrees that some of the omissions and alleged misstatements identified by defendant call into doubt at least somewhat the credibility of the alleged victims and the affiant. However, that does not compel the court to disregard or strike all of their statements from the affidavit. While defense counsel has ample bases for cross examination at trial to challenge the victims' and Agent Kizenko's testimony, in the final analysis it will be for the jury to determine the witnesses' credibility. It is not for the court to make that determination on this motion.

Overall, after all the relevant facts which should have been included in the affidavit under Franks are considered, the allegations which remain still raise a fair probability that the alleged victims feared financial harm in the form of lost unpaid wages or feared immigration harm based on defendant's threats to have them deported, and these fears caused them to continue to work for defendant at least for a time notwithstanding the fact that they were physically able to leave the property at any time and may have had means of contacting people outside the property. Because the warrant affidavit provides probable cause for a violation of 18 U.S.C. § 1589 via a theory of financial or immigration harm, notwithstanding the omissions identified by the

14

court, the court must deny defendant's request to suppress the evidence of the July 9, 2013 search under Franks.

IT IS THEREFORE ORDERED that defendant's Amended Motion to Suppress (Docket No. 110) be, and the same hereby is, DENIED.[8]

Dated: August 21, 2020

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[8] Because the court finds that probable cause exists for forced labor via a theory of financial or immigration harm, the court does not address the parties' arguments as to whether (1) a warrant was necessary for the search of the outdoor areas and the trailer at defendant's property; (2) whether the interviews of defendant and her son were proper regardless of the sufficiency of the warrant; (3) whether probable cause existed for the crimes of alien harboring and violations of the FLSA.

15